UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRIGID PIERCE,<br><br>                    Plaintiff,<br><br>     -against-<br><br>NEW YORK CITY POLICE DEPARTMENT OFFICER JOSEPH RYDER, shield number 21617, in his individual capacity; NEW YORK CITY POLICE DEPARTMENT OFFICER DANIELLE MOSES, tax identification number 966234, in her individual capacity; NEW YORK CITY POLICE DEPARTMENT OFFICER MICHAEL SAID, shield number 11735, in his individual capacity; NEW YORK CITY POLICE DEPARTMENT OFFICER STEVEN KAMALIC, tax identification number 960740, in his individual capacity; NEW YORK CITY POLICE DEPARTMENT OFFICERS "JOHN DOE" #1-7, in their individual capacities; THE CITY OF NEW YORK,<br><br>                    Defendants. | **AMENDED COMPLAINT AND JURY TRIAL DEMAND**<br><br>21 Civ. 3482 (PKC) |

Plaintiff Brigid Pierce, by and through her attorneys, Emery Celli Brinckerhoff Abady Ward & Maazel LLP, alleges as follows for her complaint:

## PRELIMINARY STATEMENT

1.      On June 3, 2020, Plaintiff Brigid Pierce joined a peaceful protest against police brutality in downtown Brooklyn.  Like millions of Americans across the country, Ms. Pierce was outraged and dismayed by the images she had seen of unjustified police violence. Sadly, her attempt to peacefully exercise her right to speak out about such violence was met by the same brutal and unjustified police behavior against which she protested.

1

2.      Around 9:00 p.m. that night, the peaceful protest Ms. Pierce had joined was surrounded by New York Police Department ("NYPD") officers at Cadman Plaza in Brooklyn.  Suddenly, unprovoked, and without warning, officers rapidly approached the protesters, assembling in a line with their shields held inches from the protesters' faces.

3.      Ms. Pierce was standing with a group of protesters, filming the interaction with her phone when she saw an officer to her right begin pushing into a protester with his shield.  Ms. Pierce turned towards that officer and stated, while continuing to film, "I'm watching you.  I'm fucking livestream . . . ."

4.      Suddenly and without warning, Defendant Ryder, a male NYPD officer twice Ms. Pierce's size, grabbed her and threw her violently to the ground.

5.      Ms. Pierce did not make any movements or present any threat to Defendant Ryder or others.  Defendant Ryder gave no prior order to Ms. Pierce.

6.      Defendants Ryder and Does #1-4 then swarmed Ms. Pierce as she lay on the ground.  They pinned her body forcefully to the ground, slammed and scraped her head on the asphalt, pressed a knee hard into her ear, exposed her breast, and zip-tied her wrists together so tightly that she bruised and began to lose circulation in her hands.

7.      Defendants Ryder and Does #1-4 also caused Ms. Pierce's face mask to fall off during this assault.  Ms. Pierce wore the mask to protect herself from Covid-19.

8.      Ms. Pierce spent the next approximately six-and-a-half hours in NYPD detention.  Despite repeated requests to Defendants Said, Moses, Kamalic, and Does #5-7 for medical attention for her injuries, including her visibly bleeding head, Ms. Pierce received none. Defendants Said, Moses, Kamalic, and Does #5-7 also refused Ms. Pierce's requests to replace

her face mask to protect against Covid-19.  As a result, Defendants put Ms. Pierce at serious risk of contracting this potentially deadly disease.

9.      When Ms. Pierce was finally released, Defendant Moses gave her a summons for violation of the curfew imposed on New York City the day before by Emergency Executive Order No. 119.  The Executive Order, however, required an order to disperse; here there was none.  Ms. Pierce's summons was subsequently summarily dismissed.

10.     Since Defendants' unlawful attack and detention, Ms. Pierce has experienced headaches; visual disturbances; loss of sensation in her wrists; tendon damage in her right shoulder; pain, bruising, and swelling on her legs, arms, shoulders, and head; sleep disturbances; fear; and stress.  Ms. Pierce now seeks redress for Defendants' unwarranted brutality and shameful abuse of authority.

## THE PARTIES

11.     Plaintiff Brigid Pierce is a citizen of the United States and a 39-year-old woman who currently, and at all times relevant to the Complaint, lives in Brooklyn, New York.

12.     Defendant NYPD Officer Joseph Ryder, shield number 21617, was, at all times relevant to this Complaint, a police officer employed by the City of New York.  In this role, Officer Ryder was a duly appointed and acting officer, servant, employee, and/or agent of the City of New York.  At all relevant times, he acted within the scope of his employment and under color of state law.

13.     Defendant NYPD Officer Danielle Moses, tax identification number 966234, was, at all times relevant to this Complaint, a police officer employed by the City of New York.  In this role, Officer Moses was a duly appointed and acting officer, servant, employee, and/or agent of the City of New York.  At all relevant times, she acted within the

3

scope of her employment and under color of state law.

14.     Defendant NYPD Officer Michael Said, shield number 11735, was, at all times relevant to this Complaint, a police officer employed by the City of New York.  In this role, Officer Said was a duly appointed and acting officer, servant, employee, and/or agent of the City of New York.  At all relevant times, he acted within the scope of his employment and under color of state law.

15.     Defendant NYPD Officer Steven Kamalic, tax identification number 960740, was, at all times relevant to this Complaint, a police officer employed by the City of New York.  In this role, Officer Kamalic was a duly appointed and acting officer, servant, employee, and/or agent of the City of New York.  At all relevant times, he acted within the scope of his employment and under color of state law.

16.     Defendants Police Officers John Does #1-7, names and shield numbers unknown, were each at all relevant times officers of the NYPD, and each was a duly appointed and acting officer, servant, employee, and/or agent of the City of New York.  At all relevant times, Defendants Does #1-7 acted within the scope of their employment and under color of state law.  The Doe Defendants are sued in their individual capacities.

17.     Defendants Ryder, Moses, Said, Kamalic, and John Does #1-7 are collectively referred to as the "Individual Defendants."

18.     Defendant City of New York (the "City") is a municipal corporation duly organized under the laws of the State of New York.  At all times relevant hereto, the City, acting through the NYPD, was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters, including the appointment, training, supervision, and conduct of all NYPD personnel.  In addition, at all relevant times, the City was responsible for enforcing the

4

rules of the NYPD and for ensuring that NYPD personnel, including Officers Ryder, Moses, Said, Kamalic, and Does #1-7 obey the laws of the United States and of the State of New York.

## JURISDICTION AND VENUE

19.     This action arises under the First, Fourth, and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§ 1983 and 1988.

20.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1367(a).

21.     The acts complained of occurred in the Eastern District of New York, and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

22.     Plaintiff demands trial by jury.

## FACTUAL ALLEGATIONS

***The Eruption of Racial Justice Protests in New York City***

23.     On May 25, 2020, George Floyd, a 46-year-old Black man, was killed by a white Minneapolis police officer.  Video of the incident shows the officer pressing his knee into Mr. Floyd's neck for 9 minutes and 29 seconds, while Mr. Floyd repeatedly states, "I can't breathe."

24.     Soon after video of the horrific killing of Mr. Floyd began circulating, the country erupted in protests against police brutality.

25.     Protesters recognized Mr. Floyd's killing as part of a national crisis in policing.  Mr. Floyd was but one in a long list of unarmed Black people killed at the hands of law enforcement officers.

26.     Thousands of people began participating in protests every night across

New York City.

27.     These protests were met with aggressive responses from the NYPD.

*A Curfew is Imposed on New York City*

28.     In response to the protests, on June 1, 2020, Mayor Bill de Blasio issued Executive Emergency Order No. 117, imposing an 11:00 p.m. curfew on the city.  On June 2, 2020, Mayor de Blasio issued Executive Emergency Order No. 119, which changed the curfew to begin at 8:00 p.m. each night and extended the curfew period through June 8, 2020.

29.     The Executive Order exempted "first responders and emergency medical technicians, individuals travelling to and from essential work and performing essential work" from the curfew.

30.     The Executive Order required that people in violation of the curfew be "order[ed] to disburse [sic]" before being arrested.

31.     On information and belief, on June 1, 2020, the NYPD issued an internal announcement instructing that enforcement of the curfew "will only be taken after several warnings are issued and the violator is refusing to comply."

*Ms. Pierce Joins a Peaceful Protest on June 3, 2020*

32.     On the evening of June 3, 2020, Ms. Pierce made plans with two friends to join one of the peaceful protests underway that evening.

33.     Ms. Pierce, who was 37 years old at the time, has lived in New York City since 2013, where she has worked in the performing arts.

34.     Ms. Pierce, like thousands of New Yorkers, was outraged by the images of police brutality against Black and brown people that she had seen in the media.

35.     Ms. Pierce wanted to lend her voice to the chorus of protesters speaking

out against this police violence.

36.      Around 7:15 p.m., Ms. Pierce left her apartment and walked to Barclay's Center.

37.      On the way to Barclay's Center, Ms. Pierce met one of the friends with whom she had made plans.

38.      Once at Barclay's Center, Ms. Pierce and her friend joined a group of demonstrators.

39.      About half an hour later, the group left the Barclay's Center and marched north through Downtown Brooklyn towards the Manhattan Bridge.

40.      Ms. Pierce's second friend joined her along the route.

41.      NYPD officers followed the protesters from the Barclay's Center.

42.      Around 8:30 p.m., NYPD officers halted the protest near Cadman Plaza West and Clinton Street.

43.      The group of protesters had been moving north on Cadman Plaza West.

44.      Ms. Pierce noticed a heavy NYPD presence amassing in the area.

45.      The NYPD officers blocked Cadman Plaza West, preventing the protesters from continuing north.

46.      The group of protesters then turned around and moved south on Cadman Plaza West.

47.      Ms. Pierce was towards the back of the group of protesters, on the north end of the group.

*NYPD Officers Attack the Protesters, Including Ms. Pierce*

7

48.     Suddenly, a large number of NYPD officers rapidly approached the group of protesters.

49.     The NYPD did not give any order to disperse before officers approached the protesters.

50.     At the time, Ms. Pierce was at the north end of the group of protesters, who were dispersing to the south.

51.     Ms. Pierce was standing on the street, near the intersection of Cadman Plaza West and Pierrepont Street.

52.     Ms. Pierce heard other protesters yelling that the police were coming towards the protesters.

53.     Ms. Pierce saw a large number of NYPD officers move towards the group, moving south on Cadman Plaza West.

54.     The NYPD officers were dressed in riot gear, wearing helmets and shields, and had their batons drawn.

55.     Ms. Pierce turned north to face them.

56.     A line of NYPD officers assembled directly north of Ms. Pierce.

57.     The line of NYPD officers had their shields drawn.

58.     At that point, Defendant Ryder was standing directly in front of Ms. Pierce with his shield only inches from Ms. Pierce.

59.     At about 8:55 p.m., Ms. Pierce saw an NYPD officer to her right, unprovoked, push a female demonstrator standing directly to Ms. Pierce's right with his shield.

60.     Ms. Pierce turned to her right.

61.     Ms. Pierce's body was turned facing east.

8

62.     At this point, Defendant Ryder was directly north of Ms. Pierce on Cadman Plaza, to her left.

63.     Ms. Pierce used her phone to video the NYPD officer pushing the woman with his shield.

64.     Ms. Pierce's use of the phone to video the NYPD officer was obvious to Defendant Ryder.

65.     Ms. Pierce said, "I'm watching you.  I'm fucking livestream . . . ."

66.     Suddenly, and without warning, Defendant Ryder grabbed Ms. Pierce.

67.     At no point before grabbing Ms. Pierce did Defendant Ryder or any other NYPD officer order or direct Ms. Pierce to disperse.

68.     Defendant Ryder threw Ms. Pierce to the ground.

69.     Defendant Ryder is male, about six feet tall, and around 250 pounds.

70.     Defendant Ryder was significantly larger than Ms. Pierce.

71.     Ms. Pierce was 5'5" and petite.

72.     Before Defendant Ryder threw Ms. Pierce to the ground, he said nothing to Ms. Pierce.

73.     Before Defendant Ryder threw Ms. Pierce to the ground, he gave no order to Ms. Pierce.

74.     Before Defendant Ryder threw Ms. Pierce to the ground, he and Ms. Pierce had had no physical interaction or contact.

75.     Before Defendant Ryder threw Ms. Pierce to the ground, he and Ms. Pierce had had no verbal interaction or contact.

76.     When Defendant Ryder threw Ms. Pierce to the ground, she was not facing him.

77.     Ms. Pierce did not pose any threat to Defendant Ryder or anyone else.

78.     Just before Defendant Ryder threw Ms. Pierce to the ground, Ms. Pierce was holding her phone with both hands, recording video.

79.     As a result of Defendant Ryder's assault, Ms. Pierce was thrown to the ground, landing on her head.

80.     Once Ms. Pierce was on the ground, Defendant Ryder and Defendants Does #1-4 swarmed Ms. Pierce.

81.     Defendants Ryder and Does #1-4 held Ms. Pierce's arms and legs, pinning her to the ground.

82.     While Ms. Pierce was pinned to the ground, one of Defendants Does #1-4 repeatedly slammed Ms. Pierce's head into the ground.

83.     Ms. Pierce could not see the officer who was slamming her head into the ground.

84.     Each time Ms. Pierce tried to lift her head off the ground, one of Defendants Does #1-4 slammed her head back down, scraping her right temple on the ground, and pressing her head to the ground with his or her body weight.

85.     This Defendant's slamming and scraping of Ms. Pierce's head caused the face mask she wore to protect herself and others from Covid-19 to fall off her face and hang around her neck.

86.     Either this Defendant's slamming Ms. Pierce's head or Defendant Ryder's throwing Ms. Pierce to the ground caused Ms. Pierce's eyeglasses to fly off her face, landing 10-

10

to-15 feet away.

87.     One of Defendants Does #1-4 then pressed a knee forcefully into Ms. Pierce's left ear, keeping her head pinned to the asphalt.

88.     During this attack, the five officers dislodged Ms. Pierce's shirt, exposing her breast.

89.     Ms. Pierce could not cover her breast because her arms were pinned to the ground by Defendants.

90.     Ms. Pierce asked Defendants Ryder and Does #1-4 to cover her exposed breast.

91.     Defendants Ryder and Does #1-4 refused to assist Ms. Pierce to cover her exposed breast.

92.     While Ms. Pierce was on the ground, Defendants Ryder and/or Does #1-4 restrained Ms. Pierce's hands behind her back using plastic zip ties.

93.     At no point did Ms. Pierce resist a lawful order, or any order, from the NYPD.

94.     At no point did Ms. Pierce resist arrest.

95.     At no point during this prolonged assault did Defendants Ryder or Does #1-4 intervene to prevent their fellow officers from assaulting Ms. Pierce.

96.     One of Defendants Does #1-4, or another NYPD officer, then walked Ms. Pierce to a New York City bus parked one-to-two blocks away.

97.     Once at the bus, this officer handed Ms. Pierce off to one of Defendants Does #5-7, another NYPD officer, and quickly moved away.

*The NYPD Detains Ms. Pierce for Hours*

98.     The NYPD detained Ms. Pierce on the City bus for approximately four hours.

99.     The NYPD detained Ms. Pierce on the bus along with approximately nine other people who had also been arrested at the protest.

100.     Defendants Does #5-7, Said, Kamalic, and Moses cycled on and off the bus.

101.     Ms. Pierce noticed that Defendant Said had covered his badge number, obscuring his identity.

102.     Ms. Pierce asked Defendant Said why he had covered his badge.

103.     Defendant Said responded, "Because I can."

104.     On the bus, Ms. Pierce asked Defendants Does #5-7, Said, Kamalic, and Moses to put her face mask, which was hanging around her neck, back in place to protect her from Covid-19.

105.     Defendants Does #5-7, Said, Kamalic, and Moses refused to put Ms. Pierce's face mask back on her face or provide her with a new face mask.

106.     At no point on the bus did the NYPD provide Ms. Pierce a face mask or place her face mask back on her face.

107.     Several other people on the bus suffered from serious injuries inflicted by NYPD officers at the protest.

108.     Ms. Pierce was bleeding from the head.

109.     She felt dizzy and nauseated.

110.     Another person detained on the bus, a medical worker, told Ms. Pierce that

he believed she had a concussion and that she needed to get to a hospital in case she was having a brain bleed.

111.   Ms. Pierce repeatedly asked for medical attention for her head injury while Defendants Does #5-7, Said, Kamalic, and Moses circulated on the bus.

112.   The medical worker also asked Defendants Does #5-7, Said, Kamalic, and Moses to provide Ms. Pierce with medical attention for her head injury.

113.   Defendants Does #5-7, Said, Kamalic, and Moses refused to give Ms. Pierce any medical attention.

114.   In response to her requests for medical attention, Defendant Said and one of Defendants Does #5-7 or Kamalic responded, "I don't care" and "I don't give a shit."

115.   The zip ties on Ms. Pierce's wrists were tied so tightly that her fingers were swollen and turning purple.

116.   Ms. Pierce told Defendants Does #5-7, Said, Kamalic, and Moses that she was in pain and losing circulation in her hands.

117.   Ms. Pierce asked Defendants Does #5-7, Said, Kamalic, and Moses to loosen her zip ties.

118.   Defendants Does #5-7, Said, Kamalic, and Moses refused to loosen Ms. Pierce's zip ties.

119.   Finally, after about one hour on the bus, one of the officers pulled the zip ties further up Ms. Pierce's arms in an attempt to relieve the pressure on her wrists.

120.   This hurt Ms. Pierce's forearms immensely, causing her to scream out in pain.

121.   At around 1:00 a.m., the NYPD took Ms. Pierce to a police station in

downtown Brooklyn, near Atlantic Avenue.

122.    Defendant Moses and one of Defendants Does #5-7 or Kamalic took Ms. Pierce off the bus to wait in a long line outside the station.

123.    As Ms. Pierce was taken off the bus, Defendant Moses and one of Defendants Does #5-7 or Kamalic zip-tied Ms. Pierce to three other women.

124.    Defendant Moses stayed with Ms. Pierce and the group of women to which Ms. Pierce was tied in the line.

125.    Defendant Moses detained Ms. Pierce in this line for approximately one to one-and-a-half hours.

126.    While in line, Ms. Pierce again repeatedly called out, asking for someone to adjust her face mask to cover her mouth and nose, to protect against Covid-19.

127.    None of the NYPD officers nearby adjusted Ms. Pierce's face mask.

128.    While in line, Ms. Pierce asked Defendant Moses for medical treatment for her head injury, which was caused by Defendants' attack at the protest.

129.    Defendant Moses refused to provide Ms. Pierce with medical treatment.

130.    Defendant Moses told Ms. Pierce that she could not take Ms. Pierce to the hospital to receive medical treatment until the other three women to whom Ms. Pierce was zip-tied were processed and released from NYPD custody.

131.    Ms. Pierce did not receive any medical care while in NYPD custody.

132.    Once inside the police station, Ms. Pierce was booked, patted down twice, questioned by a detective, and held in several different cells with other women.

133.    Inside the police station, Ms. Pierce continued to ask for medical attention.

134.    Ms. Pierce was dizzy, nauseated, and had a headache.  Her head wound

had become acutely painful.

135.    Ms. Pierce repeatedly made requests to go to the hospital to any officer that entered or passed her cell.

136.    At no point in the police station did any NYPD officer allow Ms. Pierce to receive medical attention.

***The NYPD Finally Releases Ms. Pierce with a Summons; She Goes to the Emergency Room***

137.    At about 2:45 a.m. on June 4, 2020, Defendant Moses issued Ms. Pierce a Criminal Court Appearance Ticket.

138.    Defendant Moses had no probable cause to charge Ms. Pierce with any crime.

139.    Defendant Moses acted with malice.

140.    The NYPD released Ms. Pierce at about 3:30 a.m.

141.    Ms. Pierce's Criminal Court Appearance Ticket listed her only offense as "curfew."

142.    The Criminal Court Appearance Ticket directed her to appear in Kings & New York Criminal Court on September 30, 2020.

143.    Once Ms. Pierce was released from jail, Ms. Pierce stopped by a jail support table outside the police station, where volunteers bandaged her head wound.

144.    From there, Ms. Pierce went directly to Brooklyn Hospital, arriving at approximately 4:00 a.m.

145.    On September 9, 2020, Ms. Pierce's charge was dismissed in Kings County Criminal Court Part SAP-D.

*Ms. Pierce's Lasting Physical and Emotional Damages*

146.     Ms. Pierce has experienced significant and debilitating physical and psychological distress because of Defendants' unprovoked and unjustified attack.

147.     In the days and weeks that followed the attack, Ms. Pierce experienced shooting headaches; blurred vision; flashes and pulses of light in her vision; a torn tendon in her right shoulder; numbness in her forearms; and painful bruising and swelling around her right eye, thighs, hips, lower back, forearms, shoulders, left ear, and back of head.

148.     The morning of June 4, 2020, immediately after her release from NYPD custody, Ms. Pierce sought medical attention for her injuries at Brooklyn Hospital.

149.     Staff at Brooklyn Hospital examined Ms. Pierce's injuries and conducted a CT scan of her head.

150.     The Brooklyn Hospital provided Ms. Pierce with painkillers and information about traumatic head injuries and recommended that she return for a follow-up appointment a few days later.

151.     At her follow-up appointment, on June 11, 2020, Ms. Pierce was prescribed painkillers and muscle relaxants for the injuries caused by Defendants' June 3 attack.

152.     Ms. Pierce was also told to see a neurologist and ophthalmologist about her ongoing brain and vision injuries caused by Defendants' attack.

153.     To this day, Ms. Pierce continues to suffer from brain and vision problems due to the attack.

154.     Since Defendants' June 3 attack, Ms. Pierce has experienced blurred vision, almost daily flashes of light in her eyes, extreme fatigue, and headaches.

155.     Ms. Pierce has sought regular medical treatment for these injuries from a

16

neurologist and ophthalmologists and has undergone several rounds of diagnostic testing to try to address her debilitating symptoms.

156.    Ms. Pierce has been diagnosed with a concussion, decreased visual acuity, visual disturbances, vitreous detachment, and bilateral retinal lattice degeneration.

157.    In February 2021, Ms. Pierce went to the emergency room on her ophthalmologist's advice because she was experiencing constant flashes of light.

158.    At the emergency room, doctors performed diagnostic tests on Ms. Pierce's eyes.

159.    Ms. Pierce's ophthalmologists have advised that there is virtually no treatment that would ameliorate the flashes of light or bleariness in her vision that she experiences.

160.    Ms. Pierce continues to seek medical treatment to address these injuries to this day.

161.    Ms. Pierce paid out of pocket for some of this medical treatment.

162.    In addition to her physical injuries, Ms. Pierce has experienced, and continues to experience, significant psychological and emotional distress due to Defendants' actions.

163.    Since Defendants' attack, Ms. Pierce has felt more fearful and on edge. She has experienced panic attacks, including when she is near police cars or near Cadman Plaza, where she was attacked.  Ms. Pierce has also had difficulty sleeping since Defendants' attack and sometimes experiences night terrors.  She has felt isolated from members of her community, some of whom assume that she was attacked by the police because she did something wrong. Ms. Pierce now becomes easily overwhelmed and sometimes has difficulty leaving the house.

***Ms. Pierce Timely Files a Notice of Claim***

164.     Within ninety days after Defendants' June 3, 2020 attack and arrest of Ms. Pierce, counsel for Ms. Pierce filed a Notice of Claim with the New York City Comptroller's Office.

165.     Ms. Pierce attended and testified at the hearing required under Section 50-H of the General Municipal Law on March 31, 2021, by video conference.

166.     This action has been commenced within one year and ninety days of the events upon which the claims are based.

## FIRST CAUSE OF ACTION
42 U.S.C. § 1983 – Fourth and Fourteenth Amendments
Excessive Force
(Against Defendants Ryder and Does #1-4)

167.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

168.     By reason of the foregoing, and by throwing, striking, pushing, tackling, manhandling, pinning to the ground, kneeing, and forcefully restraining Plaintiff, Defendants Ryder and Does #1-4 used unreasonable and excessive force under the circumstances they confronted.

169.     At all relevant times, Defendants Ryder and Does #1-4 acted under color of state law within the scope of their employment as police officers for the New York City Police Department.

170.     Plaintiff did not pose any threat to the safety of Defendants Ryder and Does #1-4, or others.  Plaintiff was unarmed.  Plaintiff made no sudden movements.  At all relevant times, Plaintiff's hands were visible, holding her phone.

18

171.    Defendants Ryder and Does #1-4 acted beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers to willfully, knowingly, and intentionally deprive Plaintiff of her constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth and Fourteenth Amendments to the United States Constitution.  Throwing Plaintiff to the ground, pushing her head into the ground, scraping her head on the ground, pressing a knee forcefully into her ear, forcefully pinning her arms and legs to the ground, and tightly tying her hands behind her were gratuitous uses of force that were vastly out of proportion to any danger Plaintiff could have posed.

172.    Defendants Ryder and Does #1-4 failed to take any steps to prevent the excessive force used on Ms. Pierce or to intervene at any point during her assault, though they had every opportunity to do so.

173.    As a direct and proximate result of Defendants Ryder and Does #1-4's misconduct detailed above, Plaintiff sustained the damages hereinbefore alleged.

**SECOND CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourth and Fourteenth Amendments
False Arrest
(Against Defendants Ryder and Does #1-4)

174.    Plaintiff repeats and realleges the above paragraphs as if they were fully set forth at length herein.

175.    Defendants Ryder and Does #1-4 wrongfully and illegally arrested Plaintiff.

176.    The wrongful, unjustifiable, and unlawful apprehension, arrest, and detention of Plaintiff was carried out without any basis, without Plaintiff's consent, and without probable cause or reasonable suspicion.

177.    Neither Defendants Ryder and Does #1-4, nor any other NYPD officer,

issued a dispersal order to Plaintiff before arresting her.

178.    At minimum, a dispersal order would have been required to arrest Ms. Pierce with a curfew violation, as required by Emergency Executive Order No. 119.

179.    Defendants Ryder and Does #1-4 knew they lacked probable cause to arrest Plaintiff because they knew that a dispersal warning was required prior to making any arrests for violation of the curfew, but they did not issue any such warning.

180.    No reasonable officer would have believed there was probable cause to arrest Plaintiff under these circumstances.

181.    At all relevant times, Defendants Ryder and Does #1-4 acted forcibly in apprehending and arresting Plaintiff.

182.    Plaintiff was unlawfully, wrongfully, and unjustifiably held under arrest, deprived of her liberty, and falsely charged.  At all times, the unlawful, wrongful, and false arrest of Plaintiff was without basis and without probable cause or reasonable suspicion.

183.    All this occurred without any fault or provocation on the part of Plaintiff.

184.    Defendants Ryder and Does #1-4 acted under pretense and color of state law.  Said acts by Defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and Defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiff of her constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth and Fourteenth Amendments to the United States Constitution.

185.    The conduct of Defendants Ryder and Does #1-4 was willful, wanton, and reckless.

186.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

**THIRD CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourth and Fourteenth Amendments
Malicious Prosecution
(Against Defendant Moses)

187.    Plaintiff repeats and realleges the above paragraphs as if they were fully set forth at length herein.

188.    Defendant Moses maliciously and without justification commenced criminal proceedings against Plaintiff.

189.    Defendant Moses issued a summons to Plaintiff for violation of Executive Order No. 119.

190.    Defendant Moses charged Plaintiff falsely, maliciously, in bad faith, and without probable cause.

191.    Defendant Moses acted with malice, and knew or was deliberately and recklessly indifferent to the truth that she lacked probable cause to arrest, issue a summons to, and prosecute Plaintiff, and that no reliable information suggested Plaintiff had committed any offense.

192.    No reasonable officer would have believed there was probable cause to prosecute Plaintiff under these circumstances.

193.    The summons required Plaintiff to appear in court on pain of criminal prosecution.

194.    On September 9, 2020, the prosecution terminated in Plaintiff's favor when the summons issued to her on June 3, 2020 was dismissed.

195.    Defendant Moses acted under pretense and color of state law. She acted in abuse of her powers and beyond the scope of her authority and jurisdiction to willfully, knowingly, and intentionally deprive Plaintiff of her constitutional rights secured by 42 U.S.C.

§ 1983, and by the Fourth and Fourteenth Amendments to the United States Constitution.

196.    Defendant Moses's conduct was willful, wanton, and reckless.

197.    As a direct and proximate result of Defendant Moses's actions, Plaintiff

sustained the damages hereinbefore alleged.

**FOURTH CAUSE OF ACTION**
42 U.S.C. § 1983 – First Amendment
First Amendment Retaliation
(Against Defendant Ryder)

198.    Plaintiff repeats and realleges the above paragraphs as if they were fully

set forth at length herein.

199.    Plaintiff engaged in activity protected by the First Amendment, including

but not limited to participating in and filming a peaceful protest and speaking out against

excessive force used against a fellow protester.

200.    Defendant Ryder's actions in arresting Plaintiff with excessive force were

motivated or substantially caused by Plaintiff's exercise of her First Amendment protected

rights, including her right to protest, to film the police, and to complain to public officials.

201.    Defendant Ryder's arrest of Plaintiff and use of excessive force had the

purpose and effect of chilling Plaintiff's exercise of her free speech rights, protected by the First

Amendment.

202.    As a direct and proximate result of the misconduct and abuse of authority

detailed above, Plaintiff sustained the damages hereinbefore alleged.

**FIFTH CAUSE OF ACTION**
Common Law Negligence/Denial of Medical Care
(Against All Defendants)

203.    Plaintiff repeats and realleges the foregoing paragraphs as if the same

were fully set forth at length herein.

204.     At all times relevant to this Complaint, Defendants owed a duty to Plaintiff to meet the standard of care owed to people detained before trial and/or to ensure that those under their supervision were trained adequately regarding the proper care of such detained people.  This included the prevention of Covid-19 among detained people and the implementation of adequate policies and procedures regarding the proper care of such detained people and the prevention of Covid-19 among detained people.  The standard of care required, among other things, proper treatment of Plaintiff's various injuries, provision of a face mask to Plaintiff, and ensuring that NYPD officers and detainees took appropriate precautions, including wearing face masks while near others, to protect against the spread of Covid-19.

205.     Defendants negligently and/or wantonly breached and violated this standard of care, or caused it to be violated, by the foregoing, and by denying Plaintiff access to adequate medical care, failing and refusing to provide medical treatment, failing to provide a face mask to protect against Covid-19, failing to wear face masks themselves, and/or otherwise neglecting Plaintiff's medical needs.  Defendants abused their power and failed to perform their duties in good faith.

206.     Defendant City of New York, as employer of the Individual Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

207.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

### SIXTH CAUSE OF ACTION
Common Law Assault
(Against Defendants Ryder, Does #1-4, and City of New York)

208.     Plaintiff repeats and realleges the above paragraphs as if the same were fully set forth at length herein.

209.   By reason of the foregoing, Defendants Ryder and Does #1-4, acting in their capacity as New York City Police Officers and within the scope of their employment as such, intentionally placed Plaintiff in apprehension of an imminent offensive contact and displayed the ability to effectuate such contact, and thereby committed a willful, unlawful, unwarranted, and intentional assault upon Plaintiff.

210.   The assault committed by Defendants Ryder and Does #1-4 was unnecessary and unwarranted in the performance of their duties as NYPD officers and constituted an unreasonable and excessive use of force.

211.   Defendant City of New York, as the employer of Defendants Ryder and Does #1-4, is liable for their use of excessive force against Plaintiff under the doctrine of *respondeat superior*.

212.   As a direct and proximate result of the misconduct of Defendants Ryder and Does #1-4, detailed above, Plaintiff sustained the damages hereinbefore alleged.

### SEVENTH CAUSE OF ACTION
Common Law Battery
(Against Defendants Ryder, Does #1-4, and City of New York)

213.   Plaintiff repeats and realleges the above paragraphs as if they were fully set forth at length herein.

214.   By reason of the foregoing and by throwing, striking, pushing, tackling, manhandling, pinning to the ground, kneeing, and forcefully restraining Plaintiff, Defendants Ryder and Does #1-4, acting in their capacity as NYPD officers, and within the scope of their employment as such, committed a willful, unlawful, unwarranted, and intentional battery upon Plaintiff.

215.   The battery committed by Defendants Ryder and Does #1-4 was

24

unnecessary and unwarranted in the performance of their duties as NYPD officers and

constituted an unreasonable and excessive use of force.

216.    Defendant City of New York, as the employer of Defendants Ryder and

Does #1-4, is liable for their wrongdoing under the doctrine of *respondeat superior*.

217.    As a direct and proximate result of the misconduct and abuse of authority

detailed above, Plaintiff sustained the damages hereinbefore alleged.

**EIGHTH CAUSE OF ACTION**
Common Law Malicious Prosecution
(Against Defendants Moses and City of New York)

218.    Plaintiff repeats and realleges the above paragraphs as if they were set

forth fully herein.

219.    Defendant Moses, acting in her capacity as an NYPD officer and within

the scope of her employment as such, maliciously commenced criminal proceedings against

Plaintiff.

220.    Defendant Moses issued a summons to Plaintiff for violation of  Executive

Order No. 119.

221.    Defendant Moses charged Plaintiff falsely, in bad faith, and without

probable cause.

222.    Defendant New York City, as employer of Defendant Moses, is

responsible for her wrongdoing under the doctrine of *respondeat superior*.

223.    On September 9, 2020, the prosecution terminated in Plaintiff's favor

when the summons issued to her on June 4, 2020 was dismissed.

224.    As a direct and proximate result of Defendant Moses's actions, Plaintiff

sustained the damages hereinbefore alleged.

**NINTH CAUSE OF ACTION**
Common Law False Arrest/False Imprisonment
(Against Defendants Ryder, Does #1-4, and City of New York)

225.    Plaintiff repeats and realleges the above paragraphs as if they were set forth fully herein.

226.    Defendants Ryder and Does #1-4 wrongfully and illegally arrested Plaintiff.

227.    The wrongful, unjustifiable, and unlawful apprehension, arrest, and detention of Plaintiff was carried out without any basis, without Plaintiff's consent, and without probable cause or reasonable suspicion.

228.    Neither Defendants Ryder and Does #1-4, nor any other NYPD officer, issued a dispersal order to Plaintiff before arresting her.

229.    At minimum, a dispersal order would have been required to arrest Ms. Pierce with a curfew violation, as required by Emergency Executive Order No. 119.

230.    Defendants Ryder and Does #1-4 knew they lacked probable cause to arrest Plaintiff because they knew that a dispersal warning was required prior to making any arrests for violation of the curfew, but they did not issue any such warning.

231.    No reasonable officer would have believed there was probable cause to arrest Plaintiff under these circumstances.

232.    At all relevant times, Defendants Ryder and Does #1-4 acted forcibly in apprehending and arresting Plaintiff.

233.    Plaintiff was unlawfully, wrongfully, and unjustifiably held under arrest, deprived of her liberty, and falsely charged.  At all times, the unlawful, wrongful, and false arrest of Plaintiff was without basis and without probable cause or reasonable suspicion.

26

234.   All this occurred without any fault or provocation on the part of Plaintiff.

235.   Defendants Ryder and Does #1-4 acted with a knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of Plaintiff's rights, privileges, welfare, and well-being and are guilty of egregious and gross misconduct towards Plaintiff.

236.   Defendant City of New York, as employer of Defendants Ryder and Does #1-4, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

237.   As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

\*        \*        \*

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

    a.   Compensatory damages in an amount to be determined at trial;

    b.   Punitive damages against the Individual Defendants in an amount to be determined at trial;

    c.   Reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

    d.   Such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       October 4, 2021

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

By: _____/s_____

    Ilann M. Maazel
    Scout Katovich

    600 Fifth Avenue, 10th Floor
    New York, New York 10020
    (212) 763-5000

    *Attorneys for Plaintiff Brigid Pierce*