613

```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
     - - - - - - - - - - - - - - - -X
3    BRIGID PIERCE,                   : 21-CV-3482 (PKC)
                                      :
4              Plaintiff,             :
                                      :
5          -against-                  :
                                      :
6    NEW YORK CITY POLICE             :
     DEPARTMENT; OFFICER JOSEPH       :
7    RYDER, SHIELD NUMBER             :
     21617, IN HIS INDIVIDUAL         : United States Courthouse
8    CAPACITY; NEW YORK               : Brooklyn, New York
     CITY POLICE DEPARTMENT           :
9    OFFICER DANIELLE MOSES, TAX      :
     IDENTIFICATION NUMBER            :
10   966234, IN HER INDIVIDUAL        :
     CAPACITY; NEW YORK CITY          :
11   POLICE DEPARTMENT                :
     OFFICER MICHAEL SAID, IN HIS     :
12   INDIVIDUAL CAPACITY; AND THE     :
     CITY OF NEW YORK,                :
13                                    : Friday, December 5, 2025
               Defendants.           : 10:30 a.m.
14   - - - - - - - - - - - - - - - -X

15
                 TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
16              BEFORE THE HONORABLE PAMELA K. CHEN
                   UNITED STATES DISTRICT JUDGE
17
                        A P P E A R A N C E S:
18
     For the Plaintiff:        EMERY CELLI BRINCKERHOFF ABADY WARD
19                                & MAAZEL LLP
                               1 Rockefeller Plaza, 8th Floor
20                             New York, New York 10020
                               BY:  ILANN M. MAAZEL, ESQ.
21                                  MAX B. SELVER, ESQ.

22   For the Defendants:       NEW YORK CITY LAW DEPARTMENT
                               ASSISTANT CORPORATE COUNSEL
23                             100 Church Street
                               New York, New York 10007
24                             BY:  JONATHAN HUTCHINSON, ESQ.
                                    JESSICA M. OCHOA, ESQ.
25                                  JOHN MCLAUGHLIN, ESQ.
```

Proceedings                                             614

Court Reporter:       DAVID R. ROY, RPR
                      225 Cadman Plaza East
                      Brooklyn, New York 11201
                      drroyofcr@gmail.com

Proceedings recorded by Stenographic machine shorthand,
transcript produced by Computer-Assisted Transcription.


              P  R  O  C  E  E  D  I  N  G  S

                      --ooOoo--

9        (In open court.)

10        THE COURT:  So good morning, everyone.

11        THE COURTROOM DEPUTY:  All -- oh, one moment,

12    Judge.

13        Do we need Ms. Pierce?

14        THE COURT:  Yes.  So let's have Ms. Pierce back on

15    the witness stand.  I'm sorry.  I forgot about that.

16        (Witness approaches the witness stand.)

17        (Jury enters.)

18        THE COURT:  Please be seated, everyone.

19        Good morning, Ladies and Gentlemen of the Jury.  I

20    trust you had a good night and got some rest.

21        We are going to continue with the

22    cross-examination of Ms. Pierce.

23        So, Mr. Hutchinson, if you'll take the podium.

24    And Ms. Pierce, I'm going to remind you once again that

25    you're still under oath.

Pierce - Cross - Hutchinson                    615

1              THE WITNESS:  Yes.

2              THE COURT:  Okay.

3    **BRIGID PIERCE**,

4              called as a witness having been first duly

5              sworn/affirmed, was examined and testified as

6              follows:

7              MR. HUTCHINSON:  May I, Your Honor?

8              THE COURT:  Yes, you may.

9              MR. HUTCHINSON:  Thank you.

10   CROSS-EXAMINATION (CONTINUED)

11   BY MR. HUTCHINSON:

12   Q    Good morning, Ms. Pierce.

13   A    Good morning.

14   Q    Here we are again.

15   A    Yes, here we are.

16   Q    Now, when we left off yesterday afternoon, we were

17   discussing some of your medical records from Brooklyn

18   Hospital Center when you went to the emergency room on

19   June 4th, 2020.

20             Is that right?

21   A    Yes, that's sounds right.

22   Q    Okay.  Now, we are covering sort of the substance of

23   some of those medical records, but they're in evidence so I

24   think we can leave that for now.

25             Suffice it to say that you got out of the hospital

Pierce - Cross - Hutchinson                616

1    that morning at around 7:00 a.m.; is that right?

2    A    To my recollection, it was 8:00 a.m.

3    Q    And as soon as you got out of the hospital, you texted

4    you friend Cara and started to plan to go to another protest

5    that night, correct?

6    A    I'm not sure at what time Cara and I would have

7    discussed that, but we did discuss that day.

8    Q    And a little later at about 8:15 a.m., you texted your

9    friend Susie and you told her that you were "considering

10   suing" and were "considering how it could help the

11   movement."

12            Is that right?

13   A    That, I'm not sure.

14   Q    And later that night, on June 4th, you did attend

15   another protest, correct?

16   A    Yes, I did.

17   Q    And then the following day, on June 5th, you texted

18   Cara that you were considering going to a another protest

19   that night, but you were afraid of losing your job if

20   someone snapped a picture of you, correct?

21   A    That's possible.

22   Q    And later in June and July of 2020, you continued to

23   attend protests throughout those months, correct?

24   A    Yes, I can recall a couple of protests that I attended.

25   Q    And you weren't exactly secretive about it, right?

Pierce - Cross - Hutchinson                617

1    A    No.

2    Q    You have a public *Instagram* account, right?

3    A    Yes, I do.

4    Q    And you still have *Instagram*, right?

5    A    Yes, I do.

6    Q    And do you use the user name Saylamarz,

7    S-A-Y-L-A-M-A-R-Z, correct?

8    A    Yes, correct.

9    Q    And you also have *Facebook*, right?

10   A    Yes, I do.

11   Q    Under the account Brigid Marz, correct?

12   A    Yes, I believe that's correct.

13   Q    And you had that account back in 2020, correct?

14   A    I believe so.

15   Q    And you would posts from those protests on occasion,

16   right?

17   A    On occasion, I would post -- I would post after the

18   fact.  More often, I believe, I was posting about kind of

19   the general news around the protest subject.

20   Q    And to this day, you continue to use *Instagram* to both

21   voice your opinions and also to showcase your photographer.

22            Is that right?

23   A    I use it to voice my opinions.  I do post photographs

24   from my iPhone.

25            (Pause in proceedings.)

Pierce - Cross - Hutchinson                618

1          THE COURT:  Okay.  Go ahead, Mr. Hutchinson.

2          MR. HUTCHINSON:  Your Honor, I'm showing counsel

3   what's marked as Defense Exhibit Q for identification.

4          THE COURT:  All right.

5          MR. HUTCHINSON:  We'll call it Q -- Q1 and Q2.

6          And I'm showing these to the witness, Your Honor.

7   BY MR. HUTCHINSON:

8   Q    Ms. Pierce, can you see Q1?

9   A    No, the screen is blank right now.

10         THE COURTROOM DEPUTY:  Oh.

11         THE WITNESS:  Yes, now I can see something.

12  BY MR. HUTCHINSON:

13  Q    Okay.  And can you see Q2?

14  A    Yes.

15  Q    Okay.  Now, earlier, you testified that it was

16  difficult for you after the incident to use a camera, right?

17  A    It's difficult for me to do photography the way I used

18  to, yes.

19  Q    Now, do you recognize what is in front of you as Q1?

20  A    Yes.

21  Q    And what do you recognize it to be?

22  A    It's a photo of me on the beach taking a photo of my

23  friend's dog.

24  Q    And do you recognize what is in Q2?

25  A    I guess it's an *Instagram* tag.  It says "in this

Pierce - Cross - Hutchinson                    619

1  photo."

2  Q    And do you recognize who the person tagged in the photo

3  is?

4  A    Yes, that's me.

5  Q    Okay.

6         MR. HUTCHINSON:  Okay.

7         Your Honor, I'd admit or offer Q1 and Q2 into

8  evidence as Defense Q1 and Q2.

9         MR. MAAZEL:  No objection.

10        THE COURT:  All right.  Admitted.

11        (Defendants' Exhibits Q1 and Q2 received in

12  evidence.)

13        THE COURT:  You may publish.

14        MR. HUTCHINSON:  Thank you.

15        Publishing Q1.

16 BY MR. HUTCHINSON:

17 Q    And can you just indicate --

18        (Exhibit published to the jury.)

19 BY MR. HUTCHINSON:

20 Q    Now, this is not posted from your account, correct?

21 A    No, this is not.

22 Q    But you previously testified that according to Q2,

23 you're tagged in this photo, correct?

24 A    That is correct.

25 Q    And do recognize the individual depicted in the

1   photograph?

2   A    That's me.

3   Q    Now, is there a date on this photograph?

4   A    Yes.

5   Q    Or on the post, rather?

6   A    Yes, there's a date on the post.

7   Q    And it's September 19, 2020, correct?

8   A    Correct.

9           MR. HUTCHINSON:  Your Honor, I'm showing counsel

10  what's marked as Defense R for identification.

11          I'm showing it to the witness.

12  BY MR. HUTCHINSON:

13  Q    Ms. Pierce, do you recognize what's depicted in

14  Defendants' Exhibit R for identification?

15  A    Yes, I do.

16  Q    And what is it?

17  A    It's a photo of the dancer Lloyd Knight.

18          (Reporter clarification.)

19          THE COURT:  Lloyd who?

20          THE WITNESS:  Knight, K-N-I-G-H-T.

21  BY MR. HUTCHINSON:

22  Q    And are you familiar with this photograph?

23  A    Yes.

24  Q    And why is that?

25  A    I believe that I took this photo.

1          MR. HUTCHINSON:  Your Honor, I offer

2     Defense Exhibit R into evidence.

3          MR. MAAZEL:  No objection.

4          THE COURT:  All right.  Admitted.

5          (Defendants' Exhibit R received in evidence.)

6          MR. HUTCHINSON:  Thank you.

7          THE COURT:  You may publish.

8          MR. HUTCHINSON:  Thank you.

9          (Exhibit published to the jury.)

10    BY MR. HUTCHINSON:

11    Q    Now, Ms. Pierce, again, this is not your *Instagram*

12    account, correct?

13    A    No, I don't know this *Instagram* account.

14    Q    And this post is dated, correct?

15    A    Yes, it is.

16    Q    And --

17    A    The screen is tilted.

18    Q    I'm sorry.

19          It's dated November 10th, 2023; is that correct?

20    A    Yes, it is.

21          MR. HUTCHINSON:  And, Your Honor, if we could

22    adjust Ms. Pierce's screen.  It looks like it's just hard to

23    see.

24          THE WITNESS:  I think it's --

25          MR. HUTCHINSON:  Is it possible to tilt it?

Pierce - Cross - Hutchinson                    622

1          THE WITNESS:  I think I'm just shorter than it.

2          MR. HUTCHINSON:  Oh, I see.

3          THE WITNESS:  So I just have to --

4   BY MR. HUTCHINSON:

5   Q    So it's dated November 10th, 2023, correct?

6   A    Correct.

7   Q    Okay.  Now, are you able to see the bottom of the -- of

8   the post where it says "photo by"?

9   A    Yes, I am.

10  Q    And is that your *Instagram* name following "photo by"?

11  A    Yes, it is.

12  Q    And this post is from November 10th, 2023 --

13         Okay.  Moving on.

14         MR. HUTCHINSON:  Your Honor, I'm showing counsel

15  what's been marked as Defense Exhibit S for identification.

16         THE COURT:  All right.

17         MR. HUTCHINSON:  Showing it to the witness.

18  BY MR. HUTCHINSON:

19  Q    Do you recognize this?

20  A    Yes, I do.

21  Q    And what is it?

22  A    This is a post from my *Facebook*.

23  Q    And is this a fair and accurate reproduction of that

24  post?

25  A    It's hard to see, but I think if the colors were

Pierce - Cross - Hutchinson                    623

1   brighter, it would be.

2           MR. HUTCHINSON:  Your Honor, I'd offer Defense

3   Exhibit S for identification into evidence.

4           MR. MAAZEL:  Could we have a sidebar, Judge?

5           THE COURT:  All right.

6           (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar Conference                    624

1          (The following occurred at sidebar.)

2          MR. MAAZEL:  So my problem is, Judge, this is not

3    impeachment.  These are just exhibits that should have been

4    on the pretrial order.  And had we known they were going to

5    do all of this, we would have put all sorts of exhibits in

6    the pretrial order, preparing our direct and redirect.  I

7    give a little leeway.  We can't have all these exhibits in

8    federal court.

9          MR. HUTCHINSON:  I can explain --

10         MR. MAAZEL:  It's not how it works here.

11         MR. HUTCHINSON:  This is why I asked about photos.

12   If you look at each of these photos, they're her personal

13   photography activity.  I can add more foundation to publish.

14   But this particular is being offered because clearly there's

15   no camera depicted in the picture.

16         THE COURT:  Yes.

17         MR. HUTCHINSON:  However, it's our understanding

18   that this post pertains to awards that plaintiff won for a

19   film in which she did the photography.

20         THE COURT:  Uh-huh.

21         MR. HUTCHINSON:  And I'm going to ask her

22   follow-up questions about what this was.  But this is for

23   oral agreement of her claim that -- Dr. Nadkarni's claim

24   that she wasn't able to engage in the same activity.

25         MR. MAAZEL:  She never said that she didn't stop

Sidebar Conference                     625

1   photograph.  She just said she couldn't do it at the level

2   she did before.

3          I don't have a problem with the exhibit.  But my

4   problem is putting exhibits that aren't in the proper

5   order --

6          MR. MAAZEL:  (Inaudible.)

7          (Simultaneous cross-chatter.  The reporter unable

8   to discern.)

9          MR. HUTCHINSON:  -- that's why they're not in the

10  properly.

11         MR. MAAZEL:  It's not --

12         MR. HUTCHINSON:  These are only offered for

13  impeachment.

14         THE COURT:  I understand that the defense is

15  trying to impeach her claim that she's not able to perform

16  or do the photograph at the same level as she did before,

17  and this image apparently indicates she won an award for a,

18  I guess, a film?

19         MR. HUTCHINSON:  Correct.

20         THE COURT:  Which does contradict her claim that

21  she wasn't able, and I guess as of April of 2024, to perform

22  at the same level.  So I do think it qualifies as

23  impeachment.

24         But I do want to know how much more such images

25  of -- or exhibits are you thinking of asking about?

```
                 Sidebar Conference                626
```

 1          MR. HUTCHINSON:  For photography, this is the last
 2   one.
 3          THE COURT:  Okay.  What --
 4          MR. HUTCHINSON:  I have additional ones to her
 5   other claims that I -- I've not bourn out.
 6          MR. MAAZEL:  Meaning?
 7          MR. HUTCHINSON:  Aerial --
 8          MR. MAAZEL:  Okay.  Is this --
 9          MR. HUTCHINSON:  -- Instagram account.  I'm sure
10   you looked at before the trial, as well as it's public.
11          MR. MAAZEL:  So I have a problem with that.  She
12   said she did some circus afterwards, but it was hard for her
13   and she wasn't -- she only did it a few times.  So if they
14   show her photos only of the few times, that's not
15   impeachment.  That's just putting photos before the jury of
16   her doing something or other, which had we known they were
17   going to do that, we would have shown all sorts of videos of
18   her before the incident which she could do amazing things,
19   such as trapeze, which she cannot do anymore.
20          THE COURT:  Which you can do on redirect.  So I'm
21   going to allow the defense to impeach her claim as to the
22   level she was able to perform after the incident.
23          If you want to come back and show the level that
24   she performed before the incident, you can do that.  But I
25   don't think it's unfair to impeach her testimony about the

Sidebar Conference                        627

1  level that she could perform in all of these different areas

2  after the incident and because of the incident.  So I'm

3  overruling your objection.

4          Go ahead.

5          MR. HUTCHINSON:  Okay.

6          (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Pierce - Cross - Hutchinson                628

1           (Sidebar ends; in open court.)

2           (In open court.  Jury present.)

3           THE COURT:  So you may proceed, Mr. Hutchinson.

4           MR. HUTCHINSON:  Thank you.

5           I'm showing Defense Exhibit S for identification

6    to the plaintiff, Your Honor.

7    BY MR. HUTCHINSON:

8    Q    Ms. Pierce --

9           MR. HUTCHINSON:  Well, in fact, I am offering

10   Exhibit S into evidence.  I'm not sure if you ruled on that,

11   Your Honor.

12          THE COURT:  There wasn't an objection, *per se*, so

13   you can go ahead and show it to her.

14          That was the one which we discussed just now,

15   right?

16          MR. HUTCHINSON:  Yes.

17          THE COURT:  Yes.  You can go ahead and show it to

18   the witnesses.

19          MR. HUTCHINSON:  Okay, sure.

20   BY MR. HUTCHINSON:

21   Q    I just want to ask you a few more questions about this

22   photo first.

23          Now, Ms. Pierce, you previously testified that

24   this exhibit was a fair and accurate depiction of the post

25   that you posted, correct?

Pierce - Cross - Hutchinson                    629

1    A    Yes, this is a post on my private *Facebook*.

2    Q    What do you mean by "private *Facebook*"?

3    A    Well, I use my *Facebook* to communicate with friends and

4    family, it's not -- it's not open to the public where my

5    *Instagram* is.

6    Q    But you realize that if you search your *Facebook*

7    account, you can see posts that are posted publicly,

8    correct?

9    A    This is not -- no, that's not my settings on *Facebook*.

10   Q    Okay.

11         Is this a fair and accurate reproduction of a post

12   that you posted on May 30th, 2024?

13   A    I believe so.

14   Q    And what was the subject of that post in general?

15   A    This was a -- about a student film contest that my

16   school had participated in.

17   Q    And that you, yourself, had participated in, right?

18   A    Correct.  Yes, yes.

19         MR. HUTCHINSON:  All right, Your Honor, I offer

20   Defense Exhibit S into evidence.

21         MR. MAAZEL:  No objection.

22         THE COURT:  Okay.

23         MR. MAAZEL:  Subject to what we discussed.

24         THE COURT:  All right.  Admitted.

25         (Defendants' Exhibit S received in evidence.)

Pierce - Cross - Hutchinson                630

1          MR. HUTCHINSON:  Could we --

2          THE COURT:  Stay near the microphone.  Yes.

3          MR. HUTCHINSON:  Could we please publish Exhibit

4    S, please.

5          THE COURT:  You may.

6          (Exhibit published to the jury.)

7          MR. HUTCHINSON:  Okay.  Let me zoom in a little

8    bit.

9    BY MR. HUTCHINSON:

10   Q    Now, again, this is your *Facebook* account, correct?

11   A    Yes, this is.

12   Q    And so the caption on top of the photos, those are your

13   words, correct?

14   A    Yes, that is.

15   Q    And so can you please just read what you wrote for the

16   jury?

17   A    It says, "whoops" -- pardon me.  It says, "Whoops.

18   Moved to France to become a violinmaker, accidentally won a

19   grand prize in an international short film festival."

20   Q    Okay.  And so did you participate in submitting a film

21   to this short film festival?

22   A    Yes, this was a class requirement.

23   Q    And as your part of the class requirement, you were

24   involved in producing the -- what's called in French, the

25   "images de montage."

Pierce - Cross - Hutchinson                631

1           Is that correct?

2    A    They were five of us that were kind of the actual

3    makers of this film, the -- the ones that did the work, I

4    would say.

5    Q    And what is images de montage?

6    A    It would mean essentially mounted images.  These are

7    terms that the teacher would have provided, so I'm not sure

8    quite how that would translate.

9    Q    They're photographs, correct?

10   A    No.  This would have been the image.

11   Q    Okay.  So more like videos than photographs?

12   A    Correct.

13   Q    And in producing this short film, did you use an

14   iPhone?

15   A    No.

16   Q    What did you use?

17   A    Well, we used, I believe, three different cameras.  We

18   used my friend Kelly's camera, my camera and the drone

19   camera.

20   Q    And you said "your camera," what kind of camera is

21   that?

22           THE COURTROOM DEPUTY:  I'm sorry.  Please speak

23   into the microphone, please.

24   BY MR. HUTCHINSON:

25   Q    You said "your camera," what kind of camera is that?

Pierce - Cross - Hutchinson                    632

1   A    That's a -- it's what is called a DSLR.  It's Canon 5D.

2   This is one of those cameras that has a camera body, and

3   then you can pick the lens which will change the quality of

4   the image.

5          I think I should have meant that to say, I think

6   we also used a school camera, so there were four cameras

7   involved in this shoot.

8   Q    And when you say "we," you're including yourself, too,

9   correct?

10  A    Yes.

11         MR. HUTCHINSON:  Your Honor, I'm showing counsel

12  what is marked as Defense T1 through 4 for identification.

13         THE COURT:  All right.

14         And I'm showing T1 to the witness, Your Honor.

15         THE WITNESS:  Okay.

16  BY MR. HUTCHINSON:

17  Q    Now, Ms. Pierce, you previously testified that you gave

18  an interview to that newspaper reporter in July of 2024; is

19  that correct?

20  A    Yes, he interviewed me -- no, I don't think it was in

21  July.  He interviewed me several times, but it would have

22  been -- school was over in July.

23  Q    Right.  I'm sorry.  I think the testimony earlier was

24  that the article was published in July but the interview was

25  from June, correct?

Pierce - Cross - Hutchinson                    633

1   A    That sounds correct.

2   Q    Yeah.

3   A    It would have been earlier in the year.

4   Q    My mistake.

5        As part of that article, you had photographs taken

6   as well, correct?

7   A    Yes, they staged some photographs of us.

8        MR. HUTCHINSON:  All right.  I want to have you

9   take a look at Exhibit T1.

10  BY MR. HUTCHINSON:

11  Q    Do you recognize this?

12  A    Yes, I do.

13  Q    What is it?

14  A    This is one of the photos that they did.

15  Q    And T2, same question.

16  A    This is also one of the photos that they staged for the

17  interview.

18  Q    T3.

19  A    This is a photograph of the same journalist at the

20  museum where I worked and he took the photo of me there.

21  Q    And T4.

22  A    This is also a photo that I believe this journalist

23  took at the museum where I worked.

24       MR. HUTCHINSON:  Okay.  I'm going to offer T1

25  through 4 into evidence as Defendants' Exhibit T1 through

Pierce - Cross - Hutchinson                    634

1  T4.

2              MR. MAAZEL:  I have no objection, Judge, other

3  than the TTO shoot.

4              THE COURT:  Okay.  Those are admitted.

5              (Defendants' Exhibits T1, T2, T3, and T4 received

6  in evidence.)

7              THE COURT:  You may publish.

8              (Exhibit published to the jury.)

9  BY MR. HUTCHINSON:

10 Q    And so, again, it is your testimony that these

11 photographs were taken approximately June of 2024, correct?

12 A    Yes.  Certainly June or earlier.

13 Q    And can you describe what we're looking at on the

14 screen?

15 A    Yes.  This is a photo of me with two of my classmates.

16 It was staged by the journalist after we won this film

17 competition.

18 Q    And which one in the photograph is you?

19 A    That's me in the center.

20 Q    And what are we looking at on the table -- or what's on

21 the table?

22 A    You're seeing -- on the left side of the table, you're

23 seeing the open side of the top plate of a violin and on the

24 right side of the table, you're seeing kind of a mat to

25 protect the wood.  And then you're seeing the scroll of a

Pierce - Cross - Hutchinson                    635

1   violin, and there it is, it looks like a gouge that's

2   cutting the scroll.

3   Q    And that gouge, can you indicate where that is on the

4   photograph?

5   A    (Indicating.)

6   Q    Thank you.

7              All right.  Now, where was this photograph taken?

8   A    This was taken at my vocational school.

9   Q    And so is this one of the classrooms that you would --

10  where you would attend school or one of the workshops?

11  A    I'm sorry, I didn't hear part of that sentence.

12  Q    Is this one of the workshops or classrooms where you

13  would attend school?

14  A    Correct, yes.

15  Q    And can you describe what -- what's on the board behind

16  you?

17  A    That --

18  Q    We can zoom in, if you'd like.

19  A    That is -- on the left, that is kind of a diagram

20  explaining how to space strings on a bridge.  And on the

21  right side -- I'm not sure about all of the images but one

22  of them is about how to tilt the neck in the violin body and

23  then those kind of arched-shapes things, I'm not sure what

24  they're indicating.  They might be just somebody's drawing.

25  Q    And what's on the door behind you?

Pierce - Cross - Hutchinson                636

1   A    That is -- I believe it was a promotional poster for

2   lutherie event, but I'm not sure.

3   Q    And I'm referring to left side of the photograph now

4   that I am zoomed in.

5   A    The red -- the red stuff?

6   Q    Yeah.

7   A    Yeah.  No.  I believe that that is a promotional poster

8   for some sort of an event.

9   Q    And what does it depict, if you know?

10  A    I would say that it's the violin on the right, at the

11  top right, it looks like a bridge.  To the center right, my

12  best guess is that that's a C-clamp.

13        And below that, I have no idea.  I would have to

14  see it closer up.

15  Q    Okay.  Yep.  Fair enough.  It's in the background.

16        MR. HUTCHINSON:  I'm going to show T2.

17        (Exhibit published to the jury.)

18  BY MR. HUTCHINSON:

19  Q    Do you recognize this?

20  A    Yes.

21  Q    And what is it?

22  A    That is a photo of me with my thesis project.

23  Q    And what is your thesis project?

24  A    That was a viola that was based on a viola made by

25  Gennaro Gagliano.

Pierce - Cross - Hutchinson                    637

1   Q    And what part of the viola is depicted?

2   A    This is the scroll or the head of the viola and then

3   you just see part of the neck.

4   Q    And is there another instrument depicted on the

5   left-hand side?  On the table?

6   A    Oh, yes.  You can see next to my water bottle, you can

7   see the scroll and, likewise, the beginning of the neck of a

8   violin.

9   Q    Okay.

10         MR. HUTCHINSON:  This is T3.

11   BY MR. HUTCHINSON:

12   Q    Can you describe what we're looking at here?

13   A    Yes.  This is a kind of -- I don't know if you'd say

14   staged, but it's a posed photo of me at a historic lutherie

15   workshop in Mirecourt, it's part of the museum.

16   Q    And --

17         THE COURTROOM DEPUTY:  I'm sorry.  Microphone.

18   BY MR. HUTCHINSON:

19   Q    And so just to be clear, the instruments on the table

20   behind you, those were not made by you, correct?

21   A    No, those were guitars that were made by the luthiers

22   that were in this family or that were in progress when the

23   museum acquired this space.

24   Q    And do you see any lutherie tools depicted?

25   A    No, I believe all that I see on this looks like a pair

Pierce - Cross - Hutchinson                638

1  of scissors but I know from experience that the workshop is

2  full of lutherie tools.

3  Q    Okay.

4         MR. HUTCHINSON:  And finally T4.

5  BY MR. HUTCHINSON:

6  Q    Do you recognize this?

7  A    Yes.  This is a photo of me in the adjoining room of

8  the same space.

9  Q    And what's to the right of the photograph in that back

10 room, if you know?

11 A    That's the back room that you just saw me in and that's

12 another part of the same historic workshop.

13 Q    Okay.  Now you're wearing an apron in the photograph,

14 correct?

15 A    Correct.

16 Q    And so did you perform luthier work as well at this

17 museum?

18 A    So what my job was is to do presentations to the public

19 and I had a couple of different kinds of presentations.

20 Usually, I would do a presentation on the guitar-making

21 family, that was kind of about the history of the family.

22         And then in this room, I would kind of discuss how

23 instruments are made.  And so I would put on an apron and

24 kind of almost pantomime the steps of making an instrument.

25 Q    I see.

Pierce - Cross - Hutchinson                    639

1          And were those presentations in English or French?

2    A    It depended on who was at the museum.

3    Q    So both?

4    A    Yes, correct.

5    Q    Okay.

6          MR. HUTCHINSON:  Your Honor, I'm showing counsel

7    what's marked as Defense U for identification, so bear with

8    me.

9          (Pause in proceedings.)

10         MR. HUTCHINSON:  Thanks.

11         Your Honor, I would like to show Defense U for

12   identification.

13         THE COURT:  All right.

14   BY MR. HUTCHINSON:

15   Q    Do you recognize this exhibit?

16   A    Yes, I do.

17   Q    And what is it?

18   A    This is a photograph of my friend Paris.

19   Q    And do you recall when this was taken?

20   A    Yes, I do.

21   Q    When was it?

22   A    It would have been shortly after Jessica asked me for a

23   divorce, when she asked me to come down because I was upset.

24   So I'm going to say it was probably October break of 2022,

25   is my estimate.

Pierce - Cross - Hutchinson                    640

1  Q    Okay.  And this isn't from your *Instagram* account,

2  correct?

3  A    No, this is from Paris's *Instagram* account.

4  Q    But are you tagged in this photograph?

5  A    In the text, it is hard to see on the screen, but I

6  believe the text is tagging me.

7  Q    Got it.

8          And do you know who took this photograph?

9  A    I took it.

10          MR. HUTCHINSON:  Your Honor, I'd offer Defense

11  Exhibit U into evidence.

12          MR. MAAZEL:  I have hearsay objection to the

13  defense, Your Honor.

14          THE COURT:  I apologize, the text is not the

15  writing of this -- it is the plaintiff's writing?

16          MR. MAAZEL:  No.  It's a text by someone else.

17          THE COURT:  Okay.  Let's -- can I take a look at

18  it?  I apologize.

19          MR. HUTCHINSON:  Yes.

20          (Continued on the next page.)

21

22

23

24

25

Sidebar Conference                    641

1           (The following occurred at sidebar.)

2           THE COURT:  Okay.  Go ahead.

3           MR. HUTCHINSON:  First of all, I want to apologize

4    to Court and counsel.  I recalled that there were two

5    additional photos that I didn't remember at the time, but I

6    inadvertently said that was the last one.  There's this one

7    and one more.  I'm sorry about that.

8           THE COURT:  Is the text, is it by someone named PA

9    Lutherie, L-U-T-H-E-R-I-E, so -- I'm sorry, David -- and

10   that's the spelling of it.

11          Is it being offered for its truth?  I'm not sure

12   what the relevance of the text message accompanying the

13   picture is.

14          MR. HUTCHINSON:  No.

15          THE COURT:  What are you offering this for?

16          MR. HUTCHINSON:  Your Honor, frankly, we would be

17   fine to redact the text except for the word @Saylamarz, it

18   does say she is a professional photographer.  I don't

19   honestly care if it comes in or not, but...  so in that

20   objection part, I'm okay to redact that.

21          But what I would just do now is redact the half

22   and not show the text.

23          THE COURT:  This is not of the plaintiff,

24   obviously, right?

25          MR. HUTCHINSON:  No.  This is of a photograph she

Sidebar Conference                        642

1    took.

2            THE COURT:  Okay.  Oh, I see.  This is a

3    photograph of another person who is a luthier that the

4    plaintiff took?

5            MR. HUTCHINSON:  Correct.

6            THE COURT:  And you just want the fact that

7    Ms. Pierce tagged this, I think -- someone tagged it?

8            MR. HUTCHINSON:  I think -- correct me if I'm

9    wrong, but I think the objection was to the caption; is that

10   right?

11           MR. MAAZEL:  Well, standing objection on the PTO

12   issue.  I don't understand your ruling on that, but to the

13   text.

14           THE COURT:  Right where it says your client is a

15   talented photographer and the professional part?

16           MR. MAAZEL:  Yes.

17           THE COURT:  That should be redacted; is that --

18           MR. HUTCHINSON:  Sure.

19           THE COURT:  Redact the image otherwise argue about

20   what you want.

21           MR. HUTCHINSON:  Now, when I offer this into

22   evidence subject to redaction, should I draw the attention

23   of it before it goes in, expect that I can't redact it

24   before it goes into the record?

25           THE COURT:  Well, I would put something over it,

Sidebar Conference                643

1  and that's what the exhibit will be.  I don't know how to

2  propose to redact it.

3          MR. HUTCHINSON:  Well, when I publish it, I would

4  just publish this portion and then --

5          MR. MAAZEL:  Do you have a way to do that with the

6  Elmo?

7          MR. HUTCHINSON:  Yeah.

8          THE COURT:  Okay.  Does anyone have any scissors?

9          MR. SEVER:  I think it's -- it would be better.

10          MR. HUTCHINSON:  Why don't I fold it over?

11          THE COURT:  Fine.

12          MR. HUTCHINSON:  Because then I don't want to just

13  put a marker, because it will smudge off.

14          MR. MAAZEL:  Okay.

15          MR. HUTCHINSON:  Do you want to do that?

16          THE COURT:  Time out, guys.  We have a court

17  reporter here.  You are making things very difficult.

18          So cut that off with the scissors, just attach it

19  on and -- with a piece of paper, and that will be -- you

20  have to have these things, perhaps.

21          MR. HUTCHINSON:  You know, Your Honor, this one

22  and several others, you know, there's a lot out there on the

23  Internet, so these are kind of fluid.

24          THE COURT:  Well, it's not fluid, but this should

25  already have been done before today, because they have been

Sidebar Conference                               644

1    there since, I guess, 2024 or whatever.

2            Let me also make it clear, I wasn't clear as I

3    should have been about the ruling on the images and

4    exhibits.

5            The thrust of your objection, Mr. Maazel, was that

6    they weren't identified in the joint pretrial order and you

7    think they should have been?

8            MR. MAAZEL:  Yes.

9            THE COURT:  I want to be clear, I do not find that

10   they had to be -- I think that I discussed that in the

11   order, that neither party would have to alert the other side

12   to produce or identify as part of the JPTO.  So I just

13   wanted to be clear that that was my ruling.

14           I'll admit them subject in the objection -- or

15   overruled the objection of the plaintiff.

16           MR. HUTCHINSON:  Okay.  Thank you.

17           (Continued on the next page.)

18

19

20

21

22

23

24

25

Pierce - Cross - Hutchinson                645

1              (Sidebar ends; in open court.)

2              (In open court.  Jury present.)

3              THE COURT:  So you can admit the exhibit and I'm

4     overruling the objection to it.

5              So go ahead and publish.  It's Defendants'

6     Exhibit U.

7              (Defendants' Exhibit U received in evidence.)

8              (Exhibit published to the jury.)

9     BY MR. HUTCHINSON:

10    Q    Ms. Pierce, how was this photograph taken?

11    A    This was taken on my DSLR.

12             THE COURT:  Your DSLR?

13             THE WITNESS:  DSLR.

14             THE COURT:  Digital single lens something?

15             THE WITNESS:  Yeah, I don't even know what it

16    stands for, but it's the camera that has the camera body in

17    the lens.

18    BY MR. HUTCHINSON:

19    Q    And are those luthier tools in the background of the

20    photograph?

21    A    Yes, correct.

22    Q    Okay.

23             MR. HUTCHINSON:  Your Honor, I'm showing counsel

24    Defense V for identification.

25             And I am showing it to the witness.

Pierce - Cross - Hutchinson                    646

1   BY MR. HUTCHINSON:

2   Q    Ms. Pierce, do you recognize this?

3   A    I don't recall this photo, but it looks like a photo of

4   an instrument payment at my vocational school.

5   Q    And your *Instagram* name is @ Saylamarz; is that

6   correct?

7   A    Yes, that is correct.

8   Q    And do you see anywhere on Defense Exhibit V for

9   identification where your name is mentioned?

10  A    Yes.

11  Q    And do you know who took this photograph?

12  A    They're thanking me for it, so it sounds like I took

13  it.

14  Q    Okay.

15         MR. HUTCHINSON:  I'm offering Defense Exhibit V

16  into evidence.

17         THE COURT:  Any objection other than what we've

18  previously discussed?

19         MR. MAAZEL:  I think I only --

20         THE COURTROOM DEPUTY:  I'm sorry, microphone.

21         MR. MAAZEL:  I'm sorry.

22         The photo is fine.

23         THE COURTROOM DEPUTY:  Still use the microphone.

24         THE COURT:  Is it the text that's an issue again?

25         MR. MAAZEL:  Yes.

Pierce - Cross - Hutchinson                647

1          MR. HUTCHINSON:  So in that case, Your Honor, I

2     don't need to publish it right now.

3          THE COURT:  Okay.  That's fine.

4          MR. HUTCHINSON:  And I'll be happy to redact the

5     text.

6          THE COURT:  Okay.  Alternatively, you could cover

7     the text if you want to right now, if you want to show it.

8          I'll admit it without the text.

9          MR. HUTCHINSON:  Let's do that.

10          THE COURT:  And it's Exhibit V.

11          (Defendants' Exhibit V received in evidence.)

12          THE COURT:  There you go.  Okay.  You can publish

13     that way.

14          MR. HUTCHINSON:  Thank you.

15          THE COURT:  All right.

16     BY MR. HUTCHINSON:

17     Q    And this post is dated, correct?

18     A    Yes.

19     Q    February 6th, 2024?

20     A    Yes.

21     Q    And did you take this photograph on an iPhone or a

22     DSLR?

23     A    I don't know.

24     Q    Okay.

25          MR. HUTCHINSON:  Could I just have one moment,

Pierce - Cross - Hutchinson                    648

1    please, Your Honor?

2              THE COURT:  Sure.

3              (Pause in proceedings.)

4    BY MR. HUTCHINSON:

5    Q    Okay.  Now, we were just talking about *Instagram*,

6    right?

7    A    Yes.

8    Q    You post frequently on *Instagram*, correct?

9    A    Lately, I'm more likely to kind of retweet, reshare,

10   but yes.

11   Q    And those retweets or reshares, are those called reels

12   on your stories?

13   A    I don't think so.  I think -- I think that a reel is if

14   you post something to your own account, and a reshare is if

15   it's somebody else's.  But this is not my terminology.

16   Q    Okay.  So what would you call those individual reshares

17   that you were just referring to?

18   A    I don't know the name for them.

19   Q    Okay.  So we'll call them reshares, okay?

20   A    Okay.

21   Q    In fact, in the last few weeks, you've posted over 50

22   of these reshares nearly every day; isn't that true?

23   A    That sounds right.

24   Q    And these are mainly reshares that deal with like,

25   political causes, right?

Pierce - Cross - Hutchinson                         649

1   A     Correct.

2   Q     And so it's important that you -- you know that you

3   endorse the positions in those reshares before you repost

4   them, correct?

5   A     Not necessarily.  Sometimes I'll share things for

6   information that I actually disagree with.  Usually I'm

7   sharing something because I know it's in my eye line, but

8   it's not in everybody's eye line.

9   Q     Okay.  But you wouldn't want to reshare a position that

10  you don't agree with, correct?

11  A     No, that's not correct.  Sometimes I will share

12  something that I don't agree with because I think people

13  need to hear that that's being discussed.

14  Q     Okay.  But there would be a purpose behind that reshare

15  then, right?

16  A     Yes.  I would say that I'm intentional, unless my

17  finger slips, about what I choose to reshare.  Yes.

18  Q     Okay.  Now, after your emergency treatment at

19  Brooklyn Hospital on June 4th, you returned to

20  Brooklyn Hospital on June 11th, June 25th, and July 10th,

21  correct?

22  A     I don't have the dates in front of me.  But that sounds

23  possible.

24  Q     And again, on each of these occasions in describing

25  your injuries, you told the officer -- the doctors that you

Pierce - Cross - Hutchinson                650

1   had never lost consciousness; isn't that right?

2   A    I told the nurses and doctors that I had no

3   recollection of losing consciousness.

4   Q    And you also filled out like a handwritten

5   questionnaire, correct, about your own history and your

6   family history, correct?

7   A    I believe so.  Probably.

8   Q    Those are the boxes on the left and the right.  The

9   left was self and the right was family, right?

10  A    I would have to look at that to see.

11  Q    Sure.  It was shown in evidence yesterday?

12  A    Okay.

13  Q    If you recall.

14        And on that form -- and again, its in evidence, we

15  can look at it later.  But you told the doctor that you had

16  a family history of seizures, but you yourself had not

17  experienced seizures, correct?

18  A    Correct.

19  Q    Now, on July 10th, you met with Dr. Jeffrey Davis who

20  is a neurologist, correct?

21  A    I don't know about the date but that's possible.

22  Q    And during that July 10th appointment with Dr. Davis,

23  he ordered an MRI after you reported having headaches,

24  correct?

25  A    Yes, he ordered a test.  I'm sure it was an MRI.

Pierce - Cross - Hutchinson                    651

1   Q    And at that time, he also did a neurological exam,

2   correct?

3   A    I'm not sure what a neurological exam would be at his

4   office.  I think that if he had to send me out for anything

5   it would have been imagining, and then he would have

6   discussed what my experiences were.

7   Q    And as part of his exam, whether we call it a

8   neurological exam or not --

9   A    Uh-huh.

10  Q    -- he assessed your mental status, including your

11  orientation, memory, and language, correct?

12  A    I don't recall that specifically, but that's possible.

13  Q    And he found that they were all normal, correct?

14          MR. MAAZEL:  Objection.

15  A    That, I don't know.

16          THE COURT:  Sustained.

17          Your --

18          MR. HUTCHINSON:  Oh, sure.

19          THE COURT:  -- statement.

20          Go ahead.

21          MR. HUTCHINSON:  Fine, yep.

22  BY MR. HUTCHINSON:

23  Q    Did he inform you of the results of that test?

24  A    I'm sorry, of which test?

25  Q    The neurological testing.

Pierce - Cross - Hutchinson                652

1   A    I don't have any recollection of such a conversation.

2   Q    Okay.

3        All right.  On July 18th, you had an MRI, correct?

4   A    I'm not sure about the date, but I did have an

5   imagining back at the hospital.

6   Q    Is it your understanding that the MRI was like a

7   more-detailed scan than that CT scan that you had on June

8   4th?

9   A    I'm not sure what the difference was, but I know it was

10  different than what had already been done.

11  Q    And are you aware that that MRI, from July 18th, showed

12  no abnormalities?

13  A    What I spoke to the doctor about was that he said a lot

14  of the time with brain things, you can't see what's

15  happening, but it's happening.  And so that was the

16  discussion that we had.  He said he wasn't able to find on

17  the scan what was causing my experiences, but he said it

18  sounded like a postconcussive disorder.

19  Q    Right.  Now, so I'll ask the question again --

20  A    Sure.

21  Q    -- because it may have gotten lost.

22       In that discussion it sounds like the doctor was

23  telling you he couldn't see anything, correct?

24  A    He said that he couldn't see what was causing the

25  issues that I had.

Pierce - Cross - Hutchinson                653

1   Q    Right.  And so did he tell you that the MRI was normal?

2   A    I -- I wouldn't say that he necessarily said that

3   precisely.  He just said that he couldn't see on the result

4   was what causing what I was experiencing.

5   Q    And did you learn that the MRI showed no fractures, no

6   bleeding, no swelling, no issues in the brain whatsoever?

7            MR. MAAZEL:  Objection.  This is really calling

8   for hearsay, Judge.

9            MR. HUTCHINSON:  I didn't ask for hearsay, Judge.

10           THE COURT:  Oh, hold on a second.

11           Overruled.

12           THE WITNESS:  What you are listing, I think, are

13  concerned that I had been able to dismiss after the initial

14  visit to the hospital.  I was no longer concerned that my

15  brain was bleeding.  I was no longer concerned that there

16  were fractures to my skull.

17  BY MR. HUTCHINSON:

18  Q    Okay.  But I guess my question is:  Did you learn that

19  the MRI showed no fractures, no bleeding, no swelling, no

20  issues in the brain whatsoever?

21  A    I don't think that we discussed fractures and bleeding,

22  and we discussed that the MRI could not show everything that

23  was happening in the brain.

24  Q    Okay.

25           Now, just to confirm, that was the second scan

Pierce - Cross - Hutchinson                 654

1   that you had, which was about maybe six weeks or so after

2   June 4th, correct?

3   A    Yes, I had one scan the morning of June 4th, and I had

4   a subsequent one as ordered by a Dr. Davis.

5   Q    Got it.

6            Now, Dr. Davis, you also met with Dr. Davis on

7   August 7th, 2020, correct, about three weeks later?

8   A    Again, I am not going to confirm the dates but that

9   sounds possible.

10  Q    And, again, he did that same set of neurological

11  testing, correct?

12  A    I still don't know what we would mean by "neurological

13  testing."  I think that my meetings with him were -- with

14  him -- if a test was not being done, it was conversations

15  about managing my symptoms.

16  Q    And if a test was being done, it was the same test that

17  he had done on the previous visit in July, correct?

18  A    Well, I don't think a test was being done in July in

19  like the physical test-your-body sense.

20  Q    Got it.

21            So I just want to confirm, it's your testimony

22  that you don't remember him testing your mental status,

23  orientation, memory, language, motor functions, nerve

24  testing, sensory perception, coordination and deep tendon

25  reflexes?

Pierce - Cross - Hutchinson                    655

1   A    No, I don't recall that.  I think that that might have

2   been something that was both a conversation and you know,

3   how doctors kind of tap your knee?  So I -- I'm willing to

4   believe that if knee tapping and conversation is what that

5   exam is, then that did happen.

6   Q    Okay.

7             And again, on December 18, 2020, so that's -- I

8   don't know -- four months later, you went back again to

9   Dr. Davis, correct?

10  A    Again, I can't confirm that date, but it's possible.

11  Q    And at that time, you reported no new symptoms and the

12  exam was again normal, correct?

13  A    I would not say that he ever said that what I was

14  experiencing was normal.  He told me that I was experiencing

15  something that was normal for somebody recovering from a

16  concussion.

17  Q    Except that test of your mental status, orientation,

18  memory, language, nerve testing, motor functions, passive

19  resistance, sensory perception, coordination and deep tendon

20  reflexes were all completely normal, correct?

21  A    No.

22             MR. MAAZEL:  Objection.  Hearsay, Judge.

23             THE COURT:  Overruled.

24             THE WITNESS:  He told me that what I was

25  experiencing was normal for somebody that was recovering

Pierce - Cross - Hutchinson                 656

1   from a concussion.  He told me that it's very normal for

2   somebody recovering from a concussion to have the symptoms

3   that I was having for about nine months to a year following

4   the concussion.

5              MR. HUTCHINSON:  Okay.  One moment, please.

6              (Pause in proceedings.)

7   BY MR. HUTCHINSON:

8   Q    Okay.  I'm not going to go through all these visits

9   that we just discussed.

10  A    Okay.

11  Q    But I do want to just put up on the screen August 7th,

12  because there is a little more detail on that report.

13             MR. HUTCHINSON:  Your Honor, I am publishing from

14  Defense Exhibit L, this is the page marked PL1327 on the

15  bottom right-hand corner.

16             And I would like to publish it for the jury.

17             THE COURT:  Previously admitted?

18             MR. HUTCHINSON:  Yes.

19             THE COURT:  Go ahead.

20             MR. HUTCHINSON:  Yes.

21             (Exhibit published to the jury.)

22  BY MR. HUTCHINSON:

23  Q    Now, again you testified that you met with Dr. Davis in

24  approximately August 7th of 2020, correct?

25  A    Yes.

Pierce - Cross - Hutchinson                 657

1   Q    And it appears, at least in Exhibit L, Dr. Davis

2   reported his notes, correct?

3   A    It seems like these are some notes -- yes.

4   Q    And on the top right-hand corner, under the header

5   "Progress Notes," it says, "Author, Jeffrey Davis M.D.,"

6   correct?

7   A    Yes.

8   Q    Now, I want to direct your attention to the middle of

9   the page on the left-hand side where it says "Mental

10  Status."

11  A    Yes, I see that.

12  Q    Including orientation, memory language is normal,

13  correct?

14  A    Yes, I see that.

15  Q    Okay.  So these -- this was the neurological exam I was

16  referring to earlier that he performed on each of those

17  visits, does -- does that make sense?

18  A    Again, I'm am not sure what we are calling a

19  "neurological exam."  It sounds like these are his notes on

20  my behavior.

21  Q    Pertaining to your brain, correct?

22  A    No, I would say -- it looks like behavioral, behavioral

23  notes about how I was presenting to the world.

24  Q    Okay.  So under mental status, is it correct that

25  Dr. Davis noted cranial nerve testing 2/2/12 is normal.

Pierce - Cross - Hutchinson                    658

1    Motor, five out of five.  Tone NL -- and we can ask a doctor

2    what that means.  Sensory NL in all extremes -- extremities,

3    excuse me.  Coordination normal.  DTR is normal active.

4              MR. MAAZEL:  Objection.

5              THE COURT:  Sustained.

6              Let's have a sidebar.

7              MR. HUTCHINSON:  I'll take it down, Your Honor.

8              THE COURT:  Yes, let's do that.  Let's have a

9    quick sidebar again.

10             (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar Conference                    659

1         (The following occurred at sidebar.)

2         THE COURT:  Two things:  First of all, I want to

3    explain the reason I was overruling the objection about what

4    doctors told Ms. Pierce.  That is because I think it is a

5    fair response to the questions that were asked on direct

6    about her reaction -- emotional reaction and other

7    reactions, psychological reaction, about reports of her

8    reason from Dr. Nadkarni and other people.

9             So I thought it was fair for the defense to elicit

10   that she was told other things by other providers -- of

11   other providers of the different points.  And you can make

12   whatever argument you want about that.

13        MR. HUTCHINSON:  Okay.

14        THE COURT:  But because in my view, it is within

15   the same subject as elicited by plaintiff, and can be used

16   to counter the claim that she was sort of distraught, et

17   cetera.  However, though, you're simply having her --

18        MR. HUTCHINSON:  Well --

19        THE COURT:  Hang on.  No, no, no.  That is so much

20   true.  I did say that to Mr. Maazel yesterday, that reading

21   what is in the record was done by the plaintiff, at

22   plaintiff counsel's request, and I gave you some leeway

23   yesterday on that.

24             But here it feels like you are just -- having read

25   the diagnosis and not asking her which is what Mr. Maazel

Sidebar Conference                    660

1    did, is true at that time you were conscious at the time of

2    the diagnosis?  That is what Mr. Maazel did.

3            MR. HUTCHINSON:  Uh-huh.

4            THE COURT:  I did express concern that it's

5    confirmed in the report those were self-reports.

6            MR. MAAZEL:  Correct.

7            THE COURT:  Here you're having her read it for the

8    truth by the provider as opposed to saying to her, Hey, were

9    you actually feeling okay or whatever it was.

10           If you continue to do that, I'll give you some

11   leeway.  And I want to confirm how that actually was.  But

12   you can't just have her read in all these seemingly helpful

13   facts.

14           MR. HUTCHINSON:  And, Your Honor, I wasn't even

15   going to publish this, but what I was trying to do is

16   resolve the ambiguity of that result on this date.  So

17   that's why I was putting that up on the screen, just to

18   clarify that.

19           I don't need to read the evidence into the

20   evidence.  I'll move on.

21           THE COURT:  I don't think you're clarifying or

22   it's not apparent, unfortunately.  It just appears that you

23   are offering up the doctor's responses.

24           MR. HUTCHINSON:  Okay.

25           THE COURT:  And that's improper.

Sidebar Conference                              661

1          MR. HUTCHINSON:  That's okay.  I'll move on.

2          THE COURT:  Okay.  So the jurors need a restroom

3    break.

4          MR. HUTCHINSON:  Okay.

5          (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Pierce - Cross - Hutchinson                    662

1            (Sidebar ends; in open court.)

2            (In open court.  Jury present.)

3            THE COURT:  Okay.  So, folks, I understand that a

4    nature break might be called for.  So let's take ten

5    minutes.  Be ready to go at ten of noon.

6            Remember, keep and open mind.  Don't talk about

7    the case.

8            All rise.

9            (Jury exits.)

10           THE COURT:  You can step down, Ms. Pierce.

11           You can have ten minutes.

12           Off the record for a second.

13           (Pause in proceedings.)

14           (Recess taken.)

15           THE COURTROOM DEPUTY:  All rise.

16           (Jury enters.)

17           THE COURT:  Please be seated, everyone.

18           Mr. Hutchinson, you may continue.

19           MR. HUTCHINSON:  Thank you, Your Honor.

20   BY MR. HUTCHINSON:

21   Q    So just on the timeline.  It was after you filed a

22   lawsuit against the defendants in this case that your

23   lawyers hired doctors to examine you, correct?

24   A    That, I'm not sure.

25   Q    You filed a lawsuit in 2021, correct?

Pierce - Cross - Hutchinson                    663

1   A    I really wouldn't be able to say.

2   Q    And so when your doctors hired -- when your lawyers

3   hired doctors to examine you, that was right around the

4   summer of 2022, correct?

5   A    I believe that that was the time that I came back for

6   medical examinations.  Yes.

7   Q    So that's a "yes"?

8   A    Yes.

9   Q    Okay.  They hired a neurology, a psychologist and a

10  ophthalmologist, correct?

11  A    Those are the people I saw, yes.

12  Q    Those are the people your lawyers hired to see you,

13  correct?

14  A    I believe so.

15  Q    Okay.

16       And it was after you met with the neurologist,

17  Dr. Nadkarni, that for the very first time you were

18  diagnosed with a permanent brain injury as a result of the

19  June 3rd, 2020, incident, correct?

20  A    Can you repeat that?

21  Q    It was after you met with the neurologist, whose name

22  is Dr. Nadkarni, that, for the very first time, you were

23  diagnosed with a permanent brain injury as a result of the

24  June 3rd, 2020, incident, correct?

25  A    Yes.

Pierce - Cross - Hutchinson                    664

1   Q    Okay.  And that was around July of 2020 -- 2022,

2   correct?

3   A    That was when the testing happened.  It was maybe four

4   months before the analysis that the results was complete.

5   Q    Okay.  But you never told Dr. Nadkarni that you had a

6   history of migraines, correct?

7   A    I -- I believe we would have discussed that if he took

8   the initial examination.

9   Q    And he was making notes on what you talked about,

10  right?

11  A    Yes, I believe so.

12  Q    Okay.

13       And I'm sure you also told Dr. Nadkarni about any

14  of your relevant family history of any kind of brain

15  conditions, correct?

16  A    Yes, we discussed that.

17  Q    So you told him that your father had suffered a stroke,

18  correct?

19  A    Yes.

20  Q    And he also had dementia, correct?

21  A    At that time, I don't know -- my father doesn't have a

22  dementia diagnosis.  This is kind of our familial

23  assessment.

24       At that time, it was not nearly as bad as it is

25  now, so I am not sure whether we discussed that.

Pierce - Cross - Hutchinson                665

1   Q    All right.

2        But you also told him that your uncle had

3   dementia, correct?

4   A    I would have told him that I had an uncle that I had

5   that was already passed away that had dementia.

6   Q    Okay.  But you failed to tell him that your

7   grandmother, on your mother's side, also had dementia,

8   correct?

9   A    I think that I would have discussed anything that was

10  on the family history, but I can't -- I can't tell you the

11  whole content of the conversation.

12  Q    And again, you did testify that he was taking notes,

13  correct?

14  A    I believe that he was.

15  Q    And isn't it true that you did suffer from migraines

16  before you ever met these defendants, to a point that you

17  actually sought medical treatment for them in 2018 and 2019,

18  right?

19  A    I don't have a recollection of that.  I should say I

20  was seeking medical treatment.  I will confirm that I have

21  occasional migraines, but I don't recall seeking medical

22  treatment for occasional migraines.

23  Q    You sought medical treatment for migraines from

24  Dr. Janette Davison at Maiden Lane Medical, correct?

25               (Reporter asks for clarification.)

Pierce - Cross - Hutchinson                    666

1    BY MR. HUTCHINSON:

2    Q    J-A-N-E-T-T-E Davison.  Maiden Lane Medical.

3    A    She's my gynecologist.  So I don't believe that that is

4    correct.

5    Q    Okay.

6          MR. HUTCHINSON:  Your Honor, I'm showing what's

7    marked as Defendants' Exhibit W to counsel.

8          THE COURT:  All right.

9          (Pause in proceedings.)

10          MR. HUTCHINSON:  And I'm going to show it to the

11    witness, Your Honor.

12          THE COURT:  All right.  Just for the witness.

13          You can see that in front of you?

14          THE WITNESS:  Yes, ma'am, I can see this in front

15    of me.

16    BY MR. HUTCHINSON:

17    Q    Now, Mrs. Pierce, isn't it true that you sought medical

18    treatment from Dr. Janette Davison on July 9th, 2018,

19    throughout the rest of 2018 and in 2019?

20    A    Yes.

21    Q    And these records were considered by Dr. Nadkarni in

22    making your diagnosis; is that correct?

23    A    That, I don't know.  But he had access to all of my

24    medical records.

25          MR. HUTCHINSON:  All right.  Your Honor, I offer

Pierce - Cross - Hutchinson                667

1   Defendants' Exhibit W into evidence at this time.

2            MR. MAAZEL:  Can I just see that one again?

3            MR. HUTCHINSON:  Yep.

4            THE COURT:  Let me just say, I'm prepared to allow

5   them in, subject to some confirmation that they were, in

6   fact, sent to and considered by Dr. Nadkarni.  But so far

7   this witness hasn't confirmed that.

8            Is there any agreement that, in fact, this was

9   seen by Dr. Nadkarni, or sent to him at least?

10           MR. MAAZEL:  I have to check, Your Honor.

11           THE COURT:  Okay.  Subject to that, I will let

12  you --

13           MR. HUTCHINSON:  I'm sorry.

14           THE COURT:  Subject to that connection, I'll at

15  least let you admit them and ask the witness about --

16           MR. MAAZEL:  I do object to this, Your Honor.

17           THE COURT:  All right.  Let's have a sidebar.

18           (Continued on the next page.)

19

20

21

22

23

24

25

Sidebar Conference                   668

1              (The following occurred at sidebar.)

2         THE COURT:  Okay.

3         MR. HUTCHINSON:  I think I could have probably

4    done this a little bit cleaner, asking if Dr. Storm

5    considered that, because we've already had testimony that he

6    did -- that's probably what --

7         MR. MAAZEL:  Well --

8         MR. HUTCHINSON:  -- I should say.

9         THE COURT:  So Dr. Storm said he reviewed the

10   records of Dr. Davidson for Ms. Pierce?

11        MR. HUTCHINSON:  Yes.

12        THE COURT:  I don't recall that, but I'll accept

13   your representation that that's correct.

14        MR. MAAZEL:  Dr. Storm did see those records and

15   the question should have been posed to Dr. Storm about --

16        THE COURT:  Well --

17        MR. MAAZEL:  -- what's in -- I'm objecting to it.

18        MR. HUTCHINSON:  So I guess the brain scans are

19   out, too, huh?

20        THE COURT:  Hold on.  Rule 703, that means it

21   would be inadmissible and produced, and if they were relied

22   upon by an expert.  So I actually was going to confirm for

23   you that that's actually in Rule 703.  We talked about it

24   yesterday.

25             The question becomes why should you be able to

Sidebar Conference                    669

1    show these to this witness because they are obviously not --

2              MR. HUTCHINSON:  Right.

3              THE COURT:  Is this a statement you're going to

4    cross her on to impeach her?

5              MR. HUTCHINSON:  Yes.  She just stated she was not

6    treated for migraines by Dr. Davis, and it's on the first

7    two pages.

8              THE COURT:  All right.  But he does get to cross

9    her.

10             MR. MAAZEL:  Well --

11             THE COURT:  But the entire record doesn't come in.

12             MR. HUTCHINSON:  Well, Your Honor, I don't think

13   it is really necessary to lay the foundation through the

14   witness.  What I wanted to do was orient her about what

15   we're talking about, was what I was doing.

16             I'm admitting this because it's part of her own

17   file.  It's plaintiff's expert.  If we look at the expert

18   report concerning plaintiff's exhibit binder, you'll see

19   these are references in every single expert report.

20             So I'm admitting them, you know, but not through

21   this witness.

22             THE COURT:  But you don't get to just admit them

23   without someone testifying about why they're relevant or how

24   the jury should consider them, so --

25             MR. HUTCHINSON:  I'm honestly surprised they had

Sidebar Conference                          670

1    an objection, so...

2              THE COURT:  Please do not cut me off.

3              MR. HUTCHINSON:  I apologize, Your Honor.

4              THE COURT:  Don't, just for the sake of the

5    record.

6              MR. HUTCHINSON:  I understand.

7              THE COURT:  What I wanted to say was that if you

8    have someone who can say, yes, heres's what I thought about

9    it or here's why it's relevant for the jury to consider it,

10   that would be one thing.

11             MR. HUTCHINSON:  Uh-huh.

12             THE COURT:  It's admissible.  But it shouldn't be

13   admitted without some explanation --

14             MR. HUTCHINSON:  Uh-huh.

15             THE COURT:  -- as to what it means --

16             MR. HUTCHINSON:  Uh-huh.

17             THE COURT:  -- and with respect to it.

18             But you can ask about the statement, which

19   contradicts what she just said on the stand on that issue --

20             MR. HUTCHINSON:  Okay.

21             THE COURT:  -- and that she's contradicted --

22             MR. HUTCHINSON:  This is all messy, because now

23   we're going to have multiple exhibits of the same thing.

24             THE COURT:  Why?

25             MR. HUTCHINSON:  Because we're going to admit one

Sidebar Conference                           671

1   page now and then the next when it's just admitted as all

2   one set.  This is kind of similar to that Ozuk video which

3   we knew this was going to come in.

4          MR. MAAZEL:  Well --

5          MR. HUTCHINSON:  So I'm not sure.

6          THE COURT:  -- give it a unique exhibit number and

7   we'll deal with this again.  Let's call it Z.

8          MR. HUTCHINSON:  I'm going to do this when --

9          THE COURT:  With her --

10         MR. HUTCHINSON:  Potentially.  It depends on her

11  answer.

12         MR. MAAZEL:  (Inaudible.)

13         THE COURT:  It's define on her statement.

14         MR. HUTCHINSON:  Sure.  That's fine.  If that's

15  the way that counsel wants to proceed, that's what we'll do.

16         THE COURT:  No, no, it's not the way counsel wants

17  to proceed --

18         MR. HUTCHINSON:  Well, I heard an objection --

19         THE COURT:  Careful about cutting me off.

20         All I'm telling you is you cannot admit the

21  records through the witness, even though, in theory, they

22  could come in even though they are also admissible, because

23  the expert relied on that.

24         But again, if it's something that Storm looked at,

25  then you could have asked Storm, but you didn't.

Sidebar Conference                    672

1           I don't want you just using Rule 703 to get them

2    in if you don't ask the expert about that.

3           MR. HUTCHINSON:  Yeah.

4           THE COURT:  That should be confined to how you get

5    those in and why they're relevant.

6           But you can use them to impeach their statements

7    offered --

8           MR. HUTCHINSON:  And I think we understand.

9           I guess I think what I'm trying to get in is

10   similar to the foundation issue of Officer Ozuk on the body

11   camera.  What we told counsel is we would kind of withdraw

12   or objection, and so that's kind of what I'm asking now --

13          MR. MAAZEL:  I don't know that this will come in

14   through anybody.

15          THE COURT:  Let's not make assumptions.

16          MR. HUTCHINSON:  Okay.

17          THE COURT:  Let's --

18          MR. MAAZEL:  If I could just have a copy of that?

19          MR. HUTCHINSON:  Yeah.

20          MR. MAAZEL:  I just want to follow along.

21          MR. HUTCHINSON:  Can I have it -- yeah, let me see

22   if I have copies --

23          THE COURT:  Do you have copies?

24          MR. HUTCHINSON:  Well, unless we can give an

25   electronic and produce it to you?

Sidebar Conference                     673

1          THE COURT:  No, no, that not how it works.

2          MR. HUTCHINSON:  Okay.

3          THE COURT:  If you want to use it as an exhibit,

4    you have to have two copies.  Trust me.  This is why I said

5    you've got to give them a copy while you're using it.

6          MR. HUTCHINSON:  Right.

7          THE COURT:  And you don't have that.  You --

8    folks, sit down for a second and show them what you want to

9    use.

10          MR. HUTCHINSON:  I'm surprised.

11          MR. MAAZEL:  I'm not.

12          THE COURT:  You can't count on them to have --

13          MR. HUTCHINSON:  Fair enough.

14          So if somebody -- is there someplace I can make a

15    photocopy?

16          THE COURT:  Okay.  We're going to take a little

17    early lunch break, because this is getting a little out of

18    control.

19          We're going to have a --

20          MR. HUTCHINSON:  I have an idea.  I have an

21    electronic copy.  Would you have the --

22          MR. MAAZEL:  Sure.

23          THE COURT:  Email him an electronic copy.

24          MR. HUTCHINSON:  Sure.

25          MR. MAAZEL:  Sure, fine.

Sidebar Conference                              674

1          MR. HUTCHINSON:  All right.

2          (Continued on the next page.)

Proceedings                                    675

1              (Sidebar ends; in open court.)

2              (In open court.  Jury present.)

3              THE COURT:  Sorry, folks.

4              You know, the devil's in the details, as they say.

5              So before you resume your questioning, I'm going

6     to confirm with plaintiff that they got --

7              MR. MAAZEL:  Yeah.

8              THE COURT:  -- a digital version --

9              MR. MAAZEL:  Pulling it up now, Your Honor.

10             THE COURT:  Okay.  Wait until I finish the

11    sentence.

12             -- of the exhibit.

13             (Pause in proceedings.)

14             THE COURT:  And I think, based on the discussion

15    we had before, you have two options:  Either to relabel it a

16    different letter or use that letter, and then you may have

17    to use another letter for a later exhibit.

18             MR. HUTCHINSON:  Sure.

19             THE COURT:  I'll leave that up to you.  But I

20    think right now it's W.

21             MR. HUTCHINSON:  Okay.

22             MR. MAAZEL:  (No verbal response.)

23             THE COURT:  Okay.  Is there a specific page

24    reference now that you're going to direct the witness's

25    attention to?

Pierce - Cross - Hutchinson                676

1           MR. HUTCHINSON:  Yes, Your Honor.  It's going to

2   be the fourth page with 8118 in the top left-hand corner.

3           THE COURT:  Do you know if it has a Bates Number

4   at the bottom?

5           MR. HUTCHINSON:  I don't see one, Your Honor.

6           THE COURT:  Okay.  So give the plaintiff's counsel

7   a moment to get there.

8           MR. HUTCHINSON:  Sure.

9           (Pause in proceedings.)

10          THE COURT:  And go ahead and put it on the screen

11  for the witness.

12          MR. HUTCHINSON:  Yep.

13          THE COURTROOM DEPUTY:  Marked as?

14          MR. HUTCHINSON:  W.

15          THE COURTROOM DEPUTY:  Thank you.

16          THE COURT:  You may need to move it, based on what

17  I'm looking at, because right now, I just see redacted text.

18          MR. HUTCHINSON:  Yeah.  No, that's fair,

19  Your Honor.  I'm going to ask a question about the, just the

20  date right now.

21          May I proceed?

22          THE COURT:  Yes, you may.  Go ahead.

23          MR. HUTCHINSON:  Okay.

24  BY MR. HUTCHINSON:

25  Q    Ms. Pierce, can you see what's on your screen?

Pierce - Cross - Hutchinson                    677

1    A    Yes, I can.

2    Q    And do you see a date on the screen -- or on these --

3    on this page?

4    A    Yes, I do.

5    Q    And what is it?

6    A    August 1st, 2018.

7    Q    Okay.  And on the top right-hand corner, do you see a

8    name?

9    A    It has my name and the name of my gynecologist.

10   Q    Whose name is what?

11   A    Janette Davison.

12         MR. HUTCHINSON:  Okay, Your Honor, I'm offering

13   Defendants' Exhibit W into evidence.

14         THE COURT:  Well, at this point, I'm not sure what

15   W is.

16         Can you maybe -- as we talked about before, the

17   whole document isn't coming in.

18         MR. HUTCHINSON:  Correct.

19         THE COURT:  So right now just certain portions but

20   I don't know what portions you are seeking to admit right

21   now.

22         MR. HUTCHINSON:  Just a single page.

23         THE COURT:  Okay.  And which page is it?

24         MR. HUTCHINSON:  This is the page, which is the

25   fourth page of the document, with 8/1/2018 on the top

Pierce - Cross - Hutchinson                    678

1    left-hand corner.

2            THE COURT:  Okay.

3            And the plaintiff -- plaintiff's counsel can see

4    that, right?

5            MR. MAAZEL:  Yes, Your Honor, and there's actually

6    no impeachment here so I don't think it's admissible.

7            THE COURT:  Can you -- all I'm seeing is redacted

8    text -- okay.  Thank you.

9            (Pause in proceedings.)

10           THE COURT:  All right.

11           MR. MAAZEL:  Or did she seek treatment from a

12   certain doctor?

13           THE COURT:  Hold on.  I don't want you to do that

14   in front of the jury.

15           MR. MAAZEL:  Oh, I'm sorry.

16           THE COURT:  Yeah.

17           Let's have a quick sidebar again.

18           MR. HUTCHINSON:  Sure.

19           THE COURT:  And bring the document with you.

20           MR. HUTCHINSON:  Sure.

21           (Continued on the next page.)

22

23

24

25

Sidebar Conference                       679

1          (The following occurred at sidebar.)

2          MR. MAAZEL:  My objection, Judge, is that she

3    testified that she did sometimes have migraines before.

4          THE COURT:  She did what?

5          MR. MAAZEL:  She did have migraines before.

6          THE COURT:  Right.

7          MR. MAAZEL:  She testified on cross.

8          THE COURT:  Right.

9          MR. MAAZEL:  But then the question Mr. Hutchinson

10   asked, Did you seek treatment for migraines?

11         And she said no.

12         And what about this person she saw?

13         She said a guy, just all that says is she's

14   reporting that she has that migraine, not that she's seeking

15   treatment from a gynecologist.

16         MR. HUTCHINSON:  Well, she can testify to that.

17         THE COURT:  Right.  The problem I have, as well,

18   is it doesn't indicate -- it doesn't appear to me -- and I'm

19   paging through the document -- that she got treatment from

20   the gynecologist.

21         MR. HUTCHINSON:  She does later on, but not on

22   that page.

23         THE COURT:  Okay.  Well, is there another page

24   that says -- okay.

25         MR. HUTCHINSON:  Yep.

Sidebar Conference                              680

1          THE COURT:  Here's for the plaintiff statement.

2          MR. HUTCHINSON:  For --

3          THE COURT:  Migraines.

4          MR. HUTCHINSON:  For pain overall.

5          MR. MAAZEL:  Well --

6          MR. HUTCHINSON:  It's for whole body symptom

7   Cymbalta is for depression.

8          MR. MAAZEL:  -- and whole body.

9          MR. HUTCHINSON:  It is not specific to whole body.

10          THE COURT:  Okay.  I'm just going to allow this

11  in.  She can explain whether she was seeking treatment for

12  it or just reporting all of her current issues, which --

13          MR. HUTCHINSON:  Okay.

14          THE COURT:  -- doctors often ask for.

15          MR. HUTCHINSON:  Okay.

16          THE COURT:  Specifically, whatever answer she

17  gives, it could be construed as treatment.

18          But go ahead.  I'll allow in that page and

19  whatever other page supposedly shows the treatment.

20          Okay?

21          MR. HUTCHINSON:  Yep.

22          And then we'll deal with it.

23          THE COURT:  Okay.

24          (Continued on next page.)

25

Pierce - Cross - Hutchinson                681

1              (Sidebar ends; in open court.)

2              (In open court.  Jury present.)

3              THE COURT:  All right.  So I will admit the one

4    page of Exhibit U --

5              (Defendants' Exhibit U received in evidence.)

6              THE COURT:  Right now it's a one-page exhibit.

7              MR. HUTCHINSON:  Yes.

8              THE COURT:  Go ahead.  You may publish.

9              MR. HUTCHINSON:  Thank you, Your Honor.

10             (Exhibit published to the jury.)

11   BY MR. HUTCHINSON:

12   Q    So, again, can you remind us of the date of treatment,

13   Ms. Pierce?

14   A    It's August 1, 2018.

15   Q    Okay.  And do you recall that you were asked to rate

16   the following pain symptoms on a scale from 1 to 10,

17   migraine headache?

18   A    I don't recall but this seems like a normal

19   questionnaire, yeah.

20   Q    And you answered seven, correct?

21   A    Yes.

22   Q    Okay.

23             You also reported having blurred vision to

24   Dr. Davison on July 9th, 2018, correct?

25   A    I don't recall that, but I've been nearsighted for

Pierce - Cross - Hutchinson                    682

1   quite a long time.

2   Q    Well, not just nearsighted but blurred vision, correct?

3   A    Yes.  When I don't wear my glasses, I have blurred

4   vision.

5   Q    You complained of painful joints, right?

6   A    At this point, yes, I believe so.

7   Q    And since you testified about suicidal ideations on

8   your direct examination, it has to be noted that you were

9   actually experiencing those symptoms way before June of

10  2020, in 2018 and 2019, right?

11  A    Yes.  I was also experiencing that in the wake of a

12  sexual assault that I had experienced.

13  Q    In fact, on March 13th, 2019, you told Dr. Davison that

14  you were experiencing "worsening depressive symptoms with

15  suicidal ideation."

16        Right?

17  A    I don't recall that specifically but that is possible.

18  Q    And Dr. Davison put you on strict precautions regarding

19  suicidal plans, actions or thoughts, right?

20  A    That, I -- I don't know what that would mean.  But I

21  would say that it's possible.

22  Q    And that was part of the reason you were prescribed

23  Cymbalta, correct?

24  A    Correct.

25  Q    Okay.

Pierce - Cross - Hutchinson                683

1           You also saw a therapist, Dr. Carlotta Schuster,

2   in 2019 and 2020, correct?

3   A    Correct -- no, I think we have the years wrong on this.

4   I'm not positive on the years, to be honest.

5   Q    Okay.  But it was before the incident of June 3rd,

6   2020?

7   A    Yes, it was before that.

8   Q    And Dr. Schuster, the therapist, was unable to provide

9   any relief for your migraines, correct?

10  A    I wasn't seeking help from her for the migraines.

11  Q    Is it fair to say that migraines can have a variety of

12  causes?

13  A    I don't know.  I'm not a doctor.

14          MR. HUTCHINSON:  One moment, please, Your Honor.

15          THE COURT:  All right.

16          (Pause in proceedings.)

17  BY MR. HUTCHINSON:

18  Q    I just want to confirm that prior to June of 2020, that

19  you were on a medication called hyoscyamine, correct?

20  A    Yes.

21  Q    And -- and after you went to Brooklyn Hospital on

22  June 11th, 2020, you were also prescribed Flexeril, right,

23  which is a muscle relaxant?

24  A    I -- are you asking about June 4th?

25  Q    June of 2020.  I think it was June 11th is what I am

Pierce - Cross - Hutchinson                684

1   asking you about.

2   A    That sounds --

3   Q    -- at some point?

4   A    -- possible.

5   Q    Flexeril, correct?

6   A    The name doesn't ring a bell, but I do recall a muscle

7   relaxant.

8   Q    Okay.

9        You also had a number of vision issues well before

10  June 3rd of 2020, correct?

11  A    Yes, as I said, I am nearsighted.

12  Q    And you also had a history of what Dr. Storm called

13  optical migraines, correct?

14  A    Yes, I had a couple of those a year.

15  Q    And when you went to Metropolitan Vision Center on

16  April 19th, 2018, you were diagnosed with retinal detachment

17  at that time, correct?

18  A    I believe so.

19  Q    That's when your retina pulls away from its normal

20  position, right?

21  A    That's --

22  Q    Detaches?  I'm sorry.

23  A    I don't know the medical stuff but from what was

24  described, it is gross.

25  Q    And that is a serious eye condition, correct?

Pierce - Cross - Hutchinson                    685

1  A    No, my understanding is that it's a common side effect

2  of being nearsighted.  They described it to me like stretch

3  marks.

4  Q    Got it.

5        Did you know that retinal detachment can also

6  cause blurry vision?

7        MR. MAAZEL:  Objection.

8        THE COURT:  Sustained.  Sustained.  She is not a

9  doctor.

10  BY MR. HUTCHINSON:

11  Q    Now, Dr. Nadkarni also diagnosed you with depression

12  and postraumatic stress disorder as a result of June 3rd,

13  2020, incident, correct?

14  A    I'm not sure about those diagnoses.

15  Q    Those diagnoses, depression and PTSD, are also

16  significant issues that have affected you in your adult life

17  before June 3rd, 2020, correct?

18  A    Yes.

19  Q    You also had a serious snowboarding accident when you

20  were younger, correct?

21  A    When I was 14, I fell off of my snowboard.

22  Q    And you sustained some pretty serious injuries as a

23  result of that accident, correct?

24  A    I am not sure of what would qualify as pretty serious.

25  I wore, you know, those kind of -- one of those neck braces;

Pierce - Cross - Hutchinson                    686

1  I was wearing one of those for about, I would say, maybe

2  four to five days after falling.

3  Q    So you never -- you never learned that you actually

4  sustained a chipped vertebrae as a result of that accident?

5  A    What I heard was that there was like a hairline in one

6  of my -- one of my vertebrae, but I don't know that it broke

7  away.  I think it was like -- oh, you know, when you get --

8  you know, for when you have -- when somebody has a weak

9  spot.

10 Q    And that was on you left side, correct?

11 A    I guess, my vertebrae, that's the spinal column at the

12 center of my body.

13 Q    And that resulted with issues with your left shoulder,

14 correct?

15 A    My left shoulder is higher than my right, but I would

16 say that that's muscular.

17 Q    So is it your testimony that the snowboarding accident

18 left you with no issues to your left shoulder?

19 A    I would say that I have issues to my left shoulder.  I

20 don't know that I can pinpoint what they're from.  But I've

21 not alleged that they're from any of the police violence I

22 endured.

23 Q    So after that diagnosis from Dr. Nadkarni, the

24 neurologist, in July of 2022, you traveled to Venice, Italy

25 and then to Corona, Italy, correct?

Pierce - Cross - Hutchinson                687

1   A    Are you asking if I traveled to those places directly

2   after seeing him or have I been to them?

3   Q    After seeing him.

4   A    Well, I don't know, but I can tell you that I've been

5   to them.

6   Q    And then you went from Florence back to Mirecourt,

7   France, correct?

8   A    That sounds likely.

9   Q    That was on November 9th, 2022?

10  A    That sounds like it's probably the same visit that we

11  were discussing where I visited my friend Cara.

12  Q    So yes, correct?

13  A    I think so but I really can't confirm those dates.

14  Q    Okay.

15       And then in early 2023 you travelled to Berlin,

16  Germany, and then in October to the Netherlands, correct?

17  A    If the Netherlands were Amsterdam, I think, yes.

18  Q    I believe so, yes?

19  A    I think the answer is yes.

20  Q    Okay.

21       And then from there you went to Cologne, Germany

22  and then Switzerland, correct?

23  A    Yes.

24  Q    And then back to Brooklyn in December of 2023, and then

25  back to Corono, Italy in March of 2024, correct?

Pierce - Cross - Hutchinson                    688

1   A    Yes, all of these sound correct.

2   Q    And back to France, where you moved to Paris in the

3   summer of 2024, correct?

4   A    Yes, that sounds correct.

5   Q    And was -- and did you receive any follow-up treatment

6   for your injuries in any of those places after your

7   diagnosis from Dr. Nadkarni in 2022?

8   A    Are you asking if I received --

9         I'm sorry.  Can you -- can you rephrase the

10  question a little more concisely, please?

11  Q    Sure.  I'll try.

12        In any of those places that you just mentioned,

13  did you receive any follow-up treatment for your injuries

14  after your diagnosis from Dr. Nadkarni?

15  A    I sought neurological treatment, so I guess that would

16  be considered follow-up.

17  Q    And when was that?

18  A    I'm going to say in the period between 2022 and the

19  summer of 2024.  It was within the period that I still lived

20  in Mirecourt.

21  Q    And what treatment did you receive?

22  A    I saw a neuropsychologist and he gave me a medication

23  that he thought was going to mitigate some of the symptoms

24  and some of the kind of loss of mental functions that I was

25  experiencing.

Pierce - Cross - Hutchinson                    689

1   Q    And what was his name?

2   A    I want to say it's Sebastian-something.

3   Q    And how many times did you see Dr. Sebastian, whatever

4   his name is?

5   A    I saw him the first time, and then the second

6   appointment that I had with him I had already moved to Paris

7   and then I started seeing a neurologist in Paris.

8   Q    And what was that neurologist's name?

9   A    Which one?

10  Q    In Paris.

11  A    Oh, I'm still on the waitlist.  I have appointments in

12  February and March with two different neurologists.

13  Q    Got it.

14       And do you plan on getting a second opinion from

15  those neurologists?

16  A    I think that that will be part of their plan.  The

17  doctor that I was seeing near Mirecourt had wanted to update

18  all of the -- all of the visuals on the brain to see how it

19  was progressing.

20       And so I would imagine that the doctor that I see

21  this coming year will probably ask for similar updates.

22  Q    Got it.

23       And do you plan on having any kind of brain scan

24  to confirm Dr. Nadkarni's findings?

25  A    That would be something that would be up to the

Pierce - Cross - Hutchinson                690

1    neurologist to determine what they need.

2    Q    Right.  Because that brain scan from Dr. Nadkarni was

3    the only evidence of a permanent brain injury that you've

4    received thus far, correct?

5              MR. MAAZEL:  Objection.

6              THE COURT:  Hold on one second.

7              And the question -- I'm sorry, can you repeat that

8    question?

9              MR. HUTCHINSON:  Because the brain scan ordered by

10   Dr. Nadkarni is the only evidence that you have thus far of

11   a permanent brain injury, correct?

12             THE COURT:  Sustained.

13   BY MR. HUTCHINSON:

14   Q    Okay.  Now, on direct, you testified that this incident

15   has affected you in a variety of ways, right?

16   A    Yes.

17   Q    Including the fact that you're no longer able to do the

18   circus arts that you previously practiced, correct?

19   A    Yeah.  I'm not able to do it in the way that I was.  I

20   have tried to return to it.  But it's -- my body is

21   different.

22             MR. HUTCHINSON:  One moment, please, Your Honor.

23   I'm almost done.

24             THE COURT:  That's fine.

25             (Pause in proceedings.)

Pierce - Cross - Hutchinson                    691

1          MR. HUTCHINSON:  Your Honor, I'm showing counsel

2    what's marked as Defense X, Y and Z for identification.

3          THE COURT:  All right.  And A2.

4          MR. HUTCHINSON:  And A2.

5               (Reporter asks for clarification.)

6          MR. HUTCHINSON:  Two As in a row.  Double A and

7    the number 2.

8               (Pause in proceedings.)

9          THE COURT:  Double A, I think.

10          MR. HUTCHINSON:  Double A.

11          THE COURT:  Good clarification.

12          MR. HUTCHINSON:  Okay.  Your Honor, I'm showing

13    the witness, with the Court's permission, Defense X for

14    identification.

15          THE COURT:  All right.

16    BY MR. HUTCHINSON:

17    Q    Ms. Pierce, do you recognize this?

18    A    I'm not sure whether I've seen it, but I can see what

19    it is.

20    Q    And what is it?

21    A    It is an *Instagram* post from my wields aerial coach.

22    Q    And are you depicted in this post?

23    A    Yes, I think that's me.

24          MR. MAAZEL:  Can we just below that up a little

25    more?

Pierce - Cross - Hutchinson                    692

1           MR. HUTCHINSON:  Which part, the top?

2           MR. MAAZEL:  Just the photo.

3           THE WITNESS:  Yes, that's me, thank you.

4           MR. HUTCHINSON:  Okay.

5           Your Honor, I'm offering Defense Exhibit X into

6   evidence.

7           THE COURT:  Okay.  Without the text, however.  So

8   --

9           MR. HUTCHINSON:  Sure.  I'll cover it.

10          THE COURT:  The images.

11          Objection?  Any objection?

12          MR. MAAZEL:  I have no objection to any of these

13  four exhibits coming in, or the text.

14          THE COURT:  All right.  So in that case, they'll

15  come in just as they are.

16          MR. HUTCHINSON:  All right.  Can I publish X

17  please, Your Honor?

18          THE COURT:  You may.

19          (Defendants' Exhibit X received in evidence.)

20          (Exhibit published to the jury.)

21  BY MR. HUTCHINSON:

22  Q    All right.  And can you read if there's a date on this

23  post?

24  A    Yes, there is.

25  Q    And what is it?

Pierce - Cross - Hutchinson                    693

1  A    It's August -- I think that's 5th or 6th, 2021.

2  Q    And so this is August -- you said 5th or 6th, 2021?

3  A    Yes.

4  Q    And do you recall the events that are depicted in the

5  photograph?

6  A    No, I don't.

7  Q    Okay.

8          THE COURT:  Do you want to establish whether she

9  knows if those pictures are from August of 2021?

10         MR. HUTCHINSON:  Sounds like she doesn't remember,

11  Your Honor.  That's fine.

12         THE WITNESS:  Well, I moved to France on

13  August 4th of 2021.

14  BY MR. HUTCHINSON:

15  Q    So it's clearly not from the 5th, correct?

16  A    Correct.

17  Q    Do you recall if these are from 2021?

18  A    No.  This was an aerial space that was closed and to my

19  recollection, they reopened the garden space after COVID;

20  but I don't know if they ever opened their indoor space and

21  now they are closed entirely, I believe.

22  BY MR. HUTCHINSON:

23  Q    Okay.  So is it your testimony that these photographs

24  are not from 2021?

25  A    Exactly, yes.

Pierce - Cross - Hutchinson                    694

1   Q     Okay.

2             MR. HUTCHINSON:  I'm show the witness Defense

3   Exhibit Y.

4             (Defendants' Exhibit Y received in evidence.)

5             (Exhibit published to the jury.)

6   BY MR. HUTCHINSON:

7   Q     Ms. Pierce, can you see this image on your screen?

8   A     Yes, I can.

9   Q     Do you recognize who is depicted?

10  A     That's me.

11  Q     And -- and is this your *Instagram* account or somebody

12  else's?

13  A     This is my aerial purchased *Instagram* account.

14            THE COURT:  So these are admitted.  You can go

15  ahead and publish them -- did you want to?  Because there

16  was no objection to --

17            MR. HUTCHINSON:  I offered X.  I'm now offering Y

18  into evidence.

19            THE COURT:  Well, Mr. Maazel had said he had no

20  objection --

21            MR. HUTCHINSON:  Okay.

22            THE COURT:  -- to the four exhibits.

23            MR. HUTCHINSON:  Oh.

24            THE COURT:  -- X through AA.

25            MR. HUTCHINSON:  Got it.

Pierce - Cross - Hutchinson                    695

1          MR. MAAZEL:  No objection.

2          THE COURT:  So those are all in.  You can publish.

3          MR. HUTCHINSON:  All right.  Thank you.

4          (Defendants' Exhibits X, Y, Z, and AA received in

5     evidence.)

6     BY MR. HUTCHINSON:

7     Q    All right.  Now, Ms. Pierce, is this postdated?

8     A    I don't know for sure, but I think that the date could

9     be correct.

10    Q    Meaning, what?

11    A    I -- I think it's possible that I was in town at that

12    time and this is -- remember when I said there was a

13    backyard space at the studio, this --

14    Q    And so --

15    A    -- it looks like that space.

16         MR. HUTCHINSON:  I'm sorry to cut you off.

17         THE WITNESS:  No, that's fine.

18    BY MR. HUTCHINSON:

19    Q    And so are you referring to the date June 9, 2022, on

20    the bottom left-hand corner?

21    A    That is what I am referring to.

22    Q    That is approximately accurate to this photograph,

23    correct?

24    A    I'm not positive but I believe I was in town in the

25    summer of 2022, and I believe that this outdoor space was

Pierce - Cross - Hutchinson                    696

1   opened.  I can also tell you from my form, that it was not a

2   time when I was actively practicing aerial, so it seems

3   correct to me.

4   Q    Okay.

5          MR. HUTCHINSON:  Publishing Defense Exhibit Z,

6   Your Honor.

7          THE COURT:  All right.

8   BY MR. HUTCHINSON:

9   Q    Ms. Pierce, do you recognize who is depicted in this

10  photograph?

11  A    Yes, that is a photograph of me.

12  Q    And this is actually your account, correct?

13  A    Yes, it is.

14  Q    Okay.

15          And the date is October 9th, 2024, correct?

16  A    Yes, it is.

17  Q    And were you living in France at the time?

18  A    Yes, I was.

19  Q    And so is this photograph from Les Noctambules in

20  France?

21          MR. HUTCHINSON:  Forgive my pronunciation again.

22          THE WITNESS:  Yes, I believe, I believe that it

23  is.

24          THE COURT:  Does someone want to spell that for

25  the court reporter?

Pierce - Cross - Hutchinson                    697

1          THE WITNESS:  L-E-S, space, N-O-C-T-A-M-B-U-L-E-S.

2   I think that's technically the name of a professional circus

3   group there.  They also give classes.

4   BY MR. HUTCHINSON:

5   Q    Got it.

6          Now, is October 9th, 2024, approximately accurate

7   from when these events were?

8   A    Yes, this was probably something that I shared within a

9   couple of days.

10          MR. HUTCHINSON:  And, finally, Defense Exhibit AA.

11   This one is kind of large, so I'll try to zoom out.

12   BY MR. HUTCHINSON:

13   Q    Do you recognize this photograph?

14   A    Yes.  This is the same space that you see in the other

15   photograph.

16   Q    And this is also posted from your account, correct?

17   A    I believe so -- I can't tell but it looks like I would

18   have taken this photo.

19   Q    And there's a caption on the bottom, correct?

20   A    Yes.

21   Q    And that's written by yourself?

22   A    Yes.

23   Q    Okay.  Now what's depicted in this photograph?

24   A    This is the space where that circus company, Les

25   Noctambules, does their classes.

Pierce - Redirect - Maazel                 698

```
 1   Q    Okay.  Now, when you do aerial silks, as we saw on

 2   these photographs, you don't wear a helmet, correct?

 3   A    No.

 4   Q    No harness, correct?

 5   A    There are some types of aerial where a harness is

 6   involved but I have tried that many years ago, and I don't

 7   participate in that kind and did not at the time of this

 8   incident.

 9   Q    So that's a "no," no harness?

10   A    Yes.  For more than a decade, let's say.

11            MR. HUTCHINSON:  One moment please, Your Honor.

12            (Pause in proceedings.)

13            MR. HUTCHINSON:  No further questions.

14            Thank you, Your Honor.

15            THE COURT:  Thank you.

16            Redirect?

17            MR. MAAZEL:  Thanks, Judge.  I won't be long.

18            THE COURT:  All right.

19            (Pause in proceedings.)

20   REDIRECT EXAMINATION

21   BY MR. MAAZEL:

22   Q    Good afternoon.

23   A    Good afternoon.

24   Q    Okay.  So you were asked about a museum that you worked

25   in.
```

Pierce - Redirect - Maazel                    699

1           How long did you work in that museum?

2    A    I would say about nine months.  It was from October of

3    my final year at the vocational school until I left after

4    graduation.

5    Q    And what were you paid there?

6    A    I was paid minimum wage, which is 11.88 per hour.

7    Q    You mentioned you had a brief stint working at some

8    sort of shop with instruments.

9           How long were you there?

10   A    I was there about nine months, I was there from August

11   until April.

12   Q    How much were you paid there?

13   A    The minimum wage, 11.88 per hour.

14   Q    You were asked about a text, something about "prepping

15   to be wild" before June 3rd.

16   A    Yes.

17   Q    Do you remember that?

18   A    Yes.

19   Q    What is "wild" for you?

20   A    Well, I really don't have a party, usually that means

21   feral cats, honestly, or being silly.  And we saw some

22   photos of me at the aerial studio.  You can see I just have

23   a, kind of, child-like personality sometimes.

24   Q    There seemed to be some suggestion on cross that you

25   were hoping to be arrested, June 3rd.

Pierce - Redirect - Maazel                700

1            Were you hoping to be arrested?

2    A    No.  Not at all.

3    Q    What were you planning to do again?

4    A    I was planning to return home, I had a foster kitten

5    that needed to be fed and socialized.  And then I had things

6    to do with my niece and nephew.

7    Q    And when those officers approached, that ultimately led

8    to the counter with Officer Ryder and others, where were you

9    going?

10   A    I was heading home.

11   Q    And it was the officers who approached you from the

12   north at -- following the protesters, right?

13   A    Yes.  We were walking away and -- initially when they

14   began their -- we had our backs to them.

15   Q    When you were on your stomach, you testified on direct

16   about this -- but when you were on your stomach and all

17   those officers were on top of you, could you hear what they

18   were saying?

19   A    No.

20   Q    And that's because?

21   A    Well, I don't know how much they were saying.  But I

22   know that I had one ear pinned to the concrete and one ear

23   below what I believe was somebody's knee.

24   Q    And was this also about the time that your head was

25   being slammed into the ground?

Pierce - Redirect - Maazel                701

1    A    Yes.

2    Q    You were asked about when you were in that jail that

3    night --

4              MR. MAAZEL:  Thank you.

5    BY MR. MAAZEL:

6    Q    -- and you were doing things like lifting your legs and

7    what you called prison pushups and ballet and aerial

8    conditioning.

9              Were you cuffed at this time?

10   A    Yes, I was.

11   Q    And so just tell the jury again, why were you trying to

12   keep moving?

13   A    I was afraid of falling asleep, and I had very little

14   circulation in my arms.

15   Q    So what were you doing with your body to try to not

16   fall asleep?

17   A    I was trying to keep it in motion, I was kind of doing,

18   I guess you would say like sit-downs where I would put my

19   hand on the bench and kind of sink below it, which would

20   pull my arms away from my body and get some blood flowing.

21             And then I was doing kind of toe points and leg

22   lifts to get some blood flowing in my legs.

23   Q    And what were you afraid would happen if you fell

24   asleep?

25   A    I was under the belief that if you have a concussion

Pierce - Redirect - Maazel                    702

1   and you fall asleep, you can die.

2   Q    All right.

3        You were asked on cross about whether you wrote

4   someone about considered suing the day after the incident,

5   right?

6   A    Yes, they asked that.

7   Q    And so how did you first hear about the topic of suing

8   the police for this incident?  How did that first come up?

9   A    When I was at the hospital, the nurses suggested that I

10  should sue.

11            MR. HUTCHINSON:  Objection.

12            MR. MAAZEL:  He opened the door, Judge.

13            THE COURT:  Overruled.

14  BY MR. MAAZEL:

15  Q    And the nurses suggest that you should sue after

16  evaluating you and looking at your injuries?

17  A    Yes.

18            MR. HUTCHINSON:  Objection.

19            THE COURT:  Sustained on that question.

20        The first question was really, why did you

21  consider that?  And that was appropriate.

22        Go on.

23  BY MR. MAAZEL:

24  Q    Okay.  You were asked some questions about Dr. Davis.

25  You testified on cross that -- that he said you had a

Pierce - Redirect - Maazel                703

1   postconcussive syndrome.  Was that your testimony?

2   A    Yeah, something like that.

3            MR. MAAZEL:  If we could just, again, show Exhibit

4   L, Defense Exhibit L, PL1338.

5            THE COURT:  Previously admitted.

6            Go ahead.  You can...

7            (Exhibit published to the jury.)

8            MS. DE LA CRUZ:  Ms. Abdallah?

9            THE COURTROOM DEPUTY:  One moment.

10           (Pause in proceedings.)

11  BY MR. MAAZEL:

12  Q    Well, while we look for that, let me just -- if we

13  could use the Elmo, Defense Exhibit O, which you were asked

14  about.

15           Do you remember you were asked some questions -- a

16  number of questions about this article?

17  A    Yes.

18           MR. MAAZEL:  And if we could -- I'm going to blow

19  this thing up.

20  BY MR. MAAZEL:

21  Q    Do you see the section where it says, "At 41 she was

22  twice as old as some of her old -- at 21 she was twice as

23  old as some of her fellow students"?

24  A    Yes.

25  Q    Is that true?

Pierce - Redirect - Maazel          704

1    A    That is true.

2    Q    And do you see towards the bottom, where it says, "One

3    has to realize" -- I'm sorry, we're going to get to that.

4         Where it says, "Stress levels at work.  Lutherie

5    levels are low."

6    A    Can you put your finger where you're...

7    Q    I'm sorry.

8         "Where it says studies about stress levels at

9    work.  Lutherie levels are low."

10        (Reporter asks for clarification.)

11        THE COURT:  Wait.  Wait.  Repeat that, Mr. Maazel,

12   what you said.

13        MR. MAAZEL:  Okay.  I guess it's a bit lower.  I

14   see.

15        THE COURT:  You need to stay closer to the

16   microphone and keep your voice up.

17   BY MR. MAAZEL:

18   Q    You were quoted as saying that the stress levels of

19   being a luthier are low, right?

20   A    Yes.

21   Q    Is that true?

22   A    Yes, that's very true.

23   Q    And was that one of the reasons you sought that sort of

24   work, after you were fired by New Music?

25   A    Yes, I was looking for something that continued to

Pierce - Redirect - Maazel                    705

1    serve on-stage artists that didn't put me in front of a

2    screen and that allowed me to be in kind of a calm

3    environment.

4    Q    All right.  You were asked about this quote, "Having

5    worked in a more lucrative field, I noticed it was not

6    fulfilling and that I would not leave any legacy.  One has

7    to realize that money does not all always bring happiness."

8              Do you see that quote?

9    A    Yes, I see that at the bottom.

10   Q    And my question for you is, is there a reason you

11   didn't tell this French reporter that you had a performance

12   approvement plan and you were fired, and you had a brain

13   injury and that's why you moved to France?

14             Is there a reason why you didn't give this whole

15   story to this French reporter?

16             MR. HUTCHINSON:  Objection.

17             THE COURT:  Sustained.  Leading.

18   BY MR. MAAZEL:

19   Q    Why didn't you tell this reporter about, you know, what

20   had happened to you?

21   A    There's a couple of reasons.  Number 1, this is very

22   personal and sometimes when I tell people what happened to

23   me, they don't treat me right because they assume that if I

24   was assaulted by the police I deserved it.

25             The other reason is that this is one of the series

Pierce - Redirect - Maazel                706

1   of moments when my school asked a journalist to interview

2   me, and these interviews were primarily to showcase the

3   school.  So they weren't trotting out an American to show

4   that the school has international appeal, but the school of

5   thought --

6               MR. HUTCHINSON:  Objection.

7               THE COURT:  Overruled.

8               Go ahead.

9               THE WITNESS:  This was not an article about my

10  biography.  This was an article in the context of this

11  vocational public program.

12  BY MR. MAAZEL:

13  Q    Okay.  You were shown a handful of photos you've taken

14  in the last five and a half years, right?

15  A    Yes, I was.

16  Q    And --

17  A    Some of them are not in the last five and a half years,

18  as well.

19  Q    Okay.  Well, you were shown a handful of photos that

20  were taken since the incident, right?

21  A    Not all of them were taken since the incident.

22  Q    Oh, some of the photos Defense Counsel showed you were

23  from before the incident?

24  A    Yes.

25  Q    I see.  So maybe you were shown a couple photos that

Pierce - Redirect - Maazel                707

1   postdate the incident?

2          And can you just tell us again how and why the

3   police incident has affected your photography?

4   A     Yeah.  So I still -- I would still say I am a good

5   photographer.  I know how to use a camera.  I know what lens

6   to pull up.  I know what settings to use on a camera.  But

7   photography is not just pressing a button.  Photography is

8   also processing the photos.  It's also being able to be in

9   the lighting situation of the photos.

10         So a lot of the photography that I did was -- in

11  photography, a lot of it was musicians and dancers, and that

12  means I would be taking photos in a dark theater with

13  changing light situations.  That's very difficult for me,

14  the lighting in a theater now.

15         So the process of taking the style of photos that

16  I was taking professionally, that is not something that is

17  easy for my migraines.  So that's on the button machine part

18  of it.

19         And then after that, the bigger part of

20  photography is the time you spend processing the photos.  So

21  it takes half a second to click the photo, and then I would

22  usually spend about one to two hours per photo of editing

23  the photo, using Photoshop at my computer.  And to do that,

24  you have to have accurate colors.  And one of the things

25  that I have done to mitigate my migraines is I've dropped

Pierce - Redirect - Maazel                    708

1    the light level on any screen and I have an orange filter on

2    it.

3              So I'm looking at the screen that doesn't depict

4    accurate colors.  It doesn't depict accurate brightness.

5    And so I click on edit photos on my screen to depict on

6    other screens, and then I can't be in that screen for the

7    amount of time it takes me to edit a photo.

8    Q    Okay.  You were also shown three or four photos of you,

9    at least attempting or doing some aerial, right?

10   A    Yes.

11   Q    And you testified on direct, and now cross, that you

12   tried to do aerial a few times.

13             Can you take us through --

14             MR. MAAZEL:  Well, first of all, Defense Y --

15   BY MR. MAAZEL:

16   Q    And who is SassyPants?

17   A    That's the account of Laura Witwer, who is an aerial

18   instructor in New York.

19   Q    And she wrote --

20             THE COURT:  Spell her last name.

21             THE WITNESS:  W-I-T-W-E-R.  I believe there's one

22   T.

23   BY MR. MAAZEL:

24   Q    And she wrote, "I will miss this gorgeous bundle of

25   neon sass every single day she is away."

1    A    Yes.

2    Q    And so my question for you is, are you away from that

3    class?

4    A    Yes.

5            THE COURT:  For the court reporter, that was neon

6    sass.

7            MR. MAAZEL:  You had done aerial how many

8    times before -- you know, a week before this happened?

9    A    It was four times a week or five to six if I had a show

10   coming up.

11   Q    And if not, how many times since June 3rd, 2020?

12   A    I would say three to four.

13   Q    Okay.  And what about this one, which I think is

14   Defense Z, October 7, 2024?

15   A    Yeah, that's actually the last time I tried it.

16   Q    The last time you ever tried aerial?

17   A    Yes.

18   Q    Why?

19   A    Because I don't trust my body.  I don't want to get up

20   in the air and line myself up for a drop.  And the way --

21   the way these drops work, you do kind of like eight

22   different wraps in a row and the first wrap or the third

23   wrap, or something, in that sequence is what catches you.

24   And if I miss a step, you drop to the ground.  So it's

25   something that requires you to be very present in your mind.

Pierce - Redirect - Maazel                710

 1          And then I also don't want to have a moment when
 2   my wrists touch the fabric and I let go and it's kind of a
 3   recoil.
 4          And so I just felt like I was unsafe.  I kind of
 5   tried to wrap myself up or something, and I ended up walking
 6   myself down, which is a really awkward, ugly process because
 7   you are trying to unwrap something that was just meant to
 8   break.  So I walked myself down and I didn't come back to
 9   class.
10          I still have a class card and I still have six of
11   those classes left on the card.
12          MR. MAAZEL:  Okay.  I would like to show, for
13   identification, please, Exhibit 70A.  And we should...
14          (Pause in proceedings.)
15          THE COURT:  You have a copy, right,
16   Mr. Hutchinson?
17          MR. HUTCHINSON:  No.
18          THE COURT:  Okay.  No?
19          MR. HUTCHINSON:  No, but I can see it on the
20   screen.
21          THE COURT:  Okay.
22          THE COURTROOM DEPUTY:  And that's 70A?
23          MR. MAAZEL:  Yes.  Thank you.
24   BY MR. MAAZEL:
25   Q    And do you recognize the person and the date there?

Pierce - Redirect - Maazel                    711

1    A    Yes.

2    Q    And what's the -- who's the person what's the date?

3    A    The person is me and the date a October 21, 2019.

4    Q    Okay.  Okay.  I -- and is that fair and accurate

5    depiction of you doing some aerial before the police

6    incident?

7    A    It's a really unfortunate screen capture, but yes.

8    Q    Okay.  And then, if we can show you 70B, an associated

9    video.

10        Is that again you -- depiction of you doing aerial

11   before the police incident in 2019 (sic)?

12             MR. SELVER:  Your Honor.

13             MR. HUTCHINSON:  There should be volume.

14             THE COURT:  You'll have to mute it.

15   BY MR. MAAZEL:

16   Q    Is that screenshot capturing the beginning of the video

17   that we're showing you here?

18   A    Yes.

19             MR. MAAZEL:  Okay.  I move these into evidence,

20   Your Honor, 70A and B.

21             MR. HUTCHINSON:  We object.

22             THE COURT:  Well, let's -- no, overruled.  Sorry.

23   We don't need a sidebar.  We've had a discussion about this.

24   Overruled.  You can admit those.

25             Those two are admitted and you can publish.

Pierce - Redirect - Maazel                    712

1           (Plaintiff's Exhibit 70A and 70B received in

2    evidence.)

3    BY MR. MAAZEL:

4    Q    Is this from 2019?

5    A    Yes.

6           MR. MAAZEL:  And if we can show 70B?

7           THE COURT:  Can I -- one thing, though, actually.

8    Turn it off for one second.  What about the text however?

9    Is -- all right.

10          So the text should be redacted, similar to the

11   approach we used for the defense exhibits.

12          Can you somehow blow it up so that you don't show

13   the text?

14          And I don't know what the audio is on the video.

15   I don't think you should have any audio either, but...

16          MR. MAAZEL:  We can do it without audio.

17          THE COURT:  Yeah, okay.  I mean, to the extent

18   that someone says something that's inadmissible.

19          MR. MAAZEL:  And if we could publish 70B without

20   audio.

21          (Exhibit published to the jury.)

22   BY MR. MAAZEL:

23   Q    Is that you doing aerial?

24   A    Yes, it is.

25          (Video plays.)

Pierce - Redirect - Maazel                    713

1  BY MR. MAAZEL:

2  Q    And are you able to do any of that anymore?

3  A    No.

4         MR. MAAZEL:  All right.  I have one more.  It's a

5  short video.  If we could show you Exhibit 71A, which is

6  just a screenshot, just for identification.  Without...

7  A    That's me.

8  Q    And 71B is the associated video.

9         THE COURT:  Without audio.

10         (Video plays.)

11  BY MR. MAAZEL:

12  Q    Is that you as well?

13  A    Yes, it is.

14  Q    All right.  And the screenshot, this is from when?

15  A    We have to go back to it.

16  Q    Okay.

17  A    December 15th, 2019.

18         MR. MAAZEL:  I move 71A and B --

19             (Reporter asks for clarification.)

20         THE WITNESS:  December 15, 2019.

21         MR. MAAZEL:  I move 71A and B into evidence,

22  Your Honor.

23         THE COURT:  Do you --

24         MR. HUTCHINSON:  This is --

25         THE COURT:  Go ahead.

Pierce - Redirect - Maazel                714

1          MR. HUTCHINSON:  Oh, 71A and B.  Objection.

2          And I would like a sidebar at this point.

3          THE COURT:  Overruled.  No sidebar.

4          Let's keep going.

5          THE COURTROOM DEPUTY:  Judge, are they admitted?

6          THE COURT:  Yes.

7          MR. MAAZEL:  And I'm almost done, Judge.

8          THE COURT:  Yeah.

9          THE COURTROOM DEPUTY:  I'm sorry, Judge, publish?

10         THE COURT:  Yeah, publish.  I am so sorry.

11         Admitted and you can publish.

12         (Exhibit published to the jury.)

13    BY MR. MAAZEL:

14    Q    You doing aerial --

15         THE COURTROOM DEPUTY:  I'm sorry, Counsel, which

16    one are we publishing to the jury right now?

17         MR. MAAZEL:  It is Exhibit 71A.

18    BY MR. MAAZEL:

19    Q    You doing aerial in 2019?

20    A    Yes, it is.

21         MR. MAAZEL:  And if we can just play 71B the video

22    without the audio.

23         THE COURT:  I'm going to sustain the objection,

24    though.  You just testified about the date.

25         The question is:  "Do you know when those were

Pierce - Redirect - Maazel                    715

1    made?"

2            Maybe she testified to that.

3            MR. MAAZEL:  I think she did.

4            THE COURT:  Oh, I apologize.

5            Okay, go ahead.

6            THE WITNESS:  Yes.

7            THE COURT:  Oh.  That's right.  Okay.  Never mind.

8    Sorry.

9            THE COURTROOM DEPUTY:  And now showing the jury

10   exhibit?

11           MR. MAAZEL:  71B.

12           THE COURTROOM DEPUTY:  Thank you.

13   BY MR. MAAZEL:

14   Q    Brigid, does that woman exist anymore?

15   A    No, in fact, what you just saw me do --

16           MR. HUTCHINSON:  Objection.

17           THE COURT:  Overruled.

18           Go ahead.

19           THE WITNESS:  -- could be dangerous with my wrist

20   because you hit it around the silk and it would touch the

21   part of my wrist where I'm afraid that -- if it gives a

22   shooting pain, it would force me to let go.

23           MR. MAAZEL:  I just want to show one more exhibit

24   and that is what we were going to look at before, Brooklyn

25   Hospital records, Exhibit L, Page 1338.

Pierce - Redirect - Maazel                716

1          THE COURTROOM DEPUTY:  Previously admitted.

2          MR. MAAZEL:  Previously admitted.  Thank you.

3          And if we just blow up the top third.

4    BY MR. MAAZEL:

5    Q    Does this reflect one of your many visits with

6    Dr. Davis at Brooklyn Hospital?

7    A    Yes, that looks like it was the visit December 18th.

8    Q    Of?

9    A    2020.

10   Q    Okay.  And do you see towards the bottom where it says

11   "postconcussive syndrome"?

12   A    I'm look -- oh, yes, I see it about the third --

13   right -- right there (indicating).  Above that.

14   Q    And was that a diagnosis that Dr. Davis gave you?

15   A    Yes, and we had discussed it at length.

16   Q    Brigid, all these things you've described, the panic

17   attacks, the migraines, your depression, the loss of

18   sensation in your arms, your vision issues, the nightmares,

19   the night sweats, the -- the issues with your cognition,

20   everything you've testified to, is all of that real?

21          MR. HUTCHINSON:  Objection.

22          THE COURT:  Overruled.

23          THE WITNESS:  Yes, it's very real.

24          MR. MAAZEL:  I have no further questions, Judge.

25          THE COURT:  All right.  Recross?

Pierce - Recross - Examination                717

1          MR. HUTCHINSON:  Sure.  Very briefly.

2          Can I stay here?

3          THE COURT:  No, go up to the podium for this,

4    please.

5          MR. HUTCHINSON:  Yep.

6    RECROSS EXAMINATION

7    BY MR. HUTCHINSON:

8    Q    Ms. Pierce, how old are you now?

9    A    I'm 43.

10   Q    Okay.  You know, I'm 40 and I can barely tie my shoes.

11         How old were you in those videos that we just

12   watched?

13   A    I believe that I'm 36, which is the age that I was when

14   I was assaulted.

15         MR. HUTCHINSON:  No further questions.

16         Thank you.

17         THE COURT:  Sustained.  And I'll strike the very

18   last part of that answer about an "assault."

19         Okay.  Ladies and Gentlemen, it is 1 o'clock, time

20   for our lunch break.  You have an hour.  Be ready to go

21   around 2 o'clock.

22         Don't talk about the case don't do any research.

23   Keep an open mind.  Enjoy your lunch, everyone.

24         THE COURTROOM DEPUTY:  All rise.

25         (Jury exits.)

Proceedings                                           718

1          THE COURT:  You can step down.

2          THE WITNESS:  Thank you.

3          (Witness excused.)

4          THE COURT:  Just a couple housekeeping matters.

5          One is, I want to put on the record that both

6   parties both received my deputy's witness and exhibit list

7   for the last two trial days and they have both confirmed

8   that it is -- that those are accurate.

9          And then I wanted to clarify what happened with

10  Exhibit Q.  I mean, not what happened, but whether or not we

11  have more than one Defense Exhibit Q.  Because I think

12  yesterday, there was a discussion about an exhibit that

13  didn't ultimately come in and I thought that might have been

14  labeled "Q."

15         But I don't have copies of these.

16         MR. HUTCHINSON:  Yes, that was P and so then I

17  moved on to Q.

18         THE COURTROOM DEPUTY:  No, no, no.  Q was the

19  audio of someone saying --

20         THE COURT:  "F the -- "

21         THE COURTROOM DEPUTY:  "F the -- "

22         THE COURT:  -- "curfew."

23         THE COURTROOM DEPUTY:  -- "curfew."

24         MR. HUTCHINSON:  I never marked that as an

25  exhibit; that was just to refresh her recollection.

Proceedings                                          719

1           THE COURT:  But I think we said on the record that

2    that was going to be Q, just so it was clear what it is.

3           But, I think, at this point I guess we'll just say

4    that it wasn't Q, the audio was not Q and Q is now --

5           THE COURTROOM DEPUTY:  So we have Q1 and Q2 today,

6    so...

7           THE COURT:  Yeah, okay, Q1 and Q2 were admitted

8    today, just so the record is clear.

9           MR. HUTCHINSON:  Your Honor, just to confirm too,

10   that video that was shown to Plaintiff to refresh her

11   recollection was precluded and so I wouldn't have marked it

12   as an exhibit but it sounds like an academic issue at this

13   point but that's why -- the limited purpose was to refresh

14   her recollection.

15          THE COURT:  Oh, the audio, that is?

16          MR. HUTCHINSON:  Yeah.

17          THE COURT:  Okay.  Fair enough.

18          Although, sometimes we mark it -- it's not worth

19   getting into -- sometimes it is good to have them marked

20   just so everyone agrees on what it was that was used to

21   refresh memory but ultimately it doesn't matter, I think,

22   here.

23          I wanted to, though, understand or at least have

24   you put on the record, Mr. Hutchinson, what you were going

25   to say at sidebar with --

Proceedings                                          720

1          MR. HUTCHINSON:  Sure.

2          THE COURT:  -- respect to the pre-June 2020

3    exhibit and visuals that I allowed in.

4          MR. HUTCHINSON:  Right.

5          So our argument for why the subsequent aerial silk

6    photographs were relevant was to impeach plaintiff's

7    credibility for -- and -- in previous testimony that she

8    gave.

9          And I don't believe that, you know, plaintiff

10   clearly doesn't have that rationale for introducing sort of

11   its own versions where, I guess, the theory issue is that

12   she was more --

13         THE COURT:  Mmm...

14         MR. HUTCHINSON:  -- adventurous or better at the

15   skills before the incident, that seems like pure bolstering.

16         I don't know that it would be have been admissible

17   on direct, so that --so that was the nature of my objection

18   and it applied to 70A through 70B.

19         THE COURT:  Well, I think they would have been

20   admissible on direct.  Part of plaintiff's argument was that

21   they felt sandbagged on your cross about -- or your use of

22   the exhibits post -- the post-June 2020 exhibits to show or

23   suggest that she was minimizing or "lying" to use a harsher

24   word, about her abilities post the accident.

25         This is somewhat in a gray area.  You say it's

Proceedings                                      721

1   impeachment but also the jury certainly could consider it as

2   some evidence that she certainly had abilities or still had

3   abilities, I should say, post-incident.

4          And I think it was fair for the plaintiff to be

5   able to introduce pre-incident exhibits to be able to rebut

6   any suggestion that somehow she had abilities greater than

7   what she was claiming on the stand after the alleged

8   assault.

9          So in part, because of Plaintiff's argument was a

10  procedural complaint, namely, not getting some notice that

11  you were going to cross-examine her on those.  And partly

12  to -- I think as a fair rebuttal, a response to any argument

13  or suggestion that she has greater abilities or had greater

14  abilities in with 2024 post-incident than she was claiming.

15         I think it was appropriate to allow those

16  pre-June 2020 exhibits in.

17         Lastly, I just want to caution -- or actually

18  direct defendant's to be sure to bring extra copies of

19  anything you anticipate cross-examining about or seeking to

20  introduce.

21         Because part of the reason of having -- I have to

22  keep calling sidebars is because I have no idea what you

23  folks are looking at even.  So I haven't received copies of

24  any of these and you shouldn't be sharing a copy with the

25  plaintiff, your only copy.  You should bring multiple copies

Proceedings                                    722

1    of any exhibit you anticipate showing.

2              MR. HUTCHINSON:  Yes, Your Honor.

3              THE COURT:  So before today, obviously, you knew

4    you were going to try to get some of these exhibits in.  You

5    have to, just for the sake of moving the trial along and

6    also not wearing out the jury's patience from your own point

7    of view, please bring copies for everybody.

8              MR. HUTCHINSON:  Very good.

9              THE COURT:  Anything else before I let you folks

10   go for lunch?

11             MR. MAAZEL:  No, Judge.

12             MR. HUTCHINSON:  No, Your Honor.

13             THE COURT:  Very well.  Have a good lunch.

14             (Luncheon recess taken.)

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                              723

1          A F T E R N O O N    S E S S I O N

2                          --oo0oo--

3          MR. HUTCHINSON:  So I previewed our intention to

4    introduce Plaintiff's 2018 and 2019 medical records from

5    Maiden Lane Medical --

6          THE COURT:  Uh-huh.

7          MR. HUTCHINSON:  -- through Dr. Nadkarni, who

8    reviewed those records in rendering his conclusions.

9          THE COURT:  Okay.

10         MR. HUTCHINSON:  I heard that there may be an

11   objection to that.  And so, instead of doing that at

12   sidebar, which, you know, would be nice to avoid that, but I

13   do intend to introduce that through this witness.

14         THE COURT:  Okay.

15         MR. HUTCHINSON:  And I understand that on

16   Plaintiff's side, they're introducing some of those

17   materials as well, including some of the brain images that

18   were reviewed by Dr. Nadkarni in formulating his opinions.

19         THE COURT:  Right.  Now, I think we resolved the

20   issue with the imaging because the Plaintiff, as I

21   understand it, is simply going to use the same screenshot

22   image that was in his report but remove any markings from

23   it, right?

24         MR. MAAZEL:  Correct.

25         THE COURT:  All right.  Now, what about the Maiden

Proceedings                                           724

1    Lane records?

2              MR. MAAZEL:  You got the gynecological records?

3              MR. HUTCHINSON:  Yeah, it's from Maiden Lane

4    Gynecology, and then -- let me just confirm -- and then

5    Maiden Lane Medical Primary Care Downtown.  And this was a

6    set of 2018 and 2019 records that were provided to

7    Dr. Nadkarni by plaintiff.

8              Can I just get --

9              MR. MAAZEL:  Confirm it with Dr. Nadkarni, who is

10   here.

11             THE COURT:  Yeah.

12             MR. MAAZEL:  I'm not sure if he actually reviewed

13   those.  I don't remember.

14             MR. HUTCHINSON:  Sure.

15             (Pause in proceedings.)

16             MR. MAAZEL:  And Judge, my understanding is that

17   hearsay documents can be testified to under the Federal

18   Rules, but they can't actually be admitted into evidence.

19   And that's generally the practice of, you know, whether it's

20   -- whatever it is.

21             THE COURT:  Right.

22             Well, the rule says, "If the" -- sorry.

23             "If the facts or data would otherwise be

24   inadmissible, the proponent of the opinion may disclose them

25   to the jury, only if their probative value, in helping the

Proceedings                    725

1   jury evaluate the opinions, substantially outweighs their

2   prejudicial effect."

3           So here we have a situation where the defense

4   wants to cross-examine the doctor about those records.  So

5   technically, I don't think -- it's Dr. Nadkarni who is the

6   proponent of the opinion who is offering them, but I think,

7   in fairness, if he relied on them or they entered into his

8   evaluation in any way, I think he should be cross-examined

9   on them.

10          I agree with you that maybe they don't have to be

11  introduced wholesale.  I don't know if there's any prejudice

12  with attempts to introducing them, since I don't know what's

13  in them.  But, at a minimum, the defense can certainly

14  cross-examine the doctor about them.

15          We should probably have the doctor step out for

16  this part, yeah.

17          MR. MAAZEL:  Oh, I'm sorry, yeah.

18          MR. HUTCHINSON:  I would note that -- oh, sorry,

19  one sec.

20          THE COURT:  Yeah.

21          (Pause in proceedings.)

22          THE COURT:  What exactly do you want do?  I mean,

23  is there a reason to introduce all of the records?  Couldn't

24  you just ask him some specific questions from the record?

25  Because --

Proceedings                                726

1              MR. HUTCHINSON:  There's a lot.

2              THE COURT:  There's a -- I know.  There's a lot.

3         The question is how much of it is really relevant

4    to put in?  And I notice a lot of it is redacted also.  So

5    when you say "a lot," there are a lot of pages but very

6    little...

7              MR. HUTCHINSON:  Yeah, I was referring to a lot of

8    pages with substantive information on them.  But I would say

9    no more than five or six.

10             THE COURT:  Well, let's do this, you can

11   cross-examine him about what's in them, ask him if he

12   reviewed them.  But I'm going to save for later, whether or

13   not you get in the actual document.  I just don't know yet

14   whether or not they ought -- it ought to be admitted,

15   because I don't really know what Dr. Nadkarni is going to

16   say.

17             If he acknowledges that he reviewed it and this is

18   what he thought, I don't see any reason to introduce the

19   actual document itself.  The rule was more intended to

20   operate to allow the expert or the proponent of the opinion

21   to put those in if they're relevant to their opinion really

22   by way of supporting it, I suspect.

23             So let's just see how this goes, and then I'll

24   address the question of whether the actual physical exhibit

25   comes in or the documents themselves come in later.

Proceedings                                          727

1           So your effort to try to --

2           MR. HUTCHINSON:  Okay.  All right.  Okay.  I see

3   what you're saying.  We'll do cross first and then --

4           THE COURT:  Yeah, we'll revisit.

5           MR. HUTCHINSON:  Yeah.  Okay.

6           THE COURT:  Okay.  Let's go ahead and get the

7   jury.  And off the record.

8           MR. MAAZEL:  I'll bring him in or should we have

9   them come back first?

10          THE COURT:  Yes.  Dr. Nadkarni, have him just come

11  back in the room, shorten the distance.

12          (Witness approaches the witness stand.)

13          THE COURTROOM DEPUTY:  All rise.

14          (Jury enters.)

15          THE COURT:  So have a seat everyone, except for --

16  Doctor, if you'll remain standing for a moment.  So the

17  plaintiff is calling their next witness.

18          MR. MAAZEL:  Your Honor, the plaintiff calls

19  Dr. Siddhartha Nadkarni.

20          THE COURTROOM DEPUTY:  Please raise your right

21  hand.

22          (Witness sworn.)

23          THE WITNESS:  Yes, I do.

24          THE COURTROOM DEPUTY:  Thank you, have a seat.

25  The chair does not move.

1          THE WITNESS:  Thank you.

2          THE COURT:  So pull it close to you.

3          (Pause in proceedings.)

4          THE COURTROOM DEPUTY:  Please state and spell your

5    name for the record.

6          THE WITNESS:  Siddhartha Nadkarni.  First name is

7    spelled S as in Sam, I, D as in dog, H-A-R, T as in Thomas,

8    H-A.

9          Last name is N as in Nancy, A, D as in dog, K-A-R,

10   N as in Nancy, I.

11         THE COURT:  You may inquire.

12         MR. MAAZEL:  Thank you, Your Honor.

13   **SIDDHARTHA NADKARNI**,

14              called as a witness having been first duly

15              sworn/affirmed, was examined and testified as

16              follows:

17   DIRECT EXAMINATION

18   BY MR. MAAZEL:

19   Q    Good afternoon, Dr. Nadkarni.

20   A    Good afternoon.

21   Q    What is your professional field?

22   A    I am a neuropsychologist and psychiatrist, and

23   epileptologist.

24   Q    And take us through what is neuropsychiatry.

25   A    Sure.  So they're subfield in medicine, like OB-GYN and

1   pediatrics.  Two of those are neurology and psychiatry.  And

2   you can be Board Certified in either neurology or

3   psychiatry.  Or occasionally, rarely, you can be certified

4   in both neurology and psychiatry.

5           And neuropsychiatry is the field that looks at

6   behavioral consequences and psychiatric consequences of

7   neurological illness, and sometimes neurological

8   consequences of psychiatric illness.  So there's a lot of

9   overlap.  Like, in diseases like epilepsy, movement

10  disorder, like Parkinson's disease, Alzheimer's and

11  dementias, many areas of neurology have overlap with

12  psychiatry.  So it's sort of the behavioral neurology

13  aspects of neurological diseases.

14  Q    Does neuropsychiatry include the study of head

15  injuries, including traumatic brain injuries?

16  A    Yes.  The central disorder neuropsychology?

17  Q    Right.  And are you familiar with an expert retained by

18  the defense lawyers, Dr. Robert April?

19  A    Yes, I am.

20          MR. HUTCHINSON:  Objection.

21          THE COURT:  Overruled.

22          But where is this going -- or how many questions

23  do you have along this line?

24          MR. MAAZEL:  I just had one more question on that.

25          THE COURT:  All right.  Go ahead.

Nadkarni - Direct - Maazel                    730

1  BY MR. MAAZEL:

2  Q    Is Dr. April a neuropsychiatrist?

3  A    He is not a neuropsychiatrist.

4  Q    Okay.  Could you summarize your educational background?

5  A    Sure.  I completed my undergraduate degree at Brown

6  University, studying comparative literature and biology.

7  And then I finished medical school at the University of

8  Miami School of Medicine.  And then a six-year combined

9  residency in neurology and psychiatry from 1997 to 2003.

10 And then one year of clinical neurophysiology fellowship in

11 the epilepsy track from 2003 to 2004.  And subsequently was

12 on faculty at NYU until -- and still on faculty at NYU.

13 Q    And can you summarize, Doctor, your professional

14 experience?

15 A    Sure.  So after I graduated from my fellowship, I was

16 retained as faculty in the epilepsy division of the

17 neurology department at NYU.  And there, I served many

18 educational leadership roles.  So I was the program director

19 of the clinical neurophysiology in epilepsy fellowships.  I

20 was the program director of the combined residency in

21 neurology and psychiatry.

22        I was the director of the neuroscience curriculum,

23 and still am, for the psychiatry residency training program

24 at NYU.  And I also have a large panel of patients in the

25 epilepsy division, both neuropsychiatric and epilepsy

Nadkarni - Direct - Maazel                    731

1    patients.

2           And I also serve as the consultant neurologist and

3    neuropsychiatrist to the Rusk Institute Brain Injury Day

4    Treatment Program.  So I saw all the new patients they had.

5    That were sent to me for evaluations in neurology and

6    psychiatry.

7    Q    Doctor, have we covered your hospital appointments or

8    are there others to discuss?

9    A    Yes.  I'm also -- I also do part-time work with the

10   Epilepsy Group in New Jersey.  And I am -- I've been

11   certified to work at multiple hospitals in New Jersey,

12   including Saint Barnabas, Hackensack, Saint Peter's, the

13   Atlantic Health System.  Multiple hospitals in New Jersey,

14   also.

15   Q    And what is your current position?

16   A    Mostly, right now, I'm in private practice in

17   Montclair, New Jersey.  And I spend probably 75, 80 percent

18   of my time seeing patients in private practice.

19          And some of my time I do forensic neuropsychiatry,

20   as well.

21   Q    Do you have any licenses?

22   A    I'm licensed in the States of New York and New Jersey.

23   Q    As a what?

24   A    I'm licensed as a medical doctor in both states.

25   Q    Do you have any professional certifications?

1   A    Yes, I'm Board Certified in five things.  It's

2   neurology, psychiatry, clinical neurophysiology, epilepsy,

3   and then neuropsychiatry/behavioral neurology.

4           The first four are from the American Board of

5   Psychiatry and Neurology.  And the last one is from the

6   United Council of Neurologic Subspecialties.

7   Q    Do you have experience treating traumatic brain injury

8   patients?

9   A    Yes, I do.

10  Q    How many years have you been doing that?

11  A    20 -- well, let's see.  At least 25 years.

12  Q    About how many TBI patients have you had in your

13  career?

14  A    Oh, I would say about a 15,000 -- 10, 15,000 at least.

15  Q    All right.  Are you being paid for your time in this

16  case?

17  A    Yes, I am.

18  Q    And how much have you been paid so far?  Ballpark?

19  A    Ballpark, I think it's been six or $7,000 since 2022.

20  Q    And what percent of your work is clinical work treating

21  patients and what percent is forensic work dealing with

22  legal cases?

23  A    75 to 80 percent is clinical and 20 percent is

24  forensic.

25  Q    Are there times in your forensic practice when a lawyer

Nadkarni - Direct - Maazel                733

1    or lawyers ask you to write a report and you don't?

2    A    Yes, that does happen.

3    Q    And why is that?

4    A    Because sometimes they just want to know what I

5    think -- of what's going on with the client; and whether

6    that is useful to them or not, it's going to be up to them.

7    So sometimes they just want to know my opinion before I

8    write them.

9             MR. MAAZEL:  Your Honor, I tender Dr. Nadkarni as

10   an expert in neuropsychiatry, in neurology and psychiatry

11   and in epilepsy.

12            THE COURT:  Would you like to *voir dire*?

13            MR. HUTCHINSON:  No, Your Honor.  No objection.

14            THE COURT:  Okay.  So you are so qualified in all

15   of those areas as an expert.

16            You may continue.

17   BY MR. MAAZEL:

18   Q    Doctor, did you have an opportunity to review materials

19   in connection with this case?

20   A    Yes, I did.

21   Q    And could you generally describe the materials you

22   reviewed?

23   A    Yes.  The audio files, video files, medical records and

24   I think there was deposition transcripts also.

25   Q    Did you review any expert reports and deposition of

Nadkarni - Direct - Maazel                734

1    Dr. April, the defense expert?

2    A    Yes, did.

3    Q    In addition to the various materials you reviewed, did

4    you, yourself, perform any examinations in this case?

5    A    Yes, I did.  I had the opportunity to interview and

6    examine Ms. Pierce.

7    Q    And what kind of examination was that, just generally?

8    A    Neurologic/neuropsychiatric examination.

9    Q    And when did you do that?

10   A    That was on June 3rd -- I'm sorry.  Yeah, June 3rd,

11   2022.

12   Q    So two years after the police incident?

13   A    I think to the day.

14   Q    Okay.  And where did you do that examination?

15   A    That was done at your offices.

16   Q    And why was that?

17   A    Because at that point, my office was in Mount Vernon,

18   Jersey and I think it was more convenient to meet at your

19   office.

20   Q    Convenient for who?

21   A    For Ms. Pierce.

22   Q    And when you examined Ms. Pierce, did you see anyone

23   from our office, whether myself or any other lawyers or have

24   any interaction whatsoever with any one at my firm?

25   A    I did not.

Nadkarni - Direct - Maazel                    735

1   Q    In addition to your a while ago of Ms. Pierce, the

2   materials you reviewed, did you order any tests from

3   Ms. Pierce?

4   A    Yes, I did.

5   Q    What sort of tests?

6   A    I initiated tests of her brain and neurophysiologic

7   tests of her brain and neuropsychological tests.

8   Q    After reviewing all of the materials, reviewing the

9   test results and performing your own neurologic exam of

10  Ms. Pierce, did you form any opinion or opinions in this

11  case to a reasonable degree of professional certainty?

12  A    Yes I, did.

13  Q    And what, in summary, is your opinion?

14  A    That she suffered a severe brain injury from the

15  assault that occurred on June 3rd, 2020.

16              MR. HUTCHINSON:  Objection.

17              THE COURT:  Overruled.

18              THE WITNESS:  I'm sorry.

19              Can I --

20              THE COURT:  Yes, you can continue.

21              Go ahead.

22              THE WITNESS:  From an assault, she --

23              MR. HUTCHINSON:  Objection.

24              THE COURT:  Overruled.

25              THE WITNESS:  She sustained a severe brain jury

Nadkarni - Direct - Maazel                    736

1    from the assault that occurred in June of 2020, including a

2    brain --

3              THE COURT:  Hold on a second.

4              You don't need to keep objecting.

5              Ladies and Gentlemen, as I've said to you before,

6    the question of whether or not some conduct constitutes an

7    assault under the law is something you will determine based

8    on my instructions.

9              But I am allowing witnesses to use that term in a

10   more commonly understood way.  So that's why I keep

11   overruling the objections.

12             But bear in mind, it will ultimately be up to you

13   to decide whether the conduct that you find occurred, based

14   on the evidence before you, constitutes an assault on the

15   law, that will be your determination.  Okay?

16             All right.

17             And you shouldn't be affected by what other

18   people -- how other people describe the incident.

19             So for the last time and -- and you've registered

20   your objection, could you start again, Dr. Nadkarni.

21             THE WITNESS:  Sure.

22             That Ms. Pierce suffered a severe brain injury as

23   a result of a traumatic attack in June of 2020 that resulted

24   in permanent brain damage.

25             THE COURT:  Overruled.

Nadkarni - Direct - Maazel                    737

1         Again, Ladies and Gentlemen, the words that people

2    use on the witness stand, that shouldn't govern what you

3    decide the law -- or how the law should applied.

4         Okay.  Go ahead, Doctor.

5    BY MR. MAAZEL:

6    Q    What is a traumatic brain injury?

7    A    It's a brain injury that's caused by a deceleration

8    injury of the skull, meaning the skill is moving at a

9    certain pace and it stops and the brain giggles and that's

10   the trauma, right.  The trauma is the brain is actually

11   going and then it stops.

12         And the brain shakes and that causes all sorts of

13   injuries inside the skull.

14   Q    And what causes a traumatic brain injury?

15   A    A trauma, meaning a blunt-force injury.  Like I just

16   said, the head moving and stopping suddenly.

17   Q    All right.  Now, did you create an expert report in

18   this case?

19   A    I did, yes.

20   Q    And did you bring it with you today to refer to as

21   necessary?

22   A    I have it right here, yes.

23   Q    I would like to ask you, Doctor, about -- first about

24   the symptoms that Ms. Pierce reported in the days after the

25   incident.

Nadkarni - Direct - Maazel                    738

1  A    Well, she reported several symptoms on -- in the

2  immediate days following the incident, including having her

3  right eye swollen and feeling --

4            THE COURT:  Hang on.  Are you objecting?

5            MR. HUTCHINSON:  Yeah.  The reading --

6            THE COURT:  Overruled.

7            Doctor, let me ask you a question:  Could you try

8  to not use the report, but do you have a recollection of

9  what it is she reported to you at that time?

10           THE WITNESS:  Sure.  It's a long list, so I could

11 refresh that but I could --

12           THE COURT:  Okay.  So I'm going to allow him to

13 refresh his memory based on the report.  Take a look and

14 then try to recite all of her reported symptoms.

15           THE WITNESS:  Okay.  No problem.

16           So she had right eye symptoms where her eye was

17 swollen.  She had bruising all over her -- on different

18 parts of her limbs on her body.  She had abrasion on the

19 right side of her temple, and in the right orbit -- I think

20 that is part of why her eye was -- you know, she couldn't

21 open her eye because there was a lesion there.

22           She had scalp swelling.  Pain in the right

23 shoulder.  She started reporting symptoms of seeing visual

24 symptoms, like seeing flashes of light.

25           She had difficulty with sleep, even when some of

Nadkarni - Direct - Maazel                    739

1    the painful symptoms resolved.

2           And then she had other symptoms looking at lights,

3    like a lot of visual symptoms when looking at bright lights

4    right in the few days after.

5    BY MR. MAAZEL:

6    Q    So, Doctor, what were the persistent symptoms that

7    Ms. Pierce reported as of 2022 when you examined her?

8    A    Well, she had many persistent symptoms of visual

9    problems, including those flashing lights and difficulty

10   using computer screens, seeing hallucinations like green and

11   red colors.

12          She had migraines headaches, at least clinically

13   speaking from what she describes, which were very frequent.

14          She had episodes at night where she would wake up

15   suddenly drenched in sweat, having a panicking feeling and

16   also being described as having thrashing episodes at

17   nighttime.

18          She had symptoms of posttraumatic stress disorder

19   and active symptoms of that and she had multiple cognitive

20   symptoms.

21          So she could no longer multitask, like her working

22   memory, she couldn't hold two things at the same time, so

23   she had set shifts.

24          And she described actually her job being something

25   where she was constantly on a screen and flying through

Nadkarni - Direct - Maazel                740

1  different -- and changing different things, and multitasking

2  all the time.  And she found that she really couldn't do

3  that after this injury, to the point where she actually lost

4  her job because she couldn't function there.

5              MR. HUTCHINSON:  Objection.

6              THE COURT:  Overruled.

7              THE WITNESS:  She also describes symptoms of

8  difficulty with frontal lobe functioning like things like

9  difficulty initiating or motivating.  Difficulty initiating

10 thoughts with attention, processing speed, concentration,

11 those are all symptoms that have persisted.

12             THE COURT:  So, Dr. Nadkarni, can you just put

13 down your report, at least so that it doesn't give the

14 appearance that you're simply reading from the report.

15             THE WITNESS:  Okay.  No problem.

16             THE COURT:  If necessary, you can ask to look at

17 the report to refresh your memory and then just put the

18 report down.

19             Okay.

20 BY MR. MAAZEL:

21 Q    Which of these cascade of symptoms are symptoms caused

22 by traumatic brain injury?

23 A    All of the symptoms, I think, are from a traumatic

24 brain injury.

25 Q    Okay.

Nadkarni - Direct - Maazel                    741

1          Now, did you prepare in your report and also as a

2     demonstrative exhibit for the jury today, a table?

3     A    Yes, I did.

4     Q    All right.  And what table is that?

5     A    That is a table of the objective findings in her case.

6     Q    All right.

7          MR. MAAZEL:  And I think we have marked that as

8     Exhibit 72 and, Judge, we would like to show this to the

9     jury, as a demonstrative.

10         THE COURT:  Not the jury but to the witness.

11         MR. MAAZEL:  Well --

12         THE COURT:  Oh.  Well, I'd first like to --

13         MR. MAAZEL:  First to the witness.  Okay.

14         THE COURT:  Yes, first to the witness just so he

15    can authentic it or at least explain what it is.

16         MR. MAAZEL:  Understood.

17    BY MR. MAAZEL:

18    Q    So we're now showing, just you, Dr. Nadkarni, Exhibit

19    72.

20    A    Yes.

21         THE COURT:  And what is it?

22         THE WITNESS:  Well, this is a table that I

23    prepared for my report, just listing the objective findings,

24    the tests that were done, the results of the tests, and the

25    implications clinically of the results of those test.

Nadkarni - Direct - Maazel                    742

1          THE COURT:  And you prepared this?

2          THE WITNESS:  It's in my report, yes.  I prepared

3    this table.

4          THE COURT:  All right.  Go ahead.

5          MR. MAAZEL:  So I would like to publish this as a

6    demonstrative to the jury, Your Honor.

7          THE COURT:  All right.  You may.

8          MR. MAAZEL:  And maybe just if we could do a cull

9    out at the top.

10   BY MR. MAAZEL:

11   Q    Just tell us what these columns are.

12   A    Sure.  The first column in bold at the top, it says

13   "Study," that's just a type of study that was being done.

14          The next one says "Abnormality" which is the

15   findings in the study.  And the last one says "Clinical

16   Consequences," which is, what does it mean in her life and

17   her symptoms and how she lives her life.

18          MR. MAAZEL:  All right.  Can you just cull out the

19   left column -- yes.

20   BY MR. MAAZEL:

21   Q    So was one of the studies a brain MRI?

22   A    Yes an MRI of the brain.

23   Q    Okay.

24          MR. MAAZEL:  And in -- if you could just maybe do

25   the whole left column?

Nadkarni - Direct - Maazel                743

1   BY MR. MAAZEL:

2   Q    And the next study that you relied on was which one?

3   A    The next one is called the brain CAT scan or Positron

4   Emission Tomography.

5   Q    Okay.  So what is a brain MRI?

6   A    A brain MRI is a study that looks at the structure of

7   the brain.  It's like a picture of the brain, almost like if

8   you lifted the hood of your car and took picture what the

9   structure would look like.  And it is by putting the head in

10  the magnetic field.  And when you put the head in the

11  magnetic field, what happens is that the water or the

12  hydrogen ions line up in a certain way, and then you can do

13  calculations based on that alignment and generate a picture

14  of the brain with very high resolution.  So that's what an

15  MRI of the brain is.

16  Q    And what is a brain PET scan?

17  A    It's a P-E-T, that's Positron Emission Tomography.  And

18  it's a study that measures how the brain cells use glucose.

19  So it's a proxy for a function of the neurons.  Like, the

20  more glucose you use, the more functional they are.  Then

21  the less glucose you use, the less functional they are.

22          So less use means hypometabolism where the neurons

23  are metabolizing the glucose as well.

24          The way it's done is a nuclear racer is attached

25  to a glucose molecule and injected into the bloodstream.  So

1    it gives you sort of radioactive.  And the cells that use

2    that glucose more, the tracer cools in those areas.  So you

3    can see a certain amount of tracer in a given place.  And

4    then you can see less tracer in other places.

5            So the important thing about a difference between

6    an MRI and a PET scan is a PET scan is a measure of

7    functioning.  So if you plug your car into the computer and

8    figure out the electrical system, how the computer's

9    working, that's a functional test versus just opening the

10   hood and taking a picture.

11           So the MRI is just a picture of the brain, that's

12   structural.  And the PET scan is much more functional and

13   how the brain is actually functioning in realtime.

14   Q    And who did you ask to take an MRI and PET scan of

15   Ms. Pierce's brain?

16   A    NYU Medical Center.

17   Q    And what is a study result?

18   A    A study result is when the physician, who is the

19   neuroradiologist or nuclear medicine doctor reads the study

20   itself and then makes an interpretation of what that study

21   means.

22   Q    So who actually took the MRI and the PET scan for

23   Ms. Pierce?

24   A    Well, the MRI was done by technologist at NYU and a PET

25   scan also, and read by an attending physician.

Nadkarni - Direct - Maazel                745

1   Q    And -- a radiologist?

2   A    A radiologist, yes.

3   Q    And the radiologist who prepared the study result for

4   Ms. Pierce, did that radiologist know there was a lawsuit at

5   all?

6   A    Not that I'm aware of.

7   Q    Who pays the radiologist?

8   A    NYU pays that radiologist.

9   Q    And so is there any relationship between the

10  radiologist who does the study result at NYU and my law firm

11  or anything related to this case?

12  A    Not that I'm aware of.

13  Q    I would like to show you Exhibit 21 for identification.

14  And do you recognize that --

15           THE COURTROOM DEPUTY:  One moment.  Okay.

16  BY MR. MAAZEL:

17  Q    Do you recognize Exhibit 21?

18  A    Yes, I do.

19  Q    And what is that?

20  A    This looks like records from NYU -- medical records

21  from NYU Medical Center.

22  Q    Okay.  And so is the study result for Ms. Pierce that

23  you ordered?

24  A    Yes, this looks like -- yes, exactly, this page.

25  Q    And was this prepared in the regular course of business

1   at NYU?

2   A    Yes.

3   Q    And --

4         MR. MAAZEL:  I move this into evidence.

5         THE COURT:  Any objection?

6         MR. HUTCHINSON:  No.

7         THE COURT:  All right.  It's admitted.  That's

8   Number 21.

9         (Plaintiff's Exhibit Number 21 received in

10  evidence.)

11        THE COURT:  You may publish.

12        MR. MAAZEL:  We could start with the first page --

13  I'm sorry, the second page.  And if we could just cull out

14  the top third.  Before that -- before the writing -- yes.

15        (Exhibit published to the jury.)

16  BY MR. MAAZEL:

17  Q    And so who is the patient here?

18  A    The patient is Ruby Pierce.

19  Q    And who was the referring doctor who actually assessed?

20  A    That was myself.

21  Q    By the way, were you a treating physician or were you

22  doing a forensic analysis in this case?

23  A    I was only doing a forensic analysis in this case.

24  Q    All right.  And what is the date that these tests were

25  done?

Nadkarni - Direct - Maazel                    747

1    A    This is -- date of service is July 13, 2022.

2    Q    And what tests were done?

3            MR. MAAZEL:  If we could go up there.

4            THE WITNESS:  A PET scan and MRI scan.  Or what we

5    call a PET MRI.

6            MR. MAAZEL:  And if we could just go to the bottom

7    of page 2.  Just the very bottom where it says "electronic

8    signature."  Yes.

9    BY MR. MAAZEL:

10   Q    And so who was the doctor, the radiologist at NYU who

11   prepared this study?

12           THE COURTROOM DEPUTY:  Use the microphone.

13           MR. MAAZEL:  I'm sorry.

14   BY MR. MAAZEL:

15   Q    Who was the radiologist at NYU who authored -- who

16   looked at the imaging and prepared the study?

17   A    Dr. Zan.

18   Q    That's Elcin Zan?

19   A    Yes.

20   Q    All right.  Again, Dr. Zan is that -- did he have

21   anything to do with this lawsuit?

22           MR. HUTCHINSON:  Objection.  Asked and answered.

23           THE COURT:  Overruled.

24           Answer it again.

25           THE WITNESS:  No.

Nadkarni - Direct - Maazel                    748

1    BY MR. MAAZEL:

2    Q    And he wrote, "I personally reviewed the images and

3    agree with this report," correct?

4    A    Correct.

5    Q    Is that -- all right.

6              And now, I want to go through the conclusions of

7    the radiologist and the study result of Ms. Pierce.

8              MR. MAAZEL:  And if we could start -- if we could

9    first go back to your demonstrative Exhibit 72.

10             THE COURTROOM DEPUTY:  That's on the Elmo?

11             THE COURT:  No, it's on her computer.

12             THE COURTROOM DEPUTY:  Okay.

13             MR. MAAZEL:  And so if we could just cull out the

14   top row, "brain MRI," that section.

15   BY MR. MAAZEL:

16   Q    And the -- what are the -- what are the abnormalities

17   you noted in this section?

18   A    These are all the abnormalities that the radiologist

19   read in the report.

20   Q    For which test?

21   A    For the MRI of the brain.  So the first one is

22   bilateral mesial temporal sclerosis.

23   Q    And before we go to that, I just want to show the

24   report to the jury.

25             MR. MAAZEL:  If we can go back to Exhibit 21.

Nadkarni - Direct - Maazel                749

1        Okay.  If we could cull out the first paragraph

2   under "Impression"?

3   BY MR. MAAZEL:

4   Q    Okay.  Can you take us through this first sentence,

5   Doctor?

6   A    Sure.  So this is the impression, the overall

7   impression of the combined PET/MRI study.  So it shows both

8   things.  And it's sort of a summary impression.  And it

9   reads, "FDG," that's fluorodeoxyglucose.  That's that

10  nuclear tracer glucose, "hypometabolism and corresponding

11  atrophying indicating bilateral mesial temporal sclerosis."

12  Q    And what -- can you take us through those words,

13  bilateral mesial temporal sclerosis?  What does each word

14  mean?

15  A    Sure.  Sure.  So the first word is "bilateral," means

16  both sides.  So this was involving both sides of atrophy.

17  Q    Both sides of?

18  A    The brain.

19       And you know, if you -- I'm just putting my -- my

20  fist up here with my thumb inside.  This is sort of what a

21  brain looks like.  This is kind of frontal lobe, the

22  temporal lobe, the parietal lobe, the occipital lobe.

23       So mesial temporal means inside the part of the

24  temporal lobe that's more in close to the midline.  Is --

25  has sclerosis.  Sclerosis means scar.  Like, if you cut

Nadkarni - Direct - Maazel                750

1   yourself and you develop a scar.  So this is a scar in the

2   brain in that area on both side of the temporal lobes.

3   Q    Okay.  So, I guess --

4        MR. HUTCHINSON:  Objection to the cutting analogy,

5   Your Honor.

6        THE COURT:  Overruled.

7        I didn't hear one.

8        Keep going.

9        MR. SELVER:  Hear was keep going?

10  BY MR. MAAZEL:

11  Q    So Ms. Pierce had scarring on both sides of her

12  temporal lobe.

13  A    Yes.

14  Q    And --

15  A    Correction, sorry.

16       She had scarring on both frontal lobes.  Not on

17  both sides of her temporal lobe.

18  Q    Understood.

19  A    Yeah.

20  Q    And if we go to the second page, under "MRI Findings,"

21  so you see where it says "amygdala bilateral volume loss"?

22  A    Yeah.  Yes.

23  Q    So let's start with amygdala.  What does the amygdala

24  do in the brain?

25  A    The word "amygdala" is because it is the word for

Nadkarni - Direct - Maazel                      751

1   almond.  It's an almond-shaped structure in that medial

2   temporal lobe.  That's all about fear loading, emotional

3   processing, responding to stimuli or triggers.  So it's

4   really about emotional regulation or disregulation, the

5   amygdala.

6   Q    And what does bilateral volume loss mean?

7   A    It means there's death of cells, brain cells in the

8   amygdala that won't come back.  There's been loss of tissue

9   from the amygdala from those structures, both sides.

10  Q    Is another word for cell death or volume loss atrophy?

11  A    Atrophy, correct.

12  Q    When brain cells die can they grow back and be

13  replaced?

14  A    That's not known.  We don't believe they can.

15  Q    And so this -- I should have asked, the bilateral

16  mesial temporal sclerosis, is that a normal --

17                    (Reporter admonition.)

18  BY MR. MAAZEL:

19  Q    The bilateral mesial temporal sclerosis, is that a

20  normal or abnormal finding?

21  A    That's an abnormal finding.  And you see it with T2

22  FLAIR signal, that's a sign of the sclerosis, the scarring.

23  TS FLAIR signal is noted.  That is sort of the signal for

24  mesial temporal sclerosis on MRI.

25  Q    The brain death in both sides of Ms. Pierce's amygdala,

Nadkarni - Direct - Maazel                    752

1    normal or abnormal?

2    A    Abnormal.  Very abnormal.

3    Q    Take us through the bilateral volume loss in the

4    hippocampus.

5              What does the hippocampus do?  Just take us

6    through that.

7              THE COURT:  Can I ask you, what did you say before

8    about abnormal, "peri" or "very"?

9              THE WITNESS:  Very.

10             THE COURT:  Very?

11             THE WITNESS:  Very.  Sorry.

12   BY MR. MAAZEL:

13   Q    If you could take us, Doctor, through bilateral volume

14   loss in Ms. Pierce's hippocampus.

15             What does that mean?

16   A    So, sure.

17             Hippocampus is named that because it looks like a

18   seahorse and this is where the short-term memories get

19   placed.  And I'll just explain a little bit how it works.

20             So if you go to the bank and you want to deposit

21   money into your account, the teller will take it and put it

22   in a register at the counter.  That's like the hippocampus.

23             And then later, it gets put in a vault.  So that's

24   like, for memory, it's the same thing.  We -- we hold things

25   in the hippocampus short-term, that we will put in long-term

Nadkarni - Direct - Maazel                753

1    memory later.

2           And here, there is -- same thing, death of cells

3    and tissue in the hippocampus and atrophy.  Volume loss

4    means atrophy at both hippocampi also.  So both the amygdala

5    and the hippocampi.

6           These structures are right next to each other in

7    the mesial temporal lobe.

8           And there's also other changes in that hippocampus

9    that are mentioned here that go along with the atrophy,

10   which is flattening of the head.  Remember, it looks like a

11   seahorse, so the head is where the top of it is.

12          And also, again, that T2/FLAIR signal abnormality

13   which means there's not just atrophy in loss of neurons;

14   there's also scar tissue.  That's the sclerosis part, so...

15   Q    Okay.  Now going back to your Demonstrative Exhibit 72,

16   you noted a number of the clinical consequences from the

17   abnormal MRI findings, right?

18   A    Yes.

19   Q    And if you can take us through those.  This is the top

20   row.

21   A    Sure.

22          So from that hippocampi atrophy, short-term memory

23   loss and memory loss, emotional disregulation, we just

24   mentioned, from the amygdala.  Altered fear and anxiety

25   processing from the amygdala.  That is where panic attacks

Nadkarni - Direct - Maazel                754

1   can come in.  Mood disregulation.

2           And the most commonplace for epileptic seizures to

3   arise from is also from this mesial temporal area and also

4   the defused cognitive deficits as well.

5   Q   All right.  Did the study result at NYU also refer to

6   findings from the PET scan of Ms. Pierce's brain?

7   A   Yes, it did.

8           MR. MAAZEL:  Okay.  If we can go to the PET scan

9   findings back at Exhibit 21.

10          And the first paragraph on Page 2 under "PET

11  findings."

12          Next page.  I'm sorry.  Page 3.

13          Just the first paragraph under "PET findings."

14  BY MR. MAAZEL:

15  Q   Can you talk us through that first paragraph, Doctor.

16  A   Sure.

17          So again, that's fluorodeoxyglucose, FGD,

18  hypometabolism; meaning those nerve cells aren't using

19  glucose in both temporal lobes, involving both the

20  hippocampi and the amygdala.

21          So this is a finding where the MRI and the

22  PET scan are of the exact same place, abnormal.  You don't

23  always get that finding.  Sometimes you get one abnormal and

24  not the other.

25          But this is pretty striking that both of them

Nadkarni - Direct - Maazel                          755

1    exactly point to the same area.

2              So not only is there death of amygdala and

3    hippocampus, there's also loss of function of those

4    structures.  Functionally, they're abnormal also.

5              But even more -- so PET scans are more subtle, so

6    they picked up what the MRI showed.  But even where the MRI

7    looked normal, the PET scan showed abnormalities, in both

8    occipital lobes, so that's in the back of the head and the

9    cerebellum, which is just below the occipital lobe, as well

10   as the left frontal lobe, supraorbital means above the eye

11   socket, on the left side.

12   Q    And -- okay.

13   A    And then the thalamus also.  So widespread and

14   regional, right.  So both thalami, both hippocampi, both

15   amygdala, so it's regional and widespread hypometabolism.

16   Q    And what does the occipital lobe relate to in the body?

17   A    Vision.

18   Q    Okay.  So she has this brain damage, now the occipital

19   lobe.  What does that tell you?

20   A    It tells me that her occipital lobe doesn't function

21   normally.

22   Q    Okay.  I would like to show you, from the

23   Brooklyn Hospital records in evidence, Exhibit L at

24   Page 1280.

25              THE COURT:  Previously admitted.

Nadkarni - Direct - Maazel                    756

1           MR. MAAZEL:  While we're waiting for that -- there

2     it is.  If we could just cull out the bottom part starting

3     with "head" at the bottom half.

4     BY MR. MAAZEL:

5     Q    And you see "injury noted" to the back left of

6     Ms. Pierce's head, Brooklyn Hospital?

7     A    Yes, I do.

8     Q    And you at the bottom where it says, "left occipital

9     swelling and tenderness upon palpation"?

10    A    Yes, I do.

11    Q    Is that consistent with the injuries on the brain scan

12    to the occipital lobe?

13    A    It's the same location.

14    Q    I think you mentioned -- going back to Exhibit 21 --

15    that she also had damage, noted in the PET scan, to her

16    frontal lobe.

17    A    Left frontal lobe.  Yes.

18    Q    And what does the frontal lobe do in the brain?

19    A    The frontal lobe is responsible for several things.

20    One is language, like finding words, you want to say,

21    expressing language, understanding language.

22           But also executive functioning, what people call

23    executive functioning.  So that's like what a CEO would do

24    in a company, like, for example, make decisions about the

25    future, who should I hire?  Who should I fire?  What should

Nadkarni - Direct - Maazel                    757

1   I invest in?  Using your judgment to understand the nature

2   and consequences of your action and making decisions about

3   what you want to do in your life and where you want to go,

4   that is also executive functioning -- functions the frontal

5   lobe.

6           There also an ambition.  So I want to scream at my

7   boss but my inferior orbital frontal cortex keeps me from

8   doing that.  It's like the brakes in the system.

9           And in the medial frontal lobe, again, the midline

10  is responsible for getting up and go, motivation,

11  initiation, all of those kinds of things.

12          So frontal lobe signals can have lots of different

13  symptoms; working memory, attention, processing speed, these

14  are all frontal lobe functions.

15  Q    All right.  And I think you also mentioned that the PET

16  findings showed damage to the cerebellar hemispheres?

17  A    Yes.

18  Q    Cerebellar means what?

19  A    Cerebellum is two hemispheres that are just below the

20  regular hemispheres that are around the brain stem.  And

21  they have, many, many different functions.

22          One is like a motor coordination function.  But

23  there's also cognitive and affective functions in that area.

24  So people can have something called a cerebellar plaqued

25  affective syndrome if those areas were injured sometimes.

Nadkarni - Direct - Maazel                    758

1    Q    In addition to reviewing the test results for all the

2    testing, did you, yourself, look at any images?

3    A    Yes, I did.

4    Q    And I would like to show you -- just you at this

5    moment -- plaintiff's Exhibit 17.

6    A    Yes.

7    Q    And what are these images of, just generally?

8    A    This is Ms. Pierce's PET scan.

9    Q    And by the way, did you attach these images an addendum

10   to your expert report?

11   A    I did.

12   Q    All right.  And are these true, accurate images that

13   your ordered from NYU of Ms. Pierce's PET scan?

14   A    Yes, to the best of my knowledge.

15              MR. MAAZEL:  I move --

16              THE COURT:  Were these the ones you reviewed?

17              THE WITNESS:  Yes, these are the ones I reviewed.

18   So yes.

19              THE COURT:  Okay.

20              MR. MAAZEL:  I move Exhibit 17 into evidence.

21              MR. HUTCHINSON:  No objection, Your Honor.

22              THE COURT:  Admitted.

23              (Plaintiff's Exhibit Number 17 received in

24   evidence.)

25              THE COURT:  You may publish.

Nadkarni - Direct - Maazel                    759

1          (Exhibit published to the jury.)

2     BY MR. MAAZEL:

3     Q    First of all, do you see Ms. Pierce's name in the top

4     left?

5     A    I do.

6     Q    All right.  Can you take us through this imaging.

7     A    Sure.

8          So this was a study that was done on July 13,

9     2022, and it is a PET scan of her brain.

10         The red areas are areas of normal glucose uptake.

11         THE COURT:  Up what?

12         THE WITNESS:  Uptake.

13         THE COURT:  Okay.  Don't get too close to the mic.

14         All right.

15         THE WITNESS:  And the green areas are areas of

16    hypometabolism; meaning abnormally reduced uptake of glucose

17    and speaks to atrophy.  Meaning, one reason there's not as

18    much tracer in that area is because those nerve cells are

19    not -- so there is not -- glucose isn't being used in those

20    areas.

21         So if you look at the areas here that are

22    predominately green, those are the areas that were red on

23    the PET scan.  This is the same PET scan that we just read

24    the impression about -- the only one that I'm aware of.

25         And can I pick -- can I draw on this or --

Nadkarni - Direct - Maazel                760

1   BY MR. MAAZEL:

2   Q    Sure.

3           THE COURT:  If you hold your finger down to the

4   screen, you can make a circle.

5           THE WITNESS:  Got it.

6           THE COURT:  And if you just touch it, it will make

7   an arrow.

8   BY MR. MAAZEL:

9   Q    Before you do, Doctor --

10          MR. MAAZEL:  Judge, can we have just a brief

11   sidebar?

12          THE COURT:  Okay.

13          (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar conference                    761

1              (The following occurred at sidebar.)

2         THE COURT:  Okay.  Go ahead.

3         MR. MAAZEL:  Judge, Juror Number 2 has been asleep

4    for much of this testimony, and not for the first time in

5    this trial.

6         THE COURT:  Right.

7         MR. MAAZEL:  I'm really concerned about

8    his ability to serve.

9         MR. HUTCHINSON:  I disagree.  I've been watching

10   him, too.  He closed his eyes.  He opened his eye.  He's not

11   sleeping.

12        THE COURT:  Well, I see him sleep, as well.  I am

13   surprised you kept him on the jury, for other reasons.  But

14   I think the most I can do, I can make some noise and wake

15   him up.  I don't want to remove him just yet.

16        MR. MAAZEL:  I just wanted to bring it to

17   the Court's attention.

18        MR. HUTCHINSON:  Your Honor --

19        MR. MAAZEL:  How can you be a fair juror?

20        THE COURT:  But I think we can try to stand up for

21   a moment.  I have had the issue come up before and I usually

22   try to just give the people a little --

23        MR. HUTCHINSON:  Move.

24        THE COURT:  -- break just to kind of move around

25   and stand.

Sidebar conference                          762

1        MR. HUTCHINSON:  And the reason I did notice that

2   is when noises were made, I don't think he's sleeping.  He's

3   just closing his eyes for a moment, because, again, when

4   someone's sleeping and you make a noise, you don't wake up,

5   right?  But I think he's listening.

6        THE COURT:  Well, let's all keep our eye on him.

7        MR. HUTCHINSON:  Okay.

8        THE COURT:  I didn't notice him just now, but

9   let's keep him focused.

10        MR. MAAZEL:  Yes.

11        MR. HUTCHINSON:  Okay.

12        (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Nadkarni - Direct - Maazel                         763

1              (Sidebar ends; in open court.)

2              (In open court.  Jury present.)

3              MR. HUTCHINSON:  Your Honor, could we have a brief

4     break.

5              THE COURT:  Do you want a five-minute break?

6              MR. HUTCHINSON:  Please.

7              THE COURT:  Remember, don't talk about the case.

8     Keep an open.  Don't do any research.

9              THE COURTROOM DEPUTY:  All rise.

10             (Jury exits.)

11             (Recess taken.)

12             THE COURTROOM DEPUTY:  All rise.

13             THE COURT:  Please be seated, everyone.

14             And you can have a seat, as well.

15             All right.  So you may continue, Mr. Maazel.

16             And I'll remind you, Doctor, that you're still

17    under oath.

18             MR. MAAZEL:  Thank you, Your Honor.

19             If we can put Exhibit 17 back on that screen.

20             THE COURT:  It is, at least for the witness, you

21    want -- okay.  There we go.

22             (Exhibit published to the jury.)

23    BY MR. MAAZEL:

24    Q    And so you were describing, Doctor, your analysis of

25    Ms. Pierce's PET/MRI brain images.  And could you just tell

1   us again the significance of red and green?  And then, yes,

2   you can make markings with your finger on the screen.

3   A    Sure.

4        So this is a PET/MRI of Brigid Pierce from

5   July 13, 2022.  The red areas are normal glucose uptake,

6   meaning normal functioning of the brain and the nerve cells

7   there.  And the green areas are abnormal, decreased

8   functioning of the brain loss of neurons atrophy of the

9   brain and decrease glucose uptake.

10       And I'm just going to show you, if I can here --

11       MR. MAAZEL:  We can blow that up.  Shall we blow

12  up the top left image?

13       THE WITNESS:  Oh.  That would be great, actually.

14  I'm sorry.  Can we erase that?

15       THE COURT:  Yeah, you can clear it by tapping the

16  lower right corner.

17       THE WITNESS:  Great.  Thank you.

18       THE COURT:  There you go.

19       THE WITNESS:  That's wonderful.  Great.  A big

20  line.  Let me see if I can just make it big around here.

21       THE COURT:  All right.  Well done.

22  A    So that temporal lobe at the tip, there is yellow and

23  green and blue.  And should be a lot more red.  Just like

24  the frontal lobe up here -- I'm sorry, up here is more red.

25       And so everywhere you see green is abnormal brain;

Nadkarni - Direct - Maazel                765

1    meaning brain has lost tissue, lost neurons and is not

2    functioning normally.

3              Can we go to the next picture?

4              This is the other sides.  So the previous side was

5    the left side.  This is the right side of the brain.

6              Over here is the front of the brain (indicating),

7    this is the back of the brain.  And again, this right

8    temporal lobe is also yellow and green, and not red.

9              The other thing you see in this picture of the

10   back of the head.  This is the occipital lobe.  That's also

11   yellow and green, and not red.  And underneath that, that's

12   the cerebellum.  So that's also yellow and green.  These are

13   all areas that were noted in the study.

14             There's also, you'll see, the -- maybe I'll just

15   show you here.

16             There's also green up in here (indicating).

17   That's actually the motor cortex.  So that wasn't red, it's

18   abnormal because in the PET scan you're not moving.  So when

19   you move that gets more use, so that's actually normal in

20   that location.  But the rest with the green areas are

21   abnormal.

22             Can we go to the next picture, please?

23   BY MR. MAAZEL:

24   Q    Before that, I just have a question for you, Doctor.

25             So that right temple -- temporal area that you

1   circled, is that basically near the right temple?

2   A    That's correct.

3   Q    Okay.

4   A    And over the ear, the temple right in that location, I

5   can just show you on this picture real quick -- I'm sorry.

6          Can we just go back to the other -- all of them

7   together?  Yeah.

8          So here you can see both temporal lobes.  Also the

9   temporals being green.  And both occipital lobes also being

10  green.  And the cerebellum on both sides being green.

11         So very widespread.  And when we say "regional,"

12  we mean certain structures have been affected.  And these

13  structures are typically affected in traumatic brain

14  injuries.  They are not unusual structures to be affected.

15         Can we go to the next?  Maybe the fourth one on

16  the right.

17  Q    So this is the top right?

18  A    Yes.

19         So this is a look from the bottom up at the brain.

20  Like, if you're standing at the spinal cord and looking up

21  at the brain.  So this is the right temporal lobe.  This is

22  the left temporal lobe.  So everything in neuroradiology is

23  backwards.

24         And you can see, very nicely here, that there's so

25  much green in those temporal lobes compared to the frontal

1    lobe, which is on top.  Much, much more red there.

2            And in the back of the head here, this is

3    the cerebellum, and even a piece of the occipital lobe there

4    too.

5            Can we go to the next one, please?

6    Q    So bottom left picture?

7    A    Yes, please.

8            This is a really good example because you can see

9    how much of the glucose uptake is normal in a lot of the

10   cortex.  But -- I'm sorry, let me clear my arrows.  Here and

11   here is clearly not red.  It's clearly green (indicating).

12   So green is hypometabolism.  Abnormal functioning in those

13   areas.

14           Let's go to the next one.  This is a look from the

15   back of the head.  So this is the occipital lobe and

16   cerebellum.

17   Q    So this is the bottom row, second from left?  Sorry.

18   A    Yes.

19           And again, this widespread green areas, meaning

20   abnormal functioning in these parts of her brain.

21           And let's go to the next one.

22   Q    All right.  Is this --

23   A    That's the one.

24   Q    -- bottom row, second from right?

25   A    Right.

Nadkarni - Direct - Maazel                  768

1           So this is now not the outside of the brain, which

2    we saw in the first two.  This is that medial temporal lobe,

3    the middle part of the -- if I did that fist again with the

4    temporal lobe, on the inside of the head, against the

5    amygdala area, that's what we're looking at here with these

6    arrows.  And that's abnormally functioning.  That's showing

7    green and blue and not enough red.

8           So the next one.

9    Q    Right, so at the bottom right?

10   A    Bottom right.

11          And again, this is the medial temporal lobe on

12   right side, on the other side.

13          So now, we've seen the outside of the temporal

14   lobe, the inside of the temporal lobe, the occipital lobe,

15   and the cerebellum all showing very abnormal glucose uptake

16   and damage, brain injury -- brain damage.

17   Q    All right.  In addition to --

18          MR. MAAZEL:  We can take that down.

19          Thank you.

20   BY MR. MAAZEL:

21   Q    Did you also look -- well, withdrawn.

22          What is an EEG?

23   A    An EEG is a brain wave test.  Some people may have had

24   an EKG, which is an electrocardiogram where they put the

25   little electrodes on the chest and measure the electrical

Nadkarni - Direct - Maazel                    769

1   activity of the heart with waves, and we've seen that on

2   EKG.

3           As we all just can see, that's very simple.

4   Because we're checking waves, electrical waves of the brain

5   in the same way but there's so many more.  See.

6           So it's basically a test measuring the electrical

7   brain activity of the brain.  Electric meaning -- we're very

8   concrete in neurology, so electro means electrical,

9   encephala means the brain, and gram means a measure.  So

10  it's a study that measures the electrical activity of the

11  brain.

12  Q    And so this is the one where you put electrodes all

13  over your head?

14  A    Correct.  So there is electrodes that go on the scalp,

15  after the skin is like clean and abraded and you can

16  attach -- like with a conductive gel, you can attach an

17  electrode that is a wire coming off it and go into a box.

18  And that box is an amplifier.  Because these potentially are

19  very tiny.  So the amplifier amplifies it so we can see it

20  on the screen.  And then you can measure different parts of

21  the brain and how they are functioning again.  Not the

22  structure, the EEG is realtime functional test like the

23  PET scan is.

24  Q    All right.  How many EEGs have you reviewed throughout

25  the course of your career?

Nadkarni - Direct - Maazel                    770

1   A    Oh, I think between 75,000 to a hundred thousand.  I

2   did 15 to 18 a day for, I don't know, 20, 25 years.

3   Retakes.

4        Yeah.

5   Q    A lot?

6   A    A lot.

7   Q    Can you tell us -- well, first of all, did you review

8   the EEG testing that you ordered from NYU for Ms. Pierce?

9   A    Yes, I did.  I looked at the study myself.

10  Q    And did you find it to be normal or abnormal?

11  A    I found it to be abnormal.

12  Q    And I would like to show you Exhibit 16, just for

13  identification at this moment.

14  A    Yes.

15  Q    And what are these images?

16  A    These are a bunch of squiggly lines that we call the

17  EEG.

18       So these --

19  Q    Hold on.  This is an EEG.  When and for who?

20  A    This is an EEG of Brigid Pierce.  And you can see the

21  date up there, July 20, 2022, at the very top.

22  Q    And Doctor, before we have you describe what's in them,

23  did you attach EEG images to you expert report?

24  A    I did.

25  Q    And are these at least some of those images attached --

1    A    Yes.

2    Q    -- to your report?

3            And are these true and authentic EEG images for

4    Ms. Pierce's brain from the testing you ordered in July

5    of 2022?

6    A    Yes.

7            MR. MAAZEL:  I move Exhibit 16 into evidence.

8            MR. HUTCHINSON:  No objection.

9            THE COURT:  Admitted.

10           (Plaintiff's Exhibit Number 16 received in

11   evidence.)

12           THE COURT:  You may publish.

13           (Exhibit published to the jury.)

14           MR. MAAZEL:  And so maybe if we could just cull

15   out the left column with all those letters and numbers.

16   BY MR. MAAZEL:

17   Q    And just take us -- tell us what those mean?

18   A    Sure.  So, like I said before, these electrodes that

19   are attached to the skull, each electrode has a name.  So

20   Fp1 means frontopolar 1.  And again, remember, we're

21   concrete.  So F is frontal.  T is temporal.  C is central.

22   P is parietal.  And O is occipital.

23           Luckily, we only have sort of four lobes.

24           So Fp1 is the frontopolar electrode.

25           The important thing, the most important thing is

Nadkarni - Direct - Maazel                    772

1  that the odd numbers are the left side electrodes and the

2  even numbers are on the right side of the electrodes.

3          So, you know, if you start with Fp1 and F7, and go

4  down to T1, T3 -- if you'll just highlight those -- those

5  electrodes are placed in a lateral aspect of the skull going

6  back on the left side like this (indicating) going back on

7  the left side of the skull (indicating).

8          And Fp2, F8 to T2, T4, are the analogous areas on

9  the right side.

10          So each electrodes is measuring a certain part of

11  the brain underneath it.

12          And then the ones below that are the central

13  electrodes, so Fp1, F3 to P301 are left sided in the central

14  strip of the brain, of the head, and Fp2, F4, Fp402 on the

15  right side.

16  Q    So, Doctor, can you show us where you found an

17  abnormality in this first image in the exhibit?

18  A    Yes.  So what we're looking for is asymmetries.  Both

19  sides of the EEG should look the same.

20          This is -- you know, these dark green lines

21  indicate one second of time.  So there's one, two, three,

22  four, five, six, seven, eight, nine, ten -- about ten

23  seconds on this page of time.

24          So EEG is a graph of electrical activity over

25  time.  And in these seconds -- the way the look at it is to

Nadkarni - Direct - Maazel                    773

1    compare the left side and the right side.

2           So if we look at the first six lines at the top,

3    that's the left side --

4    Q    Do you want us to blow something up?

5    A    Yeah, I'll tell you in second.

6           And the next six lines is the right side.

7           So if you could blow up the first three seconds of

8    these.

9    Q    (Indicating).

10   A    Yeah.  Keep going.  Keep going.  Keep going down.

11   That's good.  And go to the right.  Keep going.  Keep going.

12   Keep going.  Keep going.  Keep going.  Keep going.  Keep

13   going.  Keep going.  Keep going.  Keep going.  That's good.

14   That's good.

15          Okay.  So if you compare in one second, like the

16   second here, starting here (indicating) and going to here

17   (indicating) -- oops.  Here.  In that second, you want to

18   count how many brainwaves you see.

19          So if you count in Fp2FA, one, two, three, four,

20   five, six, seven in the first half of that second, if you

21   look at the top on the left side, you see these slower

22   waveforms -- oops.  Let me get those circled well.

23          Compared to.

24          So the -- when they're taller at the top and

25   pointy, and they are slower.  So meaning that particular --

Nadkarni - Direct - Maazel                774

1    those waves, that's called left temporal slowing, so -- and

2    there's more of it over here, with a sharp wave, this thing

3    (indicating) in the middle is a sharp wave.

4              So there's slowing of the background of the waves.

5    You can see there's a lot more faster waves in here in -- in

6    here than there are over here.  Meaning, the faster the

7    waves, the lower amplitude.

8    Q    Just --

9    A    The slower are high amplitude.  And you can just count

10   them between the seconds.

11   Q    So Doctor, just, what does this all mean, the temporal

12   slowing?

13   A    This is an example of a left temporal slowing, which is

14   a functional correlate of the PET scan and the MRI.  So this

15   study is also pointing to a dysfunction in the left temporal

16   lobe.

17   Q    Okay.  And without going through the other imaging, did

18   you find similar issues in the other images?

19   A    In the right temporal lobe.  Yes.

20   Q    All right.

21   A    Both sides, independently, there was temporal lobe

22   slowing, temporal region slowing.

23   Q    Now when you ordered the EG, was there a report from

24   someone at NYU about the EG?

25   A    Yes.

1   Q    And who did that report?

2   A    That was Dr. Billakota, Santoshi Billakota.

3   Q    And who is that?

4   A    She's one of the junior attendings in the epilepsy

5   division at NYU.  She came maybe six or seven years ago to

6   NYU.

7          THE COURT:  Pause for a one second.  Pull the

8   microphone a little further from you, just because it is

9   really hard for the court reporter to record when the

10  percussive sound happens.

11         And can you spell Billakota?

12         THE WITNESS:  Yes, I think it is B-I-L-A-K-O-T-A

13  (sic).  First name is S-A-N-T-O-S-H-I.

14         THE COURT:  And if you can maintain that distance

15  off the mic, that would be perfect.  Thank you.

16         THE WITNESS:  Thank you, Judge.

17  BY MR. MAAZEL:

18  Q    And you said that Dr. Billakota was a junior doctor

19  with about six or seven years' experience.

20         Did Dr. Billakota notice the temporal slowing that

21  you showed us in the EEG?

22  A    She did not.  She did not comment on that.

23  Q    Are there any reliable, authoritative peer-reviewed

24  publications that discuss the impact of traumatic brain

25  injury on the brain?

Nadkarni - Direct - Maazel                          776

1   A     The *Nexus* publications.  Yes.

2   Q     All right.

3              MR. MAAZEL:  If we could just show, just you,

4   Doctor, Plaintiff's Exhibit 35.

5   BY MR. MAAZEL:

6   Q     Entitled "Regionally Selective Atrophy After Traumatic

7   Axonal Injury" from the *Archives of Neurology*.

8              Do you recognize that article?

9   A     Yes, I do.

10             MR. HUTCHINSON:  Objection.

11             THE COURT:  Overruled.

12  BY MR. MAAZEL:

13  Q     And what is the *Archives of Neurology*?

14  A     That's a peer-reviewed journal that we would rely on

15  for new research, and studies with retrospective analyses

16  about illnesses in neurology.

17  Q     And is that considered reliable and authoritative in

18  the field?

19  A     Yes, it is.

20             MR. HUTCHINSON:  Your Honor?

21             THE COURT:  Do you want to have a sidebar on this?

22             MR. HUTCHINSON:  Yes.

23             THE COURT:  Okay.  Let's have a sidebar.

24             (Continued on the next page.)

25

Sidebar Conference                    777

1          (The following occurred at sidebar.)

2          MR. HUTCHINSON:  Your Honor, we have a prior

3    ruling on the journal arguments.  And it's my recollection

4    Your Honor ruled that they can be used to cross-examine the

5    doctor, but they couldn't be introduced in plaintiff's case

6    in chief.  I have a transcript that you can pull out just to

7    confirm.  But that was in our first pretrial conference

8    regarding motions in *limine*.

9          MR. SEVER:  So Your Honor, the defendants move to

10   exclude these articles, Your Honor, and that motion -- and

11   Your Honor did not state that they could not use them with

12   Dr. Nadkarni.  There was a discussion during that motion

13   about your use of them with Dr. April, as well, but there

14   was no ruling that precluded us from using them with

15   Dr. Nadkarni.  And you can pull up the rule with hearsay or

16   learned treatises, and I think that falls within that

17   exception, though.  I think the rule is, we can read from

18   them, but we just can't show them to the jury.

19         THE COURT:  To be honest, I thought you were going

20   to tell me nobody had disclosed the treatises.

21         MR. HUTCHINSON:  No, no.

22         THE COURT:  So both experts can be asked about

23   these treatises.  I think I previously ruled that one side

24   could or could not show it to the other expert.  Why would I

25   do that?

Sidebar Conference                 778

1            MR. HUTCHINSON:  No, you ruled that they could.

2            THE COURT:  Right, right.

3            MR. SEVER:  To cross-examine them.

4            THE COURT:  But I didn't say the plaintiff

5     couldn't show it to their own expert.

6            MR. MAAZEL:  Right.

7            THE COURT:  Right.

8            MR. HUTCHINSON:  There was --

9            MR. SEVER:  As far as the objection to the motion

10    to preclude the exhibit in general, we can look at the

11    transcript.  I have a copy.

12           THE COURT:  Right.

13           MR. SEVER:  But I think the basic issue here is

14    these are admissible as -- or Mr. Maazel says she's not even

15    going to try to speak to these exhibits.  Just have him read

16    from them as a learned treatise and he's going to lay a

17    foundation for them.

18           THE COURT:  Could you proceed thereby skipping

19    only to this, or can you simply read whatever composition

20    and --

21           MR. MAAZEL:  That's --

22           THE COURT:  -- Do you agree with this or not?

23           MR. MAAZEL:  That's --

24           THE COURT:  Don't reference it.

25           MR. MAAZEL:  Well, I was going to read from the

Sidebar Conference                              779

1   document, but I think I'm allowed to quote from the

2   treatise, Does he agree or disagree?

3            THE COURT:  Can you move on and then go to another

4   topic so we don't have to wait for you-all to get the

5   transcript, because I don't want to excuse the jury again?

6            MR. MAAZEL:  Of course.

7            THE COURT:  I'll come back to this, all right?

8            (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Nadkarni - Direct - Maazel                    780

1          (Sidebar ends; in open court.)

2          (In open court.  Jury present.)

3          THE COURT:  So if you'll move on to another topic,

4    we'll come back to that.

5          MR. MAAZEL:  Sure.

6    BY MR. MAAZEL:

7    Q    Did you, yourself perform a neurological exam on

8    Ms. Pierce?

9    A    Yes, I did.

10   Q    And can you talk us through -- well, first of all, was

11   your neurological exam normal or abnormal?

12   A    It was abnormal.

13   Q    And can you take us through what you did, tell us what

14   test that you did and what you found.

15   A    Sure.

16          So the neurological consistent of testing that

17   looks for abnormalities in different parts of the nervous

18   system.  So you check each different segment of the nervous

19   system and different function of the nervous system.

20          The first thing is called a mental status

21   examination.  That includes things like orientation,

22   language, processing speed, attention.  And you can do that

23   with something called MoCA, The Montreal Cognitive

24   Assessment, that's a 30-item test.  And if you get 26 or

25   below, that's an abnormal score.

Nadkarni - Direct - Maazel                    781

1          This is the test that President Trump passed with

2    flying colors that he likes to brag about and here her score

3    is 29 out of 30, so she passed that test in mental status

4    exam and my examinations.

5          The next thing is cranial nerve examination.  So

6    all the muscles in our face have nerves that come from the

7    brain stem that make them move and you can test those by

8    testing eye movement.  When the doctor has you -- tests your

9    eye movements, that's testing cranial nerves.

10          Sensation on the face is cranial nerves.  How you

11   close your eyes, that's cranial nerve, blinking.  Raising

12   the forehead, the eyebrows.  These are all functions of the

13   cranial nerves and her cranial nerve examination was

14   abnormal.

15          She had decreased sensation on the left side in

16   the first distribution of the fifth cranial nerve, so it's

17   B1, B2, B3.  It was on the -- in B1 distribution on the left

18   side.

19          She also had an abnormal sensation on the right

20   side of her face and we call that in our field dysesthesia.

21          That's like an abnormal sensation when you touch

22   it.  It doesn't feel normal.  And she described it as a

23   gritty sensation.

24          She also had a little bit of weakness in her right

25   pinkie finger but otherwise, her motor exam was normal.  And

Nadkarni - Direct - Maazel                      782

1    the rest of her sensory on her body, she also had less

2    sensation in various places on the left side throughout.

3           She had very brisk reflexes.  So when the doctor

4    taps the knee and the leg kicks out, it should go at a

5    certain rate.  But when somebody has damage to their central

6    nervous system, it become very fast.  So she had diffused

7    hyper reflexes that weren't very fast.

8           On my examination, these are not things that you

9    can fake or change.  This is a mechanical test.

10          And she also had an increased jaw jerk reflex

11   where you put the finger on the chin and you tap and just

12   like a knee jerk, the jaw also is a muscle and you get a

13   reflex.

14          And if that is brisk too fast, that shows a lesion

15   above the level of cranial nerve 5 in the midbrain, so it's

16   somewhere in the brain, it just points to some brain

17   dysfunction.

18          And the last thing she had was something called

19   frontal release signs.  So when we're born we have all these

20   reflexes as newborns that go away between 1 or -- between 12

21   and 18 months.  One of them is a grasp reflex.  If you put

22   you fingers -- if you put your fingers in the hand of a

23   baby, the baby will just grasp the fingers.

24          Another one is rooting where you tap the cheek and

25   the baby will go to that side or smell, or you touch the

Nadkarni - Direct - Maazel                 783

1   lips and lips will purse, or Glabellar tap where you tap the

2   forehead and they can't stop blinking.

3           THE COURT:  Could you say it again?  What?

4           THE WITNESS:  Glabellar.

5           THE COURT:  Labellar?

6           THE WITNESS:  Glabellar tap.

7           THE COURT:  Could you spell that?

8           THE WITNESS:  Yes.  G-L-A-B-E-L-L-A-R.  And the

9   then tap, T-A-P.

10          And the last one is something palmomental reflex,

11  which is kind of why when scratch the palm of the hand and

12  the mentalis muscle twitches in the chin.  Palmomental

13  reflex.  Sometimes -- I think I have one sometimes.

14          But generally speaking, if they stick around,

15  there's sign of frontal lobe injury.  So these are all

16  things that babies have that go away when the myelin -- when

17  the brain -- like the wiring of the brain gets advanced in

18  first or second year of life.  But they come back out again

19  under a couple of circumstances.

20          Mainly when frontal lobes are degenerating or

21  injured, certain dementias.  Like frontal temporal dementia

22  or Alzheimer's disease, you can see these frontal release

23  signs as degeneration of the frontal lobe happens.

24          And the second instance is head injuries, brain

25  injuries where the frontal lobe get injured and you see this

Nadkarni - Direct - Maazel                    784

1    regression to this infantile reflex.  And it's a very sure

2    sign of frontal lobe dysfunctional injury.

3            So she had a right palmomental, very marked

4    right-sided palmomental response.  I'd scratch the palm and

5    the chin would twitch.  And she also had a grasp reflex.

6    Very mild.  If you put your fingers in her hand, she would

7    close her hands around the finger.

8            So she had abnormal findings on frontal release

9    signs, as well.  I think that's a -- those are all the

10   abnormal findings.

11   Q    In addition to your own neurological exam and the

12   testing you did, did you also order neuropsychological

13   testing on Ms. Pierce?

14   A    Yes, I did.

15   Q    And did someone at NYU prepare a neuropsychology

16   report?

17   A    Yes.

18   Q    And if you could look at Exhibit 20 for identification?

19   A    Yes.

20   Q    Is that the neuropsychology consultation report that

21   you ordered?

22   A    Yes.

23   Q    And who did that report?

24   A    I believe it was Dr. Christina Morrison.

25   Q    At NYU?

Nadkarni - Direct - Maazel                    785

1   A    At NYU.

2           MR. MAAZEL:  All right.  I move Exhibit 20 into

3   evidence.

4           MR. HUTCHINSON:  No objection.

5           THE COURT:  All right.  Admit.

6           (Plaintiff's Exhibit Number 20 received in

7   evidence.)

8           THE COURT:  You may publish.

9           (Exhibit published to the jury.)

10  BY MR. MAAZEL:

11  Q    All right.  And so if we can go to Page 2, the

12  Presenting History, is that something you considered as part

13  of your analysis?

14  A    Yes, it was.

15  Q    And just take us through that.

16  A    Yes.  So this was very similar to the history that I

17  got from her as well.  And this -- this reports a -- that

18  she was assaulted by police following a protest, with

19  repeated head strikes to multiple areas of her skull.  They

20  mention that neurodiagnostics were negative in the emergency

21  department.  And she was diagnosed with a concussion.

22          And ENY notes contemporary to the event reflect

23  patient's good recall of the event.  And that she had

24  postevent sequalae migraines, visual disturbances,

25  paroxysmal hypothermia.  Those are those changes in the

Nadkarni - Direct - Maazel                    786

1  temperature.  And then these natural events of panic were

2  also reporter to Dr. Morrison, as well as neurological

3  symptoms, headache, numbness, visual disturbance.  So these

4  are very similar to the things that I also got from her

5  history.

6           And then visual disturbance is also glare and

7  spikes in her vision, nausea and headache, which found,

8  nausea headache is a -- is significant for migraines.

9           These episodes of nocturnal flashing were also

10 mentioned to Dr. Morrison and were mentioned to me.

11          And these episodes of waking up and sweating and

12 increased heart rate.

13 Q   By the way, Doctor, the question I raised:  Did she

14 tell you that she had the occasional migraine before the

15 incident?

16 A   She said that she had ocular migraines since the age of

17 12, which were just visual symptoms by themselves.

18 Q   Okay.  And then spring of 2022, I'm not sure if you

19 covered that.

20 A   Oh.  The last thing, that's when I was at -- when I had

21 evaluated her.

22 Q   Okay.  Did you also look at the cognitive symptoms?

23 And this is the second page of the report.  Take a look at

24 that.  Just the cognitive symptoms up there.  Yeah.

25          What was the significance of these findings?

Nadkarni - Direct - Maazel                    787

1   A    Yes.  So they were also in line with what I was told

2   about sort of making mistakes at work.  She described it to

3   Dr. Morrison as dropping balls.  And that her boss had

4   noticed changes as well.

5              And again, she mentions to Dr. Morrison struggles

6   with multiple tasking and playing memory problems and word

7   finding problems, that's frontal lobe that's same area as

8   the PET scan, left frontal difficulties.

9   Q    All right.  Now, did Dr. Morrison give Ms. Pierce a

10  number of tests --

11  A    Yes, she did.

12  Q    -- for intellectual functioning and things like that?

13  A    Yes.

14             MR. MAAZEL:  And so if we could turn to the bottom

15  of Page 3.  Under "test results," sorry.  Yes.

16  BY MR. MAAZEL:

17  Q    Well, that paragraph that was culled out, are those the

18  tests that Dr. Morrison --

19             THE COURTROOM DEPUTY:  I'm sorry, microphone.

20  BY MR. MAAZEL:

21  Q    Are those the tests that Dr Morrison did with

22  Ms. Pierce?

23  A    Yes.

24  Q    And then if we could go below, "Test results, general

25  intellectual functioning," was there anything of

Nadkarni - Direct - Maazel                    788

1    significance there to you?

2    A    Yes.  A speculate, a split, in the score between the

3    VCI 137 and the PRI 110.

4              So these are very high scores.  She actually has,

5    you know, high scores in her intellectual testing here.  But

6    there's a big split.

7              So VCI is verbal intelligence.  And PRI is

8    performance.  Grossly speaking, this left hemisphere

9    function, language, that's verbal.  And the right hemisphere

10   function which is more performance related.

11             And so neither one of these are abnormal on their,

12   but the difference is abnormal in the asymmetry of how

13   different it is.

14             137 is a very, very high score, and 110 is a

15   medium to moderately hide score.  So that's one thing I

16   noticed.

17   Q    All right.  Now, there were a number of other tests,

18   attention to processing, executive functions, language,

19   visual, spatial, learning and memory.  And the essential

20   result of those tests were normal or abnormal?

21   A    They were -- they were essentially normal.

22   Q    And what is your take on that?  What is your opinion as

23   to why that is?

24   A    Yes, I think that the split means -- means something.

25   But I also think that it probably relates to the fact that

Nadkarni - Direct - Maazel                    789

1   she was probably coming from a very, very, very high level.

2         So if she was coming from a very high level and

3   had a hit you might still be in the normal range.

4         And we see that routinely, depending on where your

5   baseline is.  We don't have baseline testing, we're not

6   sure.  But that would be -- that would be my hypothesis.

7   Q    Okay.

8   A    And also, I'm curious about the split because that

9   might be a result of the injury.  It's not normal to have

10  that wide of a split between verbal and performance

11  measures.

12  Q    And then after that, there is a section in the next

13  page, "mood self-report" --

14        Well, actually, let's turn to this summary.  This

15  is Dr. Morrison's summary of the neuropsychological report,

16  right?

17  A    Yes.

18  Q    And can you take us through the second and third

19  paragraphs?

20  A    Sure.  She said that overall she had preserved

21  abilities across many cognitive domains.  But she put an

22  interesting sentence in after that, which is the -- "The

23  findings of this evaluation were impressively normal and

24  seemingly at odds with the recent neuroimaging study.

25        So I think, you know, this -- this impressively

Nadkarni - Direct - Maazel                790

1    normal finding, I think she's just noting that it -- it

2    doesn't fit with what we actually see on the MRI scan.

3             So one explanation for that would be, she was

4    coming from a very high place and this is where she landed

5    after this traumatic brain injury.

6             And then there's also mention of not just that --

7    that split, but many symptoms or anxiety and depression.  So

8    those scales -- those tests, there were scales that were

9    given for anxiety and depression and those -- those were

10   found to be quite high.  Quite symptomatic.

11   Q    So the anxiety and depression, is that normal?

12   A    That's not normal.

13   Q    Okay.  And so if we could go back to Exhibit 72, your

14   demonstrative exhibit.  And so you listed a number of

15   abnormalities.  And just, in summary --

16             MR. MAAZEL:  If we just first cull out the top two

17   rows.

18   BY MR. MAAZEL:

19   Q    We found that the brain MRI scan was normal or

20   abnormal?

21   A    Abnormal.

22   Q    The brain PET scan normal or about abnormal?

23   A    Abnormal.

24             MR. MAAZEL:  Let's keep going.

25   BY MR. MAAZEL:

Nadkarni - Direct - Maazel                791

1   Q    And then you did your --

2           MR. MAAZEL:  Cull the rest of it.

3   BY MR. MAAZEL:

4   Q    You did a neurological exam.  Normal or abnormal?

5   A    Abnormal.

6   Q    And by the way, what was the clinical consequences of

7   the abnormal neurological examination?

8   A    Yeah, most of my findings involved individual trauma.

9   We found more dysfunctions of the frontal lobe syndrome,

10  which typically is, like I mentioned before, all the frontal

11  lobe functions.

12  Q    Okay.  Motivation executive functioning?

13  A    Cognitive initiation.

14  Q    Okay.  The video EEG, normal or abnormal?

15  A    Abnormal.

16  Q    And what are the clinical consequence of that?

17  A    So again, it shows abnormal functioning in the limbic

18  structure, the amygdala and the hippocampus in those

19  regions.  The temporal regions measures that.

20          So it just -- it corroborates the MRI and the

21  PET scan.

22  Q    And that leads to what type of real-world clinical

23  consequences for Ms. Pierce?

24  A    It has to do with, when we -- when we get information

25  about an object, the brain constructs a mental image of that

Nadkarni - Direct - Maazel                    792

1    object and then presents it to the frontal lobe to decide

2    salience and valence.

3            How important is it?  To me, salience, does it

4    have to do with me.  And is it good or bad?

5            And then that frontal lobe is connected to motor

6    planning and motor activity.  That's called behavior, right.

7    So judging the salience and valence of things and decide how

8    to behave in relation to them is based on this frontal and

9    limbic amygdala canvas network.

10           And so that -- that -- that network is not working

11   in her case, so it might be harder to gauge what might be

12   important and what might not be important in certain

13   circumstances.

14   Q    And then the neuropsychological testing, even though

15   Dr. Morrison said that her cognitive testing was normal, you

16   concluded that her overall test was normal or abnormal?

17   A    Abnormal.

18   Q    Because?

19   A    Because the scale showed high levels of anxiety and

20   depression.

21   Q    Okay.  Did Ms. Pierce have an MRI six weeks after the

22   incident with police?

23   A    Yes I believe she did.

24   Q    And was that at Brooklyn Hospital?

25   A    At Brooklyn Hospital Center.

Nadkarni - Direct - Maazel                    793

1   Q    What were the results of that MRI that happened six

2   weeks later?

3   A    That was normal.

4   Q    And what is the significance of a normal MRI six weeks

5   after?

6   A    It's very important in this case because we know what

7   that tells us is that prior to this incident she had a

8   normal brain.

9          And you don't see MRI changes -- often you don't

10   see MRI changes after a traumatic brain injury until many

11   months to years later.  Even 15 years, 20 years.

12          If you think about NFL football players or college

13   football players, who had chronic traumatic encephalopathy,

14   CTE --

15          MR. HUTCHINSON:  Objection.

16          THE COURT:  Overruled.

17          MR. HUTCHINSON:  Out of the scope of the report,

18   Your Honor.

19          THE COURT:  Overruled.

20          I'll allow it so you can explain the concept.

21          Go ahead.

22          THE WITNESS:  So you know, those players don't

23   even report concussions at all.  But if you look at their

24   brains in their 40s and 50s, they had atrophy, just from

25   those -- every time in the line when they hit each other,

Nadkarni - Direct - Maazel                    794

1    that's a deceleration injury of the brain.

2           And so even without a loss of consciousness, even

3    without anything, you can have a -- a -- a -- an atrophy in

4    the brain from a head injury late, not right away.

5    BY MR. MAAZEL:

6    Q    So the fact that Ms. Pierce had a normal MRI six weeks

7    after the police incident and an abnormal MRI with all that

8    brain damage you discussed two years after tells you what

9    about Ms. Pierce?

10   A    It's a textbook case of sort of atrophy after brain

11   injury.  It's typical for the kind of time coursework.  You

12   know, it's very rare that we get a case in neuropsychiatry

13   of a traumatic brain injury where every single element you

14   can check off and sort of tie it up in a bow.

15          Diagnostically speaking, this was a slam dunk of a

16   diagnosis because you have a history, you have the video

17   evidence and then you have all of these objective findings

18   that concur with her symptoms.

19          It's not like she had some symptoms and then she

20   had other areas of her brain that were not working and

21   abnormal.  Everything goes together from the history to the

22   neurologic examination, to all the testing that we have

23   done.

24          You don't see that very often, where every test

25   kind of points to the same problem.

Nadkarni - Direct - Maazel                    795

1    Q    Now, you mentioned earlier that you reviewed a sworn

2    deposition of Dr. Robert April, the defense expert, correct?

3    A    Yes.

4    Q    And I want to ask you about some of his deposition

5    testimony and ask whether you agree or disagree with it.

6    A    Sure.

7    Q    So do you agree with Dr. April -- this is Page 66, line

8    8 of his testimony -- that, "the more force that's used, the

9    more likely --"

10             MR. HUTCHINSON:  Objection.  Outside the scope of

11   the report, Your Honor.

12             THE COURT:  Let's have a sidebar.

13             Perhaps, Ladies and Gentlemen, let's take a break.

14   We'll make this our afternoon break, so be ready to go at

15   4:00.

16             Don't talk about the case.  Keep an open mind.

17             THE COURTROOM DEPUTY:  All rise.

18             (Jury exits.)

19             THE COURT:  So, Dr. Nadkarni, you can step down

20   and also if you'll leave the courtroom, I'd appreciate it.

21             THE WITNESS:  No problem.

22             THE COURT:  We just need to talk about -- to your

23   lawyer right now.

24             Have a seat, everyone.

25             So let's first address the issue that came up

Nadkarni - Direct - Maazel                    796

1    about the treatise or treatises.

2         My law clerk was able to go back and find the

3    transcript and basically what was said was as follows:

4         I say, "Okay, the medical articles, I don't see

5    any reason to preclude the introduction of those if they

6    are -- if they meet the rule basically that -- that they are

7    the type of reliable authority relied upon by experts in the

8    field."

9         So I don't see any basis to preclude reference to

10   or introduction of those articles and that's under

11   Rule 803.18.

12         "Do you want to argue further about it

13   Mr. Hutchinson?"

14         And then Mr. Hutchinson said, "Yes.  I would say

15   so, long as the plaintiff introduces those journal articles

16   in the manner that was suggested in their motions in *limine*

17   or opposition to our motion -- motions, that's fine.  We

18   have no problem with that.  I believe it must be done in

19   cross-examination once the witness is given an opportunity

20   to engage with those articles; and, of course, they should

21   meet the other rules as well."

22         Now, in the written motion in *limine*, or

23   opposition, rather, of Plaintiff, to Defendants'

24   motion in *limine*, what they said was, plaintiff's neurology

25   expert, Dr. Nadkarni, will testify that the articles are

Nadkarni - Direct - Maazel                    797

1  reliable authorities, allowing Plaintiff to cross-examine
2  Dr. April about them at the trial.

3      Okay.  So what I understand Mr. Maazel is trying
4  to do right now is to ask Dr. Nadkarni if those are reliable
5  authorities in their field, thereby, setting up the
6  cross-examine of Dr. April.

7      So that seems to be consistent with what they said
8  before, consistent with what you said was okay and roughly
9  consistent with the rule.  The rule does say that these
10 treatises should be offered on cross-examination of an
11 expert or if the expert themselves relies on them, they can
12 be admitted.

13     But it strikes me that in order to make the
14 cross-examination of an opposing expert on those, somebody
15 has to establish that these are reliable articles.  It
16 shouldn't just depend on the expert against whom they are
17 being offered or who's being cross-examined about them to
18 say no, they are not reliable.

19     So it seems to me it is fair for the party who
20 wants to use them for them cross -- and this goes both
21 ways -- to be able to have their own expert say yes, these
22 are reliable and then the jury can decide who they believe
23 in that regard.

24     MR. MAAZEL:  And to be clear, Judge, and I think
25 he started to do that and will do that.

Nadkarni - Direct - Maazel                798

1              But to be clear, I want to read some parts of

2    those treatises and get his comment on them, which I think

3    exactly what the rule permits.  So this is Rule 18A, that

4    the statement can be called to the attention on cross or

5    relied on by the expert on direct and the statement may be

6    read into evidence but not received as an exhibit.

7              THE COURT:  Okay.

8              MR. MAAZEL:  So I wanted to read relevant portions

9    of the treaties, get his comments on them and -- which I

10   think is exactly what the rule permits on direct or on

11   cross.  There's no distinction.

12             THE COURT:  Let me hear from Mr. Hutchinson.

13             MR. HUTCHINSON:  Yeah.  Your Honor, I was going to

14   agree with your ruling, and that was my recollection of the

15   ruling in pretrial.

16             The questions that I was hearing didn't pertain to

17   just the mere, Is this a reliable source?  And, in fact, you

18   know, at least our neurology expert is going to dispute that

19   those are reliable authorities.

20             But I think that you're right, that if it's

21   established through an expert, that these publications are

22   generally relied on by neurologist specifically, then --

23   then I conceded and I conferenced that they can be used for

24   cross-examination of Dr. April.

25             But the question that I objected to had to do with

Nadkarni - Direct - Maazel                    799

1    the substance of the articles.

2         THE COURT:  Right, and Mr. Maazel, you're

3    confirming that you want to have Dr. Nadkarni endorse

4    something within the article and --

5         MR. MAAZEL:  Absolutely.  And I think that's

6    exactly what the rule permits.

7         THE COURT:  Well, did he rely on these treatises

8    in forming his opinion and was that disclosed to the other

9    side?  Those are two different questions.

10        (Pause in proceedings.)

11        THE COURT:  Right.  So my -- the rule, I think

12   there's no disagreement about what the rule says, 083.18,

13   very specifically sets forth that these treatises can be

14   introduced or called to the attention of an expert witness

15   on cross-examination or relied on by the expert on direct

16   examination and is a publication that's a reliable

17   authority.

18        And then it qualifies as admissible under hearsay

19   exception.

20        But here, it's not clear to me that Dr. Nadkarni

21   relied on this treatise; and if he did so, that he disclosed

22   that in his report.  I am not sure about the second part of

23   that.  Obviously, that's not part of the rule, per se.

24        But did -- is Dr. Nadkarni going to say, "Yes,

25   this is something I did rely on"?

Nadkarni - Direct - Maazel                    800

1        MR. MAAZEL:  I think what he will testify is that

2   that is -- the treatises in his field make absolutely clear

3   that TBI's cause various types of brain injury and that

4   these are some of the treatises that say that, among many

5   others.

6        I don't believe, Your Honor, that in his expert

7   report, he cited those treatises.  I don't know that that's

8   a requirement, that any treatise that is related to the

9   subject matter, he mentions in his report and it is

10  something -- those treatises -- or articles, I should say,

11  are articles that we cross-examined Dr. April with at his

12  deposition so --

13       THE COURT:  Well, actually, yes.

14       To be more precise, the rule is, a statement in a

15  learned treatment -- a treatise, rather, sorry -- qualifies

16  as a hearsay exception.  So it actually doesn't just speak

17  about the overall treatises but it says, a statement in

18  learned treatises does qualify as an exception to the

19  hearsay rule provided that those two criteria are met.

20       And so it's going to be called to the attention of

21  Dr. April on cross and I think here Mr. Maazel wants to have

22  his expert then establish that this is the something that is

23  considered a -- well, actually, hold on one second.  Sorry.

24       No, I mean, I guess what I would say is this:  You

25  want to have your expert basically say, this is a reliable

Nadkarni - Direct - Maazel                    801

1   treatise.  And then you want to be able to cross-examine

2   Dr. April on one of the statements in it.

3        I do think certainly Dr. Nadkarni can say that the

4   publication is reliable -- is a reliable authority.  That's

5   subpart B of 18.

6        MR. HUTCHINSON:  18.

7        THE COURT:  But I think you don't necessarily get

8   to ask him, Is this particular statement something that

9   experts rely on.

10        But you can certainly cross-examine Dr. April

11   about that the statement.

12        And that's actually -- I mean, I guess, what you

13   can do is certainly ask doctor -- Dr. Nadkarni if he relied

14   on whatever the statement is or whatever the principle is in

15   formulating his opinion.

16        That, I think, you probably can do.  I guess we

17   have a question, then, of whether or not that was made clear

18   in the report or not.  But I think that that's just a minor

19   quibble.

20        So I would say that you could take one particular

21   statement or two statements, whatever they are, and say, "Is

22   this a statement that you rely on regularly as an expert or

23   relied on in reaching your conclusions in this case?"

24        I think you can do that.

25        MR. HUTCHINSON:  Well --

1          THE COURT:  Then there's a cross of Dr. April and

2     Dr. April will say, "No, I disagree with that statement."

3          MR. HUTCHINSON:  Well, see the second part, I'm

4     fine with.  It's the first part that sort of goes beyond

5     the Court's earlier ruling and that puts us at a

6     disadvantage because we haven't prepared to address the

7     substance of these articles with this witness since it's, in

8     our opinion, inadmissible hearsay --

9          THE COURT:  But --

10          MR. HUTCHINSON:  So you know, what I understood

11     and what was represented by Plaintiffs was that they were

12     going to use these article to impeach our expert.  And you

13     know, I think -- I think they probably could have

14     established the reliability of these articles through our

15     expert as well.

16          I don't think that Dr. Nadkarni needs to establish

17     that these are a reliable source because I think Dr. April

18     could have done that as well.

19          However, that sort of reading into the record of

20     these you know, cherry-picked, you know, sort of statements

21     from these -- these journal articles which, as you're going

22     to see when Dr. April is on the stand, are somewhat

23     misleading, I think not only is in contravention of Your

24     Honor's earlier ruling but also in contravention of the

25     rule.

Nadkarni - Direct - Maazel                803

1          THE COURT:  No.  You're not right about what I

2    ruled earlier.  I said, I think both sides should be able to

3    use these.  I was speaking very broadly and then you said,

4    "I'm fine with the plaintiff using the journal article so

5    long as they do so in a manner that is suggested in their

6    opposition to our motion," and in their opposition they

7    said, Dr. Nadkarni will testify that the articles are

8    reliable authorities, which would then allow plaintiff to

9    cross-examine Dr. April.

10         So at a minimum, we all agree that Dr. Nadkarni

11   can say the articles -- or this article is a learned

12   treatise that people in my field rely on.

13         Now, again, I have not made a ruling one way or

14   the other about that.  You both agreed to that essentially.

15         Now you are saying --

16         MR. MAAZEL:  Judge, I can short-circuit this.

17         THE COURT:  Hold on.  Hold on.  Oh, you can

18   short-circuit it by telling me you are not going to do it?

19         MR. MAAZEL:  Yes.  I am just reflecting on this

20   argument.  I certainly don't think Your Honor precluded us

21   from in any way, shape, or form but I am fine just

22   establishing that these are reliable authorities and not --

23   and them not reading in quotes, we'll save that for

24   Dr. Nadkarni.

25         THE COURT:  Okay.  Terrific.

Nadkarni - Direct - Maazel                    804

1          Now, let's go on to the -- I feel like I want to
2   finish this off just because the rule talks about statements
3   but I'm not going to do that.  It's -- what is it?  "The
4   candle is not worth the flame."  It's actually "the candle
5   is not worth the game," but nobody really cares about the
6   origin of that expression statement.
7          Now, the second issue is -- I've already
8   forgotten.
9          What was the second issue that we paused over?
10          MR. MAAZEL:  It was the issue of seeing whether he
11   agrees or disagrees with some of the testimony of Dr. April.
12          THE COURT:  Oh, right.
13          MR. MAAZEL:  In his deposition.
14          THE COURT:  And you're saying it was beyond the
15   scope of the report.
16          There was a supplemental report issued by
17   Dr. Nadkarni, but I gather it didn't address Dr. April's
18   report?
19          (Reporter asks for clarification.)
20          MR. HUTCHINSON:  Silent on that topic.
21          THE COURT:  Yes, use your mics.
22          So stay seated.  I know it's a --
23          MR. HUTCHINSON:  Sorry about that.
24          THE COURT:  Yeah.  Okay.
25          So not in the report.

1          MR. HUTCHINSON:  Correct.

2          MR. MAAZEL:  Yeah, I think it's fair game.

3     Dr. Nadkarni is not a rebuttal expert, but I think he's

4     allowed to comment on what the rebuttal expert is saying

5     about his conclusions.  And --

6          THE COURT:  He might be but you've got to give

7     some notice or put him on after Dr. April, and he has a

8     chance to hear Dr. April testify.

9          But in the pretrial run-up to this, there was no

10    indication that he was going to give any testimony about

11    Dr. April's conclusions.  And that would not be fair at this

12    point to let him testify in his direct about what April --

13    Dr. April hasn't yet testified, but just about his report.

14         MR. MAAZEL:  I mean, for whatever it's worth, I

15    was going to read in excerpts of Dr. April's deposition that

16    he agrees with, so.

17         THE COURT:  Well, I don't think --

18         MR. HUTCHINSON:  Well --

19         THE COURT:  Yeah, still, I mean, as a matter of

20    procedure and process, I'm not going to allow that.  That

21    would be unfair, I think, to the plaintiff -- defendant.

22         So -- defendants.

23         So don't ask him about Dr. April's report.  You

24    can go ahead and ask him about the treatise.

25         MR. MAAZEL:  Sure.

Nadkarni - Direct - Maazel                    806

1           THE COURT:  Okay.  All right.  Good.

2           So you folks take a few minutes and then we're

3    going to go to 5:30, after the jury comes back.

4           THE COURTROOM DEPUTY:  All rise.

5           (Jury enters.)

6           THE COURT:  Please be seated, everyone.

7           You may continue, Mr. Maazel.

8           MR. MAAZEL:  Thank you, Your Honor.

9           So if you could -- if we could publish, just for

10   you Doctor, Exhibit 35.

11   BY MR. MAAZEL:

12   Q    This was the Archives of Neurology article entitled

13   "Regionally Selected Atrophy After Traumatic Axial Injury."

14          Do you see that in front of you?

15          THE COURT:  Not yet.  He does -- oh, there we go.

16          THE WITNESS:  Not yet.

17          THE COURT:  Oh, it's not in front of you?

18          THE WITNESS:  No.

19          THE COURT:  Okay.  Let's see.  We have to wait

20   until Fida gets back.  Okay.

21          (Pause in proceedings.)

22          THE WITNESS:  I got it.

23   BY MR. MAAZEL:

24   Q    All right.  And again, the Archives of Neurology, is

25   that a reliable, authoritative, peer-reviewed publication

Nadkarni - Direct - Maazel                807

1   within your field?

2   A    Yes, it is.

3   Q    All right.  And I would like to show -- so is this

4   article a peer-reviewed article that is reliable and

5   authoritative in your field?

6   A    Yes, it is.

7   Q    All right.  Now, I would like to show you Exhibit 32.

8   Just you, Doctor.  And this publication -- do you have it in

9   front of you?

10  A    Yes, I do.

11  Q    A publication, *Neuropsychologia*.  Who are they?

12  A    Yes.  They're also a peer-reviewed journal that looks

13  at research in neuropsychology and data studies.

14  Q    And is this publication also a reliable authority in

15  the field of neurology?

16  A    Yes.

17  Q    Okay.  And this particular article, is that article a

18  peer-reviewed, reliable, authoritative article in the field

19  of neurology?

20  A    Yes.

21  Q    All right.  Why is it your opinion, to a reasonable

22  degree of professional certainty, that the assault by police

23  on June 3rd, 2020, caused all of the brain injury to

24  Ms. Pierce that you've described?

25  A    Because there's a confluence of history.  She didn't

Nadkarni - Direct - Maazel                808

1  have symptoms that she reported prior to the brain injury

2  that she reports after the brain injury that persisted.

3        Her neurological examination, her MRI scans of her

4  brain scan, her PET scans of her brain, neuropsychological

5  testing, or -- and video EEG testing were all abnormal, sort

6  of corroborating my impression of traumatic brain injury.

7  That's chronic and I believe permanent.

8  Q    Is there any other explanation for all of the brain

9  damage in Ms. Pierce, other than --

10        MR. HUTCHINSON:  Objection.  I'm sorry.

11        THE COURT:  Finish your question.

12 BY MR. MAAZEL:

13 Q    -- other than the incident on June 3rd, 2020?

14 A    In this case, we have an MRI, a baseline MRI right

15 after the incident so there's proof that there's no other

16 thing that happened prior to the incident, at least.

17        So I don't have any other explanation for -- for

18 the findings in her scans or her symptoms or her exam

19 findings.

20 Q    Is there any possibility that just early dementia at

21 the age of 41 can explain the brain damage that you found?

22        MR. HUTCHINSON:  Objection, Your Honor.  This is

23 outside the scope of the report as was the last question.

24        THE COURT:  Okay.  Let's have a quick sidebar.

25        (Continued on the next page.)

Sidebar Conference                    809

1          (The following occurred at sidebar.)

2          THE COURT:  Listen, not everything that he

3    testifies to has to be in the report, and my assumption is

4    that the reason these questions are being asked is because

5    the questions were being asked about the plaintiff's

6    dementia history, right?

7          MR. HUTCHINSON:  Well, this was the subject of our

8    motion, because he actually did not consider the

9    differential diagnoses of her and things like that.

10         Now, he's going to opine on whether history can

11   cause injuries such as this.  This is exactly what she

12   should have done in the first place, and these are

13   scientific opinions that are, you know, explaining why you

14   could use -- show up in these scans and they might not for

15   other reasons just exactly deviate in this report that we

16   pointed out to the Court earlier --

17         (Simultaneous cross-chatter.  The reporter unable

18   to discern.)

19         THE COURT:  -- cross-examine him on that and do

20   not let him ask the question if you think he can't give his

21   opinion.  If he didn't consider the dementia history, then

22   you cross on that.

23         MR. HUTCHINSON:  And if I cross on that, I had

24   opened the door to testimony that wouldn't be admissible

25   because it's not in the expert report.

Sidebar Conference                    810

1          THE COURT:  I think you want to challenge an

2    opinion right now.  His opinion stands as it is.

3          MR. HUTCHINSON:  Uh-huh.

4          THE COURT:  If you don't ask him about the

5    dementia, I guess it's a possibility.  I guess somehow he

6    didn't consider this as his opinion is invalidated at all.

7          MR. HUTCHINSON:  I don't know what his opinions

8    are.  I'm about to learn them for the first time, and that's

9    what the rule is designed to prevent.

10         THE COURT:  I'm going to overrule the objection.

11   Not everything has to be in the report.  You can phrase

12   this, and I know you had the discussion beforehand about the

13   validity of it.

14         MR. HUTCHINSON:  Uh-huh.

15         THE COURT:  I'm going to let you cross-examine

16   him.  I'm not ruling out other cases, but I think the

17   plaintiff should get the same if you want to try to attack

18   him.

19         MR. HUTCHINSON:  Okay.  Now, can I just clarify?

20         If these are all questions we have in the science

21   of why her repertoire could cause any injuries that aren't

22   in this report --

23         THE COURT:  Uh-huh.

24         MR. HUTCHINSON:  -- would you find that to be out

25   of bounds, because I certainly wouldn't?

Sidebar Conference                              811

1          THE COURT:  I -- you know, again, I think you're

2    overemphasizing what's in the report.  It's not as this is a

3    surprise, this issue.  I think it's been in the depositions.

4    I just don't feel at this point I want him giving his

5    explanation about some amount of causation that had been

6    suggested throughout the case and could have been explored

7    with his --

8          MR. MAAZEL:  No, we never deposed him.

9          THE COURT:  Well, he could have been deposed in a

10   deposition.  But obviously, if it was an issue that was

11   going to be raised at trial, I think you should be able to

12   assess it as something that's not concluded --

13         THE COURT:  -- as --

14         MR. HUTCHINSON:  Right.  And it's not our burden

15   of proof to prove that it was right.  It's their burden to

16   prove the measure that resulted.  This -- it's our theory

17   that the plaintiff has not proven that it's more likely than

18   not.

19         THE COURT:  Why?

20         MR. HUTCHINSON:  That the injuries were caused,

21   which --

22         THE COURT:  Well, hang on.

23         MR. HUTCHINSON:  -- just all the more cause why I

24   would have liked to hear about that so that we could have

25   prepared or own expert to address those types of things.  It

Sidebar Conference                              812

1   was never done.

2          THE COURT:  You should have deposed --

3          MR. HUTCHINSON:  We didn't need to.  That's the

4   purpose of the expert's report, that the deposition should

5   not be necessary to flesh out deficiencies in the expert

6   report.

7          THE COURT:  Okay.  Then if nobody asked him about

8   cause, then his report stands as is, so then you are stuck

9   with the diagnosis and no one can --

10          MR. HUTCHINSON:  They didn't have documents --

11   they can't ask him about other cases because they didn't

12   document his opinions on those other cases in the report.

13          THE COURT:  Here's the thing:  It is not your

14   burden to prove causation.  You are trying to attack what

15   they say is causation of the expert.  If you're not going to

16   be able to argue to the jury that dementia would be the

17   cause and you have some expert report to support that --

18          MR. HUTCHINSON:  That's our expert report, not

19   theirs.

20          THE COURT:  But Dr. April I don't recall

21   suggesting it was because of the history of dementia.

22          MR. MAAZEL:  Dr. April is all over the map.  He's

23   said a lot of different things.

24          MR. HUTCHINSON:  Are you talking about deposition

25   or expert report?  In his last report, he says he has no

Sidebar Conference                    813

1   idea what caused all the back injuries --

2          THE COURT:  If you want to ask him about the

3   cause -- you cannot raise this issue without saying it's

4   dementia, and if Dr. April doesn't say it --

5          (Simultaneous cross-chatter.  The reporter unable

6   to discern.)

7          THE COURT:  -- if you're not going to let the

8   expert supply --

9          MR. HUTCHINSON:  I don't -- I think that this is

10  sort or reversing the burden here, which is to put the other

11  side on notice of the opinions that you intend to introduce.

12         THE COURT:  No, no, nobody gets to talk about

13  dementia being a possibility because it's not in evidence.

14         MR. HUTCHINSON:  But --

15         THE COURT:  As far as I know, there isn't any.  I

16  don't think it's in Dr. April's report.  I have not

17  committed it to memory, so I can't suggest that Dr. April --

18  he didn't say it.  Then there's, I guess the dispute --

19         MR. HUTCHINSON:  Well --

20         THE COURT:  I just don't want it --

21         (Simultaneous cross-chatter.  The reporter unable

22  to discern.)

23         THE COURT:  -- Dr. April's testimony or even

24  worse; in other words, that there's a possibility.

25  Possibilities are not going to be argued here with no

Sidebar Conference                    814

1    evidence to support it.

2            MR. HUTCHINSON:  All right.  I guess I see the

3    way the wind's blowing.  But if this is Your Honor's ruling,

4    I hope it will apply to our expert, as well.

5            THE COURT:  Yes.  You should ask him if that is

6    the proximate cause.  Dr. April, if you want to ask him that

7    that way, you can ask it, as well.

8            MR. MAAZEL:  They opened that door already with

9    Ms. Pierce, so...

10           MR. HUTCHINSON:  It's all over the report.

11           THE COURT:  That's why both sides shouldn't be

12   feelings so aggrieved, because I think that's fair game.

13           MR. HUTCHINSON:  That's not our burden, but...

14           THE COURT:  Understood.  I won't argue the ruling

15   with you.

16           All right.

17           (Continued on the next page.)

18

19

20

21

22

23

24

25

1            (Sidebar ends; in open court.)

2            (In open court.  Jury present.)

3            THE COURT:  All right, Doctor.

4            THE COURTROOM DEPUTY:  Judge, we need another

5    break.

6            THE COURT:  You could have used that time

7    effectively.

8            Doctor, you can either sit here or step down.

9    Whichever you want to do.  Everyone else, you have five

10   minutes.

11           (Witness exits the witness stand.)

12           (Recess taken.)

13           THE COURTROOM CLERK:  All rise.

14           (Jury enters.)

15           THE COURT:  Please be seated, everyone.

16           If only we can synchronize our breaks, that would

17   really -- I am sorry that we didn't coordinate that one

18   better.

19           All right.  So, Mr. Maazel.

20   BY MR. MAAZEL:

21   Q    And Doctor, I was just asking you whether early

22   dementia could be a possible cause of the brain damage

23   you've described in Ms. Pierce's brain?

24   A    No, that would not be possible.

25   Q    Why not?

Nadkarni - Direct - Maazel                    816

1   A    Because to see that level -- that change in the brain

2   and the structure, you have to have many, many clinical

3   symptoms of that type of dementia, which she doesn't have

4   symptoms of dementia.  So that just doesn't go together

5   clinically at all.

6   Q    Is there any cure for Ms. Pierce's brain injury --

7   other brain damage?

8   A    There's no cure because those nerve cells don't come

9   back.

10  Q    I would like to show you Exhibit 73.  And is that

11  another demonstrative table you've created as an aid for the

12  jury today?

13          THE COURT:  Okay.  You created that demonstrative;

14  is that right?

15          THE WITNESS:  I just need to see it.

16          Yes.

17          THE COURT:  Okay.  Go ahead.  You can publish

18  that.

19          (Exhibit published to the jury.)

20          MR. MAAZEL:  Just cull out the top half, make it

21  easier to read.  I mean, the whole half top of the page.

22  BY MR. MAAZEL:

23  Q    So you -- what are the chronic conditions Ms. Pierce

24  will have in perpetuity as a result of the brain injury,

25  Doctor?

Nadkarni - Direct - Maazel                817

1   A    So migraine headaches, I mean, she -- at the time that

2   I spoke to her, she was having four -- up to four to five

3   times a week migraine headaches that have been chronic.

4            Those visual symptoms, I think will be chronic as

5   well as potentially balance symptoms and vestibular

6   symptoms.  I think that she has undiagnosed epilepsy,

7   possibly.  So I think that could be something that she needs

8   to be followed up for.

9   Q    Why do you believe that?

10  A    Because she has symptoms that are very consistent with

11  common temporal seizures and -- mesial temporal sclerosis

12  has a very high rate of epilepsy that is associated with it.

13  It is the most common finding on an MRI in temporal lobe

14  epilepsy.

15  Q    And what symptoms are you talking about?

16  A    So she has this -- this sensation of a rising in

17  temperature changes at nighttime and thrashing at nighttime

18  and a sense of panic and fear.

19           So temporal seizures happen in the same places

20  where the amygdala is and the hippocampus is.  So common

21  feature are panic or fear because the amygdala is firing in

22  a temporal lobe seizure.  So she wakes up out of the night

23  with this panic kind of feeling.  It's very typical in

24  temporal lobe epilepsy.

25           And when you see a scar like that in the same

```
                    Nadkarni - Direct - Maazel              818
```

1   area, it's really something that needs to be followed.

2   Q     Okay.  And can --

3   A     And --

4   Q     I'm sorry.

5   A     -- cognitive impairment, along multiple domains that we

6   have talked about already, mainly the frontal lobe is sort

7   of a dysfunction as well as memory dysfunction.  Depression,

8   anxiety, panic disorder, post-traumatic stress disorder and

9   this kind of frontal lobe syndrome, hypo-frontal syndrome,

10  which has to do executive function problems, attention,

11  difficulty initiating thoughts and behavior and potentially

12  just inhibition.

13         She's also at increased risk for developing

14  dementia earlier.  We know that people with traumatic brain

15  injuries have a -- they can -- they can develop dementia

16  earlier because dementia is sort of a matter of reserve on

17  how many neurons you have left.

18         So let's say you start with a 100, and you need to

19  get to 50 to get dementia, in normal course of aging, you

20  might lose five or ten every so many years.  But if you have

21  a traumatic brain injury, you have to go from 100 to 60.

22  And then you only have a buffer of ten left.  It is not

23  uncommon for people to develop cognitive degeneration of

24  dementia maybe earlier than they would have, meaning 10 or

25  15 sometimes.

Nadkarni - Direct - Maazel                 819

1          And her imaging findings are already consistent

2   with an advanced dementia.  We know she doesn't have one,

3   but we the neuro imaging looks like she could.  So she's at

4   risk of that also.

5   Q    You, in your expert report, recommended various

6   treatment to manage Ms. Pierce's symptoms.

7          Can you take us through that?

8          We don't have a table for the jury.

9   A    Oh, sure.  Sure, no problem.

10         So, first of all, after a traumatic brain injury,

11   one of the main treatment modalities is multidisciplinary

12   cognitive remediation program.  Sometimes those are in

13   people who are still working and functional; those might

14   happen two afternoons a week.  But they involve things like

15   group therapy, physical therapy, occupation, visual therapy

16   and individual psychotherapy as well, as well as cognitive

17   therapy to try to get back or get around some of the

18   deficits that you have.

19         As well as she will need to see several different

20   neurologists, I think.  With her rate of migraines, she will

21   probably have to see a migraine doctor, a headache doctor

22   because she might need injections and other advanced -- more

23   advanced treatments.

24         She should be evaluated by an epileptologist and

25   may need to be followed by one.  That's epileptologist,

1   E-P-I-L-E-P-T-O-L-O-G-I-S-T.  It's an epilepsy doctor, as

2   well as a rehab doctor that does the cognitive remediation.

3            And she -- she -- she may need -- she maybe has

4   this already -- but undergo vocational types of training,

5   right now it sounds like she's been working.

6            And further needs maybe, again, in case there's an

7   early onset of dementia, she may need help overall, so...

8   Q    "Help" meaning?

9   A    Like, help at home doing activities of daily living and

10  finances and things like that.

11  Q    And in your expert report, I think on page 8, you

12  describe when you would anticipate Ms. Pierce would need a

13  home health aide or the nurse.

14           Can you take us through that.

15  A    You often think it's -- it could be, like I said to

16  her, 15 years earlier than usual or --

17  Q    The last page.

18  A    Oh, the last page.

19           Yeah, so you know, it could be if you're going to

20  develop dementia at 80, then it could be at 65.  Usually

21  these cognitive changes start after the age of 51, normally

22  in everybody.  Word-finding problems, difficulty finding

23  names and then things like Alzheimer's, and it's not,

24  usually start in the mid-70s, late 70s, in general.  But

25  after TBI, it could be in the 50s, late 50s, early 60s.

Nadkarni - Direct - Maazel                    821

1  Q    Doctor, the jury has seen and heard Brigid Pierce.

2           Are brain injuries always visible?

3  A    Well, most brain injuries are invisible.  But if you

4  take the case of those football players I mention before,

5  you would never know; or even a boxer, right, you wouldn't

6  even necessarily know who has been punched out several times

7  and has had several concussions and loss of consciousness,

8  if they are walking down the street, or even if they are

9  talking to you, you might not know that they've had

10 significant head injuries.

11 Q    Doctor, in the end of your expert report, you have a

12 summary of your opinion.

13          Can you give us the summary of your opinion in

14 this case?

15 A    Yes.  I believe Ms. Pierce has suffered a severe

16 traumatic brain injury that has caused permanent changes to

17 her brain functioning as a result of a traumatic brain

18 injury at the hands of the police in June of 2020.

19          MR. MAAZEL:  Thank you, Doctor.

20          I have no further questions.

21          THE COURT:  Thank you very much.

22          Cross-examination?

23          MR. HUTCHINSON:  Your Honor.

24          THE COURT:  Thank you.

25          You may proceed.

Nadkarni - Cross - Hutchinson                              822

1    CROSS-EXAMINATION

2    BY MR. HUTCHINSON:

3    Q    Good afternoon, Doctor.

4    A    Good afternoon.

5    Q    Doctor, this isn't your first time testifying, is it?

6    A    It's not.

7    Q    You didn't encounter plaintiff in a hospital setting;

8    is that right?

9    A    I did not.

10   Q    You were not her treating physician on any occasion

11   that she sought medical treatment, correct?

12   A    Correct.

13   Q    You were asked to examine plaintiff by her lawyers,

14   correct?

15   A    Yes, I was.

16   Q    And they told you that she had filed a lawsuit, right?

17   A    Yes.

18   Q    You understand that this is a lawsuit for money,

19   correct?

20   A    Yes, I believe it is.

21   Q    And they arranged for you to examine her in their

22   office; is that right?

23   A    That's right.

24   Q    And that was 600 5th Avenue in Manhattan on the 10th

25   floor, right?

1    A    I will just refer to my report.

2    Q    Sure.

3    A    I believe so.  I just don't know off the top of my

4    head.  I am sure you are right.  Let me find it -- 10th

5    Floor, 5th Avenue, yep.

6    Q    Now, when you treat a patient, you don't do it in their

7    lawyer's office, right?

8    A    No, not generally, you don't do that.

9    Q    And you were paid $800 per hour for that examination,

10   correct?

11   A    Yes.

12   Q    And you met with the plaintiff at her lawyer's office

13   on June 3, 2022; is that correct?

14   A    Yes, that is correct.

15   Q    But you did have some of her medical records at your

16   disposal at the time of the examination; is that correct?

17   A    I believe I had gotten some records, yes.

18   Q    Those are records from Brooklyn Hospital Center and

19   from NYU Langone Opthalmopathy from 2020; is that right?

20   A    I don't remember, honestly, which ones I got.

21   Q    Is there something that would refresh your memory as to

22   the records that you reviewed in compiling your report?

23   A    Oh, I just don't remember when.  I remember I got

24   those, yes, but I just don't remember what the timing was.

25   Q    I see.

Nadkarni - Cross - Hutchinson                    824

1          So did you have those records that I just referred

2    to, at least some of them, before you wrote the report in

3    September of 2022?

4    A    I -- I'd have to refer to my Vista, from what I -- what

5    I wrote down, if I may?

6              MR. HUTCHINSON:  With the Court's permission?

7              THE COURT:  Go right ahead.

8              THE WITNESS:  Thank you.

9    A    Yes.  I have NYU Eye Specialist notes from 2020.

10   BY MR. HUTCHINSON:

11   Q    And also some records from Brooklyn Hospital Center

12   from 2020, correct?

13   A    Correct.

14   Q    Okay.  And those records you had from Brooklyn Hospital

15   Center specifically, at the time of your initial examination

16   of plaintiff, you only had a record of a CT scan that was

17   performed on June 4th, 2020, which was normal, correct?

18   A    I'm not sure I looked at her records before I examined

19   her.  I don't generally -- I often don't do that.  I want to

20   examine the patient first.  So -- the client first.  So I

21   don't remember what the specific timing of that was.

22          But that -- but that CT scan is negative, that's

23   correct.  It was normal.

24   Q    Right.  And -- so maybe let me -- let me rephrase it.

25          You had the records of that normal CT scan at the

Nadkarni - Cross - Hutchinson                825

1   time you wrote your report in September of 2022, correct?

2   A    Yes.  Yes, I did.

3   Q    Okay.

4          THE COURT:  Both of you, a little bit slower for

5   our court reporter.

6          MR. HUTCHINSON:  Sure.

7   BY MR. HUTCHINSON:

8   Q    But at the time you wrote the report, you didn't have

9   any of the underlying medical records from that date of

10  treatment, correct?

11  A    I'm not sure what that means.

12  Q    From the June 4th, 2020, date of treatment at

13  Brooklyn Hospital Center, you didn't have any of the

14  underlying medical records from the date of treatment,

15  correct?

16  A    I don't remember.

17  Q    Is there something in your report that would refresh

18  your memory?

19  A    I can look.

20         THE COURT:  Slower.

21  BY MR. HUTCHINSON:

22  Q    Thank you.

23         THE COURT:  Remember, slower, Mr. Hutchinson.

24         MR. HUTCHINSON:  Okay.

25  A    I wrote down Brooklyn Hospital Center June 4, 2020,

Nadkarni - Cross - Hutchinson                826

1    Emergency Department.  There's a documentation, normal head

2    CT.  So I'm sure I saw the emergency department visit

3    documentation.

4    Q    Okay.

5              In those records that you reviewed from

6    Brooklyn Hospital Center, in 2020, those consisted of about

7    ten pages of discharge records, correct?

8    A    Yes, I believe that's correct.

9    Q    And you also didn't have the findings from that

10   July 18th, 2020, MRI at the time that you wrote your report

11   in September of 2022; is that correct?

12   A    That is correct.

13   Q    Not only did you not know she had an MRI at that time,

14   but you didn't have the findings from it, correct?

15   A    Correct.

16   Q    And that was when plaintiff's attorneys sent you

17   additional materials only recently in the fall of 2025,

18   correct?

19   A    Yes.

20   Q    Over three years after you wrote your initial report;

21   is that correct?

22   A    I guess.  I don't know exactly when I got them, if it

23   was August or September.  But yeah, around that time.

24   She -- yes.

25   Q    And so you didn't have an opportunity to review those

Nadkarni - Cross - Hutchinson                    827

1  medical records at the time that you wrote your report in

2  September of 2022, correct?

3  A    Are you referring to the Brooklyn Hospital MRI?

4  Q    Correct.

5  A    I did not have a chance to look at that one when I

6  wrote my report.

7  Q    Nor did you have the complete set of full medical

8  records from her June 4th, 2020, treatment at

9  Brooklyn Hospital Center, correct?

10  A    Right.  I had the emergency department visit.

11  Q    Discharge papers, right?

12  A    Oh, no, I think it was documentation from the emergency

13  department.

14  Q    And so with regards to her symptoms that Plaintiff

15  presented with on June 4th, 2020, at Brooklyn Hospital

16  Center, is it your testimony that you reviewed records

17  documenting those symptoms?

18  A    I reviewed just records from the emergency room visit.

19  So I didn't review all records documented, like you said,

20  the other records from that time.

21  Q    Right.  My question is, is it your testimony that you

22  reviewed records from that June 4th, 2020, date of treatment

23  at the emergency room beyond just those ten pages of

24  discharge records?

25  A    I did not.  I don't believe I did.  I think that's all

Nadkarni - Cross - Hutchinson                828

1   I looked at.

2   Q    Okay.  And so you had no impression of what the doctors

3   who examined her had of her at that time, correct?

4   A    That is correct.

5   Q    Now, on direct examination you testified that there

6   were some additional moderate abnormalities that appeared on

7   the PET scan that did not appear on the MRI in 2022,

8   correct?

9   A    Right.

10  Q    You also testified that you did view abnormalities on

11  the MRI from 2022, correct?

12  A    Yes.

13  Q    And those opinions were documented in the report that

14  you prepared in September of 2022, correct?

15  A    Yes.

16  Q    But at that time, you had no idea the plaintiff

17  previously had an MRI on July 18th, 2020, which showed no

18  abnormalities, right?

19  A    That is correct.

20  Q    You only heard about that weeks ago, in the fall of

21  2025, correct?

22  A    Yes.

23  Q    And it was only after you finally found out about that

24  2020 MRI that you wrote a supplemental report that said,

25  "Oh, by the way, a PET scan can show different injuries than

Nadkarni - Cross - Hutchinson                    829

1   an MRI," right?

2   A    Well, I don't think I said, "Oh, by the way."  I'm not

3   sure that --

4   Q    In sum and substance, Doctor?

5   A    I'm sorry?

6   Q    In sum and substance?

7   A    Could you just repeat it again?  I'm sorry.

8   Q    Sure.

9   A    I just got distracted.

10          THE COURT:  Whoa, whoa, whoa.  Both of you slower,

11  please.  And don't talk over each other.  Okay.

12  BY MR. HUTCHINSON:

13  Q    It was only after you finally found out about that 2020

14  MRI that you wrote a supplemental report that said, in sum

15  and substance, "Oh, by the way, a PET scan can show

16  different injuries than an MRI," right?

17  A    I don't think "by the way" had anything to do with it,

18  but I did write a letter at the request of the -- of the

19  request of his -- her lawyers to -- to get a comment on what

20  that 2020 MRI means.

21  Q    All right.  So you've concluded that Plaintiff suffered

22  a traumatic brain injury on June 3rd, 2020, correct?

23  A    I believe that's the date, yes.

24  Q    Even though you did not have compete records from the

25  date of the injury, correct?

```
                    Nadkarni - Cross - Hutchinson            830
```

1   A    I saw it happen with my eyes.

2   Q    You were there?

3   A    On the video.

4   Q    Oh.

5            Even though you did not have complete records from

6   that date of the injury, correct?

7   A    Correct.

8   Q    You would agree that a treating physician is in the

9   best position to document a patient's condition at the time

10  of an injury; would you not?

11  A    Yes.

12  Q    The doctor who sees someone in the emergency room

13  within hours of an injury would be best situated to assess

14  that patients's condition, correct?

15  A    At that moment in time.

16  Q    And to diagnose an injury at that moment in time,

17  correct?

18  A    Well, not necessarily but -- not necessarily diagnose

19  an injury that might show up later.

20  Q    Well, I mean, that's common sense, right?

21  A    Correct.  That's right.

22  Q    You didn't have her June 3rd records when you wrote the

23  report about plaintiff.  But are you aware now that no

24  treating provider that day diagnosed plaintiff with a brain

25  injury?

Nadkarni - Cross - Hutchinson                831

1  A    Well, that's not true, because the discharge paper that

2  says, "traumatic brain injury, this is what you do after you

3  go home."  So she got a piece of paper that said "traumatic

4  brain injury."

5  Q    Doesn't that discharge paperwork have a little

6  disclaimer on the bottom?

7  A    I don't know.  I -- I'm not sure if it does or not.

8  But on top, in bold letters, it says "traumatic brain

9  injury."

10 Q    And doesn't it say that the advice in these discharge

11 papers shouldn't replace any advice from your treating

12 provider?

13 A    Well, I think the hospital is sort of the treating

14 provider in that situation.  So the hospital is telling her

15 she had a traumatic brain injury.

16          MR. HUTCHINSON:  Your Honor, could I put Exhibit L

17 on the screen, please?

18          THE COURT:  You may.  Previously admitted.

19          MR. HUTCHINSON:  I want to use the ELMO.

20          What do I do here?  Just --

21          THE COURT:  You want to use it --

22          MR. HUTCHINSON:  Oh, here we go.

23          (Pause in proceedings.)

24 BY MR. HUTCHINSON:

25 Q    Dr. Nadkarni, can you see what's on the screen right

Nadkarni - Cross - Hutchinson                    832

1   now?

2   A    Yes.

3   Q    Are these the discharge papers that you were referring

4   to earlier?

5   A    Can you pull them down a little bit?  I just want to

6   see the --

7   Q    Yeah.  Let me zoom out maybe.

8        Here you go.

9   A    Yes.  This looks like it.  Yes.

10  Q    Okay.  This is the page with "traumatic brain injury"

11  across the top in large letters that you were mentioning

12  earlier?

13  A    Right under her name?

14  Q    Yep.

15  A    Yes.

16  Q    I want to direct your attention to the end of that

17  section.

18       MR. MAAZEL:  Could we just have a Bates Number?

19  Sorry.

20       MR. HUTCHINSON:  Oh, yeah.  The end of this

21  section is going to be Bates Plaintiff 1241.

22       MR. MAAZEL:  Thank you.

23       MR. HUTCHINSON:  I'm going to zoom in because

24  that's tiny.

25       All right.

```
                 Nadkarni - Cross - Hutchinson              833

 1   BY MR. HUTCHINSON:

 2   Q    Doctor, if you're able to see the -- the type on the

 3   bottom of the screen beginning with "Elsevier"?

 4   A    Yes.

 5   Q    Could you please read that sentence starting with "this

 6   information"?

 7   A    "This information is not intended to replace the advice

 8   given to you by your health care provider.  Make sure

 9   you" --

10   Q    Okay.  Let me slide it back here.  Hold on.

11        THE COURT:  For the court reporter, Elsevier is

12   E-L-S-E-V-I-E-R.

13        Did you get that?  Okay.  What page is it?  What

14   Bates Number is it?

15        MR. HUTCHINSON:  1241.

16        MR. MAAZEL:  Could we just see the whole page,

17   Judge.

18        MR. HUTCHINSON:  Sure.  Once --

19        THE COURT:  Well, let him ask the question based

20   on what he wants the doctor to read.

21        MR. HUTCHINSON:  I'd be happy to.

22        THE COURT:  The rest of the second --

23   BY MR. HUTCHINSON:

24   Q    Please continue on the last line from the left.

25   A    "Discuss any questions you have with your healthcare
```

Nadkarni - Cross - Hutchinson                    834

1    provider," which I'm assuming is an outpatient provider,

2    that's what that means.

3    Q    Okay.

4         Now, you said that part of your practice is as a

5    treating physician, correct?

6    A    Yes.

7    Q    And so is it your testimony today that discharge

8    paperwork contains diagnoses?

9    A    Well, it -- this one is -- yes, discharge paperwork can

10   contain diagnoses, of course.  In fact, discharge paperwork

11   tells the patient what to do based on the diagnosis the

12   hospital thinks they have.

13   Q    So if the diagnosis on the discharge paperwork differs

14   from the diagnosis in the medical records, is it your

15   opinion that the patient should replace that diagnosis with

16   the one on the discharge papers?

17   A    I think that would have to be determined on a

18   case-by-case basis.  I'm not sure exactly about that

19   question.

20   Q    And in this case where the diagnosis Brooklyn Hospital

21   on June 4th, 2020, was, quote, "mild closed-head injury."

22   You're saying that these discharge papers should overrule

23   that diagnosis?

24   A    Well, in light of what we see since, yes, that's

25   correct.

Nadkarni - Cross - Hutchinson                835

1    Q    "In light of what we see since"?

2    A    Correct.

3    Q    Huh.  Well, isn't that a little -- I mean, how would a

4    treating physician diagnose somebody with symptoms that

5    don't appear until two years later?

6    A    Well, you -- I think you're asking me of those two

7    things, traumatic brain injury and discharge paperwork and

8    the treating physician's opinion.  Like in this case the --

9    the TBI is correct -- if you look at the MRI from later,

10   that's the correct diagnoses from this case.

11   Q    Okay.

12   A    Because a mild closed-head injury doesn't show --

13   doesn't end up on the MRI.

14   Q    Would a normal MRI --

15   A    Not in 2022, no, it doesn't end up like that.

16   Q    So you're saying that the treating physician in 2020

17   was just plain wrong?

18   A    No, I think at the moment in time, they didn't have all

19   the data that came afterwards, so they made an assessment of

20   her at the moment when they saw her.

21   Q    Fair enough.  Now...  One moment, please.

22   BY MR. HUTCHINSON:

23   Q    Now, her medical records from that date of treatment

24   that I just put on the screen, June 4th, 2020, those records

25   would have provided other information from her treatment

Nadkarni - Cross - Hutchinson                    836

1   that night that would be relevant to whether she suffered a

2   brain injury, correct?

3   A    Not in terms of what we had in terms of the video.  You

4   can see -- you don't need to visit it at all actually to see

5   that she suffered a head injury.  The video showed that she

6   suffered a head injury.

7   Q    So an assessment of her symptoms when she presented to

8   the emergency room immediately following, is your -- your

9   testimony that that is irrelevant?

10  A    No, no, that would be -- not with the symptoms -- not

11  in terms of whether she had an head injury or not.

12  Q    So it would be valuable to know but not in terms of

13  whether she had an head injury or not; am I understanding

14  that correctly?

15  A    Yes, to treat her symptoms, like what are the symptoms

16  of your head injury.  You ought to know what those symptoms

17  are so you can treat those symptoms.

18  Q    So it would be of no relevance, for example, whether

19  somebody lost consciousness or not?

20  A    It could be of relevance if they lost consciousness but

21  you don't need loss of consciousness for a significant head

22  injury.

23  Q    But could be relevant, right?

24  A    Could be.

25  Q    You don't know what the plaintiff's Glasgow Coma score

Nadkarni - Cross - Hutchinson                837

1    was, for example?

2    A    I don't think that's relevant, actually.  She wasn't in

3    a coma.

4    Q    So there is no relevance to measuring a person's level

5    of consciousness by evaluation, for example, eye opening,

6    verbal response and motor response?

7    A    Not if they walked into the emergency room and told you

8    the story, you don't have to do that test.

9    Q    And so decrease in consciousness has no significance

10   for a potential brain injury?

11   A    At what point?  I'm sorry.  At the time of the impact?

12   Q    At the time of her assessment in the emergency room on

13   June 4, 2020.

14   A    Would you repeat the question?  I'm sorry.

15   Q    Is it your testimony that a decrease in consciousness

16   would have no significance in assessing a potential brain

17   injury?

18   A    I wouldn't say that.

19   Q    And you said it was relevant that she walked into the

20   emergency room; right?

21   A    Yes.

22   Q    How did you know that without the medical records?

23   A    I think she said that.

24   Q    So just to summarize, correct me if I'm wrong, but you

25   didn't know that her medical records reflected that she

Nadkarni - Cross - Hutchinson                    838

1  never lost consciousness because you didn't have those

2  medical records, correct?

3  A    I think she told me she lost consciousness.  I didn't

4  have those medical records.

5  Q    Well, is there something that would refresh your

6  memory?  I think you said "You think."

7  A    I only had the ED records that we discussed before, the

8  emergency department records.

9  Q    And when you met with her, she actually told you that

10 she wasn't sure, right?

11 A    I don't remember the exact words but I got the

12 impression that she walked to the hospital.  And I think she

13 even said she knew the area but had difficulty finding it

14 and had to use GPS.

15          And then there was a whole story about getting to

16 the hospitals after the police --

17 Q    You wrote in your report that she underwent a

18 concussion protocol at the hospital after the incident;

19 isn't that right?

20 A    Maybe.  I have -- I have to look at the exact words,

21 but I certainly could have said that.  I think she did.

22 Q    Well, you think she did, that's why you wrote it,

23 right?

24 A    Yeah.

25 Q    Even though you didn't have medical records indicating

1  whether or not she did have a concussion protocol; is that

2  correct?

3  A    Yes.  It's the only reason to do if I have eyes on a

4  CT.  If you're worried about a head injury.

5  Q    Can you tell the jury what a concussion protocol

6  entails?

7  A    A concussion protocol entails doing an assessment of a

8  patient's neurological status and then doing a imaging of

9  their head to make sure there's nothing going on.

10         And then if you're talking about a protocol for

11 treatment days and weeks for concussion treatment.

12 Q    Does concussion protocol involve an observation period?

13 A    It may.

14 Q    So you also didn't know that she reported her pain out

15 as a 2 out 10 when she was released from the hospital that

16 night, right?

17 A    I didn't have those records.

18 Q    And you weren't aware that she reported no weakness, no

19 nausea or vomiting, no tingling or numbness, no vision or

20 hearing changes, no slurred speech, no unsteady gate,

21 correct?

22 A    I was not aware if she reported those or not in those

23 records.

24 Q    Okay.  But you did know about the normal CT scan that

25 showed no injuries to plaintiff's skull or brain on June

Nadkarni - Cross - Hutchinson                840

1   4th, 2020, when you wrote your report and reached your

2   conclusions, correct?

3   A    It doesn't say no injuries.  It just says that there's

4   no abnormalities in the structure of her brain on the CAT

5   scan on that day.

6   Q    And so you observed that that CAT scan showed that the

7   ventricles -- and correct my pronunciation, Doctor -- sulci

8   and cisterns are normal in caliber for the patient's age?

9   A    Yes.

10  Q    And that there were no areas of abnormal attenuation

11  within the brain parenchyma?

12  A    Parenchyma.

13              THE COURT:  Can you go ahead and spell it?

14              THE WITNESS:  P-A-R-E-N-C-H-Y-M-A.

15  BY MR. HUTCHINSON:

16  Q    You were aware of that, correct?

17  A    Yes.

18  Q    And that the CT scan showed no intraparenchymal,

19  interventricular subdural or epidural acute hemorrhage,

20  correct?

21  A    Yes.  That's what I would expect.

22  Q    And that there is no midline shift or transtentorial

23  herniation, correct?

24  A    Correct.

25  Q    That there is no territorial infarction, correct?

Nadkarni - Cross - Hutchinson                841

1   A    Correct.

2   Q    That the visualized portions of the orbits, paranasal

3   sinuses and mastoid air cells are unremarkable, correct?

4   A    Yes.

5   Q    And the calvarium is intact, correct?

6   A    Yes.

7   Q    Impression, normal, noncontrast CT of the brain.

8        That was the report that you reviewed, correct?

9   A    Correct.

10  Q    And now that you have seen the 2020 records, right, you

11  can -- you now know that she had no loss of consciousness,

12  no concussion and very little pain, correct?

13  A    I think she did have loss of consciousness, actually.

14        MR. HUTCHINSON:  Publish Exhibit L, Your Honor.

15        THE COURT:  All right.  Previously admitted page

16  number?

17        MR. HUTCHINSON:  Yep.  Let's go to 1 of 21,

18  Plaintiff's 1222.

19        THE WITNESS:  I don't think it's reported here.  I

20  think she told me -- the story that she told me, I think she

21  had loss of consciousness that day.

22  BY MR. HUTCHINSON:

23  Q    So what does "denies" LOC mean?

24  A    I think what she told me was that she didn't remember

25  if she lost consciousness or not.  But she did say that she

Nadkarni - Cross - Hutchinson                    842

1   was doing one thing and the next moment, she was in a

2   different place.  So I think she had moments of loss of

3   consciousness that she has lost for -- because she has gaps

4   in time.

5           So I don't think she calls that loss of

6   consciousness, but as a neurologist, I think she had that

7   that day.

8   Q    Doctor, are we disputing the meaning of the word

9   "denies" right now?

10  A    No, I think she -- I think denies means that she -- she

11  said she didn't have loss of consciousness but that's not

12  what she told me.  I think these records don't say anything

13  about loss of consciousness, but the story she told me, it

14  sounds like she has loss of consciousness.  From when I

15  examined her.

16  Q    Well, it's not that these records say nothing about it,

17  right?  It says that she denied it, correct?

18  A    Right.  Correct.  There's no mention of loss of

19  consciousness in this woman's records, that's correct.

20  Q    There -- okay.

21          And when you wrote your report in September

22  of 2022, you did have some medical records that predated the

23  June 3rd, 2020, incident, correct?

24  A    I did.  I think I had some records from 2018 and '19.

25  Q    That was from Maiden Lane Medical, correct?

Nadkarni - Cross - Hutchinson                843

1    A    You know, I don't remember it, and this is my fault.  I

2    didn't say where these records came from, so I don't know if

3    those are the records -- the same but they're the same

4    years.

5              MR. HUTCHINSON:  Your Honor, I would like the show

6    to witness only what has been marked as Defendants' Exhibit

7    BB for identification.

8              THE COURT:  Okay.

9              MR. HUTCHINSON:  And I previously emailed it to

10   counsel.

11             THE WITNESS:  Yes, I have seen these records.

12   BY MR. HUTCHINSON:

13   Q    Okay.

14   A    Yes.

15   Q    So, Doctor, you have seen these records previously,

16   correct?

17   A    Yes, I have.

18   Q    And these are the records --

19   A    They're the same.

20   Q    Okay.  These are the records that you relied on in

21   drafting your September 2022 report, right?

22   A    Yes.  Yes.  Correct.

23             MR. HUTCHINSON:  Your Honor, I am offering

24   Defendants' Exhibit BB into evidence.

25             THE COURT:  Any objection?

```
                  Nadkarni - Cross - Hutchinson            844

 1              MR. MAAZEL:  I do object to the admission.  I do

 2     not object to the discussion, Judge.

 3              THE COURT:  I thought we had this discussion.

 4              Hold on.

 5              I'll allow them to be admitted.

 6              Go ahead.

 7              (Defendants' Exhibit BB received in evidence.)

 8              MR. HUTCHINSON:  Thank you, Your Honor.

 9     BY MR. HUTCHINSON:

10     Q    Now, in these medical records from 2018 and 2019, these

11     documented a back injury that the plaintiff sustained back

12     the 2018 or 2019, correct?

13     A    Yes.

14     Q    Okay.

15              MR. HUTCHINSON:  One -- one moment, please.

16              (Pause in proceedings.)

17     BY MR. HUTCHINSON:

18     Q    All right.  You know what, I'm going to come back to

19     these in a minute, okay?

20     A    Sure.

21     Q    So let's get back to your examination of Plaintiff for

22     a minute.

23              When you examined Plaintiff, it was your

24     understanding that you'd write a report documenting your

25     findings after, correct?
```

Nadkarni - Cross - Hutchinson                845

1   A    Yes.

2   Q    And your intention was to be thorough and accurate in

3   that report; isn't that right?

4   A    Well, actually, I think the intention was to examine

5   and interview her and then talk to them about what I found.

6   Q    Fair.

7   A    And then make a decision about writing a report or not,

8   yes.

9   Q    Okay.  So you knew that there was a possibility that

10  you might write a report after examining her?

11  A    Yes, yes.

12  Q    Okay.  And when you compile reports like this, it's

13  your intention to be thorough and accurate, correct?

14  A    Yes.  As good as I am capable at the time.

15  Q    And you eventually indicated in your report that you

16  were of the opinion that Plaintiff would suffer from

17  post-traumatic stress disorder, generalized anxiety

18  disorder, panic disorder, and depression in perpetuity as a

19  result of the June 3rd, 2020, incident; isn't that right?

20  A    Yes, I was worried about that.  Yes.

21  Q    Are you aware that Plaintiff was also examined by a

22  clinical psychologist by the name of Dr. Jessica Pearson?

23  A    Yes, I am.

24  Q    And are you also aware that plaintiff's other expert,

25  Dr. Pearson, did not find that plaintiff met the criteria

Nadkarni - Cross - Hutchinson                  846

1  for generalized anxiety disorder or panic disorder?

2  A    I don't think she mentioned those in her report as

3  diagnoses.

4  Q    She didn't mention them because plaintiff didn't meet

5  the criteria, correct?

6  A    I'm not sure but it's possible that when she talked to

7  her she didn't get those symptoms from her.

8  Q    Are you aware that Dr. Pearson issued a supplemental

9  report about plaintiff's mental health just last week?

10 A    I am aware of that.

11 Q    And that Dr. Pearson found that Plaintiff no longer

12 meets the criteria for posttraumatic stress disorder?

13 A    Because she doesn't have triggers that would make her

14 hypervigilant because she's not in the same place as she

15 was.

16 Q    Is that a "yes"?

17 A    I don't think it's a "yes."  I think it's a very

18 qualified "yes."  I mean, if she's back in New York I think

19 she would have those.  She would have PTSD.  She would

20 qualify for PTSD.  I think that was sort of implied in that

21 report.

22 Q    Okay.  So qualified "yes"?

23 A    Yes.

24 Q    I'll take it.  Okay.

25           So do you still hold the opinion that plaintiff is

Nadkarni - Cross - Hutchinson                847

1  going to suffer from these conditions for the rest of her

2  life?

3  A    I think it's very likely that she's going to suffer off

4  and on from those conditions for the rest of her life, yes.

5  Q    Off and on?

6  A    Yes.  Those are the intermittent conditions.  Like,

7  depressions comes and goes.  Those are -- those are episodic

8  conditions.  Major depressive disorder is a condition with

9  episodic depressions.

10 Q    Okay.  And so it just so happens that she wasn't

11 suffering from any of those syndromes, except for persistent

12 depressive disorder on the two occasions that she was

13 examined by the clinical psychologist retained by her

14 attorneys?

15 A    Well, I thought the initial impression was that she had

16 PTSD initially, Dr. Pearson, and depression, I think, were

17 both -- were both present there.

18        I don't think she made confidential diagnoses of

19 anxiety disorders.

20 Q    Or panic disorders, correct?

21 A    That's an anxiety disorder.

22 Q    Okay.  Okay.

23        Did you also learn that plaintiff was under the

24 care of a therapist for depression and posttraumatic stress

25 disorder, all the way up to the months leading up to the

1    June 3rd incident?

2    A    I think I did know that, yes.

3    Q    And you noted that she was on Cymbalta, right?

4    A    Correct.

5    Q    But nowhere in either the section for "records

6    reviewed," the section for "prior psychiatric history," the

7    section where you actually discuss posttraumatic stress

8    disorder, or in your findings do you ever acknowledge that

9    plaintiff had already been diagnosed with depression and

10   posttraumatic stress disorder, correct?

11   A    I don't think I wrote that in here, but we discussed

12   her prior trauma and treatment for it.  That's in my past

13   psychiatric history, I think.

14   Q    But you never mentioned that she had previously been

15   diagnosed with PTSD and depression, correct?

16   A    I don't mention that anywhere in my report.

17   Q    You just wrote in your opinion that she has PTSD and

18   depression because of this incident on June 3rd, correct?

19   A    Well, she -- her PTSD is definitely related to this

20   incident, her flashbacks, and her triggers and all that

21   stuff, yes.

22   Q    Even though you knew she had been diagnosed with PTSD

23   and depression before June 3rd?

24   A    I don't enter that, actually.  If I knew that, I would

25   have put that in my report under "past psychiatric history."

Nadkarni - Cross - Hutchinson          849

1  I didn't know her -- she didn't tell me about psychiatric

2  diagnoses of PTSD or depression.

3          MR. HUTCHINSON:  Your Honor, I want to publish

4  defendant's BB.

5          THE COURT:  All right.

6          MR. HUTCHINSON:  And I'm going to Page 14.  And

7  that's under the treatment date of March 13th, 2019.

8          (Exhibit published to the jury.)

9  BY MR. HUTCHINSON:

10  Q    Doctor, can you read what's on the screen?

11  A    Sure.  "She has recent depressive symptoms with

12  IUD/suicidal ideation."  I'm not sure exactly what IUD

13  means.  "...with plan, does not have sick referred.  And

14  this is a long number prior that's involved and titrate."

15          I believe this related to the emotional balance

16  she had, but I'm not certain.

17  Q    Okay.  You discussed the facts of the June 3rd, 2020,

18  incident with plaintiff, correct?

19  A    Yes.

20  Q    And I know you mentioned that you reviewed video

21  footage as well, correct.

22  A    Yes.

23  Q    But you based opinions as to plaintiff's condition, at

24  least in part, on the story that she told you, correct?

25  A    Yes.

Nadkarni - Cross - Hutchinson                     850

1    Q    And isn't it true that the accuracy of your opinions

2    today depends on, at least in part, the accuracy of the

3    story that was told to you?

4    A    Yes.  In conjunction with all the other data, like

5    medical records and testing and all that stuff.

6    Q    But the details that she told you were significant to

7    you in diagnosing her injuries, correct?

8    A    I mean, yes.  The symptoms are important in diagnosing

9    her condition.

10   Q    And so if you later learn that any of these facts was

11   untrue, it would have affected your conclusions about the

12   causation of plaintiff's injuries, correct?

13   A    I think the causation was very clear from the video.

14   Q    And you also discussed the symptoms that plaintiff

15   reported experiencing since; is that right?

16   A    Yes.

17   Q    And as you just testified, those symptoms include

18   migraines, temperature changes, panic attacks, PTSD, sleep

19   disturbances, visual problems and cognitive problems, such

20   as difficulty focusing and multitasking, correct?

21   A    Yes.  Yes, but with -- I mean, there's a lot more

22   symptoms under all those, a lot more things, but yes.

23   Q    Yeah.  And those are the ones I want to discuss right

24   now, okay?

25   A    Uh-huh.

Nadkarni - Cross - Hutchinson                    851

1   Q    Because those are all subjective self-reported

2   symptoms, correct?

3   A    Can we go over them again?

4   Q    Sure.

5   A    I'm not sure.  Let's see what -- let's go line by line.

6   Q    Let's do it.

7            Migraines?

8   A    Migraines are self-reported sometimes, yes.

9   Q    Temperature change, panic attacks?

10  A    Not always because she comes up in the middle of the

11  night, she's soaked and she's having a panic attack.  That's

12  -- that's extremely obvious.  That's not something that's a

13  subjective symptom.

14  Q    Sure.  But not something that you observed, correct?

15  A    No.  Only her partner knows that.

16  Q    Okay.  And --

17           MR. HUTCHINSON:  One moment, please.

18  BY MR. HUTCHINSON:

19  Q    But you never talked to her partner, correct?

20  A    No, I think she said that her partner told her that she

21  thrashes in bed and she has these episodes.

22           And she also recalls having these episodes at

23  night.

24  Q    So self-reported, correct?

25  A    And -- and witness.

Nadkarni - Cross - Hutchinson                    852

1   Q    By someone who you didn't talk to, right?

2   A    Correct.

3   Q    Okay.  Panic attacks?

4   A    Yes.  Those are also something that was often visible.

5   When somebody's having a panic attack.  Not always but

6   often.

7   Q    Did you speak to any witnesses as to panic attacks?

8   A    I think the same.  I didn't speak to -- I didn't speak

9   myself.  I just spoke to her about those.

10  Q    PTSD?

11  A    PTSD, I also use corroborating data from Dr. Pearson

12  and from her reporting.

13  Q    Okay.  Sleep disturbances, same -- same category as

14  temperature changes, observed by her partner who you didn't

15  talk to?

16  A    Correct.  And her report.

17  Q    Yes, self-reporting, correct.  And those cognitive

18  problems, those are self-reported, correct?

19  A    Correct.

20  Q    And the vision problems, you didn't actually examine

21  her eyes, correct?

22  A    I did examine her eyes.

23  Q    You did an eye exam?

24  A    Sure.  And I looked at her pupils.  I did all those

25  things.  On a neurological exam you do that.

Nadkarni - Cross - Hutchinson                    853

1    Q    Fair enough.  I was thinking of more of a traditional
2    ophthalmology --
3    A    Ophthalmology.  I did not do an ophthalmology exam.
4    Q    Okay.  Can you just -- I know it sounds sort of
5    obvious, but can you explain to the jury what a subjective
6    symptom is?
7    A    Symptoms are subjective always.  Signs are things that
8    are objective.
9    Q    I see.
10   A    So a symptom is something that you experience in your
11   -- in your consciousness.
12   Q    Got it.  Now, you also covered some of her medical and
13   family history, right?
14   A    I did.
15   Q    And plaintiff told you that she has a history of
16   migraines, correct?
17   A    Yes, she has a history of ocular migraines.
18   Q    But that they felt different after her arrest on June
19   3rd, correct?
20   A    But they were different afterwards, yes.
21   Q    Okay.  But she never told you how long after the arrest
22   they started to feel different than before, did she?
23   A    Oh, I think she mentioned in her initial symptoms, I
24   thought, she started having headaches that were not like the
25   ones that were -- you know, were ocular.

Nadkarni - Cross - Hutchinson                854

1              But ocular migraines are just grey on your vision.

2    But she started having headaches really after the -- after

3    the incident.

4              Occular migraines.  She doesn't have headaches,

5    she just has visual changes.  That's what an occular

6    migraine is.

7    Q    And so she said that those migraines went -- began

8    feeling different after the arrest, correct?  But the

9    question was:  She didn't tell you when they started feeling

10   different, did she?

11   A    She -- yeah, she said she starting having headaches

12   right after her injury.  So those headaches are not the same

13   as occular migraines.  She had new headaches after her --

14   right after her injury that are persistent.

15             MR. HUTCHINSON:  Your Honor, I want to establish

16   Defense BB again.

17             THE COURT:  All right.

18             MR. HUTCHINSON:  And I want to publish Page 4,

19   which is under the date of treatment 8/1/2018.

20   BY MR. HUTCHINSON:

21   Q    Doctor, can you read the date of treatment on the top

22   left?

23   A    8/1/2018.

24   Q    And can you read what it says with regards to rating

25   the following pain symptoms.

Nadkarni - Cross - Hutchinson                 855

1    A    Backache, seven; migraine headache, seven.

2    Q    Okay.  Now just to confirm, this was before June 3rd,

3    2020, correct?

4    A    That was.

5    Q    All right.  Now what was the purpose of asking her

6    about her family history?

7    A    Oh, it's standard protocol when you do an assessment.

8    Q    Why?

9    A    Well, why do you ask about family history?

10   Q    Yeah.

11   A    Because some things have genetic loathing in families,

12   some illnesses.

13   Q    But it's your testimony on direct that these illnesses

14   do not; is that right?

15   A    I'm sorry, say it again?  Which -- which illnesses?

16   Q    The ones that you observed in Plaintiff.

17   A    Like, a traumatic brain injury definitely is not a

18   genetic disease, that's something that is acquired in

19   people.

20   Q    Well, the traumatic brain injury is the injury itself,

21   correct?

22   A    Right, correct.

23   Q    And so what we're discussing now are signs, like you

24   described before, correct?

25   A    Symptoms and signs.  Yes.

Nadkarni - Cross - Hutchinson                    856

1   Q    Symptoms and signs.  Right.

2   A    Yeah.

3   Q    And it is your testimony today that the symptoms and

4   signs that were relevant to plaintiff, her family history

5   had no relevance to those, right?

6   A    Oh, I think her family history showed a history of

7   dementia in an uncle and a father, I think that's irrelevant

8   to her story.

9   Q    Then why --

10  A    Meaning it is not contradictory to the story.

11  Q    So why did you ask about it?

12  A    Oh.  Because we ask everybody.  You always ask about

13  family history.

14  Q    Got it.

15       And she told you about several family members who

16  had dementia, correct?

17  A    Uncle and father, I think.

18  Q    But she didn't tell you that her maternal grandfather

19  also had dementia?

20  A    I didn't document that, I don't remember that.

21  Q    But you did review that detail in the neuropsychology

22  consultation report, correct?

23  A    Yes, I must -- I read -- I read that, yes.

24  Q    So you felt that it was important to include the

25  information about her father and her uncle but not her

Nadkarni - Cross - Hutchinson                857

1  grandfather?

2  A    I think I just -- that might have been an oversight on

3  my part.  I don't think it has any relevance to her

4  condition.

5  Q    Did you ever determine whether Plaintiff's father and

6  uncle had Alzheimer's disease?

7  A    No.

8  Q    Do you ever determine whether they had frontotemporal

9  dementia?

10  A    I did not.

11  Q    And of course, you never looked into plaintiff's

12  grandfather's dementia because you didn't even know about

13  him, right?

14  A    I mean I'm sure she had a grandfather, but I didn't

15  know about his dementia.

16  Q    You also found what you describe as nerve damage to the

17  left side of Plaintiff's face and the left side of her body

18  which you interpreted as a sign of frontal lobe syndrome;

19  isn't that right?

20  A    That's incorrect.  That's a mix-up of many different

21  things in my report.  She had sensory changes in her body.

22  That is not frontal lobe, that's parietal lobe, that is a

23  different part of the brain.

24          And then she had frontal lobe findings on her

25  examination, yes.

Nadkarni - Cross - Hutchinson                858

1          MR. HUTCHINSON:  Can we put that demonstrative aid

2    back up on the screen?  I think that was Plaintiff's, what,

3    70 something?  What was it?  I didn't write it down.

4          MR. SELVER:  There is 73.

5          MR. HUTCHINSON:  The first one.

6          Can we take a look at 72, please.

7          THE COURT:  What do you mean "take a look"?  You

8    want to show it to the witness or publish it?

9          MR. HUTCHINSON:  I think I have a copy but I am

10   not sure if someone's able to put it on the screen.

11         THE COURTROOM DEPUTY:  The Court's question is:

12   Do you want to show it to the witness or to the jury?

13         MR. HUTCHINSON:  No, we can show it to the jury;

14   it's in evidence.

15         THE COURT:  You just need to tell us what you want

16   to do.

17         MR. HUTCHINSON:  Sure.  Yes, thank you.

18         THE COURT:  Yeah.

19   BY MR. HUTCHINSON:

20   Q    Now, Doctor, can you read the section that says,

21   "Neurologic examination"?

22   A    Do you mean this next box?

23   Q    Yeah.

24   A    "One, left hemisensory deficit; two, defused

25   hyperflexia, including jaw jerk reflex suggesting central

Nadkarni - Cross - Hutchinson                859

1   nerve system injury; frontal sinus suggesting frontal lobe

2   injury."

3   Q    Okay.  So it was that left hemisensory that I was just

4   asking you about, right?

5   A    Yes, it was.

6   Q    And can you read the box to the right --

7          MR. HUTCHINSON:  Oh, thank you for bringing that

8   up.

9   BY MR. HUTCHINSON:

10  Q    Go ahead.

11  A    Yeah.

12         Frontal lobe syndrome with difficulty initiation,

13  motivation, executive functioning and compartment.

14  Q    Okay.  So let me ask the question again.  You also

15  found what you described as nerve damage to the left side of

16  Plaintiff's face, right, and the left side of her body which

17  you interpreted as a sign of frontal lobe syndrome, right?

18  A    It's not nerve damage and it is not frontal lobe

19  injury.  So this is a brain injury.  So it is not nerve

20  injury.  Nerves go to the face, peripheral nerves.  This is

21  a brain.  So it is a central injury to the brain that might

22  cause a left hemisensory deficit.

23         A left hemisensory deficit, this is clinical

24  consequences in the last column.  One of the clinical

25  consequences for her, if she goes around with a little bit

Nadkarni - Cross - Hutchinson                860

1   of numbness or nothing being able to feel her left side, I

2   didn't even include that in the clinical consequences.  I

3   just used two out of three because that is a finding that

4   doesn't really have clinical consequences.

5          But I found it on my exam.  And that is a parietal

6   lobe finding, not a frontal lobe finding.  So I can see how

7   this might get a little confusing, I apologize but it's

8   really referring to two and three, that frontal lobe

9   syndrome.

10  Q    Got it.

11         Do you want to edit this section to reflect the

12  reality?

13  A    Absolutely not, because in left hemisensory deficit, I

14  didn't even include the -- it is not a clinical consequence,

15  it has no clinical consequence, so it doesn't belong there

16  in that box.

17  Q    Got it.

18         Now, you identified those symptoms by lightly

19  touching the left side of Plaintiff's face and body and

20  pricking the left side of Plaintiff's body with a pin,

21  right?

22  A    Yeah, vibration, sounds, pinprick, light touch.

23  Q    Well, you're aware from those 2018 and 2019 medical

24  records, Defense BB, right, that Plaintiff had previously

25  had an injury to her left arm, correct?

Nadkarni - Cross - Hutchinson                861

1    A    Yes.

2    Q    And she complained of those same symptoms that you

3    observed to the same area of her body, correct?

4    A    I believe so, yes.

5    Q    You learned that as recently as December 4, 2018,

6    Plaintiff was experiencing numbness in her left arm; isn't

7    that right?

8    A    Yes, this is a hemisensory deficit.  Not an arm

9    deficit, meaning, it's the whole left side of the body.

10   Q    Sure, but part of your test is on the arm, correct?

11   A    Correct.  That's correct.  Part of it is.

12   Q    And that on December 4th, 2018, that Plaintiff's

13   perivertebral muscle tenderness was noted as severe on the

14   left side, right?

15   A    I don't remember that but I am sure that's true.

16   Q    She described on that date experiencing shooting,

17   stabbing, throbbing pain in her left lower quadrant; isn't

18   that right?

19   A    I don't remember that.  I think that that's her

20   abdomen, left lower quadrant.

21   Q    Or back, correct?

22   A    I'd have to look at a picture.  Left lower quadrant

23   usually means abdomen.  Unless you have a picture of

24   somebody's back showing something but you don't refer to the

25   back as quadrants usually.  You refer to the abdomen as

Nadkarni - Cross - Hutchinson                    862

1  quadrants.

2  Q    Sure.  Maybe I can pull that up in a bit.

3  A    Okay.

4  Q    And that she described that pain as an 8 out 10?

5  A    I'd concede, I don't remember that.

6  Q    And she also remarked that she experienced tingling in

7  that area which she described as pins and needles, right?

8  A    I mean, I would to see -- I'll take your word for it.

9  Q    Now, those 2018 and 2019 medical records that you

10 reviewed for Plaintiff's medical history, those were from

11 Dr. Davison at Maiden Lane Medical, correct?

12 A    I just don't remember it.

13 Q    And just staying with that December 18th day of

14 treatment, she also showed abnormal diminished sensation to

15 light touch on her left arm, correct?

16 A    Yeah, I mean, she had a nerve problem at that point.

17 Q    And at least with regards to that left hand -- side,

18 that's exactly what you observed in 2022, correct, that

19 diminished sensation to the left arm?

20 A    No, I had a hemisensory deficit, that's different.

21 Q    Right well, it involved more areas, right?

22 A    It includes -- yeah, but -- but -- but I had a

23 hemisensory, it wasn't with a nerve distribution or a root

24 distribution.  It was the whole left arm.  So that is a much

25 different distribution in terms of central versus peripheral

Nadkarni - Cross - Hutchinson                863

1    neurology.

2    Q     Okay.

3    A     It wasn't a peripheral arm problem that I had.  I found

4    a central sensory problem at my exam.

5    Q     But you didn't account for that pre-existing left arm

6    injury in your report, though, right?

7    A     I'm not sure what that means.

8          You mean I didn't mentioned that in my report?

9    Q     Yes.

10   A     Correct, I did not mention that in my report.

11   Q     All right.  Now, you also observed, when you examined

12   Plaintiff, an increased jaw jerk reflex, correct?

13   A     Yes, correct.

14   Q     And that you interpreted to be a sign of a central

15   nervous system injury, correct?

16   A     Above the level of cranial L5.

17   Q     So what was Plaintiff's Babinski reflex?

18   A     I believe it was the down going.

19   Q     And what does that mean?

20   A     That means she didn't have a Babinski response.

21   Q     So --

22   A     Which is an outgoing toe, the toe goes up

23   pathologically when there is a problem with the

24   corticospinal tract, the motor tract, long motor tracts in

25   the central nervous system.

Nadkarni - Cross - Hutchinson                    864

1   Q     So you just said that the increase jaw jerk reflex and

2   the Babinski reflex are both sort of tests of the central

3   nervous system, correct?

4   A     There's multiple tests of the central nervous system in

5   a neurologic exam.

6   Q     Are those two of them?

7   A     There are.

8   Q     And they showed contradictory findings, correct?

9   A     Incorrect.  That's incorrect.

10  Q     One showed no response and one showed a response.

11  A     That's almost always the case.  In a neurologic exam,

12  you might see one thing, you might not see another thing.

13  But any one thing is sort of dispositive of a central

14  nervous system.  A negative response doesn't help you.  But

15  a positive response will -- will point to a pathology.

16          MR. HUTCHINSON:  Okay.  Now, I have three more

17  questions that I think kind of round out the topic.  And so

18  if you would like me to continue past that, I'm happy to.

19          THE COURT:  How much longer do you think that it

20  will be?  Because it's 5:30.

21          MR. HUTCHINSON:  Um-hmm.

22          THE COURT:  And it is Friday.

23          MR. HUTCHINSON:  Maybe about half an hour, to 45

24  minutes to an hour.

25          THE COURT:  All right.  Let me talk to the lawyers

Nadkarni - Cross - Hutchinson                    865

1    very quickly at sidebar.  Ladies and gentlemen, I'm sorry

2    about this, but I need to figure the scheduling issue out.

3             (Continued on the next page.)

Sidebar Conference                           866

1          (The following occurred at sidebar.)

2          THE COURT:  As I understand it, Dr. Nadkarni is

3    not available on Monday.

4          MR. MAAZEL:  I have to check with him.

5          But this is the not right, Judge.  We had a

6    representation from defense counsel that it was a short

7    exam, indicating that we were not going to get to 5:30, much

8    less bleeding into Monday.

9          THE COURT:  Okay.

10         MR. MAAZEL:  So this is a problem.

11         MR. HUTCHINSON:  I'm going with his answers to my

12   questions.

13         THE COURT:  Okay.

14         MR. MAAZEL:  Well --

15         THE COURT:  I can't blame anyone.  I think he

16   started at a quarter to 5:00.

17         MR. HUTCHINSON:  Yeah.

18         THE COURT:  So, you know, he didn't have a lot of

19   time to work with.

20         You need to talk -- I am holding the jury here on

21   for another hour.  They will be very angry at all of you and

22   all of us, and I assume they have places to be.

23         MR. HUTCHINSON:  Especially me, Judge, because I'm

24   the one that's up there.

25         THE COURT:  They did indicate that he wouldn't --

Sidebar Conference                                867

1   it doesn't have to be Monday, but --

2           MR. HUTCHINSON:  Well, Your Honor, so I was going

3   to discuss this, sort of, afterwards with you, but we had --

4           THE COURT:  Hang on, hang on.

5           MR. HUTCHINSON:  Yeah.

6           THE COURT:  I'm going to let the jury go for the

7   evening.  We're going to have to figure this out, whether

8   it's Monday or another time.

9           MR. MAAZEL:  I don't think --

10           MR. HUTCHINSON:  I think it's going to have to be

11   Monday --

12           THE COURT:  Guys.  I'm letting the jury go.

13           MR. HUTCHINSON:  Sure.

14           THE COURT:  Okay?

15           MR. HUTCHINSON:  Okay.  I'll finish these last

16   three questions, if I can.

17           THE COURT:  Quickly, very quickly.

18           MR. HUTCHINSON:  Thank you, Your Honor.

19           (Continued on next page.)

20

21

22

23

24

25

Nadkarni - Cross - Hutchinson                    868

1          (Sidebar ends; in open court.)

2          (In open court.  Jury present.)

3          THE COURT:  So, ladies and gentlemen, I am really

4    sorry, but we need to beg your indulgence for about two or

5    three minutes so that Mr. Hutchinson can ask a couple more

6    questions to finish out that line of questions.  And then we

7    are going to let you all go home for the weekend.

8          Okay.

9          MR. HUTCHINSON:  Thank you.

10         THE COURT:  Yes.

11   BY MR. HUTCHINSON:

12   Q    I just want to finish up the section about the sort of

13   neuropsychological testing that you did, okay?

14   A    Sure.

15   Q    You also conducted release sign tests, correct?

16   A    Correct.

17   Q    And you testified on direct that one of those included

18   a palmomental response test, right?

19   A    Palmomental.  P-A-L-M-O-M-E-N-T-A-L.

20   Q    Okay.  And you found that plaintiff had a marked right

21   palmomental response, right?

22   A    Yes, I did.

23   Q    But there was no lesion in the frontal lobe in the

24   scans that you observed, right?

25   A    I think there is in the left frontal superior --

Proceedings                                    869

1    supraorbital left frontal lobe position.

2             THE COURT:  Supraorbit?

3             THE WITNESS:  Supraorbital.

4             THE COURT:  Okay.

5    BY MR. HUTCHINSON:

6    Q    And you just didn't feel like writing that one down?

7    A    Those are the PET scan results, I believe.

8             MR. HUTCHINSON:  Can you put those up?

9             THE COURT:  All right.  You know what, folks,

10   we're going to adjourn for now.

11            MR. HUTCHINSON:  Okay.

12            THE COURT:  You can finish up when we resume with

13   the doctor.

14            Ladies and gentlemen, we are at the end of the

15   first week.  Congratulations.  Again, over weekend don't

16   talk about the case with anyone.  Don't look up anything.

17   If you see something pop up in your phones or otherwise

18   about the case avert your eyes and keep an open mind.

19            Have a wonderful weekend, everybody.  And we'll

20   see you on Monday, ready to go at 9:30.

21            Thank you, as always, for being so punctual.

22            THE COURTROOM DEPUTY:  All rise.

23            THE COURT:  Have a good weekend, Doctor.

24            You can step down, Doctor.  And in fact, you -- do

25   we need to discuss anything --

Proceedings                                    870

1           MR. MAAZEL:  Well --

2           THE COURT:  We actually need to discuss his

3    schedule.

4           MR. HUTCHINSON:  Yeah.

5           THE COURT:  So maybe you folks can confer for a

6    minute here.

7           MR. HUTCHINSON:  Your Honor, can you please

8    instruct the plaintiff's counsel that this witness is

9    currently on cross-examination.  They shouldn't be

10   discussing testimony.

11          THE COURT:  No, we need to discuss his schedule

12   with him.

13          MR. HUTCHINSON:  Oh, my apologies, Your Honor.

14          THE COURT:  That's what I asked him to do, is just

15   talk about his schedule.

16          MR. HUTCHINSON:  My mistake, Your Honor.

17          THE COURT:  Yeah.

18          MR. HUTCHINSON:  I apologize.

19          THE COURT:  Just everyone hold on while we figure

20   this out.

21          (Pause in proceedings.)

22          THE COURT:  Off the record just so we don't

23   torture our court reporter anymore.

24          (Matter adjourned to Monday, December 7, 2025 at

25   9:30 a.m.)

```
                    I N D E X                        871
```

I N D E X

W I T N E S S E S

BRIGID PIERCE                                    615

CROSS-EXAMINATION (CONTINUED)                    615
BY MR. HUTCHINSON

REDIRECT EXAMINATION                             698
BY MR. MAAZEL

RECROSS EXAMINATION                              717
BY MR. HUTCHINSON


**SIDDHARTHA NADKARNI**                          728

DIRECT EXAMINATION                               728
BY MR. MAAZEL

CROSS-EXAMINATION                                822
BY MR. HUTCHINSON


E X H I B I T S

Defendants' Exhibits Q1 and Q2                   619

Defendants' Exhibit R                            621

Defendants' Exhibit S                            629

Defendants' Exhibits T1, T2, T3, and T4          634

Defendants' Exhibit U                            645,
                                                 681
Defendants' Exhibit V                            647

Defendants' Exhibit X                            692

Defendants' Exhibit Y                            694

I N D E X                                                872

1

**E X H I B I T S** (CONTINUED)

2

3    Defendants' Exhibits X, Y, Z, and AA              695

4    Plaintiff's Exhibit 70A and 70B                   712

5    Plaintiff's Exhibit Number 21                     746

6    Plaintiff's Exhibit Number 17                     758

7    Plaintiff's Exhibit Number 16                     771

8    Plaintiff's Exhibit Number 20                     785

9    Defendants' Exhibit BB                            844

10

11

12

13

14

15

16    *I (we) certify that the foregoing is a correct transcript*
      *from the record of proceedings in the above-entitled matter.*

17

      */s/ David R. Roy*              *December 8, 2025*
18       *DAVID R. ROY*                    *Date*

19

20

21

22

23

24

25