Ryder - Direct - Ochoa                                    1243

1    ██  ███████

2    ██  ██████████████

3    ██  █████████████████████████████.

4    Q    What time did you observe the plaintiff?

5    A    As soon as I got to Cadman Plaza West.  When I lined up,

6    she was in front of me.

7    Q    What first drew your attention to the plaintiff?

8    A    She was standing right in front of me.

9    Q    Do you remember anything she was saying?

10   A    She was chanting along with the crowd saying peaceful

11   protest and other things before I even got there.  But nothing

12   in particular.

13   Q    You said she was in front of you.  How close to you was

14   she?

15   A    So my arm is up and my shield is right here.  So maybe 12

16   to 18 inches off the shield.

17   Q    With what arm were you holding the shield?

18   A    My left arm.

19   Q    Is the shield clear?

20   A    Yes.

21   Q    Can you describe what you observed plaintiff doing?

22   A    She was recording video and chanting.

23   Q    What next?

24   A    Next, there was some commotion to my left further down

25   the line of officers.  I believe there was an arrest being

Nicole Sesta, RPR, RMR, CRR
Official Court Reporter



COURT'S
EXHIBIT
A9
21CV3482

Ryder - Direct - Ochoa                                    1244

1  effected down that way, and a lot of attention got turned that

2  way.

3  Q     You said plaintiff was chanting.  Was anyone else

4  chanting?

5  A     The whole protest group.

6  Q     Did you see the arrest to your left?

7  A     No.  I heard the commotion in the crowd reacted to

8  something that way, but I personally did not see the arrest

9  being effected over there.

10 Q     What happened after the crowd reacted?

11 A     After the crowd reacted, the plaintiff was recording it

12 and moved to get between, what appeared to me, to get between

13 me and my partner to my left, and pushed into my shield on the

14 left.

15        I pushed her back and I gave the instructions to get

16 back.  As I'm saying those instructions, I push her off, she

17 said no, you get back, grabbed onto the shield, and that's

18 when I decided to effect the arrest.

19 Q     What was your concern in her doing that?

20 A     Firstly, I mean my concern is you shouldn't ever grab a

21 police officer.  It doesn't matter who you are.  Second, I'm

22 the very last person on that line and I don't want her to get

23 between me and my partner.

24        It's not just about her but it's about all the

25 people behind her too.  I don't want to get separated from the

Ryder - Direct - Ochoa                                          1245

1   other officers, and I did give her a warning to get back,

2   which she ignored and told me to get back and pushed into me

3   again.

4   Q    Did the fact that she was filming concern you at all?

5   A    Not at all.

6   Q    Why not?

7   A    We live in New York City.  You're on camera all day every

8   day.  It doesn't matter to me that it was being filmed.  As a

9   police officer, we're a public servant we're expected to be

10  filmed.  When I wear a uniform I expect to be filmed all the

11  time.  In fact, in my current role, that's my job, to be

12  filmed.

13  Q    Were other people filming?

14  A    Yes.

15  Q    You said she pushed into you.  What area of your body was

16  that?

17  A    So that was, from my point of view, when I'm standing on

18  the edge it's the right side of my shield.  And as you can see

19  in one of the videos, the shield comes back, I come back, come

20  back forward as I push her off, happens again, and that's when

21  I effect the arrest.

22  Q    Why did you arrest plaintiff?

23  A    Obstructing governmental administration, physically

24  interfering with me doing my job, disorderly conduct, and then

25  later on I would have tacked on a resisting arrest charge.

Ryder - Direct - Ochoa                                    1246

1  Q    Can you please describe what you did when you decided to

2  take plaintiff to the ground?

3  A    So, like I said, I had the one arm in the shield.  I

4  physically cannot use this arm.  I reached around the shield

5  and I grabbed her by the shoulder and then I spun her around

6  and attempted to bring her down to the ground and guide her

7  down to the ground.

8           As I'm coming around, the shield is large, bulky,

9  heavy.  I lost contact with her when she was two to three feet

10 off the ground.  She's on the ground on her side.  She lands

11 on her left side, her left arm, on her backpack, on her left

12 thigh.

13          I'm then going down to my knees to get her hands to

14 effect the arrest.  She kicked me.  I lost balance, fell, and

15 on my body camera you see me land on my hands.  That's after

16 she kicks out and kicks me.  At that point, I compose myself

17 and attempted to get her hands.  Other officers came over,

18 were helping me attempting to get her hands.  I got her right

19 hand in custody very quickly.

20          When you hear the zip tie sound, when we're using

21 flex cuffs, which are specifically designed cuffs for large

22 demonstrations, protests when we don't want to use metal

23 cuffs, because they can get lost very easily, you hear the

24 right zip tie very quickly and then her left arm was held

25 under her body, tense under her body.

Ryder - Direct - Ochoa                                    1247

1        If you could imagine holding her arm like this and

2   tensing all your muscles, it's very hard to get out.  It's

3   difficult.  Other officers were attempting to get her hand as

4   we're telling her to give us her hand and stop resisting.

5        She then shot her hand out.  An officer was able to

6   grab her hand, get it behind her back.  You hear the second

7   zip tie cuff.  As soon as I do that and put her hand in

8   custody, I say cuffed and all force in order to effect the

9   arrest ceases.

10  Q    Going back a little bit, when you took her to the ground,

11  what do you call this?

12  A    So I was referring to it as a guided take down.  That was

13  my intention in what I was trying to do.

14  Q    What is a guided take down?

15  A    It's not specifically a term.  That's what I said in the

16  deposition.  I'm attempting to guide her down to the ground.

17  I'm not throwing her down to the ground.  I'm grabbing her and

18  turning, guiding her to bring her down to the ground.

19  Q    When did you activate your body camera?

20  A    As soon as I decided to effect the arrest.

21  Q    When was that?

22  A    So as I'm reaching over to grab her in order to effect

23  the arrest, while my hand is in the shield, as you can imagine

24  holding something you have your thumb available to do so, that

25  slide mechanism, with my thumb I'm sliding down to activate

Nicole Sesta, RPR, RMR, CRR
Official Court Reporter

Ryder - Direct - Ochoa                                    1248

1   the body camera as I'm bringing her around.

2   Q    Did you see plaintiff's head hit the ground?

3   A    No.

4   Q    And where was your body camera?

5   A    It was affixed, as you saw on the plaintiff's video, you

6   can see it.  It's directly in the center of my chest right

7   below my shield and name.  So roughly five and a half feet off

8   the ground.

9   Q    Did you have time in that moment to deescalate?

10  A    No.

11  ███████████    ████████████████████

12      █████████  ████████  ███████████

13  A    No, I did not.

14  Q    Why not?

15  A    A variety of factors.  Well, yes, as a police department

16  you want to deescalate when you can, not every circumstance

17  you can.  For instance, if you go to a scene and someone has a

18  knife, you might not necessarily go to say just whatever.

19  There's certain -- we have a force continuum.  It's a circle,

20  essentially.

21          The reason it's a circle is you can start wherever

22  you deem fit reasonably, and given how large this crowd was,

23  if I said turn around, give me your hands, other protesters

24  can grab her, then I'm grabbing her, and then there's a tug of

25  war with the arrestee in the middle.

Nicole Sesta, RPR, RMR, CRR
Official Court Reporter

Ryder - Direct - Ochoa                                   1249

1          That could lead her to get injured, me to get

2    injured, other people to get injured.  So I believe the safest

3    way to effect the arrest was to get her behind the police line

4    and effect the arrest there, while other officers were able to

5    help and I could separate other protestors that might

6    interfere or commit violence while effecting the arrest.

7    Q    When you took her to the ground, how did plaintiff react?

8    A    She wasn't happy.  I don't think I've ever seen anyone

9    who likes getting arrested.  It's not an enjoyable experience,

10   usually.  And as I'm giving her commands, she's actively

11   resisting not giving me her hands, not giving other officers

12   her hands.  It took about I'd say 45-ish seconds to get her in

13   custody.

14   Q    Did other officers come and help you?

15   A    Yes.

16   Q    What happened next?

17   A    After she was in custody?

18   Q    No.  After you take her to the ground.

19   A    After I take her down to the ground, she kicked me.  Like

20   I said, I fell onto my hands.  At that point I recover, and I

21   get her right hand into custody.  We're trying to get her left

22   hand out from under her, which is clenched really hard like

23   this.

24          She shot her hand out and onto her forearm, and like

25   it appeared to me she arched her back and trying to get up.

Nicole Sesta, RPR, RMR, CRR
Official Court Reporter

1    An officer grabs her hand, like brings it around.  I get it in

2    custody and then the arrest is effected.

3    Q    And why did you need help from other officers?

4    A    When someone is resisting, if someone doesn't want to be

5    put into handcuffs it's hard to get them in handcuffs.  Other

6    officers would have to assist to help.  I'm trying to control

7    her hands behind her back.

8            Another officer is trying to get the other arm while

9    trying to maintain control and also preventing other people

10   from coming to interfere with the arrest.

11   Q    Were you saying anything to plaintiff at this time?

12   A    Yes.

13   Q    What were you saying?

14   A    Hands, hands, give me your hands.  Other officers are

15   saying stop resisting, saying hands again, to have her give us

16   her hands.  The ultimate goal, what we want is voluntary

17   compliance.  We were not getting voluntary compliance, so we

18   had to use grip techniques force to get her hand.

19   Q    Why is it important to get handcuffs on?

20   A    You need control of the person.  When you're make than

21   arrest, and the hands are the most dangerous part of any

22   person.  You want to make sure the hands are controlled in

23   order to have someone arrested.

24   Q    What was she doing to resist?

25   A    She was actively resisting by punching her arm underneath

Ryder - Direct - Ochoa                                              1251

1   of her, not giving us her hands.  Like I said, she kicked me

2   and just generally just not providing her hands when we were

3   trying to get them and forcefully trying to keep them

4   underneath of her, and also trying to shoot her arm up and to

5   get up.

6   Q    Are you allowed to use force?

7   A    Yes.

8   Q    When she was doing all this, what were you doing?

9   A    I was trying to get her hands into custody.

10  Q    What were the other officers doing?

11  A    Attempting to get her hands to get them in custody.

12  Q    From your understanding, why would someone hold her down?

13  A    To prevent her from getting up.

14  Q    Why is that important?

15  A    Because we're trying to arrest her.  At that point she's

16  not free to leave.  She's detained.  We're trying to arrest

17  her.  She's not free to get up and leave.

18  Q    How long did the physical portion of the encounter last?

19  A    About 45 seconds.

20        MS. OCHOA:  I would like to show what's been

21  previously admitted as Plaintiff's Exhibit 52.

22        THE COURT:  You may.

23        MS. OCHOA:  If you could pause it.

24        (Video played.)

25  Q    Detective, can you identify yourself in that video?

Ryder - Direct - Ochoa                          1252

1   A      Yes, that's me.

2            MS. OCHOA:  Keep playing.  One moment, Your Honor.

3   Let the record reflect that the witness identified himself at

4   timestamp 21 seconds.

5   Q      Officer what, if anything, did you hear at that moment?

6   A      Someone saying get off me.

7   Q      Did you say anything to plaintiff?

8   A      No.

9   Q      Can we rewind a few seconds?

10           (Video played.)

11  Q      Officer, do you hear yourself saying anything at that

12  moment?

13  A      Back up.

14           MS. OCHOA:  We could hit play.

15           (Video played.)

16  Q      Detective Ryder, did you hear yourself say anything?

17  A      I said back up.

18           MS. OCHOA:  I would like to show what's previously

19  admitted as Plaintiff's Exhibit 5.

20           THE COURT:  Previously admitted, right?

21           MS. OCHOA:  Yes.

22           THE COURT:  Go ahead.

23           (Video played.)

24  Q      Officer, can you identify yourself in this video?

25  A      I'm right there.

Ryder - Direct - Ochoa                                    1253

1   Q    Let the record reflect that the witness identified

2   himself at 06 seconds.  Can you identify plaintiff?

3   A    She's right there.

4   Q    Can you tell me what was going on in that moment?

5   A    Something happened down the line to my left.  That's why

6   you see the crowd kind of reacting and turning to their right.

7   You could hear me saying back up.

8   Q    Can you tell me what was going on in that moment?

9   A    It happened quick, but if you back up a little bit you

10  see where I'm holding the shield, the guy with the bike is

11  covering it a little bit.  The plaintiff pushes into me.  You

12  see my shield.  I push her off and when I push her off I say

13  to get back.  She says no, you get back.  Does it again, and

14  at the same time as she's saying that, I effect the arrest and

15  bring her down to the ground.

16  Q    Could we please see that again.

17       (Video played.)

18  Q    Can you tell me what's happening now?

19  A    Now I'm trying to get her in custody and put her hands

20  behind her back.

21       MS. OCHOA:  Your Honor, I would like to show what's

22  been previously admitted as Plaintiff's Exhibit 6.

23       THE COURT:  All right.

24       (Video played.)

25  Q    Officer, can you identify yourself in that video?

Ryder - Direct - Ochoa                                    1254

1   A    I believe you can see a little bit of me over here.

2   Above that, a little bit with the helmet, you can see a little

3   bit.  Right there.

4        MS. OCHOA:  Let the record reflect the witness

5   identified himself at six seconds.

6        (Video played.)

7   Q    Officer, can you tell me what's going on in the portion

8   we just saw?

9   A    During the portion shows initial interaction, and you see

10  me taking her around to bring her behind the line to put her

11  into an arrest.

12  Q    Can we watch that again?

13       (Video played.)

14  Q    Did you turn your body worn camera on for this encounter?

15  A    Yes, I did.

16  Q    When?

17  A    I activated it as I'm bringing her down.  As I'm spinning

18  around, I activate the camera.

19  Q    Did your body camera capture what occurred from your

20  perspective?

21  A    From the moment I activated it on, yes.

22  Q    Did you keep it on for your entire interaction with her?

23  A    Yes.

24       MS. OCHOA:  I would like to show what's previously

25  been admitted as Defendant's Exhibit A.

1              THE COURT:  All right.

2              (Video played.)

3    Q    Officer Ryder, what is this video?

4    A    This is my body worn camera of the interaction.

5    Q    What is happening here?

6    A    So as you just -- if you play it from right here, pause

7    it, that's when she kicked out, kicked me and I fall down onto

8    my hands.

9              (Video played.)

10   Q    Can you tell me what was happening in this moment?

11   A    At this moment we're trying to get her into custody.  Her

12   right arm is fairly easy to get into custody.  I got that

13   pretty quick.  The left, her left arm she was holding

14   underneath of her, tensing, and not giving it to us to put in

15   cuffs.

16   Q    Why were you saying hands?

17   A    I wanted her hands to put them in cuffs.

18   Q    Why did you say get on your back?

19   A    So that was kind of like a -- it's a mix up in my head.

20   I see her on her back, she lands on her back, and I'm trying

21   to do ten things at once in my head.  I see she's on her back.

22   I want her on her stomach but my mouth is saying on your back.

23   That's how I'm seeing her.  I corrected myself very quickly,

24   and get her on her stomach and attempted to get her hands.

25   That was a mix up on me.

Ryder - Direct - Ochoa                                    1256

1              (Video played.)

2    Q    Did you see plaintiff's breast come out?

3    A    No.

4    Q    What would you have done if her breast was exposed?

5    A    Continue to effect the arrest.

6    Q    Why?

7    A    At that point she's under arrest, and the most important

8    thing is to get her into custody.  She was actively resisting

9    at the time.  As soon as she's in custody and her hands are

10   secured, then we can address any decency issues that she would

11   have had.

12             (Video played.)

13   Q    What was that sound we just heard?

14   A    That was the second zip tie cuff on the left hand getting

15   secured.  It kind of cuts off right there when I'm saying

16   cuff.

17   Q    How do you put those cuffs on?

18   A    So I know they keep getting described as zip ties, the

19   ones you see at the store, the thin ones.  These are much

20   thicker and they have it's one solid piece with like two of

21   the zip tie locks in the middle with a little gap in between.

22   The cuffs come around, like a butterfly, go through, and you

23   put one arm in one and you can lock it closed and do the same

24   for the other.

25   Q    How do you put them on?

Nicole Sesta, RPR, RMR, CRR
Official Court Reporter

Ryder - Direct - Ochoa                                          1257

1   A      You put the hand through the cuff and secure it and pull

2   it.

3   Q      How do you take them off?

4   A      Usually with shears.

5   Q      What kind of shears?

6   A      Like safety scissors or EMS shears.

7   Q      What are safety scissors?

8   A      Safety scissors have like a plastic guard over them.  If

9   you have metal scissors and like if the cuffs are like this,

10  like my watch here, if you put the cuffs between the band and

11  the skin, the metal could cut.  You would want something with

12  either plastic or rounded, so that when you put it underneath

13  it doesn't like cut into the skin to do it safely.

14  Q      Are they different than regular scissors?

15  A      Yes.

16  Q      Why did you say cuffed?

17  A      Because I wanted to signal to all the other officers that

18  she was in custody, and that all force to effect the arrest is

19  no longer needed.

20  Q      And was plaintiff's breasts ever out when she stood up?

21  A      No.

22  Q      Did you ever see her unclothed in any way?

23  A      Not at all.

24         (Video played.)

25  A      You can see the front of her chest, but when you paused

Nicole Sesta, RPR, RMR, CRR
Official Court Reporter

Ryder - Direct - Ochoa                                    1258

1   it before, nothing is exposed.

2   Q    Now we'll go frame by frame quickly.  If we could just --

3        THE COURT:  Or really slowly.

4   Q    Pause here.  Detective Ryder, what did you see at this

5   moment?

6   A    At this point I'm seeing the reflection of some of the

7   turret lights on her face.

8   Q    If we could keep playing.

9   A    The turret lights are the lights on top of the police

10  cars, the spinning lights.  In the NYPD we have the red

11  flashing lights, and they cast a lot of colored shadows on

12  people's faces and other objects at night.

13       (Video played.)

14  Q    Is that what you're seeing in the video?

15  A    You can see the glare from one of the lights here and

16  it's casting directly onto her over here.

17  Q    Did you see any injuries on plaintiff's head?

18  A    Not during my interaction with her, no.

19       MS. OCHOA:  One moment, Your Honor.  Now we'll skip

20  to 4 minutes and 40 seconds.

21       (Video played.)

22  Q    If we could pause here.  Officer Ryder, what were you

23  doing in this moment?

24  A    At this point, once a prisoner is in custody, she's my

25  responsibility.  And my general practice is I want to make

Ryder - Direct - Ochoa                                    1259

1   them as comfortable as possible.  So she would be more

2   comfortable with her glasses on her face.  So I'm trying to

3   address that and make her more comfortable.

4               (Video played.)

5   Q    Pause it here.  Officer Ryder, did you see any injury on

6   plaintiff at this moment?

7   A    I didn't see any and you also can't see any in the video

8   here, which shows my perspective.  But I didn't see anything

9   on her face, and I was pretty close to her at that point.

10              (Video played.)

11  Q    Officer Ryder, what is a wagon?

12  A    That's kind of police jargon.  Have you ever heard the

13  term of a paddy wagon?  It's a prisoner wagon.  We don't use

14  them as much in the NYPD as other jurisdictions, but we have

15  some.  My unit was using one at the time.

16              Basically, it's a pickup truck but in the back

17  instead of a bed it has a pretty much a mobile cell you can

18  put people in and like cuff them to like a bar in there.  So

19  you can transport multiple prisoners at once, as opposed to

20  just putting them in a SUV where we can only put one person.

21  It let's you transport multiple prisoners.

22              (Video played.)

23  Q    Officer, why did you tell her she was going to get a

24  summons and get released?

25  A    Because at that time, that's all I deemed she was going

1    to get charged with.  I was using my discretion and not

2    charging the other crimes I initially arrested her for, and

3    was just going to let her have the summons, which would have

4    had much less consequences than the other charges she could

5    have gotten.

6    Q    What other charges could she have gotten?

7    A    So the reason I initially arrested her was obstructing

8    governmental administration, which was physically stopping me

9    from doing my job, by putting hands on me or into my shield.

10             Disorderly conduct, by being in the middle of the

11   street not allowing vehicles to pass, and then later on,

12   resisting arrest by actively resisting and not giving us

13   voluntary compliance with effecting the arrest.

14   Q    As far as you knew, was there a basis to issue a summons?

15   A    Yes.

16   Q    What was that basis?

17   A    That she was out past curfew and warnings had been given.

18             (Video played.)

19   Q    Officer, why did you start a conversation with plaintiff?

20   A    Like I was saying, once she's under arrest and in my

21   care, I was trying to have a dialogue with her.  At that time,

22   as I'm sure most of us remember, there was a lot of tension

23   with police in the community.  Myself, as a police officer,

24   I'm more than just a blue suit with a gun and a badge.  I'm a

25   person also.  I was trying to tell her that what happened to

Ryder - Direct - Ochoa                                    1261

1   George Floyd was unequivocally murder and that I was very

2   happy he was arrested.  And I understand why they're

3   protesting and I support peaceful protests.

4           I just kind of wanted to have a dialogue with her to

5   get that point across, that like not all cops are Derek

6   Chauvin.  The 99.9999 percent of cops are not that.  That's

7   what I'm trying to get across to her.

8   Q    If we could keep playing.

9           (Video played.)

10  Q    Officer, did you notice any injuries to plaintiff

11  immediately following the incident?

12  A    No.

13  Q    Have you ever been trained in assessing injuries?

14  A    I have.

15  Q    What training is that?

16  A    So I was trained as an emergency medical technician basic

17  initially in 2013.  In 2014 I upgraded and became an emergency

18  medical technician critical care, which was kind of like a

19  paramedic, to paraphrase what I was able to do.

20          Trained in patient assessment, trauma assessment,

21  medical care.  And before I became a police officer, I worked

22  in that capacity for multiple agencies.

23  Q    Did you or another officer call for medical assistance?

24  A    No.  During my interaction, I didn't.  I didn't know of

25  anyone else I knew of that did.

Ryder - Direct - Ochoa                                          1262

1    Q    Why not?

2    A    She never told me she wanted any.  I didn't see any

3    injuries on her.  As you can see in the body camera, and we

4    were having a pleasant conversation, I thought.  She was

5    coherent.  She was talking to me.  She was walking normally.

6    When I was putting her glasses on, her eyes were equal and

7    reactive.  I had no reason to suspect she was injured.  Most

8    importantly she didn't say she was injured or wanted any

9    medical care.

10   Q    What do you do when an arrestee appears to be in need of

11   medical attention?

12   A    There are two things.  One, if they ask for medical care,

13   I would have provided it, gotten an ambulance, or even if they

14   didn't request medical care, if I looked at them and thought

15   they needed medical care, I would have gotten an ambulance to

16   get them treated.

17   Q    Why would you have done that?

18   A    Because it's the right thing to do, and it's what we're

19   supposed to do as police officers.

20   Q    Did plaintiff make any statements to you about being in

21   pain or needing medical care?

22   A    Not once.

23         MS. OCHOA:  One moment, Your Honor.

24         THE COURT:  All right.

25         MS. OCHOA:  If we could continue playing.

Nicole Sesta, RPR, RMR, CRR
Official Court Reporter

Ryder - Direct - Ochoa                                      1263

1          (Video played.)

2    Q    Detective Ryder, who are you talking to in this moment?

3    A    So as I'm walking toward north, there's a couple

4    executives or white shirts, as they've been said before,

5    walking past me.  There was a large commotion behind me, a lot

6    happening, and a lot of officers coming to the location.  I

7    was directing the supervisors to where that was happening.

8          (Video played.)

9    Q    Officer, why was it important to you to engage in this

10   conversation?

11   A    Like I was saying before, like I'm a person also.  Police

12   officers are people.  We have feelings about things, also.

13   I'm happy that Derek Chauvin was arrested.  I'm happy he was

14   charged and I'm happy he was convicted.  I'm trying to get

15   that across.

16        ██████████   ██████████   ██████████████████

17   ██████

18        ██████████   ██████████

19   A    I'm trying to tell the arrestee at the time that.  And

20   like I was saying, I would like to be pleasant when I arrest

21   somebody afterwards.  There's no point in denigrating or being

22   mean to someone at that point.  I'm just trying to have a

23   pleasant experience and make it as pleasant for them as

24   possible given the circumstances.

25        (Video played.)

Ryder - Direct - Ochoa                                    1264

1   Q    Officer, what were you doing in this moment?

2   A    So general practice after you arrest somebody is you do a

3   search and, basically, this is something that happens for

4   every single person that gets arrested is you're just

5   searching to make sure they don't have any weapons, anything

6   sharp, anything that could hurt them, hurt another prisoner,

7   or hurt an officer, or having means to escape.

8         If they have a knife, they could cut the restraints

9   or if they have cuffs they could have a cuff key and get out.

10  So you're just doing a general search to make sure that's

11  accounted for and their property is accounted for.

12        (Video played.)

13  Q    Can you describe what was going on in that, what we just

14  watched?

15  A    One of the things I like to do when I arrest somebody is

16  I like to over communicate with them what I'm doing,

17  especially a female prisoner.  She had keys like in her back

18  pocket and I'm not just going to touch those without saying

19  what I'm doing first.

20        So I'm trying to over communicate what I'm doing to

21  her before I do it so that she's as comfortable as possible

22  and we can get through the process easily as possible for both

23  parties.

24        (Video played.)

25  Q    Detective, why did you say they were all going to get cut

Nicole Sesta, RPR, RMR, CRR
Official Court Reporter

Ryder - Direct - Ochoa                                    1265

1   with summonses anyway?

2   A    Everyone we were putting on the bus was out past curfew.

3   There had been multiple warnings given, and that was the

4   summons they were going to get issued and then released.

5        (Video played.)



RYDER - DIRECT - OCHOA                          1268



12   Q    Detective Ryder, why does your video end there?

13   A    This is the end of the interaction.  You saw me put --

14   I guide her on to the bus, and all right, ma'am.  I

15   transferred custody to the officers on the bus at that

16   point, and now I'm walking back to where my unit is and the

17   rest of the protesters were.

18   Q    Is your entire interaction with plaintiff depicted on

19   body-worn camera?

20   A    Yes, all 9 minutes 36 seconds of it.

21   Q    Did you ever see plaintiff again?

22   A    Never until this trial.

23   Q    Did there come a time that you filled out a report

24   about the use of force?

25   A    No.

RYDER - DIRECT - OCHOA                                    1269

1    Q    Why not?

2    A    After the interaction was over, when I was going back

3    to the protest, there was a lot happening, so I never ended

4    up filling one out.  I also was intending to guide her down

5    to the ground, and through the Patrol Guide, that's -- I

6    didn't believe I needed one from that particularly.  But

7    should I have done one?  Yes.

8            MS. OCHOA:  Can we view Plaintiff's Exhibit 52

9    again?  Just play it all the way through.

10           (Exhibit published and video played.)

11   Q    Detective Ryder, did you hear yourself say anything?

12   A    I said:  Back up.

13   Q    Did you arrest plaintiff because she was protesting?

14   A    No.

15   Q    Did you arrest plaintiff because she was filming?

16   A    No.

17   Q    Did you throw her six feet to the ground?

18   A    No.

19   Q    Did plaintiff ask for medical attention at any point?

20   A    Not once.

21   Q    Did you purposefully not get medical attention for

22   plaintiff?

23   A    No --

24   ████████████    ██████████    ████████████████

25      ████████████    ██████████

*Kristi Cruz, RMR, CRR, RPR*
*Official Court Reporter*

RYDER - CROSS - MAAZEL                                    1277

1  ███████████████████

2  █  ████████

3  Q    You claim that Ms. Pierce resisted arrest, correct?

4  A    Yeah.  And you can clearly see that in the video.

5  Q    I'm not asking about the video.  I'm just saying, you

6  claim today before the jury that Ms. Pierce resisted arrest,

7  correct?

8  A    Yes, because that's what happened.

9  Q    You never charged her with resisting arrest, did you?

10 A    No.

11 Q    You never told anyone she was resisting arrest, did

12 you?

13 A    I used my discretion and I didn't charge her with

14 that --

15 Q    Sir, did you ever tell anyone that she was resisting

16 arrest?  Yes or no?

17 A    No.

18 Q    You claim today that Brigid Pierce was disorderly,

19 right?

20 A    She was standing in the middle of the roadway, yes.

21 Q    You never charged her with disorderly conduct, did you?

22 A    Again, I used my discretion --

23 Q    I'm not asking about discretion.

24    ████████████  ██████████

25 Q    Did you charge her or not?

RYDER - CROSS - MAAZEL                                    1278



1

2   Q    You never charged Ms. Pierce with disorderly conduct,

3   did you?

4   A    No.

5   Q    You never told anyone that she had committed disorderly

6   conduct, did you?

7   A    Everyone in the roadway was committing disorderly

8   conduct --

9   Q    Sir, did you tell anyone that Brigid Pierce --

10

11  Q    -- had ever committed disorderly conduct?

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1 ███████████████████████████████████

2 ████████████████████

3 Q   Officer, you said never charged Ms. Pierce with

4 disorderly conduct, correct?

5 A   Correct.

6 Q   You never told anyone that she's had committed

7 disorderly conduct, correct?

8 A   Correct.

9 Q   You claim today that Ms. Pierce was obstructing

10 governmental administration.  You said that today, right?

11 A   Yes.

12 Q   You did not charge her with obstructing governmental

13 administration either, did you?

14 A   Again, I used my discretion.

15 Q   Sir, I'm not asking about discretion.  You didn't

16 charge her with that, did you?

17 A   I did not charge her with that.

18 Q   You did not tell anyone that Ms. Pierce was obstructing

19 governmental administration, did you?

20 A   No.

21 Q   There were hundreds of people out there violating

22 curfew, in your view, right?

23 A   Yes.

24 Q   Not just Ms. Pierce, right?

25 A   Yes.

RYDER - CROSS - MAAZEL                    1283

1   Q   But the one and only person you arrested was

2   Ms. Pierce, correct?

3   A   Yes.

4   Q   And when you took Ms. Pierce down, she was filming a

5   police officer, correct?

6   A   Yes.

7   Q   You never gave Ms. Pierce an order to disperse, did

8   you?

9   A   Me myself?  No.  But I didn't --

10  Q   Sir, I'm just asking, did you give an order to disperse

11  to Ms. Pierce?  Yes or no?

12  A   No.



1 ████ ███████████████████████████████████

2 ████████████████████████████████

3 ████ ████████

4 Q   Now, let's talk about your interaction with Ms. Pierce.

5 And I want to show Exhibit 52, which you have seen a few

6 times.

7 A   Okay.

8         MR. MAAZEL:  If we could play from 14 seconds in.

9         And we will just play through 21 seconds.

10        (Video played.)

11        MR. MAAZEL:  Let's just stop for a moment.

12 Q   What's happening there is that you walked up to

13 Ms. Pierce, correct?

14 A   I was approaching the group of protestors, yes.

15 Q   Yes, you were walking south, right?

16 A   I was forming up with the other officers, yes.

17 Q   You were walking south, right?

18 A   I was forming up with the other officers that were

19 already in the line, yes.

20 Q   If you can now answer the question.

21        You were walking south, right?

22 A   Yes.

23 Q   And Ms. Pierce was to your south, right?

24 A   Yes.

25 Q   And she was just standing there and you walked up to

RYDER - CROSS - MAAZEL                    1291

1  her, correct?

2  ███████████  ███████████

3  ███████████  ███████████

4  A    I approached the group; not specifically her.

5  Q    I understand, but you then walked up to right where she

6  was, yes?

7  ███████████  ███████████

8  ███████████  ███████████

9  A    In the area, we were in a line of officers, yes.

10 Q    Okay.  And you put your body right in front of her,

11 right?

12 A    I put my body in line with the other officers, yes.

13 Q    I'm not talking about the other officers.  I'm just

14 talking about you and Brigid Pierce.

15        You put your body right in front of Ms. Pierce,

16 correct?

17 A    Yes.

18 Q    And she wasn't walking to the Brooklyn Bridge, correct?

19 A    Not in this video, no.

20 Q    She's just standing there, right?

21 A    Yes.

22 Q    And you were the one who walked to her, right?

23 A    I walked to the middle of the street, yes.

24 Q    Where she was, yes?

25 A    Yes, in the roadway.

RYDER - CROSS - MAAZEL                                    1292

1   Q    Okay.  When you walked up to Ms. Pierce, as you

2   testified earlier, she was filming.

3   A    Yes.

4   Q    And you could see that.

5   A    Yes.

6   Q    And she was at first filming you, right?

7   A    Yes.

8   Q    And in fact one of the first things you did was you

9   looked right at the camera, right?

10  A    It appears that way, yes.

11  Q    And after that, you then looked above her head, right?

12  A    I was looking at other people, yes.

13  Q    And the reason you were able to look above her head is

14  because you were so much taller than her that you could just

15  look right over her, right?

16  A    Not specifically.  I was just looking at the crowd.

17  Q    Now, as you said on direct, Ms. Pierce was chanting,

18  "peaceful protest," yes?

19  A    Yes.

20  Q    And you never saw any weapon on Ms. Pierce; did you?

21  A    Not that I saw at the moment, no.

22  Q    You never saw any weapon on Ms. Pierce; did you?

23  A    No.

24  Q    You testified on direct that you can't de-escalate if

25  you see a knife, for example, right?

RYDER - CROSS - MAAZEL                    1293

1   A    Among other things, yes.

2   Q    You didn't see any knife; did you?

3   A    I saw a very large crowd.

4   Q    Did you see a knife is the question?

5   A    No.

6   Q    Did you see a gun?

7   A    No.

8   Q    Did you see any kind of weapon on Ms. Pierce

9   whatsoever?

10  A    No.

11  Q    You didn't believe Ms. Pierce was under the influence

12  of any drugs or alcohol, correct?

13  A    I couldn't tell.

14  Q    You didn't believe that; did you?

15  A    I couldn't tell.

16  Q    Well, I would like to show you page 117, play a video

17  of your deposition --

18       By the way, sir, you were deposed in this case,

19  yes?

20  A    Yes.

21  Q    And you gave testimony under oath?

22  A    Yes.

23  Q    Oath to tell the truth, the whole truth, and nothing

24  but the truth?

25  A    Yes.

1   Q    Same oath you took today, right?

2   A    Yes.

3   Q    Represented by counsel?

4   A    Yes.

5   Q    You prepared for your deposition?

6   A    Yes.

7   Q    Your counsel had an opportunity to ask you questions at

8   your deposition?

9   A    Yes.

10  Q    Okay.  And you gave truthful testimony?

11  A    Yes.

12  Q    I would like to play page 117, line 12 through 16 of

13  your deposition.

14           MS. OCHOA:  Could we have a moment to review,

15  please?

16           MR. MAAZEL:  Yes.

17           MS. OCHOA:  Sorry, what line was that, again?

18           MR. MAAZEL:  Page 117, line 12 through 16.

19           MR. HUTCHINSON:  Okay.

20           MR. MAAZEL:  If we could -- yes, I think we're

21  playing that before the jury.

22           THE COURT:  Oh, this is the deposition, right?

23           MR. MAAZEL:  Yes, yes.

24           THE COURT:  Okay.  Go ahead.

25           (Video played.)

RYDER - CROSS - MAAZEL                    1295

```
 1              MR. MAAZEL:  All right.
 2    Q    So your testimony at your deposition was that you did
 3    not believe she was under the influence of any drugs or
 4    stimulant or alcohol, correct?
 5    A    Yes.
 6    Q    And that was truthful testimony, yes?
 7    A    Yes.
 8    Q    When you interacted with Ms. Pierce, she obviously
 9    wasn't running away from you, right?
10    A    No.
11    Q    I am correct, right?
12    A    Yes.
13    Q    Now, after a few seconds where you are right in front
14    of her and you placed your body right in front of her,
15    Ms. Pierce turned to her right, yes?
16    A    She turned her upper body.  Her feet were still planted
17    in the same spot.
18    Q    She turned her upper body 90 degrees to her right,
19    correct?
20    ██████████  ██████████
21    ██████████  ██████████
22    Q    Right?
23    A    She turned to film.  She didn't turn her entire body.
24    Q    She turned her torso to her right, yes?
25    A    Her feet were still planted in front of me.
```

RYDER - CROSS - MAAZEL                    1296

1    Q    Could you answer the question, Officer?

2    A    I am, sir.

3    Q    Did she turn her torso to her right, 90 degrees?

4    A    She turned to film --

5    Q    To her right?

6    A    Yes.

7              MR. MAAZEL:  And mean we could just play

8    Exhibit 5.

9              (Video played.)

10             MR. MAAZEL:  Stop it seven seconds in.  Just stop

11   there.

12   Q    So here is where Ms. Pierce turned to her right,

13   correct?

14   A    Yes.

15   Q    And at this point -- and she's holding up her phone to

16   film, yes?

17   A    Yes.

18   Q    And she's filming whatever's in front of her, right?

19   A    Yes.

20   Q    And she was holding the phone at face level?

21             THE COURT:  Whose face?

22             MR. MAAZEL:  Sorry.

23   Q    Ms. Pierce is holding the phone at her eye level,

24   correct?

25             THE COURT:  If you know.

RYDER - CROSS - MAAZEL                                          1297

1   A    I can't see that from this.

2   Q    Okay.  Now, when there was interaction between your

3   shield and Ms. Pierce that you described earlier, you were

4   standing to the left of her shoulder, yes?

5   A    Can you -- can you rephrase that?  What do you mean?

6   Q    When there was some interaction between Ms. Pierce and

7   your shield, you were standing to Ms. Pierce's left, to the

8   left of her shoulder, correct?

9   A    She was in front of me.

10  Q    Right, but from her perspective, you were to the left

11  of her shoulder, yes?

12  A    From my perspective, she was in front of me.

13  █ ████████████████████████████████████████████

14  ████████████████████████████████████████████████

15  █ ███████████████████████████

16       █████████    █████████

17       █████████    █████████    .

18       ████████████████████████    ███████████

19  ████████████████████████████████████████████████

20  █████████████████████████████████████████████

21  ███████████████████████████████████████████

22  █████████████████

23  Q    Was Ms. Pierce's left shoulder right in front of you?

24  A    Yes.

25  Q    And you are facing south at this point, yes?

1   A    Yes.

2   Q    And she's facing east, right?

3   A    She's looking that way, yes.

4          MR. MAAZEL:  Now, if we can look at Exhibit 6, at

5   seven seconds in.

6   Q    Now, you looked at this video on direct, correct?

7   A    Yes.

8   Q    And this is while you are taking her down, yes?

9   A    Yes.

10  Q    And while you are taking her down, Ms. Pierce is still

11  facing east, yes?

12  A    I'm grabbing her arm and turning her.

13  Q    You can see that she's facing east while you are

14  pulling her to the ground, yes?

15  A    As I'm taking her down to the ground, yes.

16  Q    Let's talk about the force that you used.

17         MR. MAAZEL:  You can take that down, thanks.

18  Q    You grabbed Ms. Pierce in her upper torso, yes?

19  A    I grabbed her by the -- by the arm, yes.

20  Q    You put your arm around her and grabbed her, yes?

21  A    I grabbed her arm.

22  Q    You grabbed her whole body.  You put your arm around

23  her and grabbed her, yes?

24  A    I grabbed her arm; I didn't put my arm around her.

25  Q    You didn't put your arm around her?

1  A    I grabbed her arm.

2  Q    And then you described this as some sort of takedown,

3  right?

4  A    Yes.

5  Q    And before the takedown, did you tell Ms. Pierce that

6  she would be arrested if she did not back up?

7  A    I told her --

8  Q    I'm sorry, that's a yes or no question.

9  A    No.

10  Q    Before the takedown, did you tell Ms. Pierce she would

11  be arrested?

12  A    No.

13  Q    Before the takedown, did you ask Ms. Pierce to turn

14  around so that you could cuff her?

15  A    No.  I don't have to.

16  Q    I'm not asking what you have to do.  Just asking what

17  you did, Officer.

18        Let's try it again.  Before you took Ms. Pierce

19  down, did you ask her to turn around so you could cuff her?

20  A    No.

21  Q    Before you took Ms. Pierce down, did you try to cuff

22  her?

23  A    No.

24  Q    Before -- earlier, on direct, you said that when you

25  have protestors who are violating curfew, you ask them why

RYDER - CROSS - MAAZEL                           1300

1  they're out, you direct them to go home.

2         Do you remember that testimony?

3  A    Yes.

4  Q    Did you ask Ms. Pierce why she was out?

5  A    No.

6  Q    Did you ask Ms. Pierce to go home?

7  A    No.

8  Q    Before your takedown of Ms. Pierce, did you ask for

9  help from any other officer?

10 A    No.

11 Q    Before -- one technique to arrest someone is to put

12 their hand behind their back and cuff them, right?

13 A    An ideal situation, yes.

14 Q    That's a technique that officers use all the time,

15 right?

16 A    When circumstances permit, yes.

17 Q    And in this, you did not do that, correct?

18 A    The circumstances didn't warrant that here.

19 Q    Sir, I'm just asking, did you do that or not?

20     ██████████  ██████████

21 A    No.

22     ██████████  ██████████

23         Go ahead.

24 Q    I want to show you Exhibit 52, Ms. Pierce's iPhone

25 video, starting at 28.

RYDER - CROSS - MAAZEL                    1301

1     And you looked at her iPhone video on direct; do

2  you remember that?

3  A    Yes.

4          MR. MAAZEL:  So let's just start at 28.

5          And if we could play that, yes, with sound.

6          (Video played.)

7  Q    That's Ms. Pierce chanting "peaceful protest," yes?

8  A    Yes.

9          MR. MAAZEL:  Let's keep going.

10         (Video played.)

11         MR. MAAZEL:  Let's go back to 28 again.  We are

12 going to look at that again.

13 Q    And do you hear a woman -- I want you to listen to see

14 if you hear a woman saying, "get off of me, I'm standing

15 here," okay?

16         MR. MAAZEL:  Let's play from 28.

17         (Video played.)

18 Q    You heard the woman say, "get off of me, I'm standing

19 here"?

20 A    In the video, yes.

21 Q    And that woman who said that was not Brigid Pierce,

22 correct; it's the black woman over there?

23 A    Correct.

24 Q    Let's just go back and listen again.

25         THE COURT:  "Over there," refers to the video.

RYDER - CROSS - MAAZEL                          1302

1    MR. MAAZEL:  I'm sorry, let's go back to 28.

2  Q   And I want to ask you who says "I'm watching you on

3  fucking live stream, you back off of her."

4        MR. MAAZEL:  Let's play it.

5        (Video played.)

6        MR. MAAZEL:  Stop.

7  Q   Did you hear it was Ms. Pierce who said, "I'm watching

8  you on fucking live stream, you back off of her"?

9        ████████████  ████████████

10       ████████████  ████████████

11       Is that what you remember?

12       THE WITNESS:  What I remember is her saying "I'm

13  watching you on fucking live stream."  As she's saying that,

14  I say, "get back."  And then she's saying, from what I

15  remember, "you get back."  And that's when I effect the

16  arrest.

17  █ ██████████████████████████████████

18  ██████████████████████████████████████

19  ███████████████

20     ████████████████████████████████████████

21  ██████████████████████████████████████

22     ██████████  ██████████

23     ██████████  ██████████████ .

24     █████████████████████

25     ██████████  ███████

1  Q    When she said, I'm watching you on live stream, she's

2  filming that other officer to your left and the black lady,

3  correct?

4  A    Correct.

5  Q    And she's saying, I'm watching you on live stream, yes,

6  with a --

7  A    An explicative.

8  Q    With an explicative, yes?

9  A    Yes.

10  Q    And then she says, "you back off of her."

11        You hear that, yes?

12  A    That's not what I hear.

13  Q    You don't hear that?

14  A    Can you play it again?

15        MR. MAAZEL:  Let's play it again.

16        (Video played.)

17  Q    Did you hear Ms. --

18  ████████████    ████████████

19  ████████████    ██████████.

20  A    I hear her saying, "you back off."

21  Q    You didn't hear, "you back off of her"?

22  A    I -- I hear "you back off," and that was in response to

23  me saying "get back."

24  ███████████    ███████████████████████████████████████

25  ███████████████████████████████████████████████████████



RYDER - CROSS - MAAZEL                                    1304

1  ███████████     ███████████████████████████████████

2  ██████████████████████████████████████████████████

3  ███████████████████████████████████████████████████

4  ████████     █████████████████████████████████████

5  ██████████████████████████

6  Q    Now, you've claimed a number of times today that you've

7  said "back up"?

8  A    Yes.

9  Q    And you have claimed that you said that twice, right?

10 A    Yes.

11 Q    And we can agree that the person who said "back up"

12 twice was the same person, right?

13 A    If we're talking about the same moment in time in the

14 video, if you play it, I can answer that.

15 Q    Your view is that you said "back up" twice; you said it

16 the first time, you said it the second time?

17 A    Yes.

18 Q    All right.  Officer, the person who said "back up" was

19 the officer left -- to the left of you; isn't that right?

20     ██████████████     ██████████████

21     ██████████████     ██████████████

22     Is that what you recall?

23     THE WITNESS:  No.  I said it.

24 █  ███████████████████████████████████████████████████

25 ██████████████████████

RYDER - CROSS - MAAZEL                                    1308

1    ██████████████

2    ████████████

3    Q    I just want to show you that video one more time, from

4    28 to 31 at half speed and then I will have a question for

5    you.  And I want you to focus on the officer to your left

6    and his lips, okay.

7              (Video played.)

8    Q    Having seen that video at half speed, do you want to

9    change your testimony or is it still your testimony that

10   you -- not the officer to your left -- is the person who

11   said, "back up"?

12   ████████████  ████████████

13   ████████████  ████████████

14   A    I said "back up."

15   Q    By the way, the officer to your left was actually face

16   to face with the black lady, right?  You could see that in

17   the video?

18   A    You could see that in the video, yes.

19   Q    Yeah, and they're facing each other, maybe they're

20   jostling each other a little bit, right?

21   ████████████  ████████████

22              THE COURT:  Again, based on what; the video or his

23   recollection?

24   Q    First the video.  Do you see that in the video?

25   A    Somewhat.

Jamie Ann Stanton, RMR, CRR, RPR
Official Court Reporter

RYDER - CROSS - MAAZEL                                    1309

1   Q    Do you remember that from the day?

2   A    Not particularly, no.

3   ▮ ████████████████████████████████████████████████

4   ████████████████████

5        ██████████████   ██████████████

6        ██████████████   ██████████████

7        ██████████████

8   ▮   ██████

9   Q    Now, you have been present for the trial and you heard

10  the openings, yes?

11  A    Yes.

12  Q    Did you hear your lawyer claim in the opening that

13  Ms. Pierce grabbed your shield?

14  A    Yes.

15  Q    Is that true?

16  A    I believe she grabbed it the second time after I pushed

17  her off.

18  Q    So you didn't testify on direct that she grabbed your

19  shield; did you?

20  A    I said that she pushed into my shield.

21  Q    Well, okay.  So did she push your shield or did she

22  grab it?

23  A    There's two instances.  The first instance, she pushed

24  into it.  I pushed her off and said get back.  As I'm coming

25  back from that, grabbed it, and that's when I initiated the

RYDER - CROSS - MAAZEL                                    1310

1   arrest.

2   Q    And there's no handle on Ms. Pierce's side of your

3   shield; is there?

4   A    No.

5   Q    So -- and she's still filming, right?

6   A    Yes.

7   Q    And so your testimony -- and she's filming with both

8   hands?

9   A    I saw her with her right hand.

10   Q    So she's filming with the right hand and she's facing

11   east, and while she's doing that, she's grabbing your

12   shield?  That's your testimony?

13   A    No, not like that.

14   ███████████  ███████████

15   ███████████  ███████████

16   A    I pushed her off and then she braced herself and put

17   her hand on my shield again with her left hand.

18   Q    Where did she grab your shield while she's looking

19   east, filming, and saying something to the people in front

20   of her?

21   A    To the side of the shield; not the top.

22   Q    So she grabbed the side of the shield with her left

23   hand?

24   A    Much lower than you are depicting it.

25   Q    Okay.  You claim that you felt threatened by Brigid

RYDER - CROSS - MAAZEL                    1311

1    Pierce, yes?

2    A    By the group and her actions.

3    Q    You claim that you felt threatened by Brigid Pierce,

4    yes?

5    ███████    ███████

6    ███████    ███████

7    Q    Is that yes?

8    A    Sort of.  It's not a yes or no.

9    Q    Okay.  You claim that she left you on an island by

10   yourself surrounded by other protestors, correct?

11   A    That's what I wanted to avoid.

12   █  ████████

13   █████████████████████████

14   ███████████████████

15   ███████    ███████

16   ███████    █████

17   █  ███████████████████

18   ██████████

19   ███████    █████████████

20   ███████    █████████

21   ███████    ██████████████

22   ██████████

23   ███████    ███████████

24   █████████████████

25   ███████    ███████

RYDER - CROSS - MAAZEL                    1318



1

2          MR. MAAZEL:  If we could play page 134, lines 15

3   to 19 of your deposition.

4               (Video is played.)

5   BY MR. MAAZEL:

6   Q    That was your sworn testimony in your deposition,

7   right?

8   A    Yes.

9   Q    And you told the truth?

10  A    Yes.

11  Q    You claim -- well, withdrawn.

12               I'd like to show you -- play page 250, line 3 of

13  your deposition.  Of the?

14

15

16

17

18

19

20

21

22

23

24

25

RYDER - CROSS - MAAZEL                                              1319



15          (Video is played.)

16    Q    And that was your testimony at your deposition, that

17    you never threw Ms. Pierce to the ground, correct?

18    A    To your characterization of it, yes.

19    Q    You testified at your deposition that you never threw

20    Ms. Pierce to the ground, correct?

23    Q    Correct?

24    A    Yes.

25    Q    You also claim that when Ms. Pierce landed on the

1   ground, she braced her fall with her left hand, right?

2   A    She landed on her left side, yes, and her left hand is

3   included in that.

4   Q    You claim that she braced her fall with her left hand,

5   correct?

6   A    Yes.

7   Q    You claim Ms. Pierce's backpack cushioned her fall,

8   correct?

9   A    Yes.

10  Q    You claim Ms. Pierce did not hit her head when she

11  landed, correct?

12  A    I don't remember.  I don't believe so.

13  Q    You don't believe she hit her head?

14  A    I didn't see her head hit the ground.

15  Q    All right.  You claim that you guided Ms. Pierce to the

16  ground in a controlled manner.  Yes?

17  A    That's what I was trying to do, yes.

18  Q    ███████████████████████████████

19      ████████████  ██████████

20      ████████████  ████████████████████

21  ████████████

22      ████████████  ████████████████████  █

23  ████████████████████

24      ████████████  ████████████████████████

25  ████████████████

1   ██████████████████████████████████

2                ███████████████   ███████████████

3   ███████████████

4   Q    According to you, when you did the takedown, you did

5   that as gently as possible, correct?

6   A    Yes.

7   Q    You claim that you did the takedown, in part, to keep

8   Ms. Pierce safe.  Yes?

9   A    Yes.

10  Q    Now, after the takedown, Ms. Pierce was on the ground.

11  Yes?

12  A    Yes.

13  Q    And at a certain point on your body cam video, she's on

14  her back.  Yes?

15  A    She lands on her back, yes.

16  Q    She landed on her back?

17  A    Her side, her left side, the left back, the left leg,

18  the left hand.

19  Q    So she landed on her back or she landed on her left

20  side?

21  A    She landed on her side and rolled to her back.

22  Q    Okay.  And when she's on her back, you are on top of

23  her, right?

24  A    No.

25        MR. MAAZEL:  Let's take a look at Exhibit 12,

RYDER - CROSS - MAAZEL                    1324

1    starting at 58 seconds in.

2              THE COURT:  Previously admitted.

3              MR. MAAZEL:  Thank you, Judge.

4              (Exhibit published and video played.)

5    Q    That's you on top of Ms. Pierce, right?

6    A    I'm to her side.  I'm not on her.

7    Q    Okay.  She's on her back here?

8    A    Yes.

9    Q    And while she was on her back, as you testified

10   earlier, you said:  On your back.

11   A    Yes.

12   Q    You said that a couple of times.

13   A    I think I said it twice.

14   Q    And at a certain point, Ms. Pierce is then on her

15   stomach.  Yes?

16   A    Yes.

17   Q    How many officers were on top of Ms. Pierce at this

18   point?

19   A    I -- I wouldn't say officers were on top of her.

20   Officers were surrounding her and trying to get her hands.

21   Q    How many?

22   A    A few.

23   Q    Five?

24   A    I'm not sure the exact number.

25   Q    Were any of them women?

RYDER - CROSS - MAAZEL                                   1325

1   A    No.

2   Q    Now, you heard Ms. Pierce at the time repeatedly ask

3   someone to put her breast away.  Yes?

4   A    Yes.

5   Q    She said that three, four times, right?

6   A    While resisting arrest, yes.

7   Q    I didn't ask about resisting.

8        Ms. Pierce three or four times said her breast had

9   fallen out of her clothing.  Yes?

10  A    She was face down on the asphalt.  There was nothing to

11  see.  She said that, yes, but --

12  Q    Okay.  And did anyone -- well, withdrawn.

13       Did you ask for a female officer to assist?  Yes

14  or no?

15  A    I was trying to effect an arrest.

16  Q    Sir --

17  A    I wasn't -- no.

18  Q    -- did you ask for a female officer to assist?  Yes or

19  no?

20       THE COURT:  When?  At that moment?

21       MR. MAAZEL:  Yes.

22  Q    While she's on her stomach repeatedly crying out that

23  her breast is exposed, did you ask a female officer to

24  assist?

25  A    You don't need a female officer to arrest a female.

RYDER - CROSS - MAAZEL                1326

1  Q    Can you answer my question?  Did you ask a female

2  officer to assist?  Yes or no?

3  A    I didn't stop --

4  Q    Yes or no?

5  A    -- what I was doing to get another female.



RYDER - CROSS - MAAZEL                                    1328



9    Q    Now, at any point while Ms. Pierce is on the ground and
10   there were, as you put it, a bunch of officers surrounding
11   her, did you intervene to prevent any other officer from
12   using any other force on Ms. Pierce?  Yes or no?
13   A    Can you restate that?
14   Q    Did you intervene to prevent any other officer from
15   using force on Ms. Pierce when she was on the ground?
16   A    Police officers can use force.
17   Q    If you can now answer the question:  Did you intervene
18   to try to prevent any other officer from using force on
19   Ms. Pierce?  Yes or no?  Did you intervene?
20   A    There was no excessive force that I saw, so there was
21   nothing to intervene on.
22   Q    Okay.  Did you intervene, is the question.  Yes or no?
23
24                                              .
25        Did you intervene at all?  That's the question.

RYDER - CROSS - MAAZEL                    1329

1          THE WITNESS:  I was using force and other officers

2     were using force to effect the arrest.  This clearly states

3     if there's excessive force, I have to intervene, but I did

4     not witness any excessive force to intervene on.

5     Q    I didn't ask about that, Officer.  We're going to get

6     to that.

7               Did you intervene to stop any force used by any

8     other officer?

9               ████████████    ████████████

10    Q    It's just yes or no.

11    A    Yes.

12    Q    You did intervene?

13    A    When I say "cuffed," all four stopped on the arrest.

14    Q    Before that, before you said "cuffed," while Ms. Pierce

15    is on her stomach and there's all those officers surrounding

16    her, did you intervene to stop any other officer from using

17    any force?  Yes or no?

18    A    No.

19    Q    Did you, at any point before you said "cuffed," did you

20    at any point ask any other officer to stop using force on

21    Ms. Pierce?

22    A    No.

23    █ ████████████████████████████████████████████████████████

24    ████████████████████████████████

25         ████████████████    ████████████

RYDER - CROSS - MAAZEL                                1330

1          ██████████    ██████████████████.

2    Q    Who was the officer who was grabbing Ms. Pierce's head

3    while she was on her stomach?

4              THE COURT:  At what point?  Are you referring him

5    to something specific?

6              MR. MAAZEL:  Yes.

7    Q    You remember seeing video in this trial where

8    Ms. Pierce is on the ground and -- well, let's just show you

9    Exhibit 12, at 1:29.

10             (Exhibit published.)

11             MR. MAAZEL:  Maybe we can show this at half speed.

12   1:29 of Exhibit 12.

13             (Video is played.)

14             MR. MAAZEL:  Let's stop there.

15             THE COURT:  Stopping at 1:33.

16             MR. MAAZEL:  Thanks, Judge.

17   Q    Did you see the left arm of one of the male officers

18   grab Ms. Pierce's head and put it to the ground?

19   A    Yes.

20   Q    Who is that?

21   A    I have no idea.

22   Q    Did you at any point tell that officer to stop?

23   A    As you see from my body camera, I don't see that.

24   Q    I'm just asking, did you at any point ask that officer

25   who put his hand on Ms. Pierce's head and put her to the

RYDER - CROSS - MAAZEL                    1331

1    ground to stop?  Yes or no?

2    ███████████  ███████████

3    ███████████  ███████████

4    A    I didn't see any of that.

5    Q    Did you ask him to stop?

6    A    I can't ask him to stop if I don't see it.

7    Q    █████████████████████████

8    ███████  █████████████████████████

9    ████████████  ███████████

10   Q    Now, as we saw from the Patrol Guide a moment ago, you

11   were required to ensure Ms. Pierce got any medical treatment

12   that was needed, correct?

13   A    Correct.

14   Q    And that's because she was in your physical custody?

15   A    Correct.

16   Q    And you testified that you were a trained EMT.

17   A    Correct.

18   Q    And you claim that -- you testified that you looked at

19   her closely.

20   A    Correct.

21   Q    You're supposed to look for physical injuries, right?

22   A    Correct, and I didn't see any.

23   Q    So you missed the reddish lump on Ms. Pierce's head

24   that Officer Moses saw?  Is that your testimony?

25   A    I didn't see a reddish lump, and in my body camera you

RYDER - CROSS - MAAZEL                    1332

1   don't see a reddish lump.

2   Q    You didn't see any lump on her head?

3   A    No.

4   Q    Let's take a look at your body cam video, which is

5   Defense Exhibit A.  We'll start at 1:10 and we'll stop at

6   1:18.

7              (Exhibit published and video played.)

8   Q    That's you having a conversation with Ms. Pierce,

9   right?

10  A    Yes.

11  Q    That's your body cam that's making this recording,

12  right?

13  A    Correct.

14  Q    And you see on the right of her forehead a raised red

15  wound, right?

16  ███████████  ██████████

17  ███████████  ██████████

18              Is that what you see?

19              THE WITNESS:  No.

20  █ ████████████████████████████████  █████████

21  █ ██████████████

22          ███████████  ██████████

23          ███████████  ██████████

24          ████████████████████████████████

25  ███████████████████████████████████████████████

RYDER - CROSS - MAAZEL                                    1333

1  ████████████████████████████████████████

2         ████████  ████████

3  Q    I'll ask it this way, Officer:  Back when Ms. Pierce

4  was sitting on the pavement at this moment, did you notice a

5  big red wound on her right temple?

6  A    No, I did not see any injuries on her.

7  Q    As you've described, your entire interaction with

8  Ms. Pierce from when she's on the ground to when you leave

9  her on the bus is on your body cam, right?

10 A    Correct.

11 Q    And during that entire time, you did not once ask her

12 if she needed medical attention, correct?  That's just a yes

13 or no, Officer.

14 A    She didn't ask me either.

15 Q    I'm not asking about what she asked you.

16        During the entire time, you didn't once ask her if

17 she needed medical attention, did you?

18 A    No.

19 Q    It was part of your job as a police officer that

20 whenever any level of force is used, to inquire if the

21 subject requires medical attention, correct?

22 A    I didn't feel that she needed attention, and she didn't

23 ask for it.

24 Q    It was part of your job to ask, whenever any level of

25 force is used, if she needed medical attention, correct?

RYDER - CROSS - MAAZEL                    1334

1   A    Is -- is there -- is that in the Patrol Guide?

2   Q    I'm just asking, was that part of your job?

3   A    Generally, yes, you want to make sure someone's okay.

4   The way she was talking to me, she -- I felt like she was

5   okay.

6   Q    I'm just saying, was it part of your job to ask?

7   A    Yeah.  If she was in my custody, I want to make sure

8   she's okay.

9   Q    But you did not ask, correct?

10  ████████████  ████████████

11  ████████████  ████████████

12  A    Not specifically, no.

13  Q    Not at all.

14  A    No.

15  Q    Now, not only are you supposed to ask if the person you

16  arrested needs medical attention, you're supposed to

17  document their response, correct?

18  A    Correct.

19  Q    You're supposed to document their response in an

20  activity log, correct?

21  A    Correct.

22  Q    You never asked anyone to provide Ms. Pierce medical

23  treatment, correct?

24  A    Correct.

25  Q    I want to show you Exhibit A.

RYDER - CROSS - MAAZEL                                    1335

1      You were shown part of your body cam video on

2  direct.  Do you remember that?

3  A    Yes.

4  Q    I want to show you a part that you weren't shown.

5  Exhibit A, at 3:26.

6      I'll first ask:  Do you remember there was a

7  moment when you had Ms. Pierce sit on the ground with

8  another arrestee?  Do you remember that?

9  A    Yes.

10      MR. MAAZEL:  So let's play that.

11      (Exhibit published and video played.)

12      MR. MAAZEL:  Let's go back to 3:25 or 3:24.

13      (Video is played.)

14  Q    Do you remember at the time Ms. Pierce asking someone

15  else who had been arrested, while she was sitting there on

16  the ground, if her head was bleeding?

17  A    I do not remember that at the time, no.

18  ██ ██████████████████████████████████

19  ███████████████████████████████████████

20  ██ ████████████████

21      ██████████  ██████████

22      ██████████████  ██████████████████

23  ██ ██████████████████████████████

24  ████████████████

25  ██  ████

RYDER - CROSS - MAAZEL                                    1339



11  Q    Now, you claimed that your body-worn camera captured

12  your entire interaction with Ms. Pierce, right?

13  A    Yes.

14  Q    But that's actually just not true, is it?

15  A    From the moment I made -- started to make the arrest,

16  it recorded the entire interaction.

17  Q    The beginning of the body-worn camera that you

18  activated, that very beginning, she's already on the ground,

19  isn't she?

20  A    It's as I'm bringing her to the ground.

21  Q    Okay.  Let's take a look at the very beginning of

22  Defendant's Exhibit A.

23          MR. MAAZEL:  Let's just play a little bit of it.

24          (Exhibit published and video played.)

25          MR. MAAZEL:  Stop there.

*Kristi Cruz, RMR, CRR, RPR*
*Official Court Reporter*

1  Q    The very beginning of your body-worn camera, she's on

2  the ground, right?

3  A    Yes.

4      ████████    ██████████

5      ████████    ██████████    ██████████

6  Q    Before your takedown, you did not put your body camera

7  on --

8  A    I activated it at that time.

9  Q    Let me try again:  Before your takedown, you did not

10 put your body camera on, did you?

11 A    I activated it as I was doing the takedown.

12 Q    Before the takedown --

13 A    Before?  No.

14 █ ██████████████

15    ███████████████████████████

16 ████████████

17    ██████████████████████████████████

18 ████████████████████████████████

19 █ ██████████████████████████████

20 █ ████████████████████████████████████

21 ████████████████

22    ██████████    ██████████

23 █ ████████████████████████████████████

24 █████████████████████████████████████

25    ██████████    ██████████████



16  Q     Now, you were shown by counsel your conversation with

17  Ms. Pierce later as you're walking to the bus.

18            Do you remember that?

19  A     Yes.

20  Q     And you were the one who started that conversation.

21  A     Yes.

22  Q     And the entire conversation you had with Ms. Pierce on

23  the way to the bus, you knew your camera was on and

24  recording, right?

25  A     Yes.

RYDER - CROSS - MAAZEL                    1342



24   Q    You were the one who put the zip ties on her.    Yes?

25   A    Yes.

RYDER - REDIRECT - OCHOA                    1343

1    Q    You were the one who decided how tight they would be?

2    A    It's not really a decision of the officer.  You pull

3    them and they -- you do them until they're tight enough that

4    the hands don't come out.

5    Q    You measured the tightness, right?

6    A    It's not really a measurement, but I put the cuffs on,

7    yes.



RYDER - REDIRECT - OCHOA                                    1344



11   Q    Detective Ryder, why didn't you charge plaintiff with
12   resisting arrest?
13   A    I used my discretion.  If I charged her with resisting
14   arrest and the other charges, she would have been put
15   through the entire process and been in jail for days.  By
16   just having her get the curfew summons, she would have been
17   out in a few hours.
18   Q    And why didn't you charge her with disorderly conduct?
19   A    I used my discretion.
20   Q    And why didn't you charge with her obstructing
21   governmental administration?
22   A    I used my discretion.
23   Q    Did you arrest her for filming a police officer?
24   A    Absolutely not.
25   Q    Are you allowed to use force to effectuate an arrest?

1  A    Yes.

2  Q    Did you have an opportunity to tell plaintiff to put

3  her hands behind her back?

4  A    No.

5  Q    Why not?

6  A    There was a very large crowd, and I didn't want to play

7  tug of war with her with the crowd.

8  Q    Were other officers giving commands that night?

9  A    Yes.

10  Q    I want to return to some of the deposition testimony

11  that counsel showed you.

12         You were asked about prior testimony about feeling

13  physically threatened by plaintiff, correct?

14  A    Yes.

15  Q    And they played a video of your deposition, right?

16  A    Yes.

17  Q    But isn't it true that you were also asked the exact

18  same question immediately before that?

19  A    I believe so.

20  Q    And that was on --

21         MS. OCHOA:  If we could roll the --

22         THE COURT:  Indicate where in the deposition.

23         MS. OCHOA:  That is page 133, line 24.

24         (Exhibit published and video played.)

25  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

RYDER - REDIRECT - OCHOA                                    1346



11    Q    Why didn't you ask plaintiff if she needed medical

12    attention?

13    A    I didn't think she needed it, and I didn't see any

14    injuries.

RYDER - REDIRECT - OCHOA                                1347



6    Q    Officer, why didn't you have your body camera on before

7    the takedown?

8    A    Before we deployed to the Brooklyn Bridge, we went to

9    one of the precincts and I went to the bathroom, and I

10   didn't want to record going to the bathroom, so I turned the

11   camera off.  When we came back out, I forgot to turn it back

12   on.  So when I activated the camera during the incident, I

13   thought there was the pre-roll because I thought it was on,

14   but that's why there's no pre-roll there.

15   Q    What would it have shown if you had had it on?

16   A    Everything I've testified to.

RYDER - RECROSS - MAAZEL                    1348

1   ▮   ▬▬

2   ▮   ▬▬▬▬▬▬▬

3   ▮   ▬▬▬   ▬▬▬▬▬

4   Q    I thought you testified this morning on direct that you

5   did have to use your body-worn camera.  Didn't you testify

6   to that this morning on direct?

7   A    In what regard?

8   Q    That you were required to put on your body-worn camera

9   and that's why you did eventually.

10  A    There was required activation for an arrest, and that's

11  why I activated it.

12  Q    And that was a requirement.  Yes?

13  A    Because I was taking police action, yes.

14  Q    And finally, you said you didn't charge Ms. Pierce with

15  all these other crimes because you didn't want to put her

16  through the process, right?

17  A    Correct.

18  ▮   ▬▬▬▬▬▬▬▬▬▬▬▬▬

19  ▮▬▬▬▬▬▬▬▬▬▬▬▬

20      ▬▬▬   ▬▬▬

21      ▬▬▬   ▬▬▬

22      ▬▬▬   ▬▬▬

23  ▮   ▬▬▬▬▬

24      ▬▬▬   ▬▬▬

25      ▬▬▬   ▬▬▬▬▬