1  ▬▬▬▬▬▬  ▬▬▬▬▬▬

2  ▬▬▬▬▬▬  ▬▬▬▬▬▬▬▬

3  ▬▬▬▬▬▬▬▬

4           THE COURTROOM DEPUTY:  Please state and spell your

5  name for the record.

6           THE WITNESS:  Siddhartha Nadkarni.  First name is

7  spelled S as in Sam, I, D as in dog, H-A-R, T as in Thomas,

8  H-A.

9           Last name is N as in Nancy, A, D as in dog, K-A-R,

10 N as in Nancy, I.

11          THE COURT:  You may inquire.

12          MR. MAAZEL:  Thank you, Your Honor.

13 **SIDDHARTHA NADKARNI,**

14          called as a witness having been first duly

15          sworn/affirmed, was examined and testified as

16          follows:

17 DIRECT EXAMINATION

18 BY MR. MAAZEL:

19 Q    Good afternoon, Dr. Nadkarni.

20 A    Good afternoon.

21 Q    What is your professional field?

22 A    I am a neuropsychologist and psychiatrist, and

23 epileptologist.

24 Q    And take us through what is neuropsychiatry.

25 A    Sure.  So they're subfield in medicine, like OB-GYN and



Nadkarni - Direct - Maazel                    117

1   pediatrics.  Two of those are neurology and psychiatry.  And

2   you can be Board Certified in either neurology or

3   psychiatry.  Or occasionally, rarely, you can be certified

4   in both neurology and psychiatry.

5          And neuropsychiatry is the field that looks at

6   behavioral consequences and psychiatric consequences of

7   neurological illness, and sometimes neurological

8   consequences of psychiatric illness.  So there's a lot of

9   overlap.  Like, in diseases like epilepsy, movement

10  disorder, like Parkinson's disease, Alzheimer's and

11  dementias, many areas of neurology have overlap with

12  psychiatry.  So it's sort of the behavioral neurology

13  aspects of neurological diseases.

14  Q    Does neuropsychiatry include the study of head

15  injuries, including traumatic brain injuries?

16  A    Yes.  The central disorder neuropsychology?

17  Q    Right.  And are you familiar with an expert retained by

18  the defense lawyers, Dr. Robert April?

19  A    Yes, I am.

20  ██████████████    ████████████

21  ██████████    ██████████

22  ████████████████████████████████

23  █████████████████

24  ██████████    ████████████████████

25  ██████████    ████████    ████████

Nadkarni - Direct - Maazel                    118

1   BY MR. MAAZEL:

2   Q    Is Dr. April a neuropsychiatrist?

3   A    He is not a neuropsychiatrist.

4   Q    Okay.  Could you summarize your educational background?

5   A    Sure.  I completed my undergraduate degree at Brown

6   University, studying comparative literature and biology.

7   And then I finished medical school at the University of

8   Miami School of Medicine.  And then a six-year combined

9   residency in neurology and psychiatry from 1997 to 2003.

10  And then one year of clinical neurophysiology fellowship in

11  the epilepsy track from 2003 to 2004.  And subsequently was

12  on faculty at NYU until -- and still on faculty at NYU.

13  Q    And can you summarize, Doctor, your professional

14  experience?

15  A    Sure.  So after I graduated from my fellowship, I was

16  retained as faculty in the epilepsy division of the

17  neurology department at NYU.  And there, I served many

18  educational leadership roles.  So I was the program director

19  of the clinical neurophysiology in epilepsy fellowships.  I

20  was the program director of the combined residency in

21  neurology and psychiatry.

22       I was the director of the neuroscience curriculum,

23  and still am, for the psychiatry residency training program

24  at NYU.  And I also have a large panel of patients in the

25  epilepsy division, both neuropsychiatric and epilepsy

Nadkarni - Direct - Maazel                                    119

1   patients.

2          And I also serve as the consultant neurologist and

3   neuropsychiatrist to the Rusk Institute Brain Injury Day

4   Treatment Program.  So I saw all the new patients they had.

5   That were sent to me for evaluations in neurology and

6   psychiatry.

7   Q     Doctor, have we covered your hospital appointments or

8   are there others to discuss?

9   A     Yes.  I'm also -- I also do part-time work with the

10  Epilepsy Group in New Jersey.  And I am -- I've been

11  certified to work at multiple hospitals in New Jersey,

12  including Saint Barnabas, Hackensack, Saint Peter's, the

13  Atlantic Health System.  Multiple hospitals in New Jersey,

14  also.

15  Q     And what is your current position?

16  A     Mostly, right now, I'm in private practice in

17  Montclair, New Jersey.  And I spend probably 75, 80 percent

18  of my time seeing patients in private practice.

19         And some of my time I do forensic neuropsychiatry,

20  as well.

21  Q     Do you have any licenses?

22  A     I'm licensed in the States of New York and New Jersey.

23  Q     As a what?

24  A     I'm licensed as a medical doctor in both states.

25  Q     Do you have any professional certifications?

Nadkarni - Direct - Maazel                    120

1   A     Yes, I'm Board Certified in five things.  It's

2   neurology, psychiatry, clinical neurophysiology, epilepsy,

3   and then neuropsychiatry/behavioral neurology.

4         The first four are from the American Board of

5   Psychiatry and Neurology.  And the last one is from the

6   United Council of Neurologic Subspecialties.

7   Q     Do you have experience treating traumatic brain injury

8   patients?

9   A     Yes, I do.

10  Q     How many years have you been doing that?

11  A     20 -- well, let's see.  At least 25 years.

12  Q     About how many TBI patients have you had in your

13  career?

14  A     Oh, I would say about a 15,000 -- 10, 15,000 at least.

15  Q     All right.  Are you being paid for your time in this

16  case?

17  A     Yes, I am.

18  Q     And how much have you been paid so far?  Ballpark?

19  A     Ballpark, I think it's been six or $7,000 since 2022.

20  Q     And what percent of your work is clinical work treating

21  patients and what percent is forensic work dealing with

22  legal cases?

23  A     75 to 80 percent is clinical and 20 percent is

24  forensic.

25  Q     Are there times in your forensic practice when a lawyer

Nadkarni - Direct - Maazel                    121

1    or lawyers ask you to write a report and you don't?

2    A    Yes, that does happen.

3    Q    And why is that?

4    A    Because sometimes they just want to know what I

5    think -- of what's going on with the client; and whether

6    that is useful to them or not, it's going to be up to them.

7    So sometimes they just want to know my opinion before I

8    write them.

9         MR. MAAZEL:  Your Honor, I tender Dr. Nadkarni as

10   an expert in neuropsychiatry, in neurology and psychiatry

11   and in epilepsy.

12        THE COURT:  Would you like to *voir dire*?

13        MR. HUTCHINSON:  No, Your Honor.  No objection.

14        THE COURT:  Okay.  So you are so qualified in all

15   of those areas as an expert.

16        You may continue.

17   BY MR. MAAZEL:

18   Q    Doctor, did you have an opportunity to review materials

19   in connection with this case?

20   A    Yes, I did.

21   Q    And could you generally describe the materials you

22   reviewed?

23   A    Yes.  The audio files, video files, medical records and

24   I think there was deposition transcripts also.

25   Q    Did you review any expert reports and deposition of

Nadkarni - Direct - Maazel                    122

1   Dr. April, the defense expert?

2   A    Yes, did.

3   Q    In addition to the various materials you reviewed, did

4   you, yourself, perform any examinations in this case?

5   A    Yes, I did.  I had the opportunity to interview and

6   examine Ms. Pierce.

7   Q    And what kind of examination was that, just generally?

8   A    Neurologic/neuropsychiatric examination.

9   Q    And when did you do that?

10  A    That was on June 3rd -- I'm sorry.  Yeah, June 3rd,

11  2022.

12  Q    So two years after the police incident?

13  A    I think to the day.

14  Q    Okay.  And where did you do that examination?

15  A    That was done at your offices.

16  Q    And why was that?

17  A    Because at that point, my office was in Mount Vernon,

18  Jersey and I think it was more convenient to meet at your

19  office.

20  Q    Convenient for who?

21  A    For Ms. Pierce.

22  Q    And when you examined Ms. Pierce, did you see anyone

23  from our office, whether myself or any other lawyers or have

24  any interaction whatsoever with any one at my firm?

25  A    I did not.

1   Q    In addition to your a while ago of Ms. Pierce, the

2   materials you reviewed, did you order any tests from

3   Ms. Pierce?

4   A    Yes, I did.

5   Q    What sort of tests?

6   A    I initiated tests of her brain and neurophysiologic

7   tests of her brain and neuropsychological tests.

8   Q    After reviewing all of the materials, reviewing the

9   test results and performing your own neurologic exam of

10  Ms. Pierce, did you form any opinion or opinions in this

11  case to a reasonable degree of professional certainty?

12  A    Yes I, did.

13  Q    And what, in summary, is your opinion?

14  A    That she suffered a severe brain injury from the

15  assault that occurred on June 3rd, 2020.

16  ███████████   ████████████

17  ████████████  ██████

18  ██████████████ ████████████

19  █████████

20  ███████████  ████████████████████

21  █████████

22  THE WITNESS:  From an assault, she --

23  ██████████████  ███████████

24  █████████  █████████

25  THE WITNESS:   She sustained a severe brain jury

Nadkarni - Direct - Maazel                    124

1    from the assault that occurred in June of 2020, including a

2    brain --

3    ████████████    ████████████████

4    ████████████████████████████

5            Ladies and Gentlemen, as I've said to you before,

6    the question of whether or not some conduct constitutes an

7    assault under the law is something you will determine based

8    on my instructions.

9            But I am allowing witnesses to use that term in a

10    more commonly understood way.  So that's why I keep

11    overruling the objections.

12            But bear in mind, it will ultimately be up to you

13    to decide whether the conduct that you find occurred, based

14    on the evidence before you, constitutes an assault on the

15    law, that will be your determination.  Okay?

16            All right.

17            And you shouldn't be affected by what other

18    people -- how other people describe the incident.

19            So for the last time and -- and you've registered

20    your objection, could you start again, Dr. Nadkarni.

21            THE WITNESS:  Sure.

22            That Ms. Pierce suffered a severe brain injury as

23    a result of a traumatic attack in June of 2020 that resulted

24    in permanent brain damage.

25    ████████████    ████████████

*David R. Roy, RPR, CSR, CCR*
*Official Court Reporter*

1          Again, Ladies and Gentlemen, the words that people

2   use on the witness stand, that shouldn't govern what you

3   decide the law -- or how the law should applied.

4          Okay.  Go ahead, Doctor.

5   BY MR. MAAZEL:

6   Q    What is a traumatic brain injury?

7   A    It's a brain injury that's caused by a deceleration

8   injury of the skull, meaning the skill is moving at a

9   certain pace and it stops and the brain giggles and that's

10  the trauma, right.  The trauma is the brain is actually

11  going and then it stops.

12         And the brain shakes and that causes all sorts of

13  injuries inside the skull.

14  Q    And what causes a traumatic brain injury?

15  A    A trauma, meaning a blunt-force injury.  Like I just

16  said, the head moving and stopping suddenly.

17  Q    All right.  Now, did you create an expert report in

18  this case?

19  A    I did, yes.

20  Q    And did you bring it with you today to refer to as

21  necessary?

22  A    I have it right here, yes.

23  Q    I would like to ask you, Doctor, about -- first about

24  the symptoms that Ms. Pierce reported in the days after the

25  incident.

1    A    Well, she reported several symptoms on -- in the

2    immediate days following the incident, including having her

3    right eye swollen and feeling --



7                Doctor, let me ask you a question:  Could you try

8    to not use the report, but do you have a recollection of

9    what it is she reported to you at that time?

10                THE WITNESS:  Sure.  It's a long list, so I could

11    refresh that but I could --

12                THE COURT:  Okay.  So I'm going to allow him to

13    refresh his memory based on the report.  Take a look and

14    then try to recite all of her reported symptoms.

15                THE WITNESS:  Okay.  No problem.

16                So she had right eye symptoms where her eye was

17    swollen.  She had bruising all over her -- on different

18    parts of her limbs on her body.  She had abrasion on the

19    right side of her temple, and in the right orbit -- I think

20    that is part of why her eye was -- you know, she couldn't

21    open her eye because there was a lesion there.

22                She had scalp swelling.  Pain in the right

23    shoulder.  She started reporting symptoms of seeing visual

24    symptoms, like seeing flashes of light.

25                She had difficulty with sleep, even when some of

1    the painful symptoms resolved.

2            And then she had other symptoms looking at lights,

3    like a lot of visual symptoms when looking at bright lights

4    right in the few days after.

5    BY MR. MAAZEL:

6    Q    So, Doctor, what were the persistent symptoms that

7    Ms. Pierce reported as of 2022 when you examined her?

8    A    Well, she had many persistent symptoms of visual

9    problems, including those flashing lights and difficulty

10   using computer screens, seeing hallucinations like green and

11   red colors.

12           She had migraines headaches, at least clinically

13   speaking from what she describes, which were very frequent.

14           She had episodes at night where she would wake up

15   suddenly drenched in sweat, having a panicking feeling and

16   also being described as having thrashing episodes at

17   nighttime.

18           She had symptoms of posttraumatic stress disorder

19   and active symptoms of that and she had multiple cognitive

20   symptoms.

21           So she could no longer multitask, like her working

22   memory, she couldn't hold two things at the same time, so

23   she had set shifts.

24           And she described actually her job being something

25   where she was constantly on a screen and flying through

1    different -- and changing different things, and multitasking

2    all the time.  And she found that she really couldn't do

3    that after this injury, to the point where she actually lost

4    her job because she couldn't function there.

5    ██████████    ██████████

6    ██████████  ██████████.

7        THE WITNESS:  She also describes symptoms of

8    difficulty with frontal lobe functioning like things like

9    difficulty initiating or motivating.  Difficulty initiating

10   thoughts with attention, processing speed, concentration,

11   those are all symptoms that have persisted.

12       THE COURT:  So, Dr. Nadkarni, can you just put

13   down your report, at least so that it doesn't give the

14   appearance that you're simply reading from the report.

15       THE WITNESS:  Okay.  No problem.

16       THE COURT:  If necessary, you can ask to look at

17   the report to refresh your memory and then just put the

18   report down.

19       Okay.

20   BY MR. MAAZEL:

21   Q    Which of these cascade of symptoms are symptoms caused

22   by traumatic brain injury?

23   A    All of the symptoms, I think, are from a traumatic

24   brain injury.

25   Q    Okay.

1          Now, did you prepare in your report and also as a

2    demonstrative exhibit for the jury today, a table?

3    A    Yes, I did.

4    Q    All right.  And what table is that?

5    A    That is a table of the objective findings in her case.

6    Q    All right.

7          MR. MAAZEL:  And I think we have marked that as

8    Exhibit 72 and, Judge, we would like to show this to the

9    jury, as a demonstrative.

10          THE COURT:  Not the jury but to the witness.

11          MR. MAAZEL:  Well --

12          THE COURT:  Oh.  Well, I'd first like to --

13          MR. MAAZEL:  First to the witness.  Okay.

14          THE COURT:  Yes, first to the witness just so he

15    can authentic it or at least explain what it is.

16          MR. MAAZEL:  Understood.

17    BY MR. MAAZEL:

18    Q    So we're now showing, just you, Dr. Nadkarni, Exhibit

19    72.

20    A    Yes.

21          THE COURT:  And what is it?

22          THE WITNESS:  Well, this is a table that I

23    prepared for my report, just listing the objective findings,

24    the tests that were done, the results of the tests, and the

25    implications clinically of the results of those test.

1        THE COURT:  And you prepared this?

2        THE WITNESS:  It's in my report, yes.  I prepared

3   this table.

4        THE COURT:  All right.  Go ahead.

5        MR. MAAZEL:  So I would like to publish this as a

6   demonstrative to the jury, Your Honor.

7        THE COURT:  All right.  You may.

8        MR. MAAZEL:  And maybe just if we could do a cull

9   out at the top.

10  BY MR. MAAZEL:

11  Q    Just tell us what these columns are.

12  A    Sure.  The first column in bold at the top, it says

13  "Study," that's just a type of study that was being done.

14       The next one says "Abnormality" which is the

15  findings in the study.  And the last one says "Clinical

16  Consequences," which is, what does it mean in her life and

17  her symptoms and how she lives her life.

18       MR. MAAZEL:  All right.  Can you just cull out the

19  left column -- yes.

20  BY MR. MAAZEL:

21  Q    So was one of the studies a brain MRI?

22  A    Yes an MRI of the brain.

23  Q    Okay.

24       MR. MAAZEL:  And in -- if you could just maybe do

25  the whole left column?

1  BY MR. MAAZEL:

2  Q    And the next study that you relied on was which one?

3  A    The next one is called the brain CAT scan or Positron

4  Emission Tomography.

5  Q    Okay.  So what is a brain MRI?

6  A    A brain MRI is a study that looks at the structure of

7  the brain.  It's like a picture of the brain, almost like if

8  you lifted the hood of your car and took picture what the

9  structure would look like.  And it is by putting the head in

10 the magnetic field.  And when you put the head in the

11 magnetic field, what happens is that the water or the

12 hydrogen ions line up in a certain way, and then you can do

13 calculations based on that alignment and generate a picture

14 of the brain with very high resolution.  So that's what an

15 MRI of the brain is.

16 Q    And what is a brain PET scan?

17 A    It's a P-E-T, that's Positron Emission Tomography.  And

18 it's a study that measures how the brain cells use glucose.

19 So it's a proxy for a function of the neurons.  Like, the

20 more glucose you use, the more functional they are.  Then

21 the less glucose you use, the less functional they are.

22        So less use means hypometabolism where the neurons

23 are metabolizing the glucose as well.

24        The way it's done is a nuclear racer is attached

25 to a glucose molecule and injected into the bloodstream.  So

Nadkarni - Direct - Maazel                    132

1   it gives you sort of radioactive.  And the cells that use

2   that glucose more, the tracer cools in those areas.  So you

3   can see a certain amount of tracer in a given place.  And

4   then you can see less tracer in other places.

5           So the important thing about a difference between

6   an MRI and a PET scan is a PET scan is a measure of

7   functioning.  So if you plug your car into the computer and

8   figure out the electrical system, how the computer's

9   working, that's a functional test versus just opening the

10  hood and taking a picture.

11          So the MRI is just a picture of the brain, that's

12  structural.  And the PET scan is much more functional and

13  how the brain is actually functioning in realtime.

14  Q    And who did you ask to take an MRI and PET scan of

15  Ms. Pierce's brain?

16  A    NYU Medical Center.

17  Q    And what is a study result?

18  A    A study result is when the physician, who is the

19  neuroradiologist or nuclear medicine doctor reads the study

20  itself and then makes an interpretation of what that study

21  means.

22  Q    So who actually took the MRI and the PET scan for

23  Ms. Pierce?

24  A    Well, the MRI was done by technologist at NYU and a PET

25  scan also, and read by an attending physician.

 1   Q    And -- a radiologist?

 2   A    A radiologist, yes.

 3   Q    And the radiologist who prepared the study result for

 4   Ms. Pierce, did that radiologist know there was a lawsuit at

 5   all?

 6   A    Not that I'm aware of.

 7   Q    Who pays the radiologist?

 8   A    NYU pays that radiologist.

 9   Q    And so is there any relationship between the

10   radiologist who does the study result at NYU and my law firm

11   or anything related to this case?

12   A    Not that I'm aware of.

13   Q    I would like to show you Exhibit 21 for identification.

14   And do you recognize that --

15            THE COURTROOM DEPUTY:  One moment.  Okay.

16   BY MR. MAAZEL:

17   Q    Do you recognize Exhibit 21?

18   A    Yes, I do.

19   Q    And what is that?

20   A    This looks like records from NYU -- medical records

21   from NYU Medical Center.

22   Q    Okay.  And so is the study result for Ms. Pierce that

23   you ordered?

24   A    Yes, this looks like -- yes, exactly, this page.

25   Q    And was this prepared in the regular course of business

1    at NYU?

2    A    Yes.

3    Q    And --

4         MR. MAAZEL:  I move this into evidence.

5         THE COURT:  Any objection?

6         MR. HUTCHINSON:  No.

7         THE COURT:  All right.  It's admitted.  That's

8    Number 21.

9         (Plaintiff's Exhibit Number 21 received in

10   evidence.)

11        THE COURT:  You may publish.

12        MR. MAAZEL:  We could start with the first page --

13   I'm sorry, the second page.  And if we could just cull out

14   the top third.  Before that -- before the writing -- yes.

15        (Exhibit published to the jury.)

16   BY MR. MAAZEL:

17   Q    And so who is the patient here?

18   A    The patient is Ruby Pierce.

19   Q    And who was the referring doctor who actually assessed?

20   A    That was myself.

21   Q    By the way, were you a treating physician or were you

22   doing a forensic analysis in this case?

23   A    I was only doing a forensic analysis in this case.

24   Q    All right.  And what is the date that these tests were

25   done?

1    A    This is -- date of service is July 13, 2022.

2    Q    And what tests were done?

3              MR. MAAZEL:  If we could go up there.

4              THE WITNESS:  A PET scan and MRI scan.  Or what we

5    call a PET MRI.

6              MR. MAAZEL:  And if we could just go to the bottom

7    of page 2.  Just the very bottom where it says "electronic

8    signature."  Yes.

9    BY MR. MAAZEL:

10   Q    And so who was the doctor, the radiologist at NYU who

11   prepared this study?

12             THE COURTROOM DEPUTY:  Use the microphone.

13             MR. MAAZEL:  I'm sorry.

14   BY MR. MAAZEL:

15   Q    Who was the radiologist at NYU who authored -- who

16   looked at the imaging and prepared the study?

17   A    Dr. Zan.

18   Q    That's Elcin Zan?

19   A    Yes.

20   Q    All right.  Again, Dr. Zan is that -- did he have

21   anything to do with this lawsuit?

22   ███████████████    ████████████    ████████████████████

23        ████████████    ████████████

24        ████████████████

25             THE WITNESS:  No.

1   BY MR. MAAZEL:

2   Q    And he wrote, "I personally reviewed the images and

3   agree with this report," correct?

4   A    Correct.

5   Q    Is that -- all right.

6        And now, I want to go through the conclusions of

7   the radiologist and the study result of Ms. Pierce.

8            MR. MAAZEL:  And if we could start -- if we could

9   first go back to your demonstrative Exhibit 72.

10   ██████████████████    ████████████████████

11   ████████████    ██████████████████████████

12   ██████████████████    ██████████

13           MR. MAAZEL:  And so if we could just cull out the

14  top row, "brain MRI," that section.

15  BY MR. MAAZEL:

16  Q    And the -- what are the -- what are the abnormalities

17  you noted in this section?

18  A    These are all the abnormalities that the radiologist

19  read in the report.

20  Q    For which test?

21  A    For the MRI of the brain.  So the first one is

22  bilateral mesial temporal sclerosis.

23  Q    And before we go to that, I just want to show the

24  report to the jury.

25           MR. MAAZEL:  If we can go back to Exhibit 21.

1          Okay.  If we could cull out the first paragraph
2   under "Impression"?
3   BY MR. MAAZEL:
4   Q    Okay.  Can you take us through this first sentence,
5   Doctor?
6   A    Sure.  So this is the impression, the overall
7   impression of the combined PET/MRI study.  So it shows both
8   things.  And it's sort of a summary impression.  And it
9   reads, "FDG," that's fluorodeoxyglucose.  That's that
10  nuclear tracer glucose, "hypometabolism and corresponding
11  atrophying indicating bilateral mesial temporal sclerosis."
12  Q    And what -- can you take us through those words,
13  bilateral mesial temporal sclerosis?  What does each word
14  mean?
15  A    Sure.  Sure.  So the first word is "bilateral," means
16  both sides.  So this was involving both sides of atrophy.
17  Q    Both sides of?
18  A    The brain.
19          And you know, if you -- I'm just putting my -- my
20  fist up here with my thumb inside.  This is sort of what a
21  brain looks like.  This is kind of frontal lobe, the
22  temporal lobe, the parietal lobe, the occipital lobe.
23          So mesial temporal means inside the part of the
24  temporal lobe that's more in close to the midline.  Is --
25  has sclerosis.  Sclerosis means scar.  Like, if you cut

Nadkarni - Direct - Maazel                                        138

1    yourself and you develop a scar.  So this is a scar in the
2    brain in that area on both side of the temporal lobes.
3    Q    Okay.  So, I guess --
4    ███████████████████    ████████████████████████████
5    ███████████
6    ██████████████  ███████████████
7    ████████████████████
8    ████████████████
9    ████████████  ███████████████████
10   BY MR. MAAZEL:
11   Q    So Ms. Pierce had scarring on both sides of her
12   temporal lobe.
13   A    Yes.
14   Q    And --
15   A    Correction, sorry.
16         She had scarring on both frontal lobes.  Not on
17   both sides of her temporal lobe.
18   Q    Understood.
19   A    Yeah.
20   Q    And if we go to the second page, under "MRI Findings,"
21   so you see where it says "amygdala bilateral volume loss"?
22   A    Yeah.  Yes.
23   Q    So let's start with amygdala.  What does the amygdala
24   do in the brain?
25   A    The word "amygdala" is because it is the word for

1   almond.  It's an almond-shaped structure in that medial

2   temporal lobe.  That's all about fear loading, emotional

3   processing, responding to stimuli or triggers.  So it's

4   really about emotional regulation or disregulation, the

5   amygdala.

6   Q    And what does bilateral volume loss mean?

7   A    It means there's death of cells, brain cells in the

8   amygdala that won't come back.  There's been loss of tissue

9   from the amygdala from those structures, both sides.

10  Q    Is another word for cell death or volume loss atrophy?

11  A    Atrophy, correct.

12  Q    When brain cells die can they grow back and be

13  replaced?

14  A    That's not known.  We don't believe they can.

15  Q    And so this -- I should have asked, the bilateral

16  mesial temporal sclerosis, is that a normal --

17                   (Reporter admonition.)

18  BY MR. MAAZEL:

19  Q    The bilateral mesial temporal sclerosis, is that a

20  normal or abnormal finding?

21  A    That's an abnormal finding.  And you see it with T2

22  FLAIR signal, that's a sign of the sclerosis, the scarring.

23  TS FLAIR signal is noted.  That is sort of the signal for

24  mesial temporal sclerosis on MRI.

25  Q    The brain death in both sides of Ms. Pierce's amygdala,

Nadkarni - Direct - Maazel                                    140

1   normal or abnormal?

2   A    Abnormal.  Very abnormal.

3   Q    Take us through the bilateral volume loss in the

4   hippocampus.

5        What does the hippocampus do?  Just take us

6   through that.

7        THE COURT:  Can I ask you, what did you say before

8   about abnormal, "peri" or "very"?

9        THE WITNESS:  Very.

10       THE COURT:  Very?

11       THE WITNESS:  Very.  Sorry.

12  BY MR. MAAZEL:

13  Q    If you could take us, Doctor, through bilateral volume

14  loss in Ms. Pierce's hippocampus.

15       What does that mean?

16  A    So, sure.

17       Hippocampus is named that because it looks like a

18  seahorse and this is where the short-term memories get

19  placed.  And I'll just explain a little bit how it works.

20       So if you go to the bank and you want to deposit

21  money into your account, the teller will take it and put it

22  in a register at the counter.  That's like the hippocampus.

23       And then later, it gets put in a vault.  So that's

24  like, for memory, it's the same thing.  We -- we hold things

25  in the hippocampus short-term, that we will put in long-term

1    memory later.

2          And here, there is -- same thing, death of cells

3    and tissue in the hippocampus and atrophy.  Volume loss

4    means atrophy at both hippocampi also.  So both the amygdala

5    and the hippocampi.

6          These structures are right next to each other in

7    the mesial temporal lobe.

8          And there's also other changes in that hippocampus

9    that are mentioned here that go along with the atrophy,

10   which is flattening of the head.  Remember, it looks like a

11   seahorse, so the head is where the top of it is.

12         And also, again, that T2/FLAIR signal abnormality

13   which means there's not just atrophy in loss of neurons;

14   there's also scar tissue.  That's the sclerosis part, so...

15   Q    Okay.  Now going back to your Demonstrative Exhibit 72,

16   you noted a number of the clinical consequences from the

17   abnormal MRI findings, right?

18   A    Yes.

19   Q    And if you can take us through those.  This is the top

20   row.

21   A    Sure.

22         So from that hippocampi atrophy, short-term memory

23   loss and memory loss, emotional disregulation, we just

24   mentioned, from the amygdala.  Altered fear and anxiety

25   processing from the amygdala.  That is where panic attacks

Nadkarni - Direct - Maazel                            142

1   can come in.  Mood disregulation.

2          And the most commonplace for epileptic seizures to

3   arise from is also from this mesial temporal area and also

4   the defused cognitive deficits as well.

5   Q    All right.  Did the study result at NYU also refer to

6   findings from the PET scan of Ms. Pierce's brain?

7   A    Yes, it did.

8          MR. MAAZEL:  Okay.  If we can go to the PET scan

9   findings back at Exhibit 21.

10         And the first paragraph on Page 2 under "PET

11  findings."

12         Next page.  I'm sorry.  Page 3.

13         Just the first paragraph under "PET findings."

14  BY MR. MAAZEL:

15  Q    Can you talk us through that first paragraph, Doctor.

16  A    Sure.

17         So again, that's fluorodeoxyglucose, FGD,

18  hypometabolism; meaning those nerve cells aren't using

19  glucose in both temporal lobes, involving both the

20  hippocampi and the amygdala.

21         So this is a finding where the MRI and the

22  PET scan are of the exact same place, abnormal.  You don't

23  always get that finding.  Sometimes you get one abnormal and

24  not the other.

25         But this is pretty striking that both of them

1   exactly point to the same area.

2          So not only is there death of amygdala and

3   hippocampus, there's also loss of function of those

4   structures.  Functionally, they're abnormal also.

5          But even more -- so PET scans are more subtle, so

6   they picked up what the MRI showed.  But even where the MRI

7   looked normal, the PET scan showed abnormalities, in both

8   occipital lobes, so that's in the back of the head and the

9   cerebellum, which is just below the occipital lobe, as well

10  as the left frontal lobe, supraorbital means above the eye

11  socket, on the left side.

12  Q    And -- okay.

13  A    And then the thalamus also.  So widespread and

14  regional, right.  So both thalami, both hippocampi, both

15  amygdala, so it's regional and widespread hypometabolism.

16  Q    And what does the occipital lobe relate to in the body?

17  A    Vision.

18  Q    Okay.  So she has this brain damage, now the occipital

19  lobe.  What does that tell you?

20  A    It tells me that her occipital lobe doesn't function

21  normally.

22  Q    Okay.  I would like to show you, from the

23  Brooklyn Hospital records in evidence, Exhibit L at

24  Page 1280.

25          THE COURT:  Previously admitted.

1          MR. MAAZEL:  While we're waiting for that -- there

2    it is.  If we could just cull out the bottom part starting

3    with "head" at the bottom half.

4    BY MR. MAAZEL:

5    Q    And you see "injury noted" to the back left of

6    Ms. Pierce's head, Brooklyn Hospital?

7    A    Yes, I do.

8    Q    And you at the bottom where it says, "left occipital

9    swelling and tenderness upon palpation"?

10   A    Yes, I do.

11   Q    Is that consistent with the injuries on the brain scan

12   to the occipital lobe?

13   A    It's the same location.

14   Q    I think you mentioned -- going back to Exhibit 21 --

15   that she also had damage, noted in the PET scan, to her

16   frontal lobe.

17   A    Left frontal lobe.  Yes.

18   Q    And what does the frontal lobe do in the brain?

19   A    The frontal lobe is responsible for several things.

20   One is language, like finding words, you want to say,

21   expressing language, understanding language.

22          But also executive functioning, what people call

23   executive functioning.  So that's like what a CEO would do

24   in a company, like, for example, make decisions about the

25   future, who should I hire?  Who should I fire?  What should

1   I invest in?  Using your judgment to understand the nature

2   and consequences of your action and making decisions about

3   what you want to do in your life and where you want to go,

4   that is also executive functioning -- functions the frontal

5   lobe.

6               There also an ambition.  So I want to scream at my

7   boss but my inferior orbital frontal cortex keeps me from

8   doing that.  It's like the brakes in the system.

9               And in the medial frontal lobe, again, the midline

10  is responsible for getting up and go, motivation,

11  initiation, all of those kinds of things.

12              So frontal lobe signals can have lots of different

13  symptoms; working memory, attention, processing speed, these

14  are all frontal lobe functions.

15  Q    All right.  And I think you also mentioned that the PET

16  findings showed damage to the cerebellar hemispheres?

17  A    Yes.

18  Q    Cerebellar means what?

19  A    Cerebellum is two hemispheres that are just below the

20  regular hemispheres that are around the brain stem.  And

21  they have, many, many different functions.

22              One is like a motor coordination function.  But

23  there's also cognitive and affective functions in that area.

24  So people can have something called a cerebellar plaqued

25  affective syndrome if those areas were injured sometimes.

Nadkarni - Direct - Maazel                    146

1    Q    In addition to reviewing the test results for all the

2    testing, did you, yourself, look at any images?

3    A    Yes, I did.

4    Q    And I would like to show you -- just you at this

5    moment -- plaintiff's Exhibit 17.

6    A    Yes.

7    Q    And what are these images of, just generally?

8    A    This is Ms. Pierce's PET scan.

9    Q    And by the way, did you attach these images an addendum

10   to your expert report?

11   A    I did.

12   Q    All right.  And are these true, accurate images that

13   your ordered from NYU of Ms. Pierce's PET scan?

14   A    Yes, to the best of my knowledge.

15              MR. MAAZEL:  I move --

16              THE COURT:  Were these the ones you reviewed?

17              THE WITNESS:  Yes, these are the ones I reviewed.

18   So yes.

19              THE COURT:  Okay.

20              MR. MAAZEL:  I move Exhibit 17 into evidence.

21              MR. HUTCHINSON:  No objection, Your Honor.

22              THE COURT:  Admitted.

23              (Plaintiff's Exhibit Number 17 received in

24   evidence.)

25              THE COURT:  You may publish.

1              (Exhibit published to the jury.)

2    BY MR. MAAZEL:

3    Q    First of all, do you see Ms. Pierce's name in the top

4    left?

5    A    I do.

6    Q    All right.  Can you take us through this imaging.

7    A    Sure.

8              So this was a study that was done on July 13,

9    2022, and it is a PET scan of her brain.

10             The red areas are areas of normal glucose uptake.

11             THE COURT:  Up what?

12             THE WITNESS:  Uptake.

13             THE COURT:  Okay.  Don't get too close to the mic.

14             All right.

15             THE WITNESS:  And the green areas are areas of

16   hypometabolism; meaning abnormally reduced uptake of glucose

17   and speaks to atrophy.  Meaning, one reason there's not as

18   much tracer in that area is because those nerve cells are

19   not -- so there is not -- glucose isn't being used in those

20   areas.

21             So if you look at the areas here that are

22   predominately green, those are the areas that were red on

23   the PET scan.  This is the same PET scan that we just read

24   the impression about -- the only one that I'm aware of.

25             And can I pick -- can I draw on this or --

```
1   BY MR. MAAZEL:

2   Q    Sure.

3           THE COURT:  If you hold your finger down to the

4   screen, you can make a circle.

5           THE WITNESS:  Got it.

6           THE COURT:  And if you just touch it, it will make

7   an arrow.

8   ███████████████

9   Q   ████████████████████

10      █████████   ███████████████████████████████

11  ██████████

12      ███████████   ██████████

13      ███████████████████████
```



18    MR. MAAZEL:  Thank you, Your Honor.

19    If we can put Exhibit 17 back on that screen.

20    THE COURT:  It is, at least for the witness, you

21  want -- okay.  There we go.

22    (Exhibit published to the jury.)

23  BY MR. MAAZEL:

24  Q    And so you were describing, Doctor, your analysis of

25  Ms. Pierce's PET/MRI brain images.  And could you just tell

1  us again the significance of red and green?  And then, yes,

2  you can make markings with your finger on the screen.

3  A.    Sure.

4            So this is a PET/MRI of Brigid Pierce from

5  July 13, 2022.  The red areas are normal glucose uptake,

6  meaning normal functioning of the brain and the nerve cells

7  there.  And the green areas are abnormal, decreased

8  functioning of the brain loss of neurons atrophy of the

9  brain and decrease glucose uptake.

10           And I'm just going to show you, if I can here --

11           MR. MAAZEL:  We can blow that up.  Shall we blow

12  up the top left image?

13           THE WITNESS:  Oh.  That would be great, actually.

14  I'm sorry.  Can we erase that?

15           THE COURT:  Yeah, you can clear it by tapping the

16  lower right corner.

17           THE WITNESS:  Great.  Thank you.

18           THE COURT:  There you go.

19           THE WITNESS:  That's wonderful.  Great.  A big

20  line.  Let me see if I can just make it big around here.

21           THE COURT:  All right.  Well done.

22  A    So that temporal lobe at the tip, there is yellow and

23  green and blue.  And should be a lot more red.  Just like

24  the frontal lobe up here -- I'm sorry, up here is more red.

25           And so everywhere you see green is abnormal brain;

1    meaning brain has lost tissue, lost neurons and is not

2    functioning normally.

3              Can we go to the next picture?

4              This is the other sides.  So the previous side was

5    the left side.  This is the right side of the brain.

6              Over here is the front of the brain (indicating),

7    this is the back of the brain.  And again, this right

8    temporal lobe is also yellow and green, and not red.

9              The other thing you see in this picture of the

10   back of the head.  This is the occipital lobe.  That's also

11   yellow and green, and not red.  And underneath that, that's

12   the cerebellum.  So that's also yellow and green.  These are

13   all areas that were noted in the study.

14             There's also, you'll see, the -- maybe I'll just

15   show you here.

16             There's also green up in here (indicating).

17   That's actually the motor cortex.  So that wasn't red, it's

18   abnormal because in the PET scan you're not moving.  So when

19   you move that gets more use, so that's actually normal in

20   that location.  But the rest with the green areas are

21   abnormal.

22             Can we go to the next picture, please?

23   BY MR. MAAZEL:

24   Q    Before that, I just have a question for you, Doctor.

25             So that right temple -- temporal area that you

Nadkarni - Direct - Maazel                              154

1  circled, is that basically near the right temple?

2  A    That's correct.

3  Q    Okay.

4  A    And over the ear, the temple right in that location, I

5  can just show you on this picture real quick -- I'm sorry.

6        Can we just go back to the other -- all of them

7  together?  Yeah.

8        So here you can see both temporal lobes.  Also the

9  temporals being green.  And both occipital lobes also being

10  green.  And the cerebellum on both sides being green.

11        So very widespread.  And when we say "regional,"

12  we mean certain structures have been affected.  And these

13  structures are typically affected in traumatic brain

14  injuries.  They are not unusual structures to be affected.

15        Can we go to the next?  Maybe the fourth one on

16  the right.

17  Q    So this is the top right?

18  A    Yes.

19        So this is a look from the bottom up at the brain.

20  Like, if you're standing at the spinal cord and looking up

21  at the brain.  So this is the right temporal lobe.  This is

22  the left temporal lobe.  So everything in neuroradiology is

23  backwards.

24        And you can see, very nicely here, that there's so

25  much green in those temporal lobes compared to the frontal

1    lobe, which is on top.  Much, much more red there.

2              And in the back of the head here, this is

3    the cerebellum, and even a piece of the occipital lobe there

4    too.

5              Can we go to the next one, please?

6    Q    So bottom left picture?

7    A    Yes, please.

8              This is a really good example because you can see

9    how much of the glucose uptake is normal in a lot of the

10   cortex.  But -- I'm sorry, let me clear my arrows.  Here and

11   here is clearly not red.  It's clearly green (indicating).

12   So green is hypometabolism.  Abnormal functioning in those

13   areas.

14             Let's go to the next one.  This is a look from the

15   back of the head.  So this is the occipital lobe and

16   cerebellum.

17   Q    So this is the bottom row, second from left?  Sorry.

18   A    Yes.

19             And again, this widespread green areas, meaning

20   abnormal functioning in these parts of her brain.

21             And let's go to the next one.

22   Q    All right.  Is this --

23   A    That's the one.

24   Q    -- bottom row, second from right?

25   A    Right.

1           So this is now not the outside of the brain, which

2    we saw in the first two.  This is that medial temporal lobe,

3    the middle part of the -- if I did that fist again with the

4    temporal lobe, on the inside of the head, against the

5    amygdala area, that's what we're looking at here with these

6    arrows.  And that's abnormally functioning.  That's showing

7    green and blue and not enough red.

8           So the next one.

9    Q    Right, so at the bottom right?

10   A    Bottom right.

11          And again, this is the medial temporal lobe on

12   right side, on the other side.

13          So now, we've seen the outside of the temporal

14   lobe, the inside of the temporal lobe, the occipital lobe,

15   and the cerebellum all showing very abnormal glucose uptake

16   and damage, brain injury -- brain damage.

17   Q    All right.  In addition to --

18          MR. MAAZEL:  We can take that down.

19          Thank you.

20   BY MR. MAAZEL:

21   Q    Did you also look -- well, withdrawn.

22          What is an EEG?

23   A    An EEG is a brain wave test.  Some people may have had

24   an EKG, which is an electrocardiogram where they put the

25   little electrodes on the chest and measure the electrical

1    activity of the heart with waves, and we've seen that on

2    EKG.

3           As we all just can see, that's very simple.

4    Because we're checking waves, electrical waves of the brain

5    in the same way but there's so many more.  See.

6           So it's basically a test measuring the electrical

7    brain activity of the brain.  Electric meaning -- we're very

8    concrete in neurology, so electro means electrical,

9    encephala means the brain, and gram means a measure.  So

10   it's a study that measures the electrical activity of the

11   brain.

12   Q    And so this is the one where you put electrodes all

13   over your head?

14   A    Correct.  So there is electrodes that go on the scalp,

15   after the skin is like clean and abraded and you can

16   attach -- like with a conductive gel, you can attach an

17   electrode that is a wire coming off it and go into a box.

18   And that box is an amplifier.  Because these potentially are

19   very tiny.  So the amplifier amplifies it so we can see it

20   on the screen.  And then you can measure different parts of

21   the brain and how they are functioning again.  Not the

22   structure, the EEG is realtime functional test like the

23   PET scan is.

24   Q    All right.  How many EEGs have you reviewed throughout

25   the course of your career?

Nadkarni - Direct - Maazel                        158

1   A    Oh, I think between 75,000 to a hundred thousand.  I

2   did 15 to 18 a day for, I don't know, 20, 25 years.

3   Retakes.

4           Yeah.

5   Q    A lot?

6   A    A lot.

7   Q    Can you tell us -- well, first of all, did you review

8   the EEG testing that you ordered from NYU for Ms. Pierce?

9   A    Yes, I did.  I looked at the study myself.

10  Q    And did you find it to be normal or abnormal?

11  A    I found it to be abnormal.

12  Q    And I would like to show you Exhibit 16, just for

13  identification at this moment.

14  A    Yes.

15  Q    And what are these images?

16  A    These are a bunch of squiggly lines that we call the

17  EEG.

18          So these --

19  Q    Hold on.  This is an EEG.  When and for who?

20  A    This is an EEG of Brigid Pierce.  And you can see the

21  date up there, July 20, 2022, at the very top.

22  Q    And Doctor, before we have you describe what's in them,

23  did you attach EEG images to you expert report?

24  A    I did.

25  Q    And are these at least some of those images attached --

1   A    Yes.

2   Q    -- to your report?

3        And are these true and authentic EEG images for

4   Ms. Pierce's brain from the testing you ordered in July

5   of 2022?

6   A    Yes.

7            MR. MAAZEL:  I move Exhibit 16 into evidence.

8            MR. HUTCHINSON:  No objection.

9            THE COURT:  Admitted.

10           (Plaintiff's Exhibit Number 16 received in

11  evidence.)

12           THE COURT:  You may publish.

13           (Exhibit published to the jury.)

14           MR. MAAZEL:  And so maybe if we could just cull

15  out the left column with all those letters and numbers.

16  BY MR. MAAZEL:

17  Q    And just take us -- tell us what those mean?

18  A    Sure.  So, like I said before, these electrodes that

19  are attached to the skull, each electrode has a name.  So

20  Fp1 means frontopolar 1.  And again, remember, we're

21  concrete.  So F is frontal.  T is temporal.  C is central.

22  P is parietal.  And O is occipital.

23           Luckily, we only have sort of four lobes.

24           So Fp1 is the frontopolar electrode.

25           The important thing, the most important thing is

1  that the odd numbers are the left side electrodes and the

2  even numbers are on the right side of the electrodes.

3          So, you know, if you start with Fp1 and F7, and go

4  down to T1, T3 -- if you'll just highlight those -- those

5  electrodes are placed in a lateral aspect of the skull going

6  back on the left side like this (indicating) going back on

7  the left side of the skull (indicating).

8          And Fp2, F8 to T2, T4, are the analogous areas on

9  the right side.

10          So each electrodes is measuring a certain part of

11  the brain underneath it.

12          And then the ones below that are the central

13  electrodes, so Fp1, F3 to P301 are left sided in the central

14  strip of the brain, of the head, and Fp2, F4, Fp402 on the

15  right side.

16  Q    So, Doctor, can you show us where you found an

17  abnormality in this first image in the exhibit?

18  A    Yes.  So what we're looking for is asymmetries.  Both

19  sides of the EEG should look the same.

20          This is -- you know, these dark green lines

21  indicate one second of time.  So there's one, two, three,

22  four, five, six, seven, eight, nine, ten -- about ten

23  seconds on this page of time.

24          So EEG is a graph of electrical activity over

25  time.  And in these seconds -- the way the look at it is to

1    compare the left side and the right side.

2           So if we look at the first six lines at the top,

3    that's the left side --

4    Q    Do you want us to blow something up?

5    A    Yeah, I'll tell you in second.

6           And the next six lines is the right side.

7           So if you could blow up the first three seconds of

8    these.

9    Q    (Indicating).

10   A    Yeah.  Keep going.  Keep going.  Keep going down.

11   That's good.  And go to the right.  Keep going.  Keep going.

12   Keep going.  Keep going.  Keep going.  Keep going.  Keep

13   going.  Keep going.  Keep going.  Keep going.  That's good.

14   That's good.

15          Okay.  So if you compare in one second, like the

16   second here, starting here (indicating) and going to here

17   (indicating) -- oops.  Here.  In that second, you want to

18   count how many brainwaves you see.

19          So if you count in Fp2FA, one, two, three, four,

20   five, six, seven in the first half of that second, if you

21   look at the top on the left side, you see these slower

22   waveforms -- oops.  Let me get those circled well.

23          Compared to.

24          So the -- when they're taller at the top and

25   pointy, and they are slower.  So meaning that particular --

1   those waves, that's called left temporal slowing, so -- and

2   there's more of it over here, with a sharp wave, this thing

3   (indicating) in the middle is a sharp wave.

4           So there's slowing of the background of the waves.

5   You can see there's a lot more faster waves in here in -- in

6   here than there are over here.  Meaning, the faster the

7   waves, the lower amplitude.

8   Q    Just --

9   A    The slower are high amplitude.  And you can just count

10  them between the seconds.

11  Q    So Doctor, just, what does this all mean, the temporal

12  slowing?

13  A    This is an example of a left temporal slowing, which is

14  a functional correlate of the PET scan and the MRI.  So this

15  study is also pointing to a dysfunction in the left temporal

16  lobe.

17  Q    Okay.  And without going through the other imaging, did

18  you find similar issues in the other images?

19  A    In the right temporal lobe.  Yes.

20  Q    All right.

21  A    Both sides, independently, there was temporal lobe

22  slowing, temporal region slowing.

23  Q    Now when you ordered the EG, was there a report from

24  someone at NYU about the EG?

25  A    Yes.

1  Q    And who did that report?

2  A    That was Dr. Billakota, Santoshi Billakota.

3  Q    And who is that?

4  A    She's one of the junior attendings in the epilepsy

5  division at NYU.  She came maybe six or seven years ago to

6  NYU.

7          THE COURT:  Pause for a one second.  Pull the

8  microphone a little further from you, just because it is

9  really hard for the court reporter to record when the

10 percussive sound happens.

11         And can you spell Billakota?

12         THE WITNESS:  Yes, I think it is B-I-L-A-K-O-T-A

13 (sic).  First name is S-A-N-T-O-S-H-I.

14         THE COURT:  And if you can maintain that distance

15 off the mic, that would be perfect.  Thank you.

16         THE WITNESS:  Thank you, Judge.

17 BY MR. MAAZEL:

18 Q    And you said that Dr. Billakota was a junior doctor

19 with about six or seven years' experience.

20         Did Dr. Billakota notice the temporal slowing that

21 you showed us in the EEG?

22 A    She did not.  She did not comment on that.

23 Q    Are there any reliable, authoritative peer-reviewed

24 publications that discuss the impact of traumatic brain

25 injury on the brain?

1    A    The *Nexus* publications.  Yes.

2    Q    All right.

3              MR. MAAZEL:  If we could just show, just you,

4    Doctor, Plaintiff's Exhibit 35.

5    BY MR. MAAZEL:

6    Q    Entitled "Regionally Selective Atrophy After Traumatic

7    Axonal Injury" from the *Archives of Neurology*.

8              Do you recognize that article?

9    A    Yes, I do.

10   ████████████    ████████████

11   ████████████    ████████████

12   BY MR. MAAZEL:

13   Q    And what is the *Archives of Neurology*?

14   A    That's a peer-reviewed journal that we would rely on

15   for new research, and studies with retrospective analyses

16   about illnesses in neurology.

17   Q    And is that considered reliable and authoritative in

18   the field?

19   A    Yes, it is.

20   ████████████    ████████████

21   ████████████    █████████████████████████

22   ████████████    ████████

23   ████████████    ████████████████████

24   ██████████████████████

25



BY MR. MAAZEL:

Q     Did you, yourself perform a neurological exam on
Ms. Pierce?

A     Yes, I did.

Q     And can you talk us through -- well, first of all, was
your neurological exam normal or abnormal?

A     It was abnormal.

Q     And can you take us through what you did, tell us what
test that you did and what you found.

A     Sure.

        So the neurological consistent of testing that
looks for abnormalities in different parts of the nervous
system.  So you check each different segment of the nervous
system and different function of the nervous system.

        The first thing is called a mental status
examination.  That includes things like orientation,
language, processing speed, attention.  And you can do that
with something called MoCA, The Montreal Cognitive
Assessment, that's a 30-item test.  And if you get 26 or
below, that's an abnormal score.

1    This is the test that President Trump passed with

2  flying colors that he likes to brag about and here her score

3  is 29 out of 30, so she passed that test in mental status

4  exam and my examinations.

5    The next thing is cranial nerve examination.  So

6  all the muscles in our face have nerves that come from the

7  brain stem that make them move and you can test those by

8  testing eye movement.  When the doctor has you -- tests your

9  eye movements, that's testing cranial nerves.

10    Sensation on the face is cranial nerves.  How you

11  close your eyes, that's cranial nerve, blinking.  Raising

12  the forehead, the eyebrows.  These are all functions of the

13  cranial nerves and her cranial nerve examination was

14  abnormal.

15    She had decreased sensation on the left side in

16  the first distribution of the fifth cranial nerve, so it's

17  B1, B2, B3.  It was on the -- in B1 distribution on the left

18  side.

19    She also had an abnormal sensation on the right

20  side of her face and we call that in our field dysesthesia.

21    That's like an abnormal sensation when you touch

22  it.  It doesn't feel normal.  And she described it as a

23  gritty sensation.

24    She also had a little bit of weakness in her right

25  pinkie finger but otherwise, her motor exam was normal.  And

1    the rest of her sensory on her body, she also had less

2    sensation in various places on the left side throughout.

3          She had very brisk reflexes.  So when the doctor

4    taps the knee and the leg kicks out, it should go at a

5    certain rate.  But when somebody has damage to their central

6    nervous system, it become very fast.  So she had diffused

7    hyper reflexes that weren't very fast.

8          On my examination, these are not things that you

9    can fake or change.  This is a mechanical test.

10          And she also had an increased jaw jerk reflex

11   where you put the finger on the chin and you tap and just

12   like a knee jerk, the jaw also is a muscle and you get a

13   reflex.

14          And if that is brisk too fast, that shows a lesion

15   above the level of cranial nerve 5 in the midbrain, so it's

16   somewhere in the brain, it just points to some brain

17   dysfunction.

18          And the last thing she had was something called

19   frontal release signs.  So when we're born we have all these

20   reflexes as newborns that go away between 1 or -- between 12

21   and 18 months.  One of them is a grasp reflex.  If you put

22   you fingers -- if you put your fingers in the hand of a

23   baby, the baby will just grasp the fingers.

24          Another one is rooting where you tap the cheek and

25   the baby will go to that side or smell, or you touch the

Nadkarni - Direct - Maazel                    171

1    lips and lips will purse, or Glabellar tap where you tap the

2    forehead and they can't stop blinking.

3              THE COURT:  Could you say it again?  What?

4              THE WITNESS:  Glabellar.

5              THE COURT:  Labellar?

6              THE WITNESS:  Glabellar tap.

7              THE COURT:  Could you spell that?

8              THE WITNESS:  Yes.  G-L-A-B-E-L-L-A-R.  And the

9    then tap, T-A-P.

10             And the last one is something palmomental reflex,

11   which is kind of why when scratch the palm of the hand and

12   the mentalis muscle twitches in the chin.  Palmomental

13   reflex.  Sometimes -- I think I have one sometimes.

14             But generally speaking, if they stick around,

15   there's sign of frontal lobe injury.  So these are all

16   things that babies have that go away when the myelin -- when

17   the brain -- like the wiring of the brain gets advanced in

18   first or second year of life.  But they come back out again

19   under a couple of circumstances.

20             Mainly when frontal lobes are degenerating or

21   injured, certain dementias.  Like frontal temporal dementia

22   or Alzheimer's disease, you can see these frontal release

23   signs as degeneration of the frontal lobe happens.

24             And the second instance is head injuries, brain

25   injuries where the frontal lobe get injured and you see this

1    regression to this infantile reflex.  And it's a very sure

2    sign of frontal lobe dysfunctional injury.

3              So she had a right palmomental, very marked

4    right-sided palmomental response.  I'd scratch the palm and

5    the chin would twitch.  And she also had a grasp reflex.

6    Very mild.  If you put your fingers in her hand, she would

7    close her hands around the finger.

8              So she had abnormal findings on frontal release

9    signs, as well.  I think that's a -- those are all the

10   abnormal findings.

11   Q    In addition to your own neurological exam and the

12   testing you did, did you also order neuropsychological

13   testing on Ms. Pierce?

14   A    Yes, I did.

15   Q    And did someone at NYU prepare a neuropsychology

16   report?

17   A    Yes.

18   Q    And if you could look at Exhibit 20 for identification?

19   A    Yes.

20   Q    Is that the neuropsychology consultation report that

21   you ordered?

22   A    Yes.

23   Q    And who did that report?

24   A    I believe it was Dr. Christina Morrison.

25   Q    At NYU?

1    A    At NYU.

2           MR. MAAZEL:  All right.  I move Exhibit 20 into

3    evidence.

4           MR. HUTCHINSON:  No objection.

5           THE COURT:  All right.  Admit.

6           (Plaintiff's Exhibit Number 20 received in

7    evidence.)

8           THE COURT:  You may publish.

9           (Exhibit published to the jury.)

10   BY MR. MAAZEL:

11   Q    All right.  And so if we can go to Page 2, the

12   Presenting History, is that something you considered as part

13   of your analysis?

14   A    Yes, it was.

15   Q    And just take us through that.

16   A    Yes.  So this was very similar to the history that I

17   got from her as well.  And this -- this reports a -- that

18   she was assaulted by police following a protest, with

19   repeated head strikes to multiple areas of her skull.  They

20   mention that neurodiagnostics were negative in the emergency

21   department.  And she was diagnosed with a concussion.

22          And ENY notes contemporary to the event reflect

23   patient's good recall of the event.  And that she had

24   postevent sequalae migraines, visual disturbances,

25   paroxysmal hypothermia.  Those are those changes in the

1    temperature.  And then these natural events of panic were

2    also reporter to Dr. Morrison, as well as neurological

3    symptoms, headache, numbness, visual disturbance.  So these

4    are very similar to the things that I also got from her

5    history.

6            And then visual disturbance is also glare and

7    spikes in her vision, nausea and headache, which found,

8    nausea headache is a -- is significant for migraines.

9            These episodes of nocturnal flashing were also

10   mentioned to Dr. Morrison and were mentioned to me.

11           And these episodes of waking up and sweating and

12   increased heart rate.

13   Q    By the way, Doctor, the question I raised:  Did she

14   tell you that she had the occasional migraine before the

15   incident?

16   A    She said that she had ocular migraines since the age of

17   12, which were just visual symptoms by themselves.

18   Q    Okay.  And then spring of 2022, I'm not sure if you

19   covered that.

20   A    Oh.  The last thing, that's when I was at -- when I had

21   evaluated her.

22   Q    Okay.  Did you also look at the cognitive symptoms?

23   And this is the second page of the report.  Take a look at

24   that.  Just the cognitive symptoms up there.  Yeah.

25           What was the significance of these findings?

1    A    Yes.  So they were also in line with what I was told

2    about sort of making mistakes at work.  She described it to

3    Dr. Morrison as dropping balls.  And that her boss had

4    noticed changes as well.

5           And again, she mentions to Dr. Morrison struggles

6    with multiple tasking and playing memory problems and word

7    finding problems, that's frontal lobe that's same area as

8    the PET scan, left frontal difficulties.

9    Q    All right.  Now, did Dr. Morrison give Ms. Pierce a

10   number of tests --

11   A    Yes, she did.

12   Q    -- for intellectual functioning and things like that?

13   A    Yes.

14          MR. MAAZEL:  And so if we could turn to the bottom

15   of Page 3.  Under "test results," sorry.  Yes.

16   BY MR. MAAZEL:

17   Q    Well, that paragraph that was culled out, are those the

18   tests that Dr. Morrison --

19          THE COURTROOM DEPUTY:  I'm sorry, microphone.

20   BY MR. MAAZEL:

21   Q    Are those the tests that Dr Morrison did with

22   Ms. Pierce?

23   A    Yes.

24   Q    And then if we could go below, "Test results, general

25   intellectual functioning," was there anything of

1  significance there to you?

2  A    Yes.  A speculate, a split, in the score between the

3  VCI 137 and the PRI 110.

4        So these are very high scores.  She actually has,

5  you know, high scores in her intellectual testing here.  But

6  there's a big split.

7        So VCI is verbal intelligence.  And PRI is

8  performance.  Grossly speaking, this left hemisphere

9  function, language, that's verbal.  And the right hemisphere

10 function which is more performance related.

11       And so neither one of these are abnormal on their,

12 but the difference is abnormal in the asymmetry of how

13 different it is.

14       137 is a very, very high score, and 110 is a

15 medium to moderately hide score.  So that's one thing I

16 noticed.

17 Q    All right.  Now, there were a number of other tests,

18 attention to processing, executive functions, language,

19 visual, spatial, learning and memory.  And the essential

20 result of those tests were normal or abnormal?

21 A    They were -- they were essentially normal.

22 Q    And what is your take on that?  What is your opinion as

23 to why that is?

24 A    Yes, I think that the split means -- means something.

25 But I also think that it probably relates to the fact that

1    she was probably coming from a very, very, very high level.

2            So if she was coming from a very high level and

3    had a hit you might still be in the normal range.

4            And we see that routinely, depending on where your

5    baseline is.  We don't have baseline testing, we're not

6    sure.  But that would be -- that would be my hypothesis.

7    Q    Okay.

8    A    And also, I'm curious about the split because that

9    might be a result of the injury.  It's not normal to have

10   that wide of a split between verbal and performance

11   measures.

12   Q    And then after that, there is a section in the next

13   page, "mood self-report" --

14           Well, actually, let's turn to this summary.  This

15   is Dr. Morrison's summary of the neuropsychological report,

16   right?

17   A    Yes.

18   Q    And can you take us through the second and third

19   paragraphs?

20   A    Sure.  She said that overall she had preserved

21   abilities across many cognitive domains.  But she put an

22   interesting sentence in after that, which is the -- "The

23   findings of this evaluation were impressively normal and

24   seemingly at odds with the recent neuroimaging study.

25           So I think, you know, this -- this impressively

1  normal finding, I think she's just noting that it -- it

2  doesn't fit with what we actually see on the MRI scan.

3          So one explanation for that would be, she was

4  coming from a very high place and this is where she landed

5  after this traumatic brain injury.

6          And then there's also mention of not just that --

7  that split, but many symptoms or anxiety and depression.  So

8  those scales -- those tests, there were scales that were

9  given for anxiety and depression and those -- those were

10  found to be quite high.  Quite symptomatic.

11  Q    So the anxiety and depression, is that normal?

12  A    That's not normal.

13  Q    Okay.  And so if we could go back to Exhibit 72, your

14  demonstrative exhibit.  And so you listed a number of

15  abnormalities.  And just, in summary --

16          MR. MAAZEL:  If we just first cull out the top two

17  rows.

18  BY MR. MAAZEL:

19  Q    We found that the brain MRI scan was normal or

20  abnormal?

21  A    Abnormal.

22  Q    The brain PET scan normal or about abnormal?

23  A    Abnormal.

24          MR. MAAZEL:  Let's keep going.

25  BY MR. MAAZEL:

1  Q    And then you did your --

2             MR. MAAZEL:  Cull the rest of it.

3  BY MR. MAAZEL:

4  Q    You did a neurological exam.  Normal or abnormal?

5  A    Abnormal.

6  Q    And by the way, what was the clinical consequences of

7  the abnormal neurological examination?

8  A    Yeah, most of my findings involved individual trauma.

9  We found more dysfunctions of the frontal lobe syndrome,

10 which typically is, like I mentioned before, all the frontal

11 lobe functions.

12 Q    Okay.  Motivation executive functioning?

13 A    Cognitive initiation.

14 Q    Okay.  The video EEG, normal or abnormal?

15 A    Abnormal.

16 Q    And what are the clinical consequence of that?

17 A    So again, it shows abnormal functioning in the limbic

18 structure, the amygdala and the hippocampus in those

19 regions.  The temporal regions measures that.

20            So it just -- it corroborates the MRI and the

21 PET scan.

22 Q    And that leads to what type of real-world clinical

23 consequences for Ms. Pierce?

24 A    It has to do with, when we -- when we get information

25 about an object, the brain constructs a mental image of that

1  object and then presents it to the frontal lobe to decide

2  salience and valence.

3         How important is it?  To me, salience, does it

4  have to do with me.  And is it good or bad?

5         And then that frontal lobe is connected to motor

6  planning and motor activity.  That's called behavior, right.

7  So judging the salience and valence of things and decide how

8  to behave in relation to them is based on this frontal and

9  limbic amygdala canvas network.

10        And so that -- that -- that network is not working

11 in her case, so it might be harder to gauge what might be

12 important and what might not be important in certain

13 circumstances.

14 Q    And then the neuropsychological testing, even though

15 Dr. Morrison said that her cognitive testing was normal, you

16 concluded that her overall test was normal or abnormal?

17 A    Abnormal.

18 Q    Because?

19 A    Because the scale showed high levels of anxiety and

20 depression.

21 Q    Okay.  Did Ms. Pierce have an MRI six weeks after the

22 incident with police?

23 A    Yes I believe she did.

24 Q    And was that at Brooklyn Hospital?

25 A    At Brooklyn Hospital Center.

1  Q    What were the results of that MRI that happened six

2  weeks later?

3  A    That was normal.

4  Q    And what is the significance of a normal MRI six weeks

5  after?

6  A    It's very important in this case because we know what

7  that tells us is that prior to this incident she had a

8  normal brain.

9        And you don't see MRI changes -- often you don't

10  see MRI changes after a traumatic brain injury until many

11  months to years later.  Even 15 years, 20 years.

12        If you think about NFL football players or college

13  football players, who had chronic traumatic encephalopathy,

14  CTE --

15  ███████████████  ████████████

16  ██████████   ████████████

17  ████████████   ████████████████████

18  ████████████

19  ██████████   ████████████

20  █████████████████████████████

21  ████████

22        THE WITNESS:  So you know, those players don't

23  even report concussions at all.  But if you look at their

24  brains in their 40s and 50s, they had atrophy, just from

25  those -- every time in the line when they hit each other,

1    that's a deceleration injury of the brain.

2           And so even without a loss of consciousness, even

3    without anything, you can have a -- a -- a -- an atrophy in

4    the brain from a head injury late, not right away.

5    BY MR. MAAZEL:

6    Q    So the fact that Ms. Pierce had a normal MRI six weeks

7    after the police incident and an abnormal MRI with all that

8    brain damage you discussed two years after tells you what

9    about Ms. Pierce?

10   A    It's a textbook case of sort of atrophy after brain

11   injury.  It's typical for the kind of time coursework.  You

12   know, it's very rare that we get a case in neuropsychiatry

13   of a traumatic brain injury where every single element you

14   can check off and sort of tie it up in a bow.

15          Diagnostically speaking, this was a slam dunk of a

16   diagnosis because you have a history, you have the video

17   evidence and then you have all of these objective findings

18   that concur with her symptoms.

19          It's not like she had some symptoms and then she

20   had other areas of her brain that were not working and

21   abnormal.  Everything goes together from the history to the

22   neurologic examination, to all the testing that we have

23   done.

24          You don't see that very often, where every test

25   kind of points to the same problem.



8    MR. MAAZEL:  Thank you, Your Honor.

9         So if you could -- if we could publish, just for

10   you Doctor, Exhibit 35.

11   BY MR. MAAZEL:

12   Q    This was the Archives of Neurology article entitled

13   "Regionally Selected Atrophy After Traumatic Axial Injury."

14        Do you see that in front of you?

15        THE COURT:  Not yet.  He does -- oh, there we go.

16        THE WITNESS:  Not yet.

17        THE COURT:  Oh, it's not in front of you?

18        THE WITNESS:  No.

19        THE COURT:  Okay.  Let's see.  We have to wait

20   until Fida gets back.  Okay.

21        (Pause in proceedings.)

22        THE WITNESS:  I got it.

23   BY MR. MAAZEL:

24   Q    All right.  And again, the Archives of Neurology, is

25   that a reliable, authoritative, peer-reviewed publication

1   within your field?

2   A    Yes, it is.

3   Q    All right.  And I would like to show -- so is this

4   article a peer-reviewed article that is reliable and

5   authoritative in your field?

6   A    Yes, it is.

7   Q    All right.  Now, I would like to show you Exhibit 32.

8   Just you, Doctor.  And this publication -- do you have it in

9   front of you?

10  A    Yes, I do.

11  Q    A publication, *Neuropsychologia*.  Who are they?

12  A    Yes.  They're also a peer-reviewed journal that looks

13  at research in neuropsychology and data studies.

14  Q    And is this publication also a reliable authority in

15  the field of neurology?

16  A    Yes.

17  Q    Okay.  And this particular article, is that article a

18  peer-reviewed, reliable, authoritative article in the field

19  of neurology?

20  A    Yes.

21  Q    All right.  Why is it your opinion, to a reasonable

22  degree of professional certainty, that the assault by police

23  on June 3rd, 2020, caused all of the brain injury to

24  Ms. Pierce that you've described?

25  A    Because there's a confluence of history.  She didn't

1  have symptoms that she reported prior to the brain injury

2  that she reports after the brain injury that persisted.

3         Her neurological examination, her MRI scans of her

4  brain scan, her PET scans of her brain, neuropsychological

5  testing, or -- and video EEG testing were all abnormal, sort

6  of corroborating my impression of traumatic brain injury.

7  That's chronic and I believe permanent.

8  Q    Is there any other explanation for all of the brain

9  damage in Ms. Pierce, other than --

10  ███████████████   █████████   ██████████

11    ███████████   ████████████████

12  BY MR. MAAZEL:

13  Q     -- other than the incident on June 3rd, 2020?

14  A    In this case, we have an MRI, a baseline MRI right

15  after the incident so there's proof that there's no other

16  thing that happened prior to the incident, at least.

17         So I don't have any other explanation for -- for

18  the findings in her scans or her symptoms or her exam

19  findings.

20  Q    Is there any possibility that just early dementia at

21  the age of 41 can explain the brain damage that you found?

22  ████████████   █████████████   ████████

23  ██████████████████████████████████████████

24  ████████   █████   ███████████████

25    ████████████████



BY MR. MAAZEL:

Q    And Doctor, I was just asking you whether early

dementia could be a possible cause of the brain damage

you've described in Ms. Pierce's brain?

A    No, that would not be possible.

Q    Why not?

1  A    Because to see that level -- that change in the brain

2  and the structure, you have to have many, many clinical

3  symptoms of that type of dementia, which she doesn't have

4  symptoms of dementia.  So that just doesn't go together

5  clinically at all.

6  Q    Is there any cure for Ms. Pierce's brain injury --

7  other brain damage?

8  A    There's no cure because those nerve cells don't come

9  back.

10 Q    I would like to show you Exhibit 73.  And is that

11 another demonstrative table you've created as an aid for the

12 jury today?

13          THE COURT:  Okay.  You created that demonstrative;

14 is that right?

15          THE WITNESS:  I just need to see it.

16          Yes.

17          THE COURT:  Okay.  Go ahead.  You can publish

18 that.

19          (Exhibit published to the jury.)

20          MR. MAAZEL:  Just cull out the top half, make it

21 easier to read.  I mean, the whole half top of the page.

22 BY MR. MAAZEL:

23 Q    So you -- what are the chronic conditions Ms. Pierce

24 will have in perpetuity as a result of the brain injury,

25 Doctor?

Nadkarni - Direct - Maazel                              205

1   A    So migraine headaches, I mean, she -- at the time that

2   I spoke to her, she was having four -- up to four to five

3   times a week migraine headaches that have been chronic.

4        Those visual symptoms, I think will be chronic as

5   well as potentially balance symptoms and vestibular

6   symptoms.  I think that she has undiagnosed epilepsy,

7   possibly.  So I think that could be something that she needs

8   to be followed up for.

9   Q    Why do you believe that?

10  A    Because she has symptoms that are very consistent with

11  common temporal seizures and -- mesial temporal sclerosis

12  has a very high rate of epilepsy that is associated with it.

13  It is the most common finding on an MRI in temporal lobe

14  epilepsy.

15  Q    And what symptoms are you talking about?

16  A    So she has this -- this sensation of a rising in

17  temperature changes at nighttime and thrashing at nighttime

18  and a sense of panic and fear.

19       So temporal seizures happen in the same places

20  where the amygdala is and the hippocampus is.  So common

21  feature are panic or fear because the amygdala is firing in

22  a temporal lobe seizure.  So she wakes up out of the night

23  with this panic kind of feeling.  It's very typical in

24  temporal lobe epilepsy.

25       And when you see a scar like that in the same

1   area, it's really something that needs to be followed.

2   Q     Okay.  And can --

3   A     And --

4   Q     I'm sorry.

5   A     -- cognitive impairment, along multiple domains that we

6   have talked about already, mainly the frontal lobe is sort

7   of a dysfunction as well as memory dysfunction.  Depression,

8   anxiety, panic disorder, post-traumatic stress disorder and

9   this kind of frontal lobe syndrome, hypo-frontal syndrome,

10  which has to do executive function problems, attention,

11  difficulty initiating thoughts and behavior and potentially

12  just inhibition.

13          She's also at increased risk for developing

14  dementia earlier.  We know that people with traumatic brain

15  injuries have a -- they can -- they can develop dementia

16  earlier because dementia is sort of a matter of reserve on

17  how many neurons you have left.

18          So let's say you start with a 100, and you need to

19  get to 50 to get dementia, in normal course of aging, you

20  might lose five or ten every so many years.  But if you have

21  a traumatic brain injury, you have to go from 100 to 60.

22  And then you only have a buffer of ten left.  It is not

23  uncommon for people to develop cognitive degeneration of

24  dementia maybe earlier than they would have, meaning 10 or

25  15 sometimes.

1          And her imaging findings are already consistent

2     with an advanced dementia.  We know she doesn't have one,

3     but we the neuro imaging looks like she could.  So she's at

4     risk of that also.

5     Q     You, in your expert report, recommended various

6     treatment to manage Ms. Pierce's symptoms.

7               Can you take us through that?

8               We don't have a table for the jury.

9     A     Oh, sure.  Sure, no problem.

10              So, first of all, after a traumatic brain injury,

11    one of the main treatment modalities is multidisciplinary

12    cognitive remediation program.  Sometimes those are in

13    people who are still working and functional; those might

14    happen two afternoons a week.  But they involve things like

15    group therapy, physical therapy, occupation, visual therapy

16    and individual psychotherapy as well, as well as cognitive

17    therapy to try to get back or get around some of the

18    deficits that you have.

19              As well as she will need to see several different

20    neurologists, I think.  With her rate of migraines, she will

21    probably have to see a migraine doctor, a headache doctor

22    because she might need injections and other advanced -- more

23    advanced treatments.

24              She should be evaluated by an epileptologist and

25    may need to be followed by one.  That's epileptologist,

1    E-P-I-L-E-P-T-O-L-O-G-I-S-T.  It's an epilepsy doctor, as

2    well as a rehab doctor that does the cognitive remediation.

3            And she -- she -- she may need -- she maybe has

4    this already -- but undergo vocational types of training,

5    right now it sounds like she's been working.

6            And further needs maybe, again, in case there's an

7    early onset of dementia, she may need help overall, so...

8    Q    "Help" meaning?

9    A    Like, help at home doing activities of daily living and

10   finances and things like that.

11   Q    And in your expert report, I think on page 8, you

12   describe when you would anticipate Ms. Pierce would need a

13   home health aide or the nurse.

14           Can you take us through that.

15   A    You often think it's -- it could be, like I said to

16   her, 15 years earlier than usual or --

17   Q    The last page.

18   A    Oh, the last page.

19           Yeah, so you know, it could be if you're going to

20   develop dementia at 80, then it could be at 65.  Usually

21   these cognitive changes start after the age of 51, normally

22   in everybody.  Word-finding problems, difficulty finding

23   names and then things like Alzheimer's, and it's not,

24   usually start in the mid-70s, late 70s, in general.  But

25   after TBI, it could be in the 50s, late 50s, early 60s.

1   Q    Doctor, the jury has seen and heard Brigid Pierce.

2         Are brain injuries always visible?

3   A    Well, most brain injuries are invisible.  But if you

4   take the case of those football players I mention before,

5   you would never know; or even a boxer, right, you wouldn't

6   even necessarily know who has been punched out several times

7   and has had several concussions and loss of consciousness,

8   if they are walking down the street, or even if they are

9   talking to you, you might not know that they've had

10  significant head injuries.

11  Q    Doctor, in the end of your expert report, you have a

12  summary of your opinion.

13        Can you give us the summary of your opinion in

14  this case?

15  A    Yes.  I believe Ms. Pierce has suffered a severe

16  traumatic brain injury that has caused permanent changes to

17  her brain functioning as a result of a traumatic brain

18  injury at the hands of the police in June of 2020.

19        MR. MAAZEL:  Thank you, Doctor.

20        I have no further questions.

21        THE COURT:  Thank you very much.

22        Cross-examination?

23        MR. HUTCHINSON:  Your Honor.

24        THE COURT:  Thank you.

25        You may proceed.

1   CROSS-EXAMINATION

2   BY MR. HUTCHINSON:

3   Q    Good afternoon, Doctor.

4   A    Good afternoon.

5   Q    Doctor, this isn't your first time testifying, is it?

6   A    It's not.

7   Q    You didn't encounter plaintiff in a hospital setting;

8   is that right?

9   A    I did not.

10   Q    You were not her treating physician on any occasion

11   that she sought medical treatment, correct?

12   A    Correct.

13   Q    You were asked to examine plaintiff by her lawyers,

14   correct?

15   A    Yes, I was.

16   Q    And they told you that she had filed a lawsuit, right?

17   A    Yes.

18   Q    You understand that this is a lawsuit for money,

19   correct?

20   A    Yes, I believe it is.

21   Q    And they arranged for you to examine her in their

22   office; is that right?

23   A    That's right.

24   Q    And that was 600 5th Avenue in Manhattan on the 10th

25   floor, right?

1  A    I will just refer to my report.

2  Q    Sure.

3  A    I believe so.  I just don't know off the top of my

4  head.  I am sure you are right.  Let me find it -- 10th

5  Floor, 5th Avenue, yep.

6  Q    Now, when you treat a patient, you don't do it in their

7  lawyer's office, right?

8  A    No, not generally, you don't do that.

9  Q    And you were paid $800 per hour for that examination,

10 correct?

11 A    Yes.

12 Q    And you met with the plaintiff at her lawyer's office

13 on June 3, 2022; is that correct?

14 A    Yes, that is correct.

15 Q    But you did have some of her medical records at your

16 disposal at the time of the examination; is that correct?

17 A    I believe I had gotten some records, yes.

18 Q    Those are records from Brooklyn Hospital Center and

19 from NYU Langone Opthalmopathy from 2020; is that right?

20 A    I don't remember, honestly, which ones I got.

21 Q    Is there something that would refresh your memory as to

22 the records that you reviewed in compiling your report?

23 A    Oh, I just don't remember when.  I remember I got

24 those, yes, but I just don't remember what the timing was.

25 Q    I see.

1        So did you have those records that I just referred
2   to, at least some of them, before you wrote the report in
3   September of 2022?
4   A    I -- I'd have to refer to my Vista, from what I -- what
5   I wrote down, if I may?
6        MR. HUTCHINSON:  With the Court's permission?
7        THE COURT:  Go right ahead.
8        THE WITNESS:  Thank you.
9   A    Yes.  I have NYU Eye Specialist notes from 2020.
10  BY MR. HUTCHINSON:
11  Q    And also some records from Brooklyn Hospital Center
12  from 2020, correct?
13  A    Correct.
14  Q    Okay.  And those records you had from Brooklyn Hospital
15  Center specifically, at the time of your initial examination
16  of plaintiff, you only had a record of a CT scan that was
17  performed on June 4th, 2020, which was normal, correct?
18  A    I'm not sure I looked at her records before I examined
19  her.  I don't generally -- I often don't do that.  I want to
20  examine the patient first.  So -- the client first.  So I
21  don't remember what the specific timing of that was.
22        But that -- but that CT scan is negative, that's
23  correct.  It was normal.
24  Q    Right.  And -- so maybe let me -- let me rephrase it.
25        You had the records of that normal CT scan at the

1  time you wrote your report in September of 2022, correct?

2  A    Yes.  Yes, I did.

3  Q    Okay.

4  ██████████    █████████████████████████████

5  ████████████████

6  ██████████████    ██████.

7  BY MR. HUTCHINSON:

8  Q    But at the time you wrote the report, you didn't have

9  any of the underlying medical records from that date of

10  treatment, correct?

11  A    I'm not sure what that means.

12  Q    From the June 4th, 2020, date of treatment at

13  Brooklyn Hospital Center, you didn't have any of the

14  underlying medical records from the date of treatment,

15  correct?

16  A    I don't remember.

17  Q    Is there something in your report that would refresh

18  your memory?

19  A    I can look.

20  ██████████  ███████

21  BY MR. HUTCHINSON:

22  Q    Thank you.

23  ██████████    ████████████████████

24  ██████████    ██████

25  A    I wrote down Brooklyn Hospital Center June 4, 2020,

Nadkarni - Cross - Hutchinson                214

1   Emergency Department.  There's a documentation, normal head

2   CT.  So I'm sure I saw the emergency department visit

3   documentation.

4   Q    Okay.

5        In those records that you reviewed from

6   Brooklyn Hospital Center, in 2020, those consisted of about

7   ten pages of discharge records, correct?

8   A    Yes, I believe that's correct.

9   Q    And you also didn't have the findings from that

10  July 18th, 2020, MRI at the time that you wrote your report

11  in September of 2022; is that correct?

12  A    That is correct.

13  Q    Not only did you not know she had an MRI at that time,

14  but you didn't have the findings from it, correct?

15  A    Correct.

16  Q    And that was when plaintiff's attorneys sent you

17  additional materials only recently in the fall of 2025,

18  correct?

19  A    Yes.

20  Q    Over three years after you wrote your initial report;

21  is that correct?

22  A    I guess.  I don't know exactly when I got them, if it

23  was August or September.  But yeah, around that time.

24  She -- yes.

25  Q    And so you didn't have an opportunity to review those

1    medical records at the time that you wrote your report in

2    September of 2022, correct?

3    A    Are you referring to the Brooklyn Hospital MRI?

4    Q    Correct.

5    A    I did not have a chance to look at that one when I

6    wrote my report.

7    Q    Nor did you have the complete set of full medical

8    records from her June 4th, 2020, treatment at

9    Brooklyn Hospital Center, correct?

10    A    Right.  I had the emergency department visit.

11    Q    Discharge papers, right?

12    A    Oh, no, I think it was documentation from the emergency

13    department.

14    Q    And so with regards to her symptoms that Plaintiff

15    presented with on June 4th, 2020, at Brooklyn Hospital

16    Center, is it your testimony that you reviewed records

17    documenting those symptoms?

18    A    I reviewed just records from the emergency room visit.

19    So I didn't review all records documented, like you said,

20    the other records from that time.

21    Q    Right.  My question is, is it your testimony that you

22    reviewed records from that June 4th, 2020, date of treatment

23    at the emergency room beyond just those ten pages of

24    discharge records?

25    A    I did not.  I don't believe I did.  I think that's all

Nadkarni - Cross - Hutchinson                    216

1    I looked at.

2    Q    Okay.  And so you had no impression of what the doctors

3    who examined her had of her at that time, correct?

4    A    That is correct.

5    Q    Now, on direct examination you testified that there

6    were some additional moderate abnormalities that appeared on

7    the PET scan that did not appear on the MRI in 2022,

8    correct?

9    A    Right.

10   Q    You also testified that you did view abnormalities on

11   the MRI from 2022, correct?

12   A    Yes.

13   Q    And those opinions were documented in the report that

14   you prepared in September of 2022, correct?

15   A    Yes.

16   Q    But at that time, you had no idea the plaintiff

17   previously had an MRI on July 18th, 2020, which showed no

18   abnormalities, right?

19   A    That is correct.

20   Q    You only heard about that weeks ago, in the fall of

21   2025, correct?

22   A    Yes.

23   Q    And it was only after you finally found out about that

24   2020 MRI that you wrote a supplemental report that said,

25   "Oh, by the way, a PET scan can show different injuries than

1   an MRI," right?

2   A    Well, I don't think I said, "Oh, by the way."  I'm not

3   sure that --

4   Q    In sum and substance, Doctor?

5   A    I'm sorry?

6   Q    In sum and substance?

7   A    Could you just repeat it again?  I'm sorry.

8   Q    Sure.

9   A    I just got distracted.

10  ███████████    █████████████    █████████████████

11  █████████  ███████████████████████████  █████████  ████████

12  BY MR. HUTCHINSON:

13  Q    It was only after you finally found out about that 2020

14  MRI that you wrote a supplemental report that said, in sum

15  and substance, "Oh, by the way, a PET scan can show

16  different injuries than an MRI," right?

17  A    I don't think "by the way" had anything to do with it,

18  but I did write a letter at the request of the -- of the

19  request of his -- her lawyers to -- to get a comment on what

20  that 2020 MRI means.

21  Q    All right.  So you've concluded that Plaintiff suffered

22  a traumatic brain injury on June 3rd, 2020, correct?

23  A    I believe that's the date, yes.

24  Q    Even though you did not have compete records from the

25  date of the injury, correct?

1   A    I saw it happen with my eyes.

2   Q    You were there?

3   A    On the video.

4   Q    Oh.

5        Even though you did not have complete records from

6   that date of the injury, correct?

7   A    Correct.

8   Q    You would agree that a treating physician is in the

9   best position to document a patient's condition at the time

10  of an injury; would you not?

11  A    Yes.

12  Q    The doctor who sees someone in the emergency room

13  within hours of an injury would be best situated to assess

14  that patients's condition, correct?

15  A    At that moment in time.

16  Q    And to diagnose an injury at that moment in time,

17  correct?

18  A    Well, not necessarily but -- not necessarily diagnose

19  an injury that might show up later.

20  Q    Well, I mean, that's common sense, right?

21  A    Correct.  That's right.

22  Q    You didn't have her June 3rd records when you wrote the

23  report about plaintiff.  But are you aware now that no

24  treating provider that day diagnosed plaintiff with a brain

25  injury?

1    A    Well, that's not true, because the discharge paper that

2    says, "traumatic brain injury, this is what you do after you

3    go home."  So she got a piece of paper that said "traumatic

4    brain injury."

5    Q    Doesn't that discharge paperwork have a little

6    disclaimer on the bottom?

7    A    I don't know.  I -- I'm not sure if it does or not.

8    But on top, in bold letters, it says "traumatic brain

9    injury."

10   Q    And doesn't it say that the advice in these discharge

11   papers shouldn't replace any advice from your treating

12   provider?

13   A    Well, I think the hospital is sort of the treating

14   provider in that situation.  So the hospital is telling her

15   she had a traumatic brain injury.

16              MR. HUTCHINSON:  Your Honor, could I put Exhibit L

17   on the screen, please?

18              THE COURT:  You may.  Previously admitted.

19              MR. HUTCHINSON:  I want to use the ELMO.

20              What do I do here?  Just --

21              THE COURT:  You want to use it --

22              MR. HUTCHINSON:  Oh, here we go.

23              (Pause in proceedings.)

24   BY MR. HUTCHINSON:

25   Q    Dr. Nadkarni, can you see what's on the screen right

1  now?

2  A    Yes.

3  Q    Are these the discharge papers that you were referring

4  to earlier?

5  A    Can you pull them down a little bit?  I just want to

6  see the --

7  Q    Yeah.  Let me zoom out maybe.

8         Here you go.

9  A    Yes.  This looks like it.  Yes.

10  Q    Okay.  This is the page with "traumatic brain injury"

11  across the top in large letters that you were mentioning

12  earlier?

13  A    Right under her name?

14  Q    Yep.

15  A    Yes.

16  Q    I want to direct your attention to the end of that

17  section.

18         MR. MAAZEL:  Could we just have a Bates Number?

19  Sorry.

20         MR. HUTCHINSON:  Oh, yeah.  The end of this

21  section is going to be Bates Plaintiff 1241.

22         MR. MAAZEL:  Thank you.

23         MR. HUTCHINSON:  I'm going to zoom in because

24  that's tiny.

25         All right.

Nadkarni - Cross - Hutchinson                    221

1  BY MR. HUTCHINSON:

2  Q    Doctor, if you're able to see the -- the type on the

3  bottom of the screen beginning with "Elsevier"?

4  A    Yes.

5  Q    Could you please read that sentence starting with "this

6  information"?

7  A    "This information is not intended to replace the advice

8  given to you by your health care provider.  Make sure

9  you" --

10  Q    Okay.  Let me slide it back here.  Hold on.

11         THE COURT:  For the court reporter, Elsevier is

12  E-L-S-E-V-I-E-R.

13         Did you get that?  Okay.  What page is it?  What

14  Bates Number is it?

15         MR. HUTCHINSON:  1241.

16         MR. MAAZEL:  Could we just see the whole page,

17  Judge.

18         MR. HUTCHINSON:  Sure.  Once --

19         THE COURT:  Well, let him ask the question based

20  on what he wants the doctor to read.

21         MR. HUTCHINSON:  I'd be happy to.

22         THE COURT:  The rest of the second --

23  BY MR. HUTCHINSON:

24  Q    Please continue on the last line from the left.

25  A    "Discuss any questions you have with your healthcare

Nadkarni - Cross - Hutchinson                    222

1  provider," which I'm assuming is an outpatient provider,

2  that's what that means.

3  Q    Okay.

4        Now, you said that part of your practice is as a

5  treating physician, correct?

6  A    Yes.

7  Q    And so is it your testimony today that discharge

8  paperwork contains diagnoses?

9  A    Well, it -- this one is -- yes, discharge paperwork can

10 contain diagnoses, of course.  In fact, discharge paperwork

11 tells the patient what to do based on the diagnosis the

12 hospital thinks they have.

13 Q    So if the diagnosis on the discharge paperwork differs

14 from the diagnosis in the medical records, is it your

15 opinion that the patient should replace that diagnosis with

16 the one on the discharge papers?

17 A    I think that would have to be determined on a

18 case-by-case basis.  I'm not sure exactly about that

19 question.

20 Q    And in this case where the diagnosis Brooklyn Hospital

21 on June 4th, 2020, was, quote, "mild closed-head injury."

22 You're saying that these discharge papers should overrule

23 that diagnosis?

24 A    Well, in light of what we see since, yes, that's

25 correct.

Nadkarni - Cross - Hutchinson                    223

1    Q    "In light of what we see since"?

2    A    Correct.

3    Q    Huh.  Well, isn't that a little -- I mean, how would a

4    treating physician diagnose somebody with symptoms that

5    don't appear until two years later?

6    A    Well, you -- I think you're asking me of those two

7    things, traumatic brain injury and discharge paperwork and

8    the treating physician's opinion.  Like in this case the --

9    the TBI is correct -- if you look at the MRI from later,

10    that's the correct diagnoses from this case.

11    Q    Okay.

12    A    Because a mild closed-head injury doesn't show --

13    doesn't end up on the MRI.

14    Q    Would a normal MRI --

15    A    Not in 2022, no, it doesn't end up like that.

16    Q    So you're saying that the treating physician in 2020

17    was just plain wrong?

18    A    No, I think at the moment in time, they didn't have all

19    the data that came afterwards, so they made an assessment of

20    her at the moment when they saw her.

21    Q    Fair enough.  Now...  One moment, please.

22    BY MR. HUTCHINSON:

23    Q    Now, her medical records from that date of treatment

24    that I just put on the screen, June 4th, 2020, those records

25    would have provided other information from her treatment

Nadkarni - Cross - Hutchinson                    224

1  that night that would be relevant to whether she suffered a
2  brain injury, correct?
3  A    Not in terms of what we had in terms of the video.  You
4  can see -- you don't need to visit it at all actually to see
5  that she suffered a head injury.  The video showed that she
6  suffered a head injury.
7  Q    So an assessment of her symptoms when she presented to
8  the emergency room immediately following, is your -- your
9  testimony that that is irrelevant?
10 A    No, no, that would be -- not with the symptoms -- not
11 in terms of whether she had an head injury or not.
12 Q    So it would be valuable to know but not in terms of
13 whether she had an head injury or not; am I understanding
14 that correctly?
15 A    Yes, to treat her symptoms, like what are the symptoms
16 of your head injury.  You ought to know what those symptoms
17 are so you can treat those symptoms.
18 Q    So it would be of no relevance, for example, whether
19 somebody lost consciousness or not?
20 A    It could be of relevance if they lost consciousness but
21 you don't need loss of consciousness for a significant head
22 injury.
23 Q    But could be relevant, right?
24 A    Could be.
25 Q    You don't know what the plaintiff's Glasgow Coma score

1   was, for example?

2   A    I don't think that's relevant, actually.  She wasn't in

3   a coma.

4   Q    So there is no relevance to measuring a person's level

5   of consciousness by evaluation, for example, eye opening,

6   verbal response and motor response?

7   A    Not if they walked into the emergency room and told you

8   the story, you don't have to do that test.

9   Q    And so decrease in consciousness has no significance

10  for a potential brain injury?

11  A    At what point?  I'm sorry.  At the time of the impact?

12  Q    At the time of her assessment in the emergency room on

13  June 4, 2020.

14  A    Would you repeat the question?  I'm sorry.

15  Q    Is it your testimony that a decrease in consciousness

16  would have no significance in assessing a potential brain

17  injury?

18  A    I wouldn't say that.

19  Q    And you said it was relevant that she walked into the

20  emergency room; right?

21  A    Yes.

22  Q    How did you know that without the medical records?

23  A    I think she said that.

24  Q    So just to summarize, correct me if I'm wrong, but you

25  didn't know that her medical records reflected that she

1  never lost consciousness because you didn't have those

2  medical records, correct?

3  A    I think she told me she lost consciousness.  I didn't

4  have those medical records.

5  Q    Well, is there something that would refresh your

6  memory?  I think you said "You think."

7  A    I only had the ED records that we discussed before, the

8  emergency department records.

9  Q    And when you met with her, she actually told you that

10 she wasn't sure, right?

11 A    I don't remember the exact words but I got the

12 impression that she walked to the hospital.  And I think she

13 even said she knew the area but had difficulty finding it

14 and had to use GPS.

15        And then there was a whole story about getting to

16 the hospitals after the police --

17 Q    You wrote in your report that she underwent a

18 concussion protocol at the hospital after the incident;

19 isn't that right?

20 A    Maybe.  I have -- I have to look at the exact words,

21 but I certainly could have said that.  I think she did.

22 Q    Well, you think she did, that's why you wrote it,

23 right?

24 A    Yeah.

25 Q    Even though you didn't have medical records indicating

Nadkarni - Cross - Hutchinson                    227

1    whether or not she did have a concussion protocol; is that

2    correct?

3    A    Yes.  It's the only reason to do if I have eyes on a

4    CT.  If you're worried about a head injury.

5    Q    Can you tell the jury what a concussion protocol

6    entails?

7    A    A concussion protocol entails doing an assessment of a

8    patient's neurological status and then doing a imaging of

9    their head to make sure there's nothing going on.

10          And then if you're talking about a protocol for

11   treatment days and weeks for concussion treatment.

12   Q    Does concussion protocol involve an observation period?

13   A    It may.

14   Q    So you also didn't know that she reported her pain out

15   as a 2 out 10 when she was released from the hospital that

16   night, right?

17   A    I didn't have those records.

18   Q    And you weren't aware that she reported no weakness, no

19   nausea or vomiting, no tingling or numbness, no vision or

20   hearing changes, no slurred speech, no unsteady gate,

21   correct?

22   A    I was not aware if she reported those or not in those

23   records.

24   Q    Okay.  But you did know about the normal CT scan that

25   showed no injuries to plaintiff's skull or brain on June

Nadkarni - Cross - Hutchinson                228

1   4th, 2020, when you wrote your report and reached your

2   conclusions, correct?

3   A    It doesn't say no injuries.  It just says that there's

4   no abnormalities in the structure of her brain on the CAT

5   scan on that day.

6   Q    And so you observed that that CAT scan showed that the

7   ventricles -- and correct my pronunciation, Doctor -- sulci

8   and cisterns are normal in caliber for the patient's age?

9   A    Yes.

10  Q    And that there were no areas of abnormal attenuation

11  within the brain parenchyma?

12  A    Parenchyma.

13       THE COURT:  Can you go ahead and spell it?

14       THE WITNESS:  P-A-R-E-N-C-H-Y-M-A.

15  BY MR. HUTCHINSON:

16  Q    You were aware of that, correct?

17  A    Yes.

18  Q    And that the CT scan showed no intraparenchymal,

19  interventricular subdural or epidural acute hemorrhage,

20  correct?

21  A    Yes.  That's what I would expect.

22  Q    And that there is no midline shift or transtentorial

23  herniation, correct?

24  A    Correct.

25  Q    That there is no territorial infarction, correct?

1   A    Correct.

2   Q    That the visualized portions of the orbits, paranasal

3   sinuses and mastoid air cells are unremarkable, correct?

4   A    Yes.

5   Q    And the calvarium is intact, correct?

6   A    Yes.

7   Q    Impression, normal, noncontrast CT of the brain.

8        That was the report that you reviewed, correct?

9   A    Correct.

10  Q    And now that you have seen the 2020 records, right, you

11  can -- you now know that she had no loss of consciousness,

12  no concussion and very little pain, correct?

13  A    I think she did have loss of consciousness, actually.

14       MR. HUTCHINSON:  Publish Exhibit L, Your Honor.

15       THE COURT:  All right.  Previously admitted page

16  number?

17       MR. HUTCHINSON:  Yep.  Let's go to 1 of 21,

18  Plaintiff's 1222.

19       THE WITNESS:  I don't think it's reported here.  I

20  think she told me -- the story that she told me, I think she

21  had loss of consciousness that day.

22  BY MR. HUTCHINSON:

23  Q    So what does "denies" LOC mean?

24  A    I think what she told me was that she didn't remember

25  if she lost consciousness or not.  But she did say that she

Nadkarni - Cross - Hutchinson                230

1   was doing one thing and the next moment, she was in a

2   different place.  So I think she had moments of loss of

3   consciousness that she has lost for -- because she has gaps

4   in time.

5          So I don't think she calls that loss of

6   consciousness, but as a neurologist, I think she had that

7   that day.

8   Q    Doctor, are we disputing the meaning of the word

9   "denies" right now?

10  A    No, I think she -- I think denies means that she -- she

11  said she didn't have loss of consciousness but that's not

12  what she told me.  I think these records don't say anything

13  about loss of consciousness, but the story she told me, it

14  sounds like she has loss of consciousness.  From when I

15  examined her.

16  Q    Well, it's not that these records say nothing about it,

17  right?  It says that she denied it, correct?

18  A    Right.  Correct.  There's no mention of loss of

19  consciousness in this woman's records, that's correct.

20  Q    There -- okay.

21         And when you wrote your report in September

22  of 2022, you did have some medical records that predated the

23  June 3rd, 2020, incident, correct?

24  A    I did.  I think I had some records from 2018 and '19.

25  Q    That was from Maiden Lane Medical, correct?

1    A    You know, I don't remember it, and this is my fault.  I

2    didn't say where these records came from, so I don't know if

3    those are the records -- the same but they're the same

4    years.

5             MR. HUTCHINSON:  Your Honor, I would like the show

6    to witness only what has been marked as Defendants' Exhibit

7    BB for identification.

8             THE COURT:  Okay.

9             MR. HUTCHINSON:  And I previously emailed it to

10   counsel.

11            THE WITNESS:  Yes, I have seen these records.

12   BY MR. HUTCHINSON:

13   Q    Okay.

14   A    Yes.

15   Q    So, Doctor, you have seen these records previously,

16   correct?

17   A    Yes, I have.

18   Q    And these are the records --

19   A    They're the same.

20   Q    Okay.  These are the records that you relied on in

21   drafting your September 2022 report, right?

22   A    Yes.  Yes.  Correct.

23            MR. HUTCHINSON:  Your Honor, I am offering

24   Defendants' Exhibit BB into evidence.

25            ███████  ████████?

Nadkarni - Cross - Hutchinson                    232

1   ████████  ███████████████  ████

2   ██████████████████████

3   █████████  █████████████████

4   ██████

5           I'll allow them to be admitted.

6           Go ahead.

7           (Defendants' Exhibit BB received in evidence.)

8           MR. HUTCHINSON:  Thank you, Your Honor.

9   BY MR. HUTCHINSON:

10  Q    Now, in these medical records from 2018 and 2019, these

11  documented a back injury that the plaintiff sustained back

12  the 2018 or 2019, correct?

13  A    Yes.

14  Q    Okay.

15          MR. HUTCHINSON:  One -- one moment, please.

16          (Pause in proceedings.)

17  BY MR. HUTCHINSON:

18  Q    All right.  You know what, I'm going to come back to

19  these in a minute, okay?

20  A    Sure.

21  Q    So let's get back to your examination of Plaintiff for

22  a minute.

23          When you examined Plaintiff, it was your

24  understanding that you'd write a report documenting your

25  findings after, correct?

1    A    Yes.

2    Q    And your intention was to be thorough and accurate in

3    that report; isn't that right?

4    A    Well, actually, I think the intention was to examine

5    and interview her and then talk to them about what I found.

6    Q    Fair.

7    A    And then make a decision about writing a report or not,

8    yes.

9    Q    Okay.  So you knew that there was a possibility that

10   you might write a report after examining her?

11   A    Yes, yes.

12   Q    Okay.  And when you compile reports like this, it's

13   your intention to be thorough and accurate, correct?

14   A    Yes.  As good as I am capable at the time.

15   Q    And you eventually indicated in your report that you

16   were of the opinion that Plaintiff would suffer from

17   post-traumatic stress disorder, generalized anxiety

18   disorder, panic disorder, and depression in perpetuity as a

19   result of the June 3rd, 2020, incident; isn't that right?

20   A    Yes, I was worried about that.  Yes.

21   Q    Are you aware that Plaintiff was also examined by a

22   clinical psychologist by the name of Dr. Jessica Pearson?

23   A    Yes, I am.

24   Q    And are you also aware that plaintiff's other expert,

25   Dr. Pearson, did not find that plaintiff met the criteria

1    for generalized anxiety disorder or panic disorder?

2    A    I don't think she mentioned those in her report as

3    diagnoses.

4    Q    She didn't mention them because plaintiff didn't meet

5    the criteria, correct?

6    A    I'm not sure but it's possible that when she talked to

7    her she didn't get those symptoms from her.

8    Q    Are you aware that Dr. Pearson issued a supplemental

9    report about plaintiff's mental health just last week?

10   A    I am aware of that.

11   Q    And that Dr. Pearson found that Plaintiff no longer

12   meets the criteria for posttraumatic stress disorder?

13   A    Because she doesn't have triggers that would make her

14   hypervigilant because she's not in the same place as she

15   was.

16   Q    Is that a "yes"?

17   A    I don't think it's a "yes." I think it's a very

18   qualified "yes." I mean, if she's back in New York I think

19   she would have those. She would have PTSD. She would

20   qualify for PTSD. I think that was sort of implied in that

21   report.

22   Q    Okay. So qualified "yes"?

23   A    Yes.

24   Q    I'll take it. Okay.

25        So do you still hold the opinion that plaintiff is

1  going to suffer from these conditions for the rest of her

2  life?

3  A    I think it's very likely that she's going to suffer off

4  and on from those conditions for the rest of her life, yes.

5  Q    Off and on?

6  A    Yes.  Those are the intermittent conditions.  Like,

7  depressions comes and goes.  Those are -- those are episodic

8  conditions.  Major depressive disorder is a condition with

9  episodic depressions.

10  Q    Okay.  And so it just so happens that she wasn't

11  suffering from any of those syndromes, except for persistent

12  depressive disorder on the two occasions that she was

13  examined by the clinical psychologist retained by her

14  attorneys?

15  A    Well, I thought the initial impression was that she had

16  PTSD initially, Dr. Pearson, and depression, I think, were

17  both -- were both present there.

18        I don't think she made confidential diagnoses of

19  anxiety disorders.

20  Q    Or panic disorders, correct?

21  A    That's an anxiety disorder.

22  Q    Okay.  Okay.

23        Did you also learn that plaintiff was under the

24  care of a therapist for depression and posttraumatic stress

25  disorder, all the way up to the months leading up to the

1   June 3rd incident?

2   A    I think I did know that, yes.

3   Q    And you noted that she was on Cymbalta, right?

4   A    Correct.

5   Q    But nowhere in either the section for "records

6   reviewed," the section for "prior psychiatric history," the

7   section where you actually discuss posttraumatic stress

8   disorder, or in your findings do you ever acknowledge that

9   plaintiff had already been diagnosed with depression and

10  posttraumatic stress disorder, correct?

11  A    I don't think I wrote that in here, but we discussed

12  her prior trauma and treatment for it.  That's in my past

13  psychiatric history, I think.

14  Q    But you never mentioned that she had previously been

15  diagnosed with PTSD and depression, correct?

16  A    I don't mention that anywhere in my report.

17  Q    You just wrote in your opinion that she has PTSD and

18  depression because of this incident on June 3rd, correct?

19  A    Well, she -- her PTSD is definitely related to this

20  incident, her flashbacks, and her triggers and all that

21  stuff, yes.

22  Q    Even though you knew she had been diagnosed with PTSD

23  and depression before June 3rd?

24  A    I don't enter that, actually.  If I knew that, I would

25  have put that in my report under "past psychiatric history."

1    I didn't know her -- she didn't tell me about psychiatric

2    diagnoses of PTSD or depression.

3              MR. HUTCHINSON:  Your Honor, I want to publish

4    defendant's BB.

5              THE COURT:  All right.

6              MR. HUTCHINSON:  And I'm going to Page 14.  And

7    that's under the treatment date of March 13th, 2019.

8              (Exhibit published to the jury.)

9    BY MR. HUTCHINSON:

10   Q    Doctor, can you read what's on the screen?

11   A    Sure.  "She has recent depressive symptoms with

12   IUD/suicidal ideation."  I'm not sure exactly what IUD

13   means.  "...with plan, does not have sick referred.  And

14   this is a long number prior that's involved and titrate."

15             I believe this related to the emotional balance

16   she had, but I'm not certain.

17   Q    Okay.  You discussed the facts of the June 3rd, 2020,

18   incident with plaintiff, correct?

19   A    Yes.

20   Q    And I know you mentioned that you reviewed video

21   footage as well, correct.

22   A    Yes.

23   Q    But you based opinions as to plaintiff's condition, at

24   least in part, on the story that she told you, correct?

25   A    Yes.

Nadkarni - Cross - Hutchinson                          238

1  Q    And isn't it true that the accuracy of your opinions

2  today depends on, at least in part, the accuracy of the

3  story that was told to you?

4  A    Yes.  In conjunction with all the other data, like

5  medical records and testing and all that stuff.

6  Q    But the details that she told you were significant to

7  you in diagnosing her injuries, correct?

8  A    I mean, yes.  The symptoms are important in diagnosing

9  her condition.

10 Q    And so if you later learn that any of these facts was

11 untrue, it would have affected your conclusions about the

12 causation of plaintiff's injuries, correct?

13 A    I think the causation was very clear from the video.

14 Q    And you also discussed the symptoms that plaintiff

15 reported experiencing since; is that right?

16 A    Yes.

17 Q    And as you just testified, those symptoms include

18 migraines, temperature changes, panic attacks, PTSD, sleep

19 disturbances, visual problems and cognitive problems, such

20 as difficulty focusing and multitasking, correct?

21 A    Yes.  Yes, but with -- I mean, there's a lot more

22 symptoms under all those, a lot more things, but yes.

23 Q    Yeah.  And those are the ones I want to discuss right

24 now, okay?

25 A    Uh-huh.

1   Q    Because those are all subjective self-reported

2   symptoms, correct?

3   A    Can we go over them again?

4   Q    Sure.

5   A    I'm not sure.  Let's see what -- let's go line by line.

6   Q    Let's do it.

7        Migraines?

8   A    Migraines are self-reported sometimes, yes.

9   Q    Temperature change, panic attacks?

10  A    Not always because she comes up in the middle of the

11  night, she's soaked and she's having a panic attack.  That's

12  -- that's extremely obvious.  That's not something that's a

13  subjective symptom.

14  Q    Sure.  But not something that you observed, correct?

15  A    No.  Only her partner knows that.

16  Q    Okay.  And --

17       MR. HUTCHINSON:  One moment, please.

18  BY MR. HUTCHINSON:

19  Q    But you never talked to her partner, correct?

20  A    No, I think she said that her partner told her that she

21  thrashes in bed and she has these episodes.

22       And she also recalls having these episodes at

23  night.

24  Q    So self-reported, correct?

25  A    And -- and witness.

Nadkarni - Cross - Hutchinson                    240

1   Q     By someone who you didn't talk to, right?

2   A     Correct.

3   Q     Okay.  Panic attacks?

4   A     Yes.  Those are also something that was often visible.

5   When somebody's having a panic attack.  Not always but

6   often.

7   Q     Did you speak to any witnesses as to panic attacks?

8   A     I think the same.  I didn't speak to -- I didn't speak

9   myself.  I just spoke to her about those.

10  Q     PTSD?

11  A     PTSD, I also use corroborating data from Dr. Pearson

12  and from her reporting.

13  Q     Okay.  Sleep disturbances, same -- same category as

14  temperature changes, observed by her partner who you didn't

15  talk to?

16  A     Correct.  And her report.

17  Q     Yes, self-reporting, correct.  And those cognitive

18  problems, those are self-reported, correct?

19  A     Correct.

20  Q     And the vision problems, you didn't actually examine

21  her eyes, correct?

22  A     I did examine her eyes.

23  Q     You did an eye exam?

24  A     Sure.  And I looked at her pupils.  I did all those

25  things.  On a neurological exam you do that.

1   Q    Fair enough.  I was thinking of more of a traditional
2   ophthalmology --
3   A    Ophthalmology.  I did not do an ophthalmology exam.
4   Q    Okay.  Can you just -- I know it sounds sort of
5   obvious, but can you explain to the jury what a subjective
6   symptom is?
7   A    Symptoms are subjective always.  Signs are things that
8   are objective.
9   Q    I see.
10  A    So a symptom is something that you experience in your
11  -- in your consciousness.
12  Q    Got it.  Now, you also covered some of her medical and
13  family history, right?
14  A    I did.
15  Q    And plaintiff told you that she has a history of
16  migraines, correct?
17  A    Yes, she has a history of ocular migraines.
18  Q    But that they felt different after her arrest on June
19  3rd, correct?
20  A    But they were different afterwards, yes.
21  Q    Okay.  But she never told you how long after the arrest
22  they started to feel different than before, did she?
23  A    Oh, I think she mentioned in her initial symptoms, I
24  thought, she started having headaches that were not like the
25  ones that were -- you know, were ocular.

Nadkarni - Cross - Hutchinson                   242

1          But ocular migraines are just grey on your vision.

2     But she started having headaches really after the -- after

3     the incident.

4          Occular migraines.  She doesn't have headaches,

5     she just has visual changes.  That's what an occular

6     migraine is.

7     Q    And so she said that those migraines went -- began

8     feeling different after the arrest, correct?  But the

9     question was:  She didn't tell you when they started feeling

10    different, did she?

11    A    She -- yeah, she said she starting having headaches

12    right after her injury.  So those headaches are not the same

13    as occular migraines.  She had new headaches after her --

14    right after her injury that are persistent.

15         MR. HUTCHINSON:  Your Honor, I want to establish

16    Defense BB again.

17         THE COURT:  All right.

18         MR. HUTCHINSON:  And I want to publish Page 4,

19    which is under the date of treatment 8/1/2018.

20    BY MR. HUTCHINSON:

21    Q    Doctor, can you read the date of treatment on the top

22    left?

23    A    8/1/2018.

24    Q    And can you read what it says with regards to rating

25    the following pain symptoms.

1   A    Backache, seven; migraine headache, seven.

2   Q    Okay.  Now just to confirm, this was before June 3rd,

3   2020, correct?

4   A    That was.

5   Q    All right.  Now what was the purpose of asking her

6   about her family history?

7   A    Oh, it's standard protocol when you do an assessment.

8   Q    Why?

9   A    Well, why do you ask about family history?

10  Q    Yeah.

11  A    Because some things have genetic loathing in families,

12  some illnesses.

13  Q    But it's your testimony on direct that these illnesses

14  do not; is that right?

15  A    I'm sorry, say it again?  Which -- which illnesses?

16  Q    The ones that you observed in Plaintiff.

17  A    Like, a traumatic brain injury definitely is not a

18  genetic disease, that's something that is acquired in

19  people.

20  Q    Well, the traumatic brain injury is the injury itself,

21  correct?

22  A    Right, correct.

23  Q    And so what we're discussing now are signs, like you

24  described before, correct?

25  A    Symptoms and signs.  Yes.

Nadkarni - Cross - Hutchinson                    244

1    Q    Symptoms and signs.  Right.

2    A    Yeah.

3    Q    And it is your testimony today that the symptoms and

4    signs that were relevant to plaintiff, her family history

5    had no relevance to those, right?

6    A    Oh, I think her family history showed a history of

7    dementia in an uncle and a father, I think that's irrelevant

8    to her story.

9    Q    Then why --

10   A    Meaning it is not contradictory to the story.

11   Q    So why did you ask about it?

12   A    Oh.  Because we ask everybody.  You always ask about

13   family history.

14   Q    Got it.

15        And she told you about several family members who

16   had dementia, correct?

17   A    Uncle and father, I think.

18   Q    But she didn't tell you that her maternal grandfather

19   also had dementia?

20   A    I didn't document that, I don't remember that.

21   Q    But you did review that detail in the neuropsychology

22   consultation report, correct?

23   A    Yes, I must -- I read -- I read that, yes.

24   Q    So you felt that it was important to include the

25   information about her father and her uncle but not her

1  grandfather?

2  A     I think I just -- that might have been an oversight on

3  my part.  I don't think it has any relevance to her

4  condition.

5  Q     Did you ever determine whether Plaintiff's father and

6  uncle had Alzheimer's disease?

7  A     No.

8  Q     Do you ever determine whether they had frontotemporal

9  dementia?

10  A     I did not.

11  Q     And of course, you never looked into plaintiff's

12  grandfather's dementia because you didn't even know about

13  him, right?

14  A     I mean I'm sure she had a grandfather, but I didn't

15  know about his dementia.

16  Q     You also found what you describe as nerve damage to the

17  left side of Plaintiff's face and the left side of her body

18  which you interpreted as a sign of frontal lobe syndrome;

19  isn't that right?

20  A     That's incorrect.  That's a mix-up of many different

21  things in my report.  She had sensory changes in her body.

22  That is not frontal lobe, that's parietal lobe, that is a

23  different part of the brain.

24        And then she had frontal lobe findings on her

25  examination, yes.

1          MR. HUTCHINSON:  Can we put that demonstrative aid

2    back up on the screen?  I think that was Plaintiff's, what,

3    70 something?  What was it?  I didn't write it down.

4          MR. SELVER:  There is 73.

5          MR. HUTCHINSON:  The first one.

6          Can we take a look at 72, please.

7          THE COURT:  What do you mean "take a look"?  You

8    want to show it to the witness or publish it?

9          MR. HUTCHINSON:  I think I have a copy but I am

10   not sure if someone's able to put it on the screen.

11         THE COURTROOM DEPUTY:  The Court's question is:

12   Do you want to show it to the witness or to the jury?

13         MR. HUTCHINSON:  No, we can show it to the jury;

14   it's in evidence.

15         THE COURT:  You just need to tell us what you want

16   to do.

17         MR. HUTCHINSON:  Sure.  Yes, thank you.

18         THE COURT:  Yeah.

19   BY MR. HUTCHINSON:

20   Q    Now, Doctor, can you read the section that says,

21   "Neurologic examination"?

22   A    Do you mean this next box?

23   Q    Yeah.

24   A    "One, left hemisensory deficit; two, defused

25   hyperflexia, including jaw jerk reflex suggesting central

1  nerve system injury; frontal sinus suggesting frontal lobe

2  injury."

3  Q    Okay.  So it was that left hemisensory that I was just

4  asking you about, right?

5  A    Yes, it was.

6  Q    And can you read the box to the right --

7            MR. HUTCHINSON:  Oh, thank you for bringing that

8  up.

9  BY MR. HUTCHINSON:

10 Q    Go ahead.

11 A    Yeah.

12          Frontal lobe syndrome with difficulty initiation,

13 motivation, executive functioning and compartment.

14 Q    Okay.  So let me ask the question again.  You also

15 found what you described as nerve damage to the left side of

16 Plaintiff's face, right, and the left side of her body which

17 you interpreted as a sign of frontal lobe syndrome, right?

18 A    It's not nerve damage and it is not frontal lobe

19 injury.  So this is a brain injury.  So it is not nerve

20 injury.  Nerves go to the face, peripheral nerves.  This is

21 a brain.  So it is a central injury to the brain that might

22 cause a left hemisensory deficit.

23          A left hemisensory deficit, this is clinical

24 consequences in the last column.  One of the clinical

25 consequences for her, if she goes around with a little bit

1    of numbness or nothing being able to feel her left side, I

2    didn't even include that in the clinical consequences.  I

3    just used two out of three because that is a finding that

4    doesn't really have clinical consequences.

5           But I found it on my exam.  And that is a parietal

6    lobe finding, not a frontal lobe finding.  So I can see how

7    this might get a little confusing, I apologize but it's

8    really referring to two and three, that frontal lobe

9    syndrome.

10   Q    Got it.

11          Do you want to edit this section to reflect the

12   reality?

13   A    Absolutely not, because in left hemisensory deficit, I

14   didn't even include the -- it is not a clinical consequence,

15   it has no clinical consequence, so it doesn't belong there

16   in that box.

17   Q    Got it.

18          Now, you identified those symptoms by lightly

19   touching the left side of Plaintiff's face and body and

20   pricking the left side of Plaintiff's body with a pin,

21   right?

22   A    Yeah, vibration, sounds, pinprick, light touch.

23   Q    Well, you're aware from those 2018 and 2019 medical

24   records, Defense BB, right, that Plaintiff had previously

25   had an injury to her left arm, correct?

1  A     Yes.

2  Q     And she complained of those same symptoms that you

3  observed to the same area of her body, correct?

4  A     I believe so, yes.

5  Q     You learned that as recently as December 4, 2018,

6  Plaintiff was experiencing numbness in her left arm; isn't

7  that right?

8  A     Yes, this is a hemisensory deficit.  Not an arm

9  deficit, meaning, it's the whole left side of the body.

10 Q     Sure, but part of your test is on the arm, correct?

11 A     Correct.  That's correct.  Part of it is.

12 Q     And that on December 4th, 2018, that Plaintiff's

13 perivertebral muscle tenderness was noted as severe on the

14 left side, right?

15 A     I don't remember that but I am sure that's true.

16 Q     She described on that date experiencing shooting,

17 stabbing, throbbing pain in her left lower quadrant; isn't

18 that right?

19 A     I don't remember that.  I think that that's her

20 abdomen, left lower quadrant.

21 Q     Or back, correct?

22 A     I'd have to look at a picture.  Left lower quadrant

23 usually means abdomen.  Unless you have a picture of

24 somebody's back showing something but you don't refer to the

25 back as quadrants usually.  You refer to the abdomen as

Nadkarni - Cross - Hutchinson                    250

1  quadrants.

2  Q    Sure.  Maybe I can pull that up in a bit.

3  A    Okay.

4  Q    And that she described that pain as an 8 out 10?

5  A    I'd concede, I don't remember that.

6  Q    And she also remarked that she experienced tingling in

7  that area which she described as pins and needles, right?

8  A    I mean, I would to see -- I'll take your word for it.

9  Q    Now, those 2018 and 2019 medical records that you

10 reviewed for Plaintiff's medical history, those were from

11 Dr. Davison at Maiden Lane Medical, correct?

12 A    I just don't remember it.

13 Q    And just staying with that December 18th day of

14 treatment, she also showed abnormal diminished sensation to

15 light touch on her left arm, correct?

16 A    Yeah, I mean, she had a nerve problem at that point.

17 Q    And at least with regards to that left hand -- side,

18 that's exactly what you observed in 2022, correct, that

19 diminished sensation to the left arm?

20 A    No, I had a hemisensory deficit, that's different.

21 Q    Right well, it involved more areas, right?

22 A    It includes -- yeah, but -- but -- but I had a

23 hemisensory, it wasn't with a nerve distribution or a root

24 distribution.  It was the whole left arm.  So that is a much

25 different distribution in terms of central versus peripheral

Nadkarni - Cross - Hutchinson                    251

1   neurology.

2   Q    Okay.

3   A    It wasn't a peripheral arm problem that I had.  I found

4   a central sensory problem at my exam.

5   Q    But you didn't account for that pre-existing left arm

6   injury in your report, though, right?

7   A    I'm not sure what that means.

8        You mean I didn't mentioned that in my report?

9   Q    Yes.

10  A    Correct, I did not mention that in my report.

11  Q    All right.  Now, you also observed, when you examined

12  Plaintiff, an increased jaw jerk reflex, correct?

13  A    Yes, correct.

14  Q    And that you interpreted to be a sign of a central

15  nervous system injury, correct?

16  A    Above the level of cranial L5.

17  Q    So what was Plaintiff's Babinski reflex?

18  A    I believe it was the down going.

19  Q    And what does that mean?

20  A    That means she didn't have a Babinski response.

21  Q    So --

22  A    Which is an outgoing toe, the toe goes up

23  pathologically when there is a problem with the

24  corticospinal tract, the motor tract, long motor tracts in

25  the central nervous system.

Nadkarni - Cross - Hutchinson                    252

1    Q    So you just said that the increase jaw jerk reflex and

2    the Babinski reflex are both sort of tests of the central

3    nervous system, correct?

4    A    There's multiple tests of the central nervous system in

5    a neurologic exam.

6    Q    Are those two of them?

7    A    There are.

8    Q    And they showed contradictory findings, correct?

9    A    Incorrect.  That's incorrect.

10   Q    One showed no response and one showed a response.

11   A    That's almost always the case.  In a neurologic exam,

12   you might see one thing, you might not see another thing.

13   But any one thing is sort of dispositive of a central

14   nervous system.  A negative response doesn't help you.  But

15   a positive response will -- will point to a pathology.

16   ████████████    ████    ███████████████

17   ████████████████████████████████████    █████

18   ██████████████████████████████████████████

19      █████████    ████████████████████████████

20   ███████    ██████████████████

21      █████████████    ██████████

22      █████████████    █████████

23      █████████████    ██████████████████████

24   █████████████████

25      █████████████    ██████████████████████



11    BY MR. HUTCHINSON:

12    Q    I just want to finish up the section about the sort of

13    neuropsychological testing that you did, okay?

14    A    Sure.

15    Q    You also conducted release sign tests, correct?

16    A    Correct.

17    Q    And you testified on direct that one of those included

18    a palmomental response test, right?

19    A    Palmomental.  P-A-L-M-O-M-E-N-T-A-L.

20    Q    Okay.  And you found that plaintiff had a marked right

21    palmomental response, right?

22    A    Yes, I did.

23    Q    But there was no lesion in the frontal lobe in the

24    scans that you observed, right?

25    A    I think there is in the left frontal superior --

Proceedings                                                   257

1    supraorbital left frontal lobe position.

2            THE COURT:  Supraorbit?

3            THE WITNESS:  Supraorbital.

4            THE COURT:  Okay.

5    BY MR. HUTCHINSON:

6    Q    And you just didn't feel like writing that one down?

7    A    Those are the PET scan results, I believe.



1  A    Good afternoon.

2  Q    Doctor, before we get back to talking about some of the

3  tests that you performed on plaintiff and your examination

4  of her, I want to get back to this analogy that you used

5  during your direct examination about NFL linebackers, okay?

6  A    Sure, linemen.

7  Q    Linemen, yes.

8        You used an interesting analogy about these

9  professional football players getting CTE, right, or some

10  other brain illness after repeated concussions and head

11  trauma throughout their careers, right?

12  A    Actually, the point that I was making is that even

13  without any history of concussions, they had atrophy from

14  repeated head injuries without any history of clinical

15  concussions.

16  Q    Got it.  So -- and I think your point was, right, that

17  after those repeated head traumas throughout their career,

18  sometimes the illnesses showed up later, correct?

19  A    Correct.

20  Q    There is no evidence in this case that plaintiff

21  suffered repeated concussions over a period of time or

22  repeated head traumas over a period of time, correct?

23  A    No.  I think a few on that night.

24  Q    Right.  One night only, correct?

25  A    Correct.

1  Q    Right.  And, in fact, she wasn't even diagnosed with a

2  concussion when she received medical treatment following the

3  incident in June of 2020; was she?

4  A    No.  I think it was TBI that she was given a diagnosis

5  of.

6  Q    Discharge papers, right, we disagree on those, correct?

7  A    Yes.

8  Q    So your neurological examination of plaintiff, right,

9  you testified that you observed numerous signs of a brain

10 injury in a number of the tests that you performed, correct?

11 A    Yes.

12 Q    Those were cranial nerve tests, motor tests, sensory

13 tests, coordination tests, and then the tests of the

14 reflection and release signs, correct?

15 A    That's correct.

16 Q    And the last ones involved tapping the jaw, scratching

17 the palm, doing the light touch and pinprick tests, correct?

18 A    Yeah.  The light touch and pinprick are under sensory

19 exam, but yes.

20 Q    Okay.  Just to be clear, no other physician has

21 documented any of those findings that you observed in the

22 neurological testing that you performed, correct?

23 A    I don't believe so.  I don't think they did some of

24 these tests.

25 Q    And that's despite the fact that a plaintiff -- the

NADKARNI - CROSS - HUTCHINSON                    1028

1    plaintiff saw a neurologist for a year after the June 3,

2    2020 incident, right?

3    A    Yes.

4    Q    So these symptoms that plaintiff reported and the signs

5    that you observed, that caused you to order additional

6    testing, correct?

7    A    Yes.

8    Q    And that was the brain PET scan, the head MRI, and the

9    video EEG; is that right?

10   A    Yes.  And I think neuropsychological testing.

11   Q    Right.  And so you sent the plaintiff to have those

12   tests done and they were completed on July 21, 2022; is that

13   right?

14   A    I believe that's correct, yes.

15   Q    And you received the results of those -- well, let's

16   first talk about the MRI scan, right?

17   A    Sure.

18   Q    And that scan, basically, took hundreds of images of

19   plaintiff's brain using different contrasts and imaging

20   planes; is that right?

21   A    Yes.

22   Q    What's the purpose of that, using different contrasts

23   and imaging planes in an MRI?

24   A    Because there's different types of tissue in the brain

25   and different imaging planes and contrast, I don't think she

1   got contrast, but different imaging planes can give you

2   different pictures of different parts of the brain, better

3   or worse.

4   Q    And are imaging planes like basically a way to capture

5   in 2D what's a 3D object?

6   A    Yeah.  It slices, right, it slices this way, slices in

7   different -- in different directions of the brain, like

8   this, also.

9   Q    And so each image would be like one of those slices

10  that you are describing?

11  A    Right.  And they are different thicknesses, meaning

12  each slice can be a different -- different MRIs have

13  different thicknesses of slices.

14  Q    And you also had a report from another doctor who

15  interpreted that MRI, correct?

16  A    Yes.

17  Q    And that was Dr. Elcin Zan MD, correct?

18  A    I believe that's right, yes.

19  Q    And you also received the results of the PET scan,

20  correct?

21  A    Yes.

22  Q    And that's the scan, just to remind everyone of what

23  happened last week, right, that's the scan that takes images

24  of a patient's brain after they ingest what's basically a

25  sugar drink, right?

```
1    A    Yeah -- yes.

2    Q    And the test measures how the glucose is metabolized in

3    various parts of the brain, correct?

4    A    Correct.

5    Q    And you received Dr. Zan's interpretation of that PET

6    scan; is that right?

7    A    Yes, I did.

8    Q    Now, isn't it true that before Dr. Zan interpreted

9    those PET and MRI scans, that doctor was told that plaintiff

10   had sustained a, quote, significant head injury; isn't that

11   right?

12   A    I'm sure the doctor had some history.  There's usually

13   one line of history in the report.  So we can see.  But yes,

14   usually there's some history.

15   Q    And that history given was that plaintiff had sustained

16   a, quote, significant head injury, correct?

17   A    I'm not -- I don't remember.  I'd have to look at what

18   the report -- it's probably in the report, what the history

19   is.

20        MR. HUTCHINSON:  Your Honor, can I show the

21   witness the report to refresh his memory?

22        THE COURT:  Yes, you may.

23        MR. HUTCHINSON:  Can I do it from here?

24        THE COURTROOM DEPUTY:  Yes, marked as?

25        MR. HUTCHINSON:  Oh, let's mark it as --
```

1     MR. MAAZEL:  Judge, this is in evidence.  We can

2  just put it on the screen.

3     MR. HUTCHINSON:  Is it?  What exhibit is this?

4     MR. MAAZEL:  21.

5     MR. HUTCHINSON:  Plaintiff's 21 is admitted?

6     THE COURTROOM DEPUTY:  Yes.

7     MR. HUTCHINSON:  Fantastic.

8     THE COURT:  You can go ahead and show it on the

9  screen.

10     (Exhibit published.)

11     MR. HUTCHINSON:  I can show it on the ELMO.

12  Q    Doctor, I want to direct your attention to the section

13  that says:  History.  It's going to be at the bottom of the

14  page, if you can see that.

15  A    Yes.

16  Q    Can you please read that?

17  A    Sure.  Patient has sustained a significant head injury.

18  Has spells concerning her epileptic seizures.

19  Q    I just want to confirm, that was information that was

20  given to the doctor before the doctor interpreted these

21  results --

22  A    Yes.

23  Q    -- correct?

24  A    Yes.

25  Q    And Dr. Zan was also told that plaintiff had spells

NADKARNI - CROSS - HUTCHINSON                    1032

1    concerning for epileptic seizures, correct?

2    A    Yes, yes.

3    Q    So you saw some, but not all, images from the PET scan

4    and the MRI, correct?

5    A    Yes.  I think -- I don't think I saw all of the images.

6    Q    But you testified on direct that when you looked at the

7    images, you generally agreed with Dr. Zan's interpretation

8    of what they showed, correct?

9    A    Yes, but I'm not somebody who reads PET scans, but yes,

10   even I could see it, let's put it that way.

11   Q    Got it.  But you would agree that these brain scans

12   showed no signs of an old injury from 2020; just those

13   abnormalities that you say developed more recently, correct?

14   A    I'm not sure how to answer that question because the

15   scan from 2022 can only show what's in 2022.  I mean, I'm

16   not sure what the question is about the previous scan.

17   Q    There were no signs on that scan of an old injury from

18   2020, correct?

19   A    Right.  The 2020 scan did not show any injury.

20   Q    In 2022, when you reviewed the MRI and the PET scan

21   from 2022, those scans showed no sign of an old injury from

22   2020, correct?

23   A    It -- I think it does show signs of an old injury

24   because it shows atrophy and it shows hypometabolism.

25   Q    But your testimony on direct was that it was natural

1  that those changes would develop later on, correct?

2  A    From a head injury, yes.  That's why it shows that, I

3  think, that's right.

4  Q    And your opinion about the cause of those injuries was

5  based in part on the version of events that was relayed to

6  you by plaintiff, correct, as well as photos, videos, that

7  you viewed of the incident?

8  A    Yes, the documentation that I viewed, yes.

9  Q    And was that the opinion that you gave on direct, that

10  it was the initial taking her to the ground, that you

11  observed on the video, and the holding down of her head on

12  the ground that caused those injuries that you just

13  testified about?

14  A    Yes.  I think there -- I mean, I -- yes, that's right.

15  Q    And those were the cause of injuries that developed

16  between, some point, right, the clean MRI from July 18,

17  2020, and the MRI and PET scan that you're viewing in

18  September of 2022, correct?

19  A    I would expect a normal MRI in 2020.

20  Q    Right.

21  A    And then these changes by 2022, that's right.

22  Q    Somewhere in that range, correct?

23  A    Right.  She did not have changes in the MRI in 2020,

24  that is correct.

25  Q    And that is because plaintiff didn't report any head

1  trauma that occurred since June 3rd, 2020?

2  A     Is what because of that?

3  Q     Your ability to draw a conclusion about the causation

4  of her injuries?

5  A     Well, I think the whole picture, her symptoms, her

6  functionality, and all the testing, I think, points to an

7  injury on June 3, 2020.

8  Q     Right.  And the absence of an injury after that,

9  correct?

10  A     No.  I think -- an injury after that may also

11  contribute, but I think this whole pattern fits an injury on

12  June 3, 2020.

13  Q     Right, because there is no evidence that she had

14  repeated head trauma over a period of time like those NFL

15  linemen that you referenced earlier, correct?

16  A     I think I would have documented that if she told me

17  that, yeah.

18  Q     I would hope so.

19        And because you had no other explanation for the

20  abnormalities that you observed in the MRI and the PET scan,

21  right?

22  A     I had a very good explanation for them.

23  Q     Right.  And because you had no other explanation, you

24  naturally concluded that it must have been this incident on

25  June 3rd, correct?

1  A    I don't think it was because I had no other

2  explanation.  I think it's because I had a good explanation.

3  Q    Okay.

4            Now, when you testified on direct, you described

5  observing a host of these various abnormalities throughout

6  plaintiff's brain, correct?

7  A    In -- you mean in the -- in the imaging studies?

8  Q    Yes.

9  A    Yes.

10  Q    Some regions showed atrophy or cell death, others

11  showed hypometabolism, and others showed sclerosis, correct?

12  A    Yes.

13  Q    To cause such extensive injuries, the impacts to

14  plaintiff's head would have had to be severe, right?

15  A    I disagree.  I don't know what that word means.  That's

16  a vague word, severe.  I think it was severe.

17  Q    Doesn't the literature refer to moderate to severe

18  traumatic brain injuries?

19  A    There's a lot of debate about those words, a lot of

20  debate.

21  Q    What was the publication that you testified about on

22  direct?

23  A    There was one that was Neuropsychologia, and the other

24  one, I think, was that was Journals of Head Trauma.

25  Q    And those journals use that terminology, right?

1    A    I don't know if the journals do, but some papers that

2    are accepted by those journals do use that terminology.

3    Q    And the general concept is relatively simple, right,

4    the greater the impact, the greater response in the brain

5    cells that leads to that atrophy and scarring, correct?

6    A    Yes.

7    Q    A trauma to the head leading to these injuries can only

8    be categorized as severe, right?

9    A    Well, yes, yes, correct, it would cause atrophy and

10   symptoms, that's right.

11   Q    And if the injury wasn't caused by a severe head

12   trauma, it could only be explained as having another cause,

13   such as something immune-related or another kind of

14   inflammatory response, a hereditary condition or something

15   else, right?

16   A    Oh, I think I disagree with that.

17   Q    A physical trauma to the head sufficient to cause

18   bilateral mesial temporarily sclerosis would have to be so

19   severe that the patient would be expected to be in a coma

20   for weeks or months; is that right?

21   A    I disagree with that.  I have many patients in my own

22   practice, that that's not the case.

23   Q    Not walking out of the emergency room two hours after

24   seeing the doctor with, quote, mild closed head injury,

25   right?

1    A    Is that a -- what's the question, I'm sorry?

2    Q    A physical trauma to the head sufficient to cause the

3    bilateral mesial temporal sclerosis like you described would

4    have to be so severe that the patient would be in a coma for

5    weeks to months, not walking out of the hospital with a mild

6    closed head trauma, right?

7    A    I disagree with that.

8    Q    And this is a fundamental point, isn't it, that the

9    imaging that you receive when you are examining a patient

10   must correspond to clinical observations to have any

11   significance in making a diagnosis, yes?

12   A    If you could specify what you mean by clinical

13   observations.

14   Q    Clinical observations throughout -- through your

15   testing, through the plaintiff's self-reported symptoms,

16   things like that?

17   A    Yes, correct, that's correct.

18   Q    They need to correspond to the clinical reality of the

19   situation, right?

20   A    Yes, yes, correct.

21   Q    Otherwise the imaging, the EEG, these would all be

22   ancillary findings that aren't significant to whether

23   plaintiff actually sustained a traumatic brain injury,

24   correct?

25   A    Well, both of these are very significant findings no

1    matter what.  These aren't incidental findings, meaning if

2    we don't know what the cause of this is, these are not just

3    incidental findings.  These are very abnormal, both of

4    those.

5    Q    And that's because they did correspond in your opinion

6    to your clinical observations, correct?

7    A    No.  The findings are abnormal.  The MRI -- the

8    pictures are abnormal.  It has nothing to do with my

9    opinion.

10   Q    Now, you testified on direct that the causes of these

11   abnormalities could not be hereditary, correct?

12   A    I didn't say -- you mean in this case?  That's correct

13   in this case.

14   Q    In general?

15   A    It depends on the patient and the clinical situation.

16   It's possible.

17   Q    Now, when you testified about that on direct, that in

18   this situation, hereditary causes could not explain what you

19   were observing, that was the first time you had rendered

20   that opinion, right, right here in this courtroom?

21   A    No, I don't think that's true.

22   Q    Where is it?

23   A    Oh, I didn't write it down anywhere.  I think we

24   discussed it.

25   Q    You didn't document your opinions about potential

NADKARNI - CROSS - HUTCHINSON                    1039

1  hereditary causes of plaintiff's alleged brain injuries in

2  your report?

3  A    I would have to document an infinite number of things

4  that warrant the possible cause of this if I started out on

5  that road.  This is a clear case.  So I wouldn't document

6  all the things it's not.

7  Q    But you didn't document an infinite number of things in

8  your report, you documented two examples of her relevant

9  family history, right?

10 A    Yes.

11 Q    And that was her father and her uncle's history of

12 dementia, correct?

13 A    Yes.

14 Q    And you issued a second supplemental report that you

15 issued in November of this year right before this trial

16 started, right?

17 A    Yes.

18 Q    And you did not document your opinions about potential

19 hereditary causes in that report either; did you?

20 A    I do not recall doing that.

21 Q    Do you need to refresh your memory?

22 A    It's okay.  I don't remember -- yes, no, I don't think

23 I did that.

24 Q    Okay.  All right.  Now, plaintiff underwent an EEG, as

25 well, correct?

1   A    Yes.

2   Q    And that involved the measuring of the electrical

3   activity in her brain over a period of days, correct?

4   A    Yes.

5   Q    That was from July 19th to July 21st?

6   A    I believe that's right.

7   Q    And you found -- and you found that the EEG showed

8   bilateral independent temporal slowing at times with sharp

9   contour, correct?

10  A    Correct.

11  Q    But the EEG, you would agree, showed no focal

12  abnormality and no epileptic discharge at any point over the

13  course of the three days that plaintiff was on the EEG,

14  correct?

15  A    I would not agree with that, that's why I said what I

16  found.

17  Q    No focal abnormality means that there was no localized

18  lesions in any one part of plaintiff's brain, correct?

19  A    That's what that would mean, yes.

20  Q    And the temporal slowing that you noted, that was not a

21  persistent finding; was it?

22  A    No, I found it.  I showed it.

23  Q    Not a persistent find, correct?

24  A    I'm not sure -- meaning it came over and over again, it

25  was throughout the record, so I would say that is

1  persistent.

2  Q    But there was a doctor who interpreted that EEG, too,

3  wasn't there?

4  A    Yes, there was.

5  Q    That was Dr. Michael Taw, MD, that's T-A-W, correct?

6  A    I think that was the fellow and the attending was

7  Dr. Bilakota.

8  Q    And those doctor's noted that this was a, quote, normal

9  video EEG, correct?

10  A    That's the way they wrote it, yeah.

11  Q    Even though the plaintiff was on the EEG for three days

12  while she was awake and while she was sleeping, right, they

13  noted it was normal?

14  A    Correct.

15  Q    And this time, unlike Dr. Zan who read the MRI and the

16  PET scans, those doctors, Dr. Taw and the other doctor you

17  mentioned, they were not told that the plaintiff had

18  suffered a quote/unquote, significant head injury ahead of

19  time, right?

20  A    Oh, I'm sure they were because that test involves

21  taking a history and doing a physical and getting admitted

22  to a hospital, so they definitely were.

23  Q    But the report contains a section for the plaintiff's

24  history, correct?

25  A    Probably, yes.

1  Q    And doesn't the history section read that plaintiff

2  only -- doesn't the history section only read that plaintiff

3  had a history of proximal events with unclear etiology?

4  A    Yes, that's a catch phrase we use to put the person in

5  the hospital because that's a very generally phrase, but

6  that doesn't give -- everybody who comes into that unit has

7  that diagnosis, proximal spells, meaning we want to rule out

8  seizures.

9  Q    So it's your testimony that those doctors were informed

10 ahead of time that plaintiff had a, quote, significant head

11 injury before interpreting this EEG?

12 A    The patient gets a history taken when they come to the

13 hospital for that -- to be admitted to that unit.  So

14 somebody took a history from the patient and there should be

15 a long history in there about what happened and I'm sure in

16 that history all of that is mentioned.

17        So I'm sure they knew the history.  When they did

18 the study, they knew the whole history, in fact, because

19 this isn't just an outpatient study, this is an inpatient

20 study when you get admitted to a hospital.

21        MR. HUTCHINSON:  Your Honor, I would like to show

22 Plaintiff's Exhibit 22.

23        THE COURT:  Previously admitted?

24        THE COURTROOM DEPUTY:  No.

25        THE COURT:  Okay, so you can show it just to the

1    witness.

2    Q    Was it your testimony that you don't remember when they

3    wrote down for the history or that you don't know?

4    A    Oh, I don't remember.

5    Q    If you could take a look at this document and see if it

6    refreshes your memory.  Let me know if you could see the

7    bottom of the page because I have it in this binder.

8    ███████████    ███████████████████████

9                ██████████████    ███████

10   Q    Otherwise, I could just pass this up to you, Doctor.

11   █████████████    ████████████████████████    ██████████████

12   ███████████████████████████    ████████████    █████████

13   Q    Doctor, otherwise I can pass you this piece of paper.

14   I want you to see the history section on the bottom.

15   A    I don't see the history section.

16        MR. HUTCHINSON:  Your Honor, with the Court's

17   permission, can I approach?

18        THE COURT:  You may.

19   Q    And please let me know when you have had a chance to

20   take a look at the history section on the EEG report.

21   A    Yes, I see that.  This is like a one-line history just

22   for the report.  There's a whole different history in this

23   admission.

24   Q    And does it refresh your memory as to what was noted

25   for the plaintiff's history on this report?

1  A    Yes.  The least thing that you need to, which is that

2  she has episodes that we want to rule out for seizures.  It

3  doesn't say anything else about all the other history that

4  she has in the admission.

5  ███████████  ███████████████████████

6  ██████

7      ███████████  ███████████

8  Q    Doctor, what did you testify the attending physician's

9  name was on that report?

10 A    On the EEG report, I thought it was Santori Bilakota,

11 B-I-L-A-K-O-T-A.  Dr. Taw was a fellow.  That's his first

12 year of reading EEGs.

13 Q    So Dr. Bilakota, am I pronouncing it correctly?

14 A    That is correct.

15 Q    Is Dr. Bilakota affiliated with this lawsuit in any

16 way?

17 A    No, she's not.

18 Q    Did is Dr. Bilakota being paid by plaintiff's attorneys

19 or by NYU?

20 A    I think she has a salary from NYU.

21 Q    So Dr. Bilakota wasn't primed in advance to find

22 evidence of a head injury, right?

23 A    I think she had a history of what the story was so if

24 that means primed in advance.  I'm not sure what primed in

25 advance means.  I think she knew the history when she was



1    reading the EEG.

17   Q    Now, when the doctor who interpreted the EEG wrote

18   their report, they wrote that:  No generalized background

19   slowing was present and no focal slowing was present, right?

20   A    Yes, they did.

21   Q    Generalized background slowing is what, exactly?

22   A    Like those -- every per second, how many waves you see,

23   there should be a certain number and if it's fewer than that

24   number, then that's slowing.

25   Q    That would be the generalized background slowing that

1   you are describing?

2   A   When you see that everywhere, that's called

3   generalized.

4   Q   And focal slowing is what?

5   A   The same thing, but in only one part of the EEG like we

6   saw it before.

7   Q   Got it.  So the doctor who interpreted it found no

8   generalized slowing throughout the whole thing and also no

9   focal slowing in any one part?

10  A   That's correct.

11  Q   You also reviewed a neuropsychology consultation of

12  plaintiff that was prepared by Dr. Morrison; is that right?

13  A   Yes.

14  Q   And you saw that Dr. Morrison administered a few

15  different tests to plaintiff to assess her degree of

16  neurological and cognitive functioning, correct?

17  A   Yes.

18  Q   That included the Wexler Adult Intelligence Scale,

19  right?

20  A   Yes.

21  Q   And you testified on direct that although there were

22  differences between the categories, plaintiff was not found

23  to be deficient in any one category, correct?

24  A   Correct.

25  Q   She scored over a hundred in every category, correct?

1  A    I'd have to look to refresh my memory, but yes, I

2  believe.

3  Q    In fact, Dr. Morrison observed that plaintiff is a very

4  bright woman with overall preserved ability across cognitive

5  areas, correct?

6  A    Yes.

7  Q    Now, let's talk about the RBANS test for a minute,

8  that's R-B-A-N-S, that Dr. Morrison performed on the

9  plaintiff.

10          Can you tell the jury what the Repeatable Battery

11  For the Assessment of Neurological Symptoms tests for?

12  A    Yes, it's a short battery.  It looks for questions

13  about cognition, especially when you look for things like

14  dementia, so it looks for problems in language and

15  processing and things like that.

16  Q    By the way, Doctor, I want to put back up on the screen

17  Plaintiff's Exhibit 22 for identification.  You just looked

18  at this on the stand, correct?

19  A    I'm just waiting for it.

20  Q    Yes.

21          MR. HUTCHINSON:  Oh, we need?  Yes.

22          THE COURT:  Do you see it now?

23          THE WITNESS:  Yes.

24          THE COURT:  All right.

25  Q    And I am going to show you the first page.

```
 1            Do you recognize this to be a certification page?
 2   A    It looks like that, yes.
 3   Q    And then the second page, starting on the bottom left,
 4   is titled EEG video monitoring, correct?
 5   A    Yes.
 6   Q    And what do you recognize this document to be?
 7   A    This is an ongoing record of daily EEG reports when the
 8   patient's in the hospital.  So it says -- okay.
 9   Q    I'm sorry, I am going to show you the next page, sorry
10   about that.
11   A    No problem.
12   Q    Just what the document overall is, I don't need to
13   actually read from it right now.
14   A    This is a documents that shows daily reports on the
15   EEG, so the patient is hooked up to an EEG for three days,
16   every day the report is generated.
17   Q    I am going to show you the last page of the report so
18   you can see the exhibit, okay?
19   A    Yes.
20   Q    Is this the EEG video monitoring report that you
21   reviewed for plaintiff in July of 2022?
22   A    I believe so.  It looks like it.
23   Q    Does this fairly and accurately represent that
24   document?
25   A    I believe so, yes.
```

1    MR. HUTCHINSON:  I am going to offer Plaintiff's

2  Exhibit 22 into evidence.

3    MR. MAAZEL:  No objection.

4    THE COURT:  Admitted.  You may publish.

5    (Plaintiff's Exhibit 22 received in evidence.)

6    MR. HUTCHINSON:  That's okay, we'll publish later,

7  Your Honor.

8    THE COURT:  All right.

9  Q   We were talking about the RBANS.  Sorry to jump around.

10 So it's a set of tests, right, and one of the categories

11 tests for immediate memory, right?

12 A   Yes.

13 Q   And others for attention and processing speed, right?

14 A   Yes.

15 Q   Another is for expressive language functioning, and

16 another is for delayed memory, right?

17 A   Yes.

18 Q   So short-term and long-term memory in addition to

19 language functioning and some other factors, right?

20 A   It's not really long-term memory, but delayed memory is

21 like five minutes instead of -- I mean, delayed memory is

22 like 15 minutes instead of five minutes, so -- but yes,

23 different kinds of memory.

24 Q   And plaintiff's total score was 122, correct?

25 A   I don't remember, but I'll take your word for it.

1   Q    A 122 on the RBANS is classified as a superior result,

2   correct?

3   A    Yes, I believe that's right.

4   Q    And despite that result, an objective test, right,

5   plaintiff self-reported to Dr. Morrison that she rated her

6   memory as low, low normal compared to others her age, right?

7   A    Yes.

8   Q    You also noted that plaintiff had some occular and

9   visual symptoms that would require regular vision therapy,

10  correct?

11  A    Yes.

12  Q    Are you aware that an ophthalmology expert retained by

13  plaintiff's attorneys in this case did not recommend vision

14  therapy?

15  A    I'm not aware of that.

16         (Continued on the following page.)

17

18

19

20

21

22

23

24

25

NADKARNI - CROSS - HUTCHINSON                    1051

1    (Continuing.)

2    BY MR. HUTCHINSON:

3    Q    So let's talk about some of your other predictions of

4    plaintiff's needs going forward.  Okay?

5            You said she needed regular weekly psychotherapy,

6    right?

7    A    Yes.

8    Q    Are you aware that she has not been seeing a regular

9    weekly psychotherapist?

10   A    I'm not aware.

11   Q    You said that she needs regular treatment with a

12   migraine specialist, correct?

13   A    Yes, I would expect that.

14   Q    Are you aware that she is not seeing a migraine

15   specialist in the last three years since your report?

16   A    I'm not aware.

17   Q    She hasn't been going to regular and ongoing cognitive

18   remediation therapy, did you know that?

19   A    I didn't know that.

20   Q    She has not been attending regular physical and

21   occupational therapy as you recommended.  Is that your

22   understanding?

23   A    I didn't -- I don't know what she's been doing.

24   Q    Now, just to be clear, November of 2025 you issued a

25   supplemental report in this case; is that correct?

NADKARNI - REDIRECT - MAAZEL                    1052

1   A    Yes, I believe that's right.

2   Q    And isn't that because for the first time, you were

3   provided with the results of an MRI that was performed on

4   plaintiff's brain on July 18, 2020?

5   A    That's correct.

6   Q    And you noted that a clean MRI from six weeks following

7   the incident is normal in cases of moderate to severe brain

8   injury from head trauma, right?

9   A    Yes.

10  Q    Isn't a clean MRI also normal in cases of no traumatic

11  brain injury?

12  A    Sure.

13       MR. HUTCHINSON:  No further questions.

14       THE COURT:  Thank you.

15       Redirect?

16       MR. MAAZEL:  I'll be very brief so we can all get

17  to lunch, Judge.

18  REDIRECT EXAMINATION

19  BY MR. MAAZEL:

20  Q    After reviewing the MRI, the PET scan, the EEG images

21  yourself, Ms. Pierce's medical history, performing your own

22  neurological exam, reviewing all the medical records, the

23  symptoms, and the neuropsychological report, did you come to

24  an opinion in this case?

25  A    I did, yes.

1   Q     And after that very lengthy cross-examination, does

2   anything change your opinion, to a reasonable degree of

3   professional certainty, that the police incident on June 3,

4   2020 caused Ms. Pierce a permanent, significant traumatic

5   brain injury?  Is that still your opinion?

6   A     Still my opinion.  Nothing changed.