1          The defense calls their next witness, who is?

2          MR. HUTCHINSON:  Thank you, Your Honor.

3          The defense calls Dr. Robert April.

4          THE COURTROOM DEPUTY:  Please raise your right

5    hand.

6          (Witness sworn.)

7          THE COURTROOM DEPUTY:  Thank you.

8          Please state and spell your name for the record.

9          THE WITNESS:  Robert S. April.

10         THE COURTROOM DEPUTY:  Thank you very much.

11         THE COURT:  We assume common spelling of April,

12   correct?

13         THE WITNESS:  A-P-R-I-L.

14         THE COURT:  All right.  You may inquire,

15   Mr. Hutchinson.

16   **ROBERT APRIL**,

17         called as a witness, having been first duly

18         sworn/affirmed, was examined and testified as

19         follows:

20   DIRECT EXAMINATION

21   BY MR. HUTCHINSON:

22   Q    Good morning, Doctor.

23   A    Good morning.

24   Q    Doctor, what do you do for work?

25   A    I am a physician.

*Kristi Cruz, RMR, CRR, RPR*
*Official Court Reporter*

COURT'S EXHIBIT
Blumberg No. 5213
EI4
21 W3482

APRIL - DIRECT - HUTCHINSON                               1434

1    Q    Are you a physician who is duly licensed to practice

2    medicine in the state of New York?

3    A    Yes.

4    Q    How long have you been practicing?

5    A    Since I ended my training, which would be about 55

6    years.

7    Q    What areas of medicine do you specialize in?

8    A    I specialize in the medical area of neurology.

9    Q    Can you explain what that field is?

10   A    Yes.  It's a field of diagnostic and therapeutic

11   medicine, not surgery, that concentrations on diseases and

12   the dysfunctions of the central and peripheral nervous

13   systems.  That is the brain, the brain stem, the spinal

14   cord, the nerve roots that come out of the spinal cord, and

15   continue into the limbs as the peripheral nerves, and the

16   muscles that move the limbs.  So pretty much, it's a field

17   that describes and treats with and deals with problems that

18   arise from many causes that span the entire field of

19   medicine, surgery, and psychiatry.

20   Q    Did you go to medical school?

21   A    I did.

22   Q    Where did you go?

23   A    The University of California in San Francisco.

24   Q    When did you graduate?

25   A    1960.

1  Q    Can you tell us about your employment history and any

2  positions that you've held?

3  A    Sure.

4       Well, I went to medical school, so I graduated and

5  then made the transcontinental trip to New York where I

6  interned at the Mount Sinai Hospital in New York City and

7  did a general rotating internship, which is something long

8  gone, in general medicine and general surgery.

9       And then I entered a post-internship specialty

10 training program at the Mount Sinai Hospital in neurology,

11 and I stayed there and I did rotations in various different

12 places during the four-year period of the residency.  I

13 spent a period of time at the Howard Rusk Institute in

14 physical medicine and rehabilitation.  I spent a year at

15 Kings County Hospital in neuropathology in the morgue

16 dissecting brains and making surgical reports.  And I spent

17 two years after my residency training at Mount Sinai

18 learning how to do electroencephalography, which is EEG, and

19 electromyography, which is EMG, in the study of muscular

20 diseases.

21      After that, I left Mount Sinai and spent two years

22 as a fellow at the NYU Medical Center, which is now NYU

23 Langone.  And those days, I worked in the laboratory of Eric

24 Kandel and William Spencer.  Kandel got the Nobel Prize in

25 2011 in neurophysiology.  I was a neurophysiologist.  I

1    studied the way that pain mechanisms work in the spinal

2    cord.  And I did studies of research and I published at that

3    time, and I was part of the faculty at NYU Medical School.

4            And then I did one more year of post-doctoral

5    fellowship at University College London in the Medical

6    Research Council -- Her Majesty's Medical Research Council

7    Cerebral Functions Group, where I did more work on pain and

8    taught neuroanatomy to medical students at University

9    College London.  And that was my year in the United Kingdom.

10   At that time the country was at war and doctors were being

11   drafted, so I was called to go into the service, and I was

12   given the position of director of neurology of the United

13   States Marine Hospital in Baltimore, Maryland, where I spent

14   that time.  And that was a two-year service.

15           Then I came back to New York in 1973 and I took a

16   position as director of neurology at the Burt S. Coler

17   Hospital.  That is on Roosevelt Island and it is New York

18   City's only chronic disease hospital, where people who have

19   terrible diseases, end-stage diseases, gunshot wounds,

20   physical accidents of all kinds go there because this is the

21   only facility beds we had at that time.  So I directed that

22   service, which was part of the New York Medical College

23   program of medical school.  I was associate professor of

24   neurology at New York Medical College for the seven years I

25   was there.  And I ran conferences and was able to study

APRIL - DIRECT - HUTCHINSON                    1437

1    patients in great detail in a way that you can't do today

2    because you just don't have people in beds like that.  And

3    we made a lot of interesting experiences with teaching

4    students and rotating through and visiting people from other

5    institutions.

6            In any event, after that, I left my institutional

7    life and I went to private practice.  I started a private

8    practice in 1979, and I was in private practice in that one

9    office for many, many years.  I then moved into a group

10   practice now that I've slowed down, and I'm in a practice

11   with four other doctors who are internists and

12   cardiologists, and we do general medicine and I do general

13   neurology.

14           So my positions have been attending neurologist at

15   New York Hospital -- I'm sorry, New York University and

16   Lenox Hill Hospital and Mount Sinai Hospital.  And right

17   now, I'm really only active at Mount Sinai Hospital.

18   Q    Got it.  Thank you.

19           Now, in your private practice and at Mount Sinai

20   Hospital, what kind of patients do you see?

21   A    Well, I don't practice at Mount Sinai Hospital, I

22   practice in my office on 86th Street and Lexington, and I

23   see general neurological patients.  By these days, I'm able

24   to sort of select and seek problems that are problems to the

25   people sending them to me, difficulties in chronic diseases

APRIL - DIRECT - HUTCHINSON                        1438

1   like Parkinson's disease, patients with seizures, patients

2   with headaches, patients who have neuromuscular weakness and

3   paralysis, diseases like peripheral neuropathy, and also

4   more serious ones.  And since I pretty much know everybody

5   in town, I can refer to all the specialists, and I brag when

6   I say I can get people to see anybody fast.  And that is my

7   specialty these days, navigating a terrible system, and

8   that's what I pride myself on.

9   Q    Had do you hold any certifications?

10  A    Yes.  I'm board certified in neurology, and I was board

11  certified by an ancient, long-gone board called the American

12  Board of Electroencephalography.  I think it's been absorbed

13  into other organizations, but that's where I got my board

14  certification.

15  Q    And is that abbreviated EEG?  Is that what we're

16  talking about?

17  A    Yes, it is.

18  Q    Have you published any articles in medical journals in

19  the field of neurology?

20  A    I have, a few.

21  Q    And have you otherwise presented on any topics related

22  to neurology?

23  A    Well, during the long period of -- well, I presented

24  topics all the time when I was a chief at Burt S. Coler.

25  Then when I went into private practice, we would have grand

APRIL - DIRECT - HUTCHINSON                              1439

1    rounds everyone week at Lenox Hill Hospital where I did most

2    of my work during those years, and I would present cases at

3    grand rounds in neurology and in other specialty.

4    Q    And specifically, have you presented on the topic of

5    traumatic brain injuries?

6    A    I have.  I even presented one to the conference of the

7    New York City Traumatic Brain Injury Society.  So I have,

8    yes.

9    Q    Do you belong to any professional organizations?

10   A    Sorry?  What was that?

11   Q    Any professional organizations?

12   A    What do you mean by that?

13   Q    Do you belong to any?

14   A    Oh, yes, I belong to the American Academy of Neurology

15   and the American Medical Association and the New York

16   Academy of Medicine.

17   Q    Doctor, have you ever testified as an expert witness

18   before?

19   A    Yes.

20   Q    Approximately how many times?

21   A    Many times.  Over 200.  Probably around 250 times.

22   Q    In what courts?

23   A    In New York State, New York Federal.  I guess those are

24   actually the witness positions, yes, because I have done a

25   lot of workers' compensation deposition testimony,

1    administrative judge hearings and so forth.

2    Q    And in your capacity as an expert witness, have you

3    testified for claimants and respondents?

4    A    Yes.  But almost -- almost overwhelmingly, a large

5    majority compared to a few, for the defendants.

6    Q    Now, when you've testified in court as an expert, have

7    you been qualified as an expert witness in neurology?

8    A    Yes.

9    Q    And are you being compensated for your time today?

10   A    Yes.

11          MR. HUTCHINSON:  Your Honor, at this time I move

12   to qualify Dr. April as an expert in neurology.

13          THE COURT:  Any voir dire?

14          MR. MAAZEL:  Yes, Your Honor.

15          THE COURT:  Go right ahead.

16   VOIR DIRE

17   BY MR. MAAZEL:

18   Q    Good morning, Doctor.

19   A    Good morning.

20   Q    So in the last 25 years -- well, withdrawn.

21          You gave a CV in this case.  Yes?

22   A    Sorry?

23   Q    You gave a curriculum vitae in this case.  Yes?

24   A    Yes, I did.

25   Q    And in the last 25 years, you've written seven

APRIL - DIRECT - HUTCHINSON                    1441

1    publications.  Yes?

2    A    I might have, yes.

3    Q    Did you get a master's degree at NYU?

4    A    Yes.

5

6

7

8    Q    And what was your master's degree in?

9    A    In French literature.

10   Q    French literature, okay.

11       So in 2004, you wrote an article that you put on

12   your CV that you provided in this case about French

13   literature.  Yes?

14

15

16

17

18   A    Yes.

19   Q    In 2005 you wrote another article in French about the

20   French author Emile Zola.  Yes?

21   A    Yes.

22   Q    In --

23   A    You pronounced his name correctly.

24   Q    Thank you.  I have a little high school French.

25       2006, another article about Emile Zola?

APRIL - DIRECT - HUTCHINSON                               1442

1     ████████████    ████████████

2          ████████████  ████████████

3     A    Yes.

4     Q    And actually, six out of your seven publications in the

5     last 25 years are about French literature, right?

6     A    Yes.

7     Q    But never in your entire life have you written any

8     publication related to traumatic brain injury, correct?

9     A    Well, perhaps not directly, no.

10         MR. MAAZEL:  I have no objection, Judge.

11         THE COURT:  All right.

12         You are going to be qualified as an expert in

13    neurology, Dr. April.

14         You may continue, Mr. Hutchinson.

15         MR. HUTCHINSON:  Thank you, Your Honor.

16    DIRECT EXAMINATION (cont'd)

17    BY MR. HUTCHINSON:

18    Q    Doctor --

19         THE COURT:  And perhaps French literature.  But go

20    ahead, continue.

21    Q    Doctor, did there come a time that my office asked you

22    to perform a neurology consultation on the plaintiff in this

23    case, Brigid Pierce?

24    A    Yes.

25    Q    And did you examine the plaintiff?

1   A    Yes, I did.

2   Q    When was that?

3   A    Dates, I would like to be able to look at my reports to

4   be certain.

5            THE COURT:  Go ahead.

6   A    Let me find it.

7            April 3, 2023.

8   Q    And, Doctor, what was the purpose of that consultation?

9   A    The purpose was to examine Ms. Pierce and to determine

10  if she had suffered any significant neurological dysfunction

11  from an episode or an incident that took place in her life

12  on June 3, 2020, some years before, and to examine her and

13  whatever other adjunctive material was sent to me regarding

14  her case, to come to that conclusion with some degree of

15  medical certainty and in good conscience.  So I was actually

16  asked to assess damages without relative to an incident in

17  her history.

18  Q    Had she already been examined by another doctor

19  retained for the purpose of this litigation?

20  A    I would say I think so, but I don't know if it was

21  before or after my examination.  I think it was before.

22  Q    And who was that?

23  A    Dr. Siddhartha Nadkarni.  I don't know if I'm

24  pronouncing his name properly.

25           THE WITNESS:  What is his name as pronounced --

APRIL - DIRECT - HUTCHINSON                                1444

1          THE COURT:  You don't have to worry about it.

2          THE WITNESS:  Okay.

3          THE COURT:  That's close enough.

4          Go ahead.

5    A    I think that was who examined her for the purposes of

6    doing the same thing.

7    Q    When you examined plaintiff, were you compensated for

8    your time?

9    A    Yes.

10   Q    What are your rates?

11   A    I don't remember what the bill was for that examination

12   because it might have taken a lot of review of records.  But

13   normally, I charge between $500 and $800 to do a

14   consultation for a defendant or a plaintiff, and that's

15   normally what it is, unless there's an enormous amount of

16   records, then I have to charge an hourly rate.

17   Q    What is your hourly rate, typically?

18   A    Well, for the purpose of reviewing records, it's

19   usually $400.

20   Q    And what about for testimony, what's your rate that you

21   charge for testimony?

22   A    Well, when I come to court, it usually takes a whole

23   day, so I charge $9,000 for the day.

24   Q    All right.  So back to the consultation.

25          In general, what does a neurological consultation

1    entail?

2    A    Well, it entails taking a history of the individual's

3    complaints, past history of medical issues or other

4    situations similar to the ones she's complaining about now,

5    a family history, and then coming in and doing a

6    neurological examination in my examining room, which is a

7    physical examination of the subject to look for signs,

8    physical signs of manifestations of the complaint.

9            So if someone were to come, for example, and have

10   a complaint of shoulder pain having undergone an injury a

11   few days before, and on examination I found that the

12   shoulder was dislocated and one of the nerves in the

13   shoulder was compressed, the abnormal movements and weakness

14   and sensory distribution of abnormality in that arm would be

15   the signs of the -- would be the signs of the symptoms that

16   had been given to me subjectively.  That's what I try to do,

17   to look for physical signs that are manifestations of the

18   complaints that the patient says bother him or her.  That's

19   what a neurologist does.

20   Q    And following the consultation, before we get into what

21   it actually -- what you found, did you write a report

22   documenting your findings?

23   A    Yes.

24            And just one more aspect for the consultation.

25   That's the review of documents, of documents that are

APRIL - DIRECT - HUTCHINSON                                    1446

1    relevant to the complaint.  That would be laboratory tests,

2    other doctors' opinions, images of radiological studies now

3    with computer, special electrodiagnostic studies like the

4    EMG and EEG that I told you about.

5              When that's all put together, then one can

6    formulate the answers to the questions:  A, is there a

7    significant neurological injury or disease here, or are the

8    complaints due to something entirely different?  And if

9    there are, where in the nervous system is the problem?

10   Where is the lesion?  That's what neurologists want to know.

11   What is the pathology?  Where can you find something

12   structurally wrong?  Will it be in the brain, the brainstem,

13   spinal cord, the nerves, the peripheral nerves, or the

14   muscles?

15             And that is based on everything that I, as a

16   neurologist, would have done with the patient and with the

17   records.

18   Q    I want to get to those records in a minute, but I want

19   to start with the plaintiff, okay?

20             Did you speak with the plaintiff?

21   A    Yes.

22   Q    Some about what topics?

23   A    About her complaints.

24   Q    Did she tell you about the incident itself?

25   A    She did.

1   Q    In general, what was she alleging?

2   A    She was alleging that she was assaulted by police

3   officers at a demonstration on Cadman Plaza, right over

4   here, and that the assault was a physical injury to her,

5   including her head.  You know, essentially she said that she

6   had been physically restrained and roughed up and pushed

7   around and fell to the ground under the influence of

8   another -- of an officer's force, and she injured her head

9   and face and neck and shoulders and back.

10  Q    Now, did anything in particular stand out to you about

11  the way she related the history of her alleged injuries?

12  A    I'm not aware that anything especially stood out, no.

13  Q    Was she able to provide you with details about what

14  happened?

15  A    With what?

16  Q    Details about what happened?

17  A    Oh, yes.  I mean, yes, she was very, very detailed.

18  She was not just detailed to me, but she was also detailed

19  in the deposition I reviewed, which showed to me that

20  whatever extended injury she received, she never really lost

21  consciousness or the ability to integrate the experience she

22  was going through, remember it, and relate it back to me.

23  That is usually a sign that no matter how severe the

24  physical assault on other parts of the body, that the brain

25  remains intact because it records, integrates, and then

1   relates at later times what happened to it and the body,

2   which is what we call memory.

3   Q    Now, did she also tell you about any symptoms that she

4   was experiencing?

5   A    She did, in great detail.

6   Q    What were those?

7   A    Well, they were headaches, recurrent headaches.  They

8   were asleep disturbances in which she would awaken and have

9   flashbacks, and all kinds of subjective symptoms that were

10  very disturbing.  There were visual experiences, including

11  flashes of light that interfere with her visual acuity.

12  There were problems of pain, including pain in the shoulder,

13  in the neck and the back and even the arm.  And she had

14  problems with balance and with her ability to move in space

15  and to walk normally, she said.  Many of these were

16  episodic, they would come and go, so that they related in a

17  way to a pre-existing history of migraine that she related

18  to me, but they certainly were worsened by this experience.

19  Q    And what you're relaying now is her subjective reports

20  of her own symptoms, correct?

21  A    Yes.

22  Q    Okay.

23  A    If you want me to state them with more precision, I

24  would have to read from my report.

25  Q    If it becomes necessary in a moment, okay?  But first,

APRIL - DIRECT - HUTCHINSON                                    1449

```
 1   I want to just -- you mentioned something.
 2           Did she report to you that she had a prior history
 3   of migraines?
 4   A    Yes.
 5   Q    When I say "prior history," those predated June 3,
 6   2020?
 7   ████████████      ████████      ████████████████
 8   ████████████      ████████      ████████████
 9   A    Yes, prior to the incident.
10   Q    Now, you mentioned that she had some visual symptoms,
11   as well, which you described as flashes of light, right?
12   A    Yes.
13   Q    And that was reported by plaintiff, correct?
14   A    Yes.  She would describe what we would call scotoma,
15   flashing areas of light in her visual field that was
16   bothersome and any would interfere with vision.  She said
17   that her migraine frequency had increased to the point where
18   it interrupted her daily scheduled function.  She would have
19   to leave and desist things that she was doing in order to
20   get rest and take medication.
21   Q    And did you learn whether she was on medication?
22   A    Yes.
23   Q    What was that?
24   A    Well, I know she was taking Cymbalta, which is an
25   anti-anxiety, sometimes it can be anti-epileptic, and is
```

1   used even for central and neurological pain.

2   Q    Doctor, did she ever report to you at any time that she

3   was experiencing bleary vision or blurry vision?

4   A    Yes.

5   Q    And did you learn whether that predated the incident as

6   well?

7   A    I really don't know.

8   Q    Okay.  Now, did you talk to the plaintiff about other

9   topics other than the incident?

10  A    Well, I wanted to know how all of this affected her

11  daily life and what was going on.  I learned, interestingly,

12  that she and her partner had moved to France, actually,

13  which of course you understand would make me very interested

14  now that you know that part about my history, and she was

15  studying a craft of how to make violins; violin, the musical

16  instrument.  Of course I was interested and we chatted, not

17  for long, a few minutes, in French about her life there.

18  And I was quite impressed by the fact that she had changed

19  culture and learned a new language well enough to function

20  with over a very short period of time, which I would say is

21  a great feat of adaptability, which is one of the highest

22  forms of human intelligence.

23  Q    You mentioned earlier that you speak French, as well?

24  A    I do speak French.  I had to, so I learned.

25  Q    When you were communicating with plaintiff in French,

1    did you have any difficulty understanding what she was

2    saying?

3    A    No.

4    Q    How would you describe your fluency in French?

5    A    Sorry?

6    Q    How would you describe your fluency in French?

7    A    Very fluent.  I mean, the only thing I could improve is

8    if I were to leave here and go live in France.  So I'm

9    getting more information about that.

10   Q    And how would you describe plaintiff's proficiency in

11   French?

12   A    Quite adequate for daily function.  I mean, as good as

13   could be expected in that time.

14   Q    And did you learn where plaintiff was residing at the

15   time of your consultation?

16   A    As I understood it, she was residing in France.  I

17   don't remember exactly where.  In a rural community

18   somewhere; in a provincial community.

19   Q    And where did your exam take place?

20   A    In my office, at 120 East 86th Street, New York, New

21   York 10028.

22   Q    And did you learn how she got to the exam from France?

23   A    Well, I didn't learn any great detail, but she flew,

24   obviously, and came to this appointment.  She interrupted

25   her lifestyle and went through that kind of an experience,

1    which takes a great deal of energy, function, focus,

2    attention, and all of the qualities that we would describe

3    as neurobehaviorally sophisticated.

4    Q    You mentioned earlier that the plaintiff had already

5    been examined by Dr. Nadkarni.

6    A    Yes.

7    Q    Did you review any materials from that doctor?

8    A    Yes.

9    Q    What did you review?

10   A    I reviewed his report, and I reviewed his subsequent

11   reports about his considerations of traumatic injury to the

12   brain and subsequent wasting of structures, meaning

13   shrinking.

14              (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

April - Direct - Hutchinson                                    1453

1   DIRECT EXAMINATION: (Continued.)

2   Q    I want to get into the specifics of that in a minute.

3   For now, what was your general impression of this report, in

4   general?

5   A    I thought it was very adequate, and although his findings

6   differed from mine, I thought it was a very complete report

7   and gave his opinion of what he saw.

8   Q    You mentioned that your findings differed.

9   A    Yes.  No, I don't think my findings differed very much.

10  I think my interpretation differed.

11  Q    What do you mean by that?

12  A    Well, whereas he saw, based on his emphasis of the

13  adjunctive testing that was done at NYU Langone.  By that I'm

14  referring to two tests in particular, the MRI done with the

15  machinery at NYU, which is extremely state of the art and

16  highly accurate, and with nuclear medicine, functional MRI,

17  and FDG PET scan, which is a test that would be done in

18  neurology for somebody who would have signs of significant

19  brain dysfunction, bordering on dementia.  That test is

20  usually done with cognitive dysfunction.

21       I thought it was a little bit of overkill, but it

22  did produce unexpected findings and he looked at those and he

23  interpreted them in a certain way.  He said, if I may

24  paraphrase, he said that the signs on those tests showed that

25  over a two-year period, which had transpired since she was at

1   Brooklyn Hospital for emergency treatment after the incident,

2   there had come about chronic progressive abnormalities of her

3   brain due to the incident.

4          And that was his interpretation, and he used

5   articles from the literature, which were concerned with the

6   actual problem of does traumatic brain injury produce chronic

7   progressive wasting of the brain so that if you have a head

8   injury now, one could say 30 years from now you're going to be

9   cognitively or epileptically or motorically impaired.  That's

10  a terribly important question.

11         That's where all the research is, to find out if

12  that is really so or not.  I think we know this much.  We know

13  that people in situations where they receive repetitive head

14  trauma, such as prize fighters, take Muhammad Ali, for

15  example, or football players, or generally contact sports

16  people who suffer concussions over and over, they have a

17  propensity to develop a particular degenerative disease of the

18  brain called spongiform encephalopathy, which is also called

19  Pugilist Syndrome and chronic traumatic brain injury syndrome.

20         But that is from multiple, repetitive, persistent

21  head trauma, not one incident which in itself does or does not

22  look severe, depending how you look at it.

23  Q    Are you summarizing your different interpretation?

24  A    Yes.  That's the basic difference between what Nadkarni

25  said and what I said.  He said that the incident that Ms.

April - Direct - Hutchinson                     1455

1   Pierce described, and that we've seen on video and all that,

2   was necessary and sufficient to produce the lesions that were

3   unexpectedly found on this very big work up.

4           I've said I don't think they meet the criteria at

5   all, and certainly don't meet the criteria of those

6   individuals in the studies cited who were included because of

7   the severity of the traumatic brain injury.  By that I mean,

8   all the people in those studies, if you look at those papers,

9   had Glasgow Coma scores less than 12 or 12 out of 15.

10          And the plaintiff had a 15 Glasgow Coma score.  So

11  on that basis alone, she wouldn't be included in any study on

12  traumatic brain injury.

13  Q    You mentioned the Glasgow Coma score.  What is that?

14  A    What is it?

15  Q    Yes.

16  A    It's a set of observations on eye movements, motor

17  behavior, and general response to external stimuli in somebody

18  who has a head injury.  And if, for example, just talking

19  about eye movements, if the eye movements are spontaneous and

20  following you and moving around and looking in the room, that

21  gives you a maximum score of five on eye movement.

22          If they only respond when you scream a name or if

23  you pinch or do something noxious to the body, then the score

24  goes all the way up or down, depending on what the response

25  is.  It could be zero to five, and that's true for motor

1    movements and speech.

2           In those three domains they're given a numerical

3    score for responsiveness.  You can understand that zero is

4    zero response.  It's just somebody lying mobile, whereas 15 is

5    somebody like you and me, talking, moving, and doing that.

6           The general tendencies for studies of long-term

7    patients who had a brain injury, what's the severity of the

8    brain injury?  What was the Glasgow Coma score at onset?

9           In these studies you'll find that there was a

10   significant abnormality.  Our plaintiff had no abnormality on

11   that parameter alone.

12   Q    Now, you mentioned that Dr. Nadkarni took a look at some

13   of these adjunctive studies, correct?

14   A    Yes.

15   Q    What else did he consider?

16   A    Well, he considered one psychological score testing

17   and --

18   Q    Are you referring to the neuropsychological consultation?

19   A    Yes.  That was done by Pearson, wasn't it?

20   Q    There were two, I believe.

21   A    Not the Morrison one, but the other.

22   Q    Got it.

23   A    The one done -- they were both done under his orders, but

24   different places.

25   Q    Let's talk about the Dr. Morrison report for a minute.

April - Direct - Hutchinson                    1457

1    Did you have an opportunity to review that Dr. Morrison

2    neuropsychological consultation?

3    A    Yes, I did.

4    Q    And what were your impressions of that consultation?

5    A    She had a general intelligence portion test, the Wechsler

6    Intelligence Scale, and that really scored in normal range for

7    all the subtests.  It showed that she was a normally

8    intelligent person, and I think Dr. Nadkarni interpreted that

9    as saying she was really super intelligent, and that she was

10   only intelligent when Dr. Morrison saw her because of the

11   change in her brain function.

12          So I don't know how one really differentiates on

13   these scores between super intelligent and intelligent, and

14   I'm always happy if my patients end up intelligent.

15   Q    Now, as part of your review of Dr. Nadkarni's report, did

16   you notice whether he reviewed any of her prior medical

17   records?

18   A    Yes.  He reviewed the Brooklyn medical record.

19   Q    Now, the Brooklyn medical records, did there come a time

20   after April of 2023 that you actually received additional

21   records from Brooklyn Hospital Center?

22   A    Yes, yes.

23   Q    And what types of treatment did those records document?

24   A    I actually have that file with me somewhere.  Well, they

25   defined that regular general medical work up and following her

1    for some time by a neurologist named Dr. Davis.

2    Q    And what did you learn about Dr. Davis' examinations of

3    plaintiff over time?

4    A    Well, they were always -- the neurological examination

5    was always normal.  There was no progressive abnormality or

6    any particular abnormality that he observed getting worse and

7    worse, and he treated her symptoms.  If she had headaches, he

8    treated the headaches.  If she had anxiety, he treated the

9    anxiety.  That's what we do.

10   Q    And Dr. Davis is a neurologist?

11   A    Yes.  He's a very good neurologist.  He was one of my

12   students.

13   Q    And did he perform neurological testing on each of those

14   occasions?

15   A    He did, yes.  That's all documented in the record.

16   Q    You just testified that the results of those tests were

17   normal, correct?

18   A    His own examination didn't show any positive neurological

19   diagnosis that could be attributed to a traumatic brain

20   injury.

21   Q    And coming back to the materials that you reviewed during

22   your consultation, you mentioned video.

23   A    Yes.

24   Q    And what was your impression of the video footage that

25   you reviewed in terms of assessing whether plaintiff may have

April - Direct - Hutchinson                    1459

1  sustained a traumatic brain injury?

2  A    It was very difficult to come to any conclusions because

3  there was so much going on, there was so much tumult, and so

4  much confusion, and so many bodies and it's very difficult to

5  identify any which one.

6         But the one thing I did not see in these scenes that

7  I observed was any example of someone hit so hard in the head

8  that she could not get up off the ground and had to be taken

9  off on a stretcher.  That I did not see and that would have

10  been prima facie evidence of a severe head injury, severe

11  brain injury.  I didn't see anything like that.

12         Anybody who was led away was led away standing.

13  When people were on the ground, I didn't see with my own eyes

14  any evidence of repetitive head injury or somebody being

15  beaten on the head or head slammed on the ground.  I didn't'

16  see it.  I don't know if it happened or not.  I was told it

17  did.

18  Q    Did you observe on those videos any evidence of altered

19  consciousness?

20  A    I couldn't determine that.  Nothing to the extent that I

21  described that would have been open and shut for me.

22  Q    Because the person on the stretcher that you were

23  describing --

24  A    There was no such.

25  Q    -- would have been unconscious, correct?

April - Direct - Hutchinson                                    1460

1    A    That's right.  Yes.

2    Q    So it's the consciousness that's important to you?

3    A    The conscious, general, motor behavior and consciousness

4    and any signs of severe contact with anybody's head.

5    Q    Now, you mentioned that Dr. Davis performed some

6    neurological testing over the years.  Correct?  During your

7    consultation, did you also perform neurological testing on

8    plaintiff?

9    A    I did a neurological examination, which means I examined

10   cranial nerves, motor function coordination and power, deep

11   tendon reflexes, looking for pathological reflexes, and

12   sensory examination and looked at general motor coordination

13   and her general responsiveness, attentiveness, language usage,

14   which are parts of mental status without having done any kind

15   of a score or timed neuropsychological test or even a mini

16   mental test.

17   Q    I want to go through each one of those in a minute.

18            But while you were conducting the examination, did

19   you have an opportunity to observe plaintiff?

20   A    May I just retract?  I did one mini mental examination

21   called the Saint Louis University Mental Status, which is a

22   very cursory mental status examination and her score was

23   normal.

24   Q    I want to ask you about those things in a minute.  But

25   did you have an opportunity to observe the plaintiff during

April - Direct - Hutchinson                    1461

1    that examination?

2    A    Yes.

3    Q    And while she was in your consultation room?

4    A    I did.

5    Q    What were your impressions from your general

6    observations?

7    A    Well, she was attentive.  She responded appropriately.

8    She was dressed appropriately.  She had, as I told you before,

9    normal language usage.  She didn't search for words or make

10   wrong statements or use wrong sentences or words or syllables,

11   and her speech itself, the speech sounds and formations were

12   normal.

13         She didn't fidget or move around or change

14   positions, as people often do when they're in great pain.  And

15   she was able to stand up by herself and walk without a limp,

16   not using any cane or crutches to my examining room where she

17   took off her outer shoes and outer clothes.

18         She got up on the table by herself and moved around

19   without any obvious limitation of movement, and certainly

20   without any great complaints of pain.  I measured her vital

21   functions.  They were normal and she looked to be a normal

22   young woman of her stated age.

23   Q    Now, when you arrived at the courthouse today and you

24   came up to the fourth floor, did you have an opportunity to

25   observe plaintiff today?

1  A    Yes.

2  Q    And that was only for a matter of minutes, correct?

3  A    Yes.

4  Q    And it wasn't in a consultation setting, correct?

5  A    No.

6  Q    But what, if anything, did you observe about her today?

7  A    Well, I'm happy to see that she looked spry, walked with

8  a normal gait, took her things to the people she was coming to

9  meet, took off her clothes using both hands.  There was no

10  tendency to limit motion in the right arm or the left, the arm

11  that Dr. Nadkarni had said was weak.

12        She moved her head, neck in directions that were

13  normal and had conversation with people.  Later, the clothes

14  she took off on the bench, and then moved on with them to

15  another place.

16  Q    Did you see her carrying on any conversations?

17  A    She was speaking.  I don't know what she was saying, but

18  there was social interactions.

19  Q    Now, you testified that you administered this mini mental

20  examination, and I think you gave me the full name but the

21  abbreviation is SLUMS.  Correct?

22        What is the significance of that test?

23  A    Well, it's a test of cognition.  It's not a very powerful

24  test.  It really only shows abnormalities when people are

25  significantly cognitively impaired.  So if somebody has a very

April - Direct - Hutchinson                1463

1   mild cognitive impairment from whatever cause, it may not be

2   detected here.

3   Q     And what was the result of that?

4   A     In my office the result was 29 over 30, which means that,

5   as I recall, she did not immediately recall five words I had

6   given to her, five novel words.  And after five minutes she

7   could only tell me four.  That was the only error she made on

8   all the parts of the test, which test orientations, time,

9   date, place, which test ability to do simple arithmetic in a

10  problem, which tests the ability to remember parts of a simple

11  story, which tests the ability to draw a clock from a circle

12  and set the hands and the indicated time, and to repeat

13  numbers backwards and forwards.

14  Q     You also mentioned -- I'm not sure you mentioned.  Did

15  you perform any testing of cranial nerves?

16  A     Yes, I did.

17  Q     Can you explain what that means and what the result was?

18  A     The cranial nerves are the nerves that exit from the

19  brain stem, the lower part of the brain, and they innervate

20  the muscles of the eyes, the optic nerve, the facility of

21  smell, and taste, movements of the face, movements of chewing,

22  movements of the tongue, movements of the palate, larynx, and

23  vocal chain and head and neck.

24        So we tested by doing a follow my finger, look to

25  the left and right, up, down, look with your head in this

1   direction and that direction, up and down, make a smile, open

2   your jaw, close your eyes.

3           We test visual fields when we really think there's a

4   visual fields -- but it was normal.  She really had a normal

5   neurological examination in my office.

6   Q    And what about the motor examination, what did that

7   entail and why is that examination significant?

8   A    Well, it tests the integrity of motor output from the

9   brain to all of the lower levels that integrate motor

10  function, like the muscles of the limbs and joints.

11          So that's an input, output function that's

12  constantly detected by the central computer of the brain in

13  order to adjust muscle tone and position, and ability to

14  resist the force of gravity.  If we didn't have that system,

15  we couldn't stand direct.  We would fall on our face.

16          When people have lesions in that system, they have a

17  great deal of falling predisposition.  So that's why it's

18  important.  And, of course, reflex activity is part of the

19  motor exam because it tests the integrity of each level of the

20  input, output function of sensory motor nerves.  Again, the

21  postural reflexes that allow us to stand up and move against

22  gravity without falling.

23          All these systems are remarkably active all the time

24  and being monitored by themselves and the brain.  It's a

25  remarkable complex system, as I'm sure you all understand.

April - Direct - Hutchinson                1465

1   Q    Yes.  And the motor exam that you performed on plaintiff,

2   in addition to the test of reflexes that you just mentioned,

3   what was the result of that exam?

4   A    In my office, April 3, 2023, she was normal.

5   Q    And finally, was there a mechanical exam?

6   A    I looked at the movement of her lumbar spine flexion.  I

7   looked at the movements of her neck just laterally, up and

8   down, and I looked at her shoulder movements.  Those are the

9   joints I looked at, because they're reflective of the motor

10  and sensory integration of the brain at a higher level on

11  those parts of the body.

12  Q    And what were your findings?

13  A    All normal.

14  Q    What about a sensory examination, what does that entail?

15  A    She didn't have any subjective complaints of inability to

16  feel because of overwhelming numbness or tingling in the legs

17  or hands.  And on stimulation with touch and with position and

18  pin, everything was normal.

19  Q    So you did your neurological examination, you spoke with

20  her in person, you reviewed her prior deposition testimony,

21  you looked at video of the incident, and you reviewed Dr.

22  Nadkarni's report, which included additional medical records,

23  the MRI, the PET scan, and an EEG, as well?

24  ████████████     ██████████████████

25  ██████████████     ████████████████████████

1  ███████████

2            ████████  ████████

3  Q    Was there an EEG as well from Dr. Nadkarni?

4  A    Yes.

5  Q    After reviewing all of these materials, did you form a

6  conclusion about whether plaintiff was suffering from a

7  traumatic brain injury?

8  A    I did.

9  Q    What was that conclusion?

10 A    I do not think there was enough evidence here to support

11 a significant traumatic brain injury, certainly none that

12 changed her Glasgow Coma score, even around the time of the

13 incident itself.

14        I thought she had a physical assault.  She was

15 certainly roughed up in an undesirable way, and I think she

16 was fortunate enough not to have anything worse than what she

17 suffered, which was injury to the scalp and face and head and

18 neck, which resolved over time.  Whatever the meaning of the

19 findings on these tests that were done, I don't think we have

20 an answer.

21 Q    Now, just to confirm, was that conclusion to a reasonable

22 degree of medical certainty?

23 A    Yes.

24 Q    Let's talk about some of those factors that Dr. Nadkarni

25 relied on in reaching his conclusion, because clearly you

April - Direct - Hutchinson                    1467

1    don't agree with his conclusion.  Right?

2    A    His interpretation I do not agree with.  I guess that's

3    his conclusion.  Yes, you're right.  I don't agree with his

4    conclusion.

5    Q    So Dr. Nadkarni performed his own neurological exam,

6    correct?

7    A    Yes.

8    Q    And what was your impression of his findings?

9    A    Well, he reported -- I mean the only thing he reported

10   that was different from me is he reported the presence of what

11   we call pathological reflexes, and he reported a weakness in

12   one arm.  That's what he found when he examined her.

13          Now, why does someone have those kinds of reflexes,

14   particularly the jaw jerk and the palmomental.  That's what he

15   mentioned.  The jaw jerk is done by placing one's finger on

16   the jaw and asking the subject to relax, and then striking it

17   with a hammer.  The normal response is either nothing or a

18   little closure of the jaw, a little movement of the masseter

19   muscle.  I'm sorry.  I'll stand.

20          THE COURT:  No, no.  You should remain seated.  We

21   need you to -- and pull the microphone down a little bit.

22   A    A normal jaw jerk is like this.  To what extent it

23   happened, a very significant contraction of the masseter

24   muscle.

25          Now, in clinical neurology, I always taught my

1  students when you see a positive jaw jerk and you see

2  paralysis below and some decrease in reflexes in the arms, or

3  legs, this means that you have a lesion in the cervical spine.

4        So I use it for localization of traumatic lesions to

5  the cervical spine, because this reflex is mediated at the

6  brain stem, which is above the cervical spine, whereas the

7  other reflexes are mediated below.  So it's a way of

8  anatomically honing in on where the problem is.

9        That would be in a person who is complaining of

10  trouble with motor function of the limbs.  So it doesn't fit

11  this.  So we also say in neurology, maybe we use this as a

12  wastebasket to explain what we don't understand, when somebody

13  has hyperactive reflexes, it's because he's anxious or because

14  the general level of central excitability, whatever that

15  means, is hyper.

16        So we know that we are a changing system.  The

17  nervous system is sometimes on guard.  Sometimes it's relaxed.

18  In sleep it's in a different state whatsoever, and all these

19  reflexes change as a function of that underlying state of the

20  nervous system.

21        Yes.  Reflexes will become hyperactive or less

22  active.  When they're really important and when neurologists

23  really raise eyebrows, is when they're asymmetrical and you

24  see the hyperactivity on one side and not the other, or when

25  they're associated with certain pathological reflexes like the

1    Babinski sign, which I'm sure you've all heard of, but it

2    amounts to an involuntary hyperextension of the big toe.

3           Pretend this is my foot.  You strike -- you scratch

4    the underside of the foot and this goes up involuntarily.

5    That means there is a lesion in the cerebral spinal motor

6    axon, the long tracks that come down from the brain to move

7    the limbs.  In a stroke, that's what you see.  Hyperactive

8    reflexes, up going toe, and motor reflexes.  So those are the

9    pathological reflexes that are highly indicative of lesions.

10          He mentioned the palmomental.  The palmomental is

11   one of the reflexes we call reflexes of dementia, because in

12   people with Alzheimer's disease you see these release signs

13   from the frontal lobe, which Dr. Nadkarni at least in one of

14   the depositions I read, described in great detail and much

15   better than I could do.

16          The palmomental is one of those.  What it is is that

17   you strike the palm and the chin deviates to the side.  It

18   doesn't sound like anything very much, but that is a sign my

19   teachers used to call diffuse brain disease.  Like

20   Alzheimer's, that affects cells all over the brain.

21          He found an unexpected reflex for somebody with

22   Alzheimer's disease in this plaintiff.  I don't know what that

23   means.  He saw it.  You have to say it was there.  You can

24   dismiss it as not related to this.  It has nothing to do with

25   the case, or you can put it in your observational bag and look

April - Direct - Hutchinson                    1470

1    for it again down the line.

2          Now, suddenly, we have these two tests that Dr.

3    Nadkarni did, including the FDG PET, and it's showing

4    hypometabolism here, here, here, and here.  It shows up on

5    color images that are very nice to look at.  What does it

6    mean?  Does she have early Alzheimer's disease?  God, I hope

7    not.  I hope that's not what it means and I don't think so.  I

8    don't know what it means.

9          Is it related to this?  Not in any way I can

10   understand.  That's where we are.  We see the same things, but

11   we can't put them together the same way.

12   Q    What about the MRI that Dr. Nadkarni ordered, did you

13   review anything about the 2022 MRI that was performed at NYU?

14   A    Yes, I looked at the images.

15   Q    And what were your conclusions from your review of that

16   MRI?

17   A    Well, there's evidence of hippocampal wasting.  There's

18   also some evidence of asymmetry, which means that the right

19   and the left don't look exactly alike.  But many of us don't

20   have right and left organs that look exactly alike.  There can

21   always be one kidney bigger than the other, or one ear bigger

22   than the other, or a thumb that's bigger than the other.  So

23   asymmetry in neurology don't in themselves have definitive

24   significance.

25         That's really what I saw, and I saw what he called a

April - Direct - Hutchinson                                    1471

1   gliosis in the mesial part of the hippocampus.  I saw that.

2           I had my own interpretation, but I don't think I'm

3   more correct than Dr. Nadkarni using speculation.  I think it

4   was there before and I think it wasn't seen in Brooklyn

5   because that scanner is much less magnetized, a much smaller

6   magnet, than the one at NYU.  We have another rule in

7   neurology.

8           If you're going to make comparative radiological

9   statements about point A in time and B in time, be sure the

10  instrument that generated it is the same instrument, because

11  they don't produce the same visual images, depending on the

12  size of the magnet and how many evolved computer programs have

13  come about to analyze the same data.

14  Q   So are you saying that if the plaintiff had undergone an

15  MRI on that sophisticated NYU machine before she ever

16  encountered these defendants on June 3rd, it may have showed

17  the same thing?

18  A   Yes.  But it's only speculation.  I cannot say that with

19  any certainty.

20  ██████████████    ██████████████████    █████████████████

21  ████████████████████

22     ████████████    ██████████    ████████████████    ████████

23  ████████

24  Q   Doctor, you mentioned that there was an EEG, as well.

25  Can you describe what that tells you?

1   A      Well, the EEG is really the great instrument we have for

2   studying epilepsy.  It's the only recording device that can

3   show the physiological nature of epilepsy when an attack is

4   going on.  So you can record people now for up to 96 hours

5   with them unimpeded walking around and doing their thing, and

6   they can be having epileptic attacks and you can now see them

7   where you couldn't before.  It's very powerful for epilepsy.

8   Q      When you say see them, what do you mean by that?

9   A      You can see the abnormal electrical discharges from the

10  brain, which are the clinical diagnostic signs of epilepsy.

11  Dr. Nadkarni is an expert in that.  His group at NYU is the

12  best in the world.  There's no place better, and they are

13  really sophisticated epileptologists.  That's where they do

14  surgery on the mesial temporal lobe in those patients who have

15  mesial temporal gliosis, just like this scan report but have

16  epilepsy.

17          There's also people who have it and don't have

18  epilepsy.  And in the old days, we used to find it at autopsy

19  in people who have no neurological history in their lives.  We

20  didn't know what it meant and we said, this must come from

21  birth because we know that birth lesions can produce it and

22  epilepsy, as well.  So it may be just a matter of degree that

23  people who have it die with it, have never had epilepsy, had

24  an injury at birth that wasn't a sufficient intensity to cross

25  the threshold.  That's the only explanation I can give.

April - Direct - Hutchinson                                    1473

1   Q      Just so we're using the same terminology so we can all

2   understand which of the findings this applies to, are you

3   referring to the bilateral mesial temporal sclerosis that Dr.

4   Nadkarni reported?

5   A      That the radiology reported and Dr. Nadkarni

6   acknowledged, yes.

7   Q      And were you able to review the report of the EEG that

8   was performed on plaintiff?

9   A      Yes.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  ████████     ████████████████     ████████

2  ████████████████████████████████████████████████

3        ████████████     ██████████

4   Q     Did you observe whether plaintiff demonstrated any

5   slowing on the EEG?

6   A     I just want to report --

7               THE COURTROOM DEPUTY:  Sorry, microphone.  Thank

8   you.

9   A     The EEG video recording that was done between July 19th

10  and July 21, 2022 was reported by the laboratory of NYU to be

11  totally normal.  So I would just rather depend on their

12  interpretation, and not step in here and try to second guess.

13  Q     Okay.

14  A     I would accept that.

15  Q     Now, Dr. Nadkarni used a certain methodology in making

16  his determinations, correct?

17  A     I'm not sure what you're saying.

18  Q     Well, you just referred to a neurological exam, an

19  ordering of adjunctive studies, an EEG.  That was the

20  methodology that Dr. Nadkarni used to reach his conclusions,

21  correct?

22  A     Yes.

23  Q     Do you have any opinions about how he went about making

24  this diagnosis?

25  A     Yes.  You know, he did make a diagnosis based on what he

1  did, and I made a diagnosis based on what I did, and it's

2  really based on the different interpretations of those

3  unexpected findings.

4          What was interesting is to ask oneself, if this were

5  my patient and I was treating her, what would I have done.  I

6  certainly wouldn't have started by asking for metabolic PET

7  scans because I'm examining her.  I didn't find very much, and

8  I would have said she had some kind of an incident.

9          How much brain injury there was seems to be minimal,

10  but I'm not sure.  I would follow her and examine her

11  regularly.  I would see her once a month for the next 6 to

12  12 months, and I would do more studies if she was getting

13  better.

14          But if I can venture to say that if I could use the

15  few times I've seen her, that once on April 3, 2023 and today,

16  I would be very pleased with whoever was treating her because

17  she looks great.  So that's the difference.  I don't know if

18  that's a difference in methodology.  You have to ask yourself,

19  what's going on here.  What if I were treating her?  What

20  would I have done and what would I have done if I saw these

21  weird findings.

22  Q    You mentioned something interesting.  You said if she had

23  additional medical records from a neurologist going forward

24  that would be highly relevant to you, correct?

25  ████████████    ████████████

1 ████████  ████████  ████████  ████████  ██

2 ████████

3 █ ████████████████████████████

4  A    That would have been, of course, what a commission would

5  have liked, keep in touch with your patient, even if you don't

6  understand all aspects of the case.  As my teacher, the late

7  great Morris Bender at Mount Sinai said, just look at the

8  patient, stop reading, just look at your patients.  That's

9  where you're going to get the truth.

10           MR. HUTCHINSON:  One moment, please, Doctor.

11  Q    Just to confirm, Doctor, based on everything that you've

12  reviewed, do you have any reason to believe that plaintiff

13  suffered a permanent brain injury as a result of this incident

14  on June 3, 2020?

15  A    No reason whatsoever.

16           MR. HUTCHINSON:  Thank you.  No further questions.

17           THE COURT:  All right.  Thank you.  Ladies and

18  gentlemen, let me check, does anyone need a nature break

19  before we start cross?  Okay.  Let's take about ten minutes

20  and then we'll resume.  Keep an open mind.  Don't talk about

21  the case.  Don't do any research.

22           (Recess taken.)

23           (Continued on next page.)

24

25

APRIL - CROSS - MAAZEL                    1484

1          (In open court.)

2          THE COURT:  Let's get the jury back in here.

3          (Pause in proceedings.)

4          THE COURTROOM DEPUTY:  All rise.

5          (Jury enters.)

6          (In open court; jury present.)

7          THE COURT:  Please be seated, everyone.

8          Welcome back, ladies and gentlemen of the jury.

9          You can be seated Dr. April.

10         You may resume your examination, Mr. Maazel.

11         I will remind you, Doctor, that you are still

12  under oath.

13  CROSS-EXAMINATION

14  BY MR. MAAZEL:

15  Q    Good morning, again, Doctor.

16  A    Good morning.

17  Q    You have been retained in this case by lawyers for the

18  City of New York?

19  

20

21

22

23

24

25  Q    And the City is paying you, correct?

APRIL - CROSS - MAAZEL                    1485

1   A    Yes.

2   Q    And you testified in your forensic practice, you are

3   retained almost entirely by defendants?

4   A    Yes.

5   Q    Just like today?

6   A    Like what?

7   Q    Just like today, you're being retained by the

8   defendants, right?

9   A    Yes.

10  Q    In fact, I think you have testified over 95 percent of

11  the time for the defendants, right?

12  A    Yes.

13  Q    And less than 5 percent for the plaintiffs, yes?

14  A    Yes.

15  Q    The City of New York has retained you many times,

16  correct?

17  A    Yes.

18  Q    Hundreds of times, right?

19  A    Yes.

20  Q    And you've never testified against the City of New

21  York, right?

22  A    What does that mean?

23  Q    You've never been retained and testified in a case

24  where the City of New York was a defendant; have you?

25  A    I don't know.  It's possible.

APRIL - CROSS - MAAZEL                          1486

1   Q    And so for the -- they're a regular client of yours,

2   right, the City?

3   A    No.

4   Q    Well, in those hundreds of times you have been retained

5   by them, how many hundreds of thousands or millions of

6   dollars have they paid you?

7   A    Gee, I wish it was hundreds of billions.

8   Q    And then the answer is, then, Doctor?

9   A    It hasn't been, no.

10  Q    Hundreds of times, each time you are being paid 10, 20,

11  30, $50,000, right?

12  A    Not that I know of.  I wish you were my accountant.

13  Q    You never treated Ms. Pierce, of course, right?

14  A    No.

15  Q    And you never discussed the case with any of

16  Ms. Pierce's treating physicians, correct?

17  A    No.

18  Q    The only people you discussed the case with were the

19  lawyers for the defense, right?

20  A    Yes.

21  Q    And whatever records or documents you have is what they

22  gave you, right?

23  A    Yes.

24  Q    And you never looked at any photos of Ms. Pierce's

25  injuries, correct?

1    A    Any what?

2    Q    Photos of her injuries?

3    A    I can't recall that I have, no.

4    Q    The defense lawyers never gave you photos; am I right?

5    A    I don't know.  They may have.  I just don't remember

6    them.

7    Q    Did you ever ask for any of the photos?

8    A    No.

9    Q    Did you want to at least see the injuries as part of

10   your review?

11   A    Did I want to see the injuries?

12   Q    Yes, did you want to see all the injuries to

13   Ms. Pierce's head, her scalp, face, et cetera?

14   A    I've never thought about it, but I wouldn't not want to

15   see them, but they weren't provided to me.

16   Q    By the defense lawyers, right?

17   A    Yeah.

18   Q    Dr. Nadkarni did look at the photos, right?

19   A    I'm sorry?

20   Q    Dr. Nadkarni, as reflected in his expert report, did

21   look at all the photos; didn't he?

22   A    I don't remember.

23   Q    Now, the defense lawyers gave you one video to look at,

24   right?

25   A    Yes.

APRIL - CROSS - MAAZEL                                    1488

1    ███████████    ████████████████████

2    ███████████████████

3    ████████  ███  ██████████

4         The question is:  Were you given one video?

5    ██████████████████    ███████████████████████████

6    ████████████

7         THE WITNESS:  Yes, I was.

8    ████████████  █████████████████████

9    ████████████████

10   Q    And that one video they gave you, you described in your

11   expert report, right?

12   A    Yes.

13   Q    And you described it as a video of Ms. Pierce on the

14   ground and a bunch of officers standing over her, right?

15        THE COURT:  Hang on.

16        So your question has to be a little clearer.  Are

17   you asking him did he say that on direct?  I don't believe

18   he necessarily described it, but -- so go ahead.

19        MR. MAAZEL:  I'll rephrase, Judge.

20        THE COURT:  Yes.

21   Q    As described in your expert report, the one video that

22   you saw was Ms. Pierce on the ground and a bunch of officers

23   standing over her?

24   A    I don't remember exactly how I worded it.  Can I look

25   at my report?

1    Q    Of course.

2    A    Thank you.

3    Q    And just to move this along, this is the bottom of

4    page 7.

5    A    Thank you.  Here it is.  Would you like me to read it?

6    Q    Well, just looking at the bottom paragraph of page 7,

7    does that refresh your memory that the one video you saw was

8    of Ms. Pierce on the ground while a bunch of officers were

9    standing over her?

10   A    Yes, I actually said, quote, involved in the scuffle

11   was about three or four police officers who were standing

12   over her and appeared to push her to the ground.

13   Q    But the lawyers for the city never gave you a different

14   video that showed a different officer throwing Ms. Pierce to

15   the ground; did they?

16   A    No, I don't remember it.

17   Q    You never saw that one where she's standing and then

18   she's thrown to the ground, you've never seen that, correct?

19   A    Well, doesn't that say this here in the same words?

20   Q    Well, did you know there was more than one video?

21   A    No.

22   Q    Did you know that an officer threw Ms. Pierce to the

23   ground when she was standing and then came to the ground?

24   A    Yes.

25   Q    Because she told you, right?

APRIL - CROSS - MAAZEL                    1490

1    A    Well, it said appeared to push her.  To me, it looked

2    like they pushed her to the ground in the one video I saw.

3    But yes, she told me that, as well, that is true.

4    Q    Did you ever ask the defense lawyers for all the videos

5    in the case?

6    A    I don't think so, no.

7    Q    Now, a traumatic brain injury is the pathology of the

8    brain that results from a forceful blow to the head, yes?

9    A    That can result from a forceful blow of sufficient

10   intensity.

11   Q    And put another way, traumatic brain injury is the

12   alteration of brain function and structure caused by an

13   external mechanical force to the head?

14   A    That's right.

15   Q    So that includes if someone throws you to the ground

16   and your head hits the pavement?

17   A    If it happened with sufficient force, yes.

18   Q    That includes if someone smashes your head into the

19   ground, right?

20   A    Well, now, I don't know how to answer that question,

21   what a smash means as opposed to a forcible blow.  A

22   forcible blow is a generic term.

23   Q    Any external mechanical force, could be a blow, could

24   be a bunch, could be falling on the ground, could be a lot

25   of things, right?

1   A    I think it speaks for itself, yes.

2   Q    I would like to show you Exhibit 5.

3            MR. MAAZEL:  And play it from 12 seconds in.

4            THE COURT:  Previously admitted.

5            (Video played.)

6   Q    And if you could just look, Doctor, do you see a woman

7   in peach, in the peach shirt there in the video?

8   A    Well, peach looks red to me.  I only see person who is

9   standing with a red or peach garment which is in the center.

10           THE COURT:  Be careful, there is someone in red

11  and then --

12  Q    I am referring further to the right where there is

13  someone in a peach top with some sort of aqua backpack.

14           Do you see that?

15  A    I see a pink sleeve, I think.

16           MR. MAAZEL:  Can I approach?

17           THE COURT:  Yes, you may.  I wish we had a pointer

18  for that.

19           MR. HUTCHINSON:  Your Honor, could we also have a

20  timestamp for the record?

21           THE COURT:  Yes.  So the video was stopped at

22  eight seconds into the video.

23           So, Doctor, just so we are clear, there is someone

24  with a clear NYPD jacket on.  Do you see that person in the

25  middle of the screen?

1          THE WITNESS:  Yes.  I see, it looks like a right

2     arm and a short sleeve shirt with a PD or PD jacket.  I

3     mean, a PD insignia on the short sleeve.

4          THE COURT:  Okay.

5          THE WITNESS:  Is that what you see?

6          THE COURT:  Well, see right in the middle of the

7     picture, there is someone who appears to be an officer with

8     NYPD on the back of that person's jacket?  Do you see that

9     person right in the middle of the video?

10         THE WITNESS:  I think I know what you are looking

11    at.

12         THE COURT:  Yes.

13         THE WITNESS:  It's two persons down from the other

14    red coat.

15         THE COURT:  Correct.  So to his left is someone in

16    the red coat in the video, right?  But now the lawyer is

17    focusing you --

18         THE WITNESS:  I can't see it on this screen, it's

19    all dark, so I'm going to look there.

20         THE COURT:  Yes, so look up.

21         And then to the right, you see someone, the only

22    person who is in kind of a salmon-colored top.  Do you see

23    that person?

24         THE WITNESS:  It's a sleeve.

25         THE COURT:  Okay.  But you see it a little bit of

1  color there, right?

2           THE WITNESS:  Okay.

3           THE COURT:  Okay, go ahead.

4           MR. MAAZEL:  Thank you, Judge.

5           THE COURT:  Yes.

6  Q    And you've never seen this video before, correct?

7  A    I don't think so.  I don't think so.  I don't recall.

8  Q    Let's play the video, and I want you to try to focus on

9  that woman there with the backpack in the peach top.

10 A    Okay.

11          (Video played.)

12          MR. MAAZEL:  Stop there.

13 Q    Did you see the woman falling to the ground?

14 A    Well, the one that I was looking at, it was about three

15 persons to the right of the police officer we described, was

16 suddenly flooded by a number of figures that obscured her.

17 I did not see her fall to the ground.

18          THE COURT:  Do you want to try it at half speed?

19          MR. MAAZEL:  Sure.

20          THE COURT:  It does move quickly.

21          MR. MAAZEL:  Let's try it one more time at half

22 speed.  Thank you, Judge.

23          THE COURT:  Starting again at eight seconds into

24 the video at half speed.

25          (Video played.)

APRIL - CROSS - MAAZEL                    1494

1   A    There she goes out of view.  Now, she looks like she's

2   on the ground.

3   Q    Did you see that now, Doctor?

4   A    I saw the flash of pink with the head, it was

5   horizontal on the ground.  I saw the pink sleeve and the

6   head horizontal on the ground for a moment.

7   Q    And you would describe that as an external mechanical

8   force when her head lands on the ground, fair?

9   A    Potentially, yeah.

10  Q    And now I want to show you Exhibit 12 and ask if you

11  have seen this before.

12          MR. MAAZEL:  And maybe we can start around 1:20.

13          (Video played.)

14  Q    Have you seen this video before?

15  A    I think I have, yes.

16          MR. MAAZEL:  If we could play this one at half

17  speed.

18  Q    And just if you could focus on Ms. Pierce's head.

19          MR. MAAZEL:  Without sound.

20          (Video played.)

21          MR. MAAZEL:  Let's just stop there.

22  Q    Did you see the officer moving her head to the ground

23  there?

24  A    Yes.

25  Q    And have you seen that before?

APRIL - CROSS - MAAZEL                                    1495

1    A    I think I have, yeah.

2    Q    And would you also describe that as an external

3    mechanical force to the head?

4    A    Yes, with explanation.

5              THE COURT:  Just so the record's clear, the video

6    was stopped at one minute and 32 seconds into the video.

7    Q    Doctor, the brain --

8              MR. MAAZEL:  We can take that down.

9    Q    The brain is soft, yes?

10   A    Yes.

11   Q    The brain is encased in fluid, yes?

12   A    Yes.

13   Q    And the skull is hard?

14   A    Yes.

15   Q    And when there is a traumatic brain injury, the soft

16   tissue that is the brain hits the skull.

17   A    Does what?

18   Q    When there is a traumatic brain issue, the soft tissue

19   that is the brain hits the skull, right?

20   A    Yes.

21   Q    And generally speaking, the more force that's used, the

22   more likely there will be for a more severe traumatic brain

23   injury; is that --

24   A    Yes.

25   Q    Now, you are familiar with something called board

APRIL - CROSS - MAAZEL                                    1496

1    certification, yes?

2    A    Yes.

3    Q    And that's when you do a fellowship, yes?

4    A    Yes.

5    Q    And you pass an exam?

6    A    Yes.

7    Q    And you have a number of cases in that subspecialty?

8    A    Yes.

9    Q    Dr. Nadkarni is board certified in neuropsychiatry,

10   correct?

11   A    I have admitted that and I would praise him for all of

12   his certifications.  He's great.

13   Q    You have never been board certified in neuropsychiatry,

14   correct?

15   A    No, but with explanation.

16   Q    Okay.  Doctor, you have also never been certified in

17   neuropsychology, correct?

18   A    No, but with an explanation.

19   Q    Dr. Nadkarni is board certified in epilepsy?

20   A    I don't know, is that a question?

21   Q    You know that to be true, yes?

22   A    Yes, I know that to be true.

23   Q    You are not board certified in epilepsy, correct?

24   A    Yes, with explanation.

25   Q    Dr. Nadkarni is board certified in psychiatry?

APRIL - CROSS - MAAZEL                                    1497

1   A    Yes.

2   Q    And you are not?

3   A    With explanation.

4   Q    Dr. Nadkarni is board certified in clinical

5   neurophysiology?

6   A    Yes.

7   Q    And you are not?

8   A    No, with explanation.

9   Q    And just to be clear, you have never passed a board

10  examination in neuropsychiatry or in neuropsychology?

11  A    No.

12  Q    Or in epilepsy?

13  A    No.

14  Q    Or in neurophysiology?

15  A    No.

16  Q    Or in psychiatry?

17  A    No.

18  Q    Am I correct?

19  A    You are absolutely correct.

20  Q    You did get a certification in EEGs in 1974.

21  A    Yes.

22  Q    And you haven't updated or renewed that certification

23  in 51 years, correct?

24  A    No, with explanation.

25  Q    Am I correct?

1    A    Yes, with explanation.

2    Q    I think you've testified a few times today that you do

3    think highly of Dr. Nadkarni.

4    A    I think I've tried to say that.

5    Q    And you've worked with him before?

6    A    Yes.

7    Q    And he has a fine reputation?

8    A    He is a fine physician and neurologist and I would not

9    hesitate to send anybody to him.

10   Q    Now, Dr. Nadkarni wrote his expert report in

11   September 2022, right?

12   A    Yes.

13   Q    And you wrote yours a half year later in April 2023?

14   A    Yes.

15   Q    Before Dr. Nadkarni wrote his expert report, he ordered

16   an MRI for Ms. Pierce at NYU, correct?

17   A    Again, when -- yes, yes, I know he did, yes.

18   Q    Yes.  You never ordered an MRI; did you?

19   A    No, with explanation.

20   Q    Before Dr. Nadkarni wrote his expert report, he also

21   ordered a PET scan for Ms. Pierce, right?

22   A    Yes.

23   Q    And you did not order a PET scan; did you?

24   A    No, with explanation.

25        ████████████        ████████████████

1    ████████████████████████████

2    ████████████  ████████████

3    ████████████████

4    Q    Before Dr. Nadkarni wrote his expert report, he ordered

5    EEG testing, that's the one with the electrodes in the head

6    for Ms. Pierce, right?

7    A    Yes, I've said that.

8    Q    Yes.  You never ordered an EEG test; did you?

9    A    No, with explanation.

10   Q    Before Dr. Nadkarni wrote his expert report, he ordered

11   a neuropsychiatry evaluation for Ms. Pierce, right?

12   A    A what?

13   Q    A neuropsychiatry evaluation.

14   A    I don't think so.

15   Q    The one with Dr. Morrison?

16   A    Neuropsychology.

17   Q    Apologies.

18   A    It's different.

19   Q    Before Dr. Nadkarni wrote his expert, he ordered a

20   neuropsychology examination for Ms. Pierce.

21   A    Now you've got it.

22   Q    And you did not, right?

23   A    No, I did not, with explanation.

24   Q    You never ordered any tests of any kind for Brigid

25   Pierce, correct?

APRIL - CROSS - MAAZEL                                    1500

1   A    Correct, with explanation.

2   Q    You had a neurological examination with Ms. Pierce,

3   yes?

4   A    Yes.

5   Q    And when you met with Ms. Pierce, you chatted in French

6   for a while, right?

7   A    Yes.

8   Q    Because you love France.

9   A    I don't know what the reason was.  The motivation for

10  speaking a few words in French may not have been very

11  significant.  I just did.

12  Q    Okay.  Well, you chatted with her about living in a

13  small town in France, right?

14  A    Yes.

15  Q    That was an interest to you.

16  ████████████████    ████████████████

17  A    I'm not sure what you mean.  I can't answer those

18  questions --

19  ████████████████    ████████████████

20  A    -- because they don't mean anything.

21  Q    You chatted about what it was like to go to a violin

22  school?

23  A    Yes.

24  Q    You chatted about violin making?

25  A    Yes.

1   Q    And you found all of this personally interesting,

2   right, because of your own love --

3   A    It is a part of being civilized and having intercourse

4   with someone in my room.  She was a person of some interest

5   and I was interested in her as a person.

6   Q    Okay.

7   A    Now, I don't know if that's beyond the bounds of my

8   scope, but that happened.

9   Q    Okay.

10  A    Okay.

11  Q    Now, you testified today that Ms. Pierce learned French

12  after the incident and went off to France, right?

13  A    That's what I was told, yes.

14  Q    Well, actually, you assumed that she learned French;

15  isn't that right?

16  A    I don't remember.

17  Q    She never told you she learned French after the

18  incident; did she?

19  A    That's what was implied by my experience with her.

20  Q    Well, did you know that she was fluent in French long

21  before the police incident?

22  A    No.

23  Q    You didn't ask her about that; did you?

24  A    I didn't.  I don't remember -- I really don't remember.

25  Q    Okay.  Did you know that when she took a French test

APRIL - CROSS - MAAZEL                          1502

1  before the incident and years later she didn't improve at

2  all?

3  A    No, I don't know any of that.

4  ███████████    ███████████

5  ███████████    ███████████

6  Q    But you noted in your expert report her increased

7  French language ability; that was of significance to you,

8  even though it wasn't true, right?

9  ███████████    ███████████████

10  A    I can't answer you.

11  ███████████  ███████████  ███████████

12        The question is did you say that in your report,

13  is that your question?

14        MR. MAAZEL:  Right.

15  Q    You noted, part of your analysis was that she learned

16  French after the police incident, but that actually wasn't

17  true?

18  ███████████  ███████████████  ███████████████

19  ███████████

20        THE COURT:  ███████████  The question is was that

21  in your report, Dr. April, if you remember?

22        THE WITNESS:  Can I look at my report?

23        THE COURT:  Yes, go ahead and reference it.

24        THE WITNESS:  Thank you.

25  A    It says -- and I really have to read it because it says

1    something very specific.

2             THE COURT:  That's all right.  Take your time.

3             THE WITNESS:  May I read it?

4             THE COURT:  Yes, please do.

5             THE WITNESS:  Aloud?

6             THE COURT:  No, just read it to yourself.

7             THE WITNESS:  I have done that.

8             THE COURT:  Does it refresh your memory about --

9    and then Mr. Maazel, what did you want to ask him -- about

10   whether he had noted that she had learned French after the

11   incident?

12   Q    Right.  You noted in your report that she had learned

13   French after the incident and that was significant to you,

14   right?

15   A    Well, again, I'd like to use the specific language and

16   let the jury decide.

17            THE COURT:  No, do you remember --

18            THE WITNESS:  Not specifically, it's only what I

19   said.

20            THE COURT:  Move on.  His memory is not refreshed.

21            MR. MAAZEL:  Moving on, Judge.

22            THE COURT:  Move on.

23   Q    You ended the exam, the examination because you didn't

24   want to keep Ms. Pierce's husband in the waiting room,

25   right?  Do you remember that?

APRIL - CROSS - MAAZEL                                    1504

1  A    Are you referring to something in my report?

2  Q    No.  I am just referring to when you met with her, you

3  believed her husband was in the waiting room and that's why

4  you ended the exam, right?

5  A    I'm sorry, what?

6  Q    You believed her husband was in the waiting room and

7  that's why you ended the exam.

8        Do you remember that?

9  A    No.

10 Q    Do you remember whether she had a husband?

11 A    She had told me about her husband.

12 Q    Okay.  And what did she tell you about her husband?

13 A    That her husband went with her to France.

14 Q    And did you understand her husband to be French?

15 A    I didn't ask.  It really wasn't important.

16        THE COURT:  Remember to use the microphone.

17        THE WITNESS:  Oh, sure.

18 A    I didn't ask.  I didn't ask.

19 Q    Doctor, Ms. Pierce never had a husband.

20        Do you know that?

21 A    She told me she had a partner that went with her to

22 France.

23 Q    Oh, a partner, okay.

24        THE COURT:  You can put your report down, Doctor,

25 if it's getting in your way.  I want to make sure you use

1    the microphone.

2    Q    And did you understand her partner to be American?

3    A    I didn't know.

4    Q    But you understood that her partner moved from the

5    United States to France, that's what you remember?

6    A    Again, I don't have any particular memory of any of

7    that, except that it was just something that I thought was

8    noteworthy in her neuro behavior.

9    ████ ████████████████████████████████████████

10   ████████████████████████████████████

11        ████████████████████  ██████████  ████████████████

12   ████████████

13   █  ████████

14        ████████████  ██████████  ████████████████████████

15   ██████████████████████████████████████████  ██████████

16   ██████████████████

17        ████████████████  ████████████████████

18             THE COURT:  Ladies and gentlemen, ultimately it's

19   your recollection of the testimony that governs here,

20   neither the lawyers nor mine.

21             If you want to ask another question, Mr. Maazel,

22   go ahead.

23             MR. MAAZEL:  Thank you, thank you.

24   Q    Dr. Nadkarni did a neurological exam of Ms. Pierce,

25   correct?

APRIL - CROSS - MAAZEL                    1506

1   A    Yes.

2   Q    And you were not there for that exam, correct?

3   A    No.

4   Q    And Dr. Nadkarni found a number of abnormal results in

5   the exam, yes?

6   A    Yes.

7   Q    For example, he did the jaw jerk reflex test?

8   A    Yes.

9   Q    And he found an abnormal result, right?

10  A    Yes.

11  Q    And a substantially increased jaw jerk reflex is what

12  he found, yes?

13  A    He had increased jaw reflex.

14  Q    Okay.

15  A    I don't remember the adjectives he used before.

16       Do you want me to look at his report?

17  Q    I will ask a next question, Doctor.

18  A    Okay.

19  Q    You, however, did not do the jaw jerk reflex test,

20  correct?

21  A    I don't think so.

22  Q    Am I right?

23  A    I think you're right.

24  Q    Dr. Nadkarni also did the palmomental test, yes?

25  A    Yes.

1  Q    That's the one where you scratch the part of the palm

2  and see if the chin twists?

3  A    Yes.

4  Q    And an abnormal finding indicates pathology in the

5  frontal lobe, correct?

6  A    That's its classical interpretation.

7  Q    The frontal lobe being the lobe in the front of the

8  brain, correct?

9  A    Yes.

10 Q    And frontal lobe controls things like executive

11 function, multitasking, math, memory, right?

12 A    Yes.

13 Q    And the result for Ms. Pierce was, again, abnormal,

14 yes, when Dr. Nadkarni did the test?

15 A    The palmomental test.

16 Q    It was abnormal result, yes?

17 A    That's what Dr. Nadkarni reported.

18 Q    Right.  Her chin twisted when it should not have

19 twisted, right?

20 A    I don't know.  I wasn't there.

21 Q    Now, you, Doctor, did not do the palmomental test; did

22 you?

23 A    No.

24 Q    Another test that Dr. Nadkarni did was the grasp

25 response test, yes?

APRIL - CROSS - MAAZEL                                    1508

1   A    Yes.

2   Q    And that's the one where you see if -- I mean, I think

3   Dr. Nadkarni talked about how children, when you, you know,

4   put a pen or a finger in their hand, they grasp it, right?

5   A    Yes.

6   Q    And adults are not supposed to do that, right?

7   A    I don't know about supposed to.  It's not the normal

8   response.

9   Q    And Ms. Pierce did have a grasp response, correct?

10  A    Yes, according to that report.

11  Q    And that is yet another abnormal finding in

12  Dr. Nadkarni's neurological exam, correct?

13  A    Yes.

14  Q    And that is yet another neurological test that you did

15  not do, correct?

16  A    Yes, that's correct.

17  Q    You said previously, or you've testified, that all

18  these abnormal results from Dr. Nadkarni's neurological exam

19  of Ms. Pierce were the result of Ms. Pierce having emotional

20  hyperactivity?

21  A    I did not say that.  I said that's a possible

22  explanation.

23  Q    Okay.

24  A    Because they don't make any sense in this case.

25  Q    So your explanation for these abnormal tests which you

APRIL - CROSS - MAAZEL                    1509

1   did not witness yourself was that Ms. Pierce was emotional?

2   ████████████   ████████   ██████████

3   ████████████████

4   ██████████  ████████████

5   Q    Emotional?

6         THE COURT:  Was it your prior conclusion, is that

7   what you are asking?

8         MR. MAAZEL:  Yes.

9   A    Was it what, emotional?

10  Q    Yes.

11  A    Well, we're all emotional.

12  Q    So is that a yes?

13  A    No.  You're implying that's a pathological diagnosis,

14  that I made a psychiatric diagnosis over somebody else's

15  finding on exam when I wasn't present and which to me seems

16  unexpected for the reasons I've stated in my testimony.

17  Q    So a series of unexpected abnormal neurological

18  findings in tests that Dr. Nadkarni did, correct?

19  A    Yes.

20  Q    Unexpected for you, right?

21  A    And for him, too, I think.

22  Q    Well --

23  A    I haven't talked to him about the case because I don't.

24  Q    You also testified that a test you did do was you asked

25  Ms. Pierce to memorize five words, correct?

APRIL - CROSS - MAAZEL                    1510

1   A    To recall them, yes.

2   Q    And she was unable to do that?

3   A    She did four.

4   Q    Normally people should be able to memorize five words,

5   right?

6   A    People -- that's why we have a score range, which is

7   normal.

8   Q    When you do an independent forensic medical

9   examination, you generally take notes, correct?

10  A    Sometimes; sometimes not.

11  Q    You generally have a pencil and paper in your hand?

12  A    Sometimes; sometimes not.

13  Q    That is your general practice, though; isn't it?

14  A    I don't really know -- yes, I suppose you could say

15  that.

16  Q    And you generally take those notes during the exam,

17  right?

18  A    Yes.

19  Q    And then you use those notes to generate your expert

20  report?

21  A    By and large, yes.

22  Q    And then you keep those notes in the patient's file?

23  A    Or I destroy those notes.

24  Q    Your notes from Ms. Pierce's examination, did you

25  destroy them?

 1   A    I don't remember.

 2             THE COURTROOM DEPUTY:  I'm sorry, you will have

 3   to --

 4   A    I don't remember.

 5             THE COURT:  Push the mic a little closer.

 6             THE WITNESS:  There you go.  Like the crooner.

 7             THE COURT:  Let's avoid that, though, unless you

 8   really get -- okay.

 9   Q    You took notes during her exam, right?

10   A    I don't remember.

11   Q    But that would have been your general practice?

12   A    Yes.

13   Q    Any reason you would not have taken notes just of this

14   exam?

15   A    No.

16   Q    So in all likelihood, you did take notes, right?

17   A    Yes.

18   Q    Did you bring those notes with you today?

19   A    I don't -- I don't know if they exist, but I don't have

20   them with me.  Whatever their meaning in content were

21   transcribed into my report.

22   Q    By whom?

23   A    Sorry?

24   Q    By whom?

25   A    By my typing service that gets a dictation immediately

1  after the subject or patient leaves.

2  Q    So is it your testimony that you destroyed the notes,

3  or is it your testimony that you just left them in your

4  office?

5  ████████████    ████████████

6  A    I don't know.

7  ████████████    ████████████████

8  ██████████    ████████

9  Q    You met with Ms. Pierce in total for about 45 to

10  50 minutes, yes?

11  A    Yes.

12  Q    And I think -- and a good chunk of that time, you were

13  talking in French about France, yes?

14  A    I don't think so, no.

15  Q    The actual exam was only about ten, 15 minutes, right?

16  A    I think the whole exam was from when she comes in to

17  when she leaves, because everything that happens is part of

18  it, including the more or less unimportant part in which I

19  spoke in French.

20  Q    Doctor, do you agree that the death of neurons in the

21  brain is irreversible?

22  A    Yes.

23  Q    And permanent?

24  A    Irreversible would mean permanent, yes.  Permanent and

25  irreversible are interchangeable in this sense.

APRIL - CROSS - MAAZEL                          1513

1   Q    So there are some other cells in the body like liver

2   cells that can regrow, right?

3   ████████████████    ████████████████████████

4              ████████████    ████████████

5   A    Yes.

6   Q    But once neurons die in the brain, they don't regrow,

7   correct?

8   A    Yes, they do not.

9   Q    The neurons are the functional units of the brain, yes?

10  A    Yes.

11  Q    With neuron loss, goes loss of function, yes?

12  A    Yes.

13  Q    And that could be intellectual function, yes?

14  A    Yes.

15  Q    It could be vision?

16  A    You want me to respond to each part of your sentence?

17  Q    Yes.

18  A    Yes.

19  Q    Sensory function, what we feel?

20  A    Yes.

21  Q    Everything that makes human beings human beings is in

22  the brain, yes?

23  A    Yes.

24  Q    Now, sclerosis in the brain is a lesion or a scar, yes?

25  A    Yes.

APRIL - CROSS - MAAZEL                    1514

1   Q    And sclerosis represents cell death.

2   A    Yes.

3   Q    And it's not good to have lesions on the brain

4   anywhere, correct?

5   A    It doesn't represent cell death.  It's a response of

6   other cells of the brain to neuronal death.  There are

7   different kinds of cells in the brain.

8   Q    Okay.

9   A    Some are the functioning cells, as you described, which

10  are the neurons.  And then there's a whole team of

11  supportive cells called glial cells which themselves are

12  differentiated because they have specialized functions.

13  Q    Okay.

14  A    The scar is a result of glial activity, that's why it's

15  called gliosis.

16           THE COURT:  Doctor, could you spell that?

17           THE WITNESS:  G-L-I-A-L, is glial.  And gliosis,

18  G-L-I-O-S-I-S.

19           THE COURT:  Thank you.

20  Q    Let's talk about atrophy.  First of all, cerebral is

21  the same as brain, right?

22  A    Yes.

23  Q    So cerebral atrophy the loss of neurons and the

24  connections between them, yes?

25  A    Yes.

1  Q    And atrophy is a synonym for volume loss, yes?

2  A    For what?

3  Q    Volume loss.

4  A    Volume loss.  It's a synonym for the process of cell

5  death from swelling, which is volume gain, which is the

6  first step, to the production of intracellular contents

7  which normally aren't present which also swelled and then to

8  shrinkage and death.

9  Q    So atrophy and volume loss and neuron death are all

10 essentially the same thing, right?

11 A    Well, it depends how you're defining the same thing.

12 Q    They're synonyms, essentially, yes?

13 A    I don't think so.

14 Q    Let's talk about the amygdala.  That is in the temporal

15 lobe?

16 A    Yes.

17 Q    The temporal lobes are near the temples, yes?

18 A    Yes.

19 Q    And the amygdala is obviously an important part of the

20 brain?

21 A    Every part of the brain is important.

22 Q    Fair.  The amygdala controls emotion, emotional memory,

23 right?

24 A    That's the way that a neuropsychiatrist would describe

25 it, yes.

APRIL - CROSS - MAAZEL                    1516

1   Q    And there are two amygdala, one in the left temporal

2   lobby, one on the right temporal lobe?

3   A    Yes.

4   Q    And in your words, neural loss to both amygdala is

5   devastating, yes?

6   A    Yes.

7   Q    And both, means bilateral, correct?

8   A    Yes.

9   Q    Let's talk about the hippocampus, that's also in the

10  temporal lobes, yes?

11  A    Yes.

12  Q    Also one on each side?

13  A    Yes.

14  Q    And the hippocampus controls, among other things,

15  memory, yes?

16  A    Parts of memory.  Certain kinds of early memories,

17  emotional memory, but not necessarily working executive

18  memory.

19  Q    Bilateral damage to both hippocampi is also a bad

20  finding, right?

21  A    Catastrophic.  But when I say that, I mean

22  extra-patient, I mean, removal of the entire organelle.  I

23  don't mean the presence of a scar.

24  Q    Okay, but bilateral damage to both hippocampi is not a

25  good finding; would you agree with that?

1  A    Is not what?

2  Q    It's a bad finding.

3  A    You know, it depends on circumstance.  Everything

4  depends on the context in neurology, and you can't make

5  individual, sort of, definitive absolute statements like

6  this with any kind of real truth.

7           (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Continuing.)

2    BY MR. MAAZEL:

3    Q    There are four lobes in the brain.  The temporal lobes,

4    right?

5    A    Yes.

6    Q    The frontal lobe in the front, correct?

7    A    Yes.

8    Q    The occipital lobe in the back?

9    A    Yes.

10   Q    And the parietal lobe?

11   A    Which is also in the back, but on top.

12   Q    Let's talk about the frontal lobe.  That's the part of

13   the brain unique to humans?

14   A    Well, I mean, what does that mean, "unique to humans"?

15   Q    Well, let's put it this way:  In your words, the

16   frontal lobe controls all the human functions that make us

17   different from gorillas.  Yes?

18   A    Yes, I would say that.

19   Q    So executive function, multitasking, math, language,

20   memory, all those things?

21   A    Yes, yes, yes.  Non-humans do have frontal lobe.  And

22   in primates, frontal lobes are used for investigations that

23   are -- that results are used in the application of knowledge

24   to human brain.

25   Q    Okay.

1   A    So they're very similar, but different.

2   Q    The occipital lobe is in the back of the head?

3   A    Yes.

4   Q    And that controls, among other things, vision?

5   A    Vision and associated vision and visual memory.

6   Q    And damage to the occipital lobe could damage your

7   vision.  Yes?

8   A    It can make you blind.

9   Q    And it can cause a lot of other vision issues.  Yes?

10  A    Yes.

11         MR. MAAZEL:  If we could look at Exhibit L, in

12  evidence, PL 1280 from the Brooklyn Hospital records.

13         THE COURT:  All right.

14         (Exhibit published.)

15  Q    So you've, of course, reviewed the Brooklyn Hospital

16  records for Ms. Pierce?

17  A    Yes.

18         MR. MAAZEL:  If we just call out the bottom.

19  Q    You know that Ms. Pierce reported -- withdrawn.

20         That the hospital found that she had left

21  occipital swelling in the back left of her head.  Yes?

22  A    Yes.

23  Q    And that's that big, yes, rectangle there.

24         And again, that controls vision?

25  A    What controls vision?

APRIL - CROSS - MAAZEL                    1520

1   Q    The occipital lobe.

2   A    The thing on her head?

3   Q    The occipital lob.

4   A    Well, the occipital lobs, you're not showing me the

5   occipital.

6   Q    I understand.

7   A    You're showing me the occipital skull.

8   Q    Okay.  Let's talk about the effects of traumatic brain

9   injury on the brain.

10          You agree that TBI can cause structural and

11  functional changes of the brain.  Yes?

12  A    Yes.

13  Q    Including cerebral atrophy, right?

14  A    Yes.

15  Q    Meaning cell death.  Yes?

16  A    Yes.

17  Q    You are familiar with the archives -- I'm sorry,

18  withdrawn.

19          Traumatic brain injury causes cell death in a

20  number of ways.  Yes?

21  A    Yes.

22  Q    Produces inflammation in the brain?

23  A    Yes.

24  Q    It disrupts the structural integrity of nerve cells?

25  A    Yes.

1  Q    It creates cavities in the brain?

2  A    Yes.

3  Q    Empty spaces which -- with no volume of brain mass.

4  Yes?

5  A    Yes.

6  Q    And that's how you got volume loss.

7  A    That's part of the way you get volume loss.

8  Q    TBI also causes sclerosis, or scarring in the brain.

9  Yes?

10 A    Yes.

11 Q    Now, you are familiar with the Archives of Neurology?

12 A    Yes.

13 Q    It's a peer-reviewed journal, very well respected?

14 A    Yes.

15 Q    If we could show you Exhibit 35.

16      MR. MAAZEL:  Just to the witness.

17 Q    Do you see that in front of you, sir?

18 A    Do I see which?

19 Q    Do you see an article Regionally Selective Atrophy

20 After Traumatic Accidental Injury?

21 A    Yes.

22 Q    Well that's in the Archives of Neurology published by

23 the American Medical Association.  Yes?

24 A    Yeah.

25 Q    And there are 13 authors; two M.D.s, four Ph.D.s, two

APRIL - CROSS - MAAZEL                                1522

1   M.D. Ph.D.s, an M.D. M.P.H, Master of Public Health, and

2   four others who wrote this, right?

3   A    Yes.

4   Q    And the second sentence says:  A common consequence of

5   TBI is cerebral atrophy which progresses over months and

6   possibly years after injury.  Right?

7   A    Well --

8   Q    That's what it says?

9   A    Am I supposed to make a comment if that's not right?

10        THE COURT:  The first question is:  Do you agree

11  that that's what it says?

12        THE WITNESS:  No.  I think they're being really --

13  if I were the editor, I would have made a big point right

14  here.

15  Q    Okay.  The document --

16  A    This article is not about TBI; it's about TAI.

17  Q    Doctor, I'm just reading you a quote from the article.

18  A    I understand.  I don't agree.  You asked me if I did.

19  Q    Let me just make sure we're on the same page.

20  A    Sure.

21  Q    This article states, quote:  A common consequence of

22  TBI is cerebral atrophy which progresses over months and

23  possibly years after injury.

24        That's what it says, right?

25  A    That's what it says.

1    Q    All right.  And again, a well respected, peer-reviewed

2    journal.  Yes?

3    A    Yes.

4    Q    You agree with that quote, don't you?

5    A    No.

6    Q    Sir, can you please look at your deposition.  You gave

7    a deposition in this case under oath.  Yes?

8    A    I'm talking about this article.

9    Q    I understand.

10   A    I don't see what it has to do with my deposition.

11   Q    Doctor, if you could look at your own deposition, which

12   is in a binder to your right.

13   A    Which is in my --

14         THE COURT:  No, it's not.  Hold on a second.

15         Page?

16         MR. MAAZEL:  Page 73, line 3.

17         THE COURT:  Here's the page, Doctor.

18   Q    And you testified under oath at your deposition.  Yes?

19   A    Yes.

20         MR. HUTCHINSON:  What's the end line?

21   Q    And --

22         MR. HUTCHINSON:  Your Honor --

23         THE COURT:  What's the end line?

24         MR. MAAZEL:  Oh.  Page 73, lines 3 through 15.

25         ███████████████        ███████████████

1  Q    Were you asked the following question and did you give

2  the following answer:

3          Question:  Looking at the first page, it says:  A

4  common consequence of TBI is cerebral atrophy which

5  progresses over months and possibly years after injury.

6          Do you see that quote?

7          Answer:  Yes.

8          Question:  Do you agree with it?

9          Answer:  Yes.

10          Question:  So traumatic brain injury commonly

11  causes cerebral atrophy, right?

12          Answer:  Yes, with an explanation.

13          Did you give those answers --

14  ███████████████████        ██████████████████████████████

15  ████████████████████████████████████████████

16          ██████████████████        █████████████████████

17          ██████████████████        ██████████████

18          ██████████████████   ████████████████████████

19          ████████████████████████████████████

20  Q    Did you give those answers to those questions?

21  A    Yes, at that time I did.

22  Q    All right.  And you gave truthful testimony when you

23  agreed with the article that a common consequence of TBI is

24  cerebral atrophy which progresses over months and possibly

25  years after injury, your testimony under oath was you agree

APRIL - CROSS - MAAZEL                                1525

1   with that.  Yes?

2   A    Yes.

3   Q    And, in fact, on her 2022 MRI two years after the

4   incident, Ms. Pierce had cerebral atrophy, or cell death.

5   Yes?

6            THE COURT:  Not looking at the article.  Not

7   looking at your deposition.  Let me take that back.

8            Ask the question again.  I think he missed the

9   transition.  Go ahead.

10  Q    In fact, in her 2022 MRI, two years after the incident,

11  Ms. Pierce did have cerebral atrophy, or cell death,

12  correct?

13  A    Yes, with an explanation.

14  Q    Now, the article -- do you still have the article in

15  front of you on the screen, sir?

16  A    Yes.

17  Q    If I could turn your attention --

18           MR. MAAZEL:  Give me just a moment, Judge.

19  Q    In this article, a study was done, correct?

20  A    Yes.

21  Q    And if you turn to --

22           MR. MAAZEL:  If we can go to page 1340 at the

23  bottom.

24  Q    If you look under the comments, it says about four

25  lines down:  The distribution of atrophy was essentially

APRIL - CROSS - MAAZEL                                    1526

1   symmetric.

2           Do you see that line?

3   A    Yes.

4   Q    Symmetric means bilateral?

5   A    It means the same on the left and the right.

6   Q    Okay.  And, in fact, in her 2022 MRI, Ms. Pierce had

7   bilateral atrophy, correct?

8   A    Yes.

9   Q    Meaning on both sides, correct?

10  A    Yes.

11  Q    Yes?

12  A    Yes.

13  Q    If you look at the bottom right of this page, bottom

14  paragraph, do you see where it says, quote:  Posttraumatic

15  atrophy was not uniformly diffuse amongst subcortical

16  structures.  The highest rates of atrophy were noted

17  bilaterally in the amygdala, hippocampus, thalamus, and

18  putamen.

19          Do you see that?

20  A    Yes.

21  Q    And Ms. Pierce had bilateral atrophy in the amygdala

22  and the hippocampus, right?

23  A    Yes.

24  Q    You're familiar with the -- a publication

25  Neuropsychologia?

APRIL - CROSS - MAAZEL                    1527

1    A    Yes.

2    Q    And that is another peer-reviewed and well-respected

3    journal in the field of neuropsychology?

4    A    Yes.

5    Q    Let me show you Exhibit 32.

6         Do you recall that article in Neuropsychologia

7    entitled Hippocampal Head Atrophy After Traumatic Brain

8    Injury?

9    A    Yes.

10   Q    And the very first sentence is, quote:  Traumatic brain

11   injury causes hippocampal damage.

12        Do you see that quote?

13   A    Yes.

14   Q    And there was a study done there as well, right?

15   A    There was a study done.

16   Q    Yes.

17   A    I didn't hear the rest of your sentence.

18   Q    There was a study done.

19        And you agree that a traumatic brain injury causes

20   hippocampal damage, right?

21   A    When did I agree to that?

22   Q    Do you agree with that?

23   A    It can.

24   Q    Okay.  And if we look at the third page of this

25   peer-reviewed publication, under Discussion, do you see that

APRIL - CROSS - MAAZEL                                    1528

1   section?

2   A    Yes.

3   Q    And it says, quote:  Our results show that survivors

4   and testable moderate and severe TBI patients have

5   significant bilateral hippocampal atrophy.

6            Do you see that quote?

7   A    Yes.

8   Q    In fact, Ms. Pierce had bilateral hippocampal atrophy,

9   correct?

10  A    Yes, with an explanation.

11  Q    Okay.  I want to talk directly about Ms. Pierce's brain

12  scan.  NYU did the scans at Dr. Nadkarni's request?

13  A    They did the scans in 2022, I think.

14  Q    Right.  And you said that those scans are highly

15  accurate?

16  A    Yes.

17  Q    And a radiologist at NYU interpreted the brain scans

18  and prepared a study result.  Yes?

19  A    Yes.

20           MR. MAAZEL:  If we could publish Exhibit 21

21  already in evidence.

22           THE COURT:  All right.

23           (Exhibit published.)

24  Q    Let's just start on the first page under Impression,

25  just the first paragraph.

1          So, Ms. Pierce had bilateral mesial temporal

2   sclerosis, correct?

3   A    Yes.

4   Q    And that is an abnormal finding, correct?

5   A    It's a abnormal finding radiologically.

6   Q    What it means is scarring or lesions on both sides of

7   her temporal lobes, correct?

8   A    That's what it says.

9   Q    Okay.

10  A    If you translate that from the Latin, that's what it

11  says.

12  Q    Okay.

13  A    That's not what it means, but that's what it says.

14  What it means is in the interpretation.

15  Q    Okay.  But you never looked at the MRI, did you?

16  A    Yes.

17  Q    You did?

18  A    Yeah.

19  Q    Well, you don't disagree with the MRI results, do you?

20  A    Well, I have my questions, but I'm going to defer to

21  the radiologist because that's what we do.

22  Q    Okay.  And neither in your first or your second expert

23  reports did you ever question any of the MRI results,

24  correct?

25  A    No.

1   Q    Am I right?

2   A    Yes.

3   Q    You never questioned any of the PET scan results before

4   today, did you?

5   A    But I questioned their meaning.  That's what I've tried

6   to explain all through my testimony.

7   Q    Okay.  But the finding -- let's look at the next

8   finding from the NYU study.  If we could look at page 2,

9   under MRI Findings, starting with the hippocampus there.

10              MR. MAAZEL:  If we could just call out the

11   hippocampus and then five lines down so we can all see it.

12              Right there, yes, thank you.

13   Q    So NYU also found that Ms. Pierce had volume loss,

14   meaning atrophy or cell death, in both of her hippocampi,

15   right?

16   A    Yes.

17   Q    That's what bilateral means, both of them?

18   A    Yes.

19   Q    And that, again, is an abnormal finding?

20   A    With explanation, yes.

21   Q    And NYU also found that Ms. Pierce had volume loss,

22   atrophy, cell death in both of her amygdala, correct?

23   A    Yes.

24   Q    And that's another abnormal finding, right?

25   A    Yes, with explanation.

APRIL - CROSS - MAAZEL                                    1531

1  Q    And all of these abnormal findings are in the temporal

2  lobes, which are near the temples.   Yes?

3  A    Yes.

4  Q    And you agree that the scars, sclerosis, the volume

5  loss, the atrophy, the cell death in all these areas is

6  irreversible, correct?

7  A    Yes, but with explanation.

8  Q    And you agree that Ms. Pierce has what you call brain

9  pathology.   Yes?

10 A    Yes, with explanation.

11 Q    And brain pathology is a fancy word for brain damage,

12 right?

13 A    That's another -- it's a synonym.

14 Q    And that's permanent, correct?

15 A    Synonyms?

16 Q    No.   The brain damage is permanent.

17 A    Brain damage is brain damage, and the structural

18 abnormal will probably not change very much.

19 Q    Which is to say that it's permanent.   Yes?

20 A    All right, it's permanent, with explanation.

21 Q    Your first expert report offered no explanation for any

22 of this brain damage, correct?

23 A    For these finding, you mean.

24 Q    Right.   In short, your first expert report offered no

25 explanation for the abnormal 2022 MRI, correct?

1  A    Correct.

2  Q    Or for the abnormal 2022 PET scan, correct?

3  A    Correct.

4  Q    Or for the sclerosis, correct?

5  A    Well, that's -- yes, that's correct.

6  Q    Or for the cell death or the atrophy, correct?

7  A    Correct.

8  Q    And your second expert report, which you wrote like two

9  weeks ago, also offer no explanation for any of these

10 abnormal findings, correct?

11 ███████████████  ████████████████

12 Q    Maybe it was three weeks ago.

13        In any event, your second expert report, which you

14 wrote in the last month, also offers no explanation for any

15 of these abnormal findings, correct?

16 A    It does.

17 Q    Well, you actually wrote in your second report that:

18 In the present situation, we have no explanation for the

19 unexpected finding on PET scan.  Right?

20 A    That in itself is an explanation.

21 Q    All right.

22 A    Despite its being disappointing to absolute truth

23 seekers.

24 Q    Okay.  You discussed on direct the EEG.  Yes?

25 A    Yes.

1  Q    And again, neither your first nor your second expert
2  reports says anything about the EEG, right?
3  A    I don't remember.  Just one second, please.
4        Well, no, but you'll remember I have testified
5  today that --
6  Q    I'm asking about your report, sir.  I'm sorry to
7  interrupt you.
8  A    No, I know, but --
9  Q    Does anything about your reports say anything about
10 EEGs?
11 A    The reports, no, with explanation.
12 Q    Okay.  And you yourself did not review any of the EEG
13 images, did you?
14 A    Well, just the one that Dr. Nadkarni reviews in his
15 report.
16 Q    Well, you actually didn't review that, did you?
17 A    I saw a picture of it.  He took a picture of a sample
18 of the EEG.
19 Q    Didn't you testify at your deposition that the defense
20 lawyers never gave you any of the images?
21 A    They didn't.  That was in Dr. Nadkarni's report to a
22 Max Selver.
23 Q    You never have actually reviewed the EEG images or
24 given any opinion on them; is that right?
25 A    The official EEG recording on the computer at NYU?

APRIL - CROSS - MAAZEL                                    1534

1  Q    The EEG images with all the squiggly lines, you never

2  reviewed that.

3  A    All the squiggly lines on the computer in the NYU under

4  the name of this person.

5  Q    You never analyzed those, have you?

6  A    No.

7  Q    Am I correct?

8  A    Yes.

9  Q    Okay.  Dr. Nadkarni did analyze those.  Yes?

10 A    Yes.

11 Q    All right.

12 A    I don't know if he analyzed them, but he certainly

13 produced one sample that he gave to show what he was talking

14 about.

15 Q    And Dr. Nadkarni found that the EEG was abnormal,

16 correct?

17 A    Yes, but --

18 Q    He found --

19 A    -- again, I would just point out with explanation.

20 Q    Okay.  And he found temporal slowing on the EEG.  Yes?

21 A    Yes.

22 Q    And you agree that temporal slowing on the EEG can

23 represent an abnormality in the temporal lobe, correct?

24 A    It can, if it meets certain criteria.

25 Q    You can't personally dispute any of Dr. Nadkarni's

APRIL - CROSS - MAAZEL                                    1535

1   analysis of the EEG images because you didn't review them

2   yourself.  Is that fair?

3   A    It's not fair, but --

4   ████████████      ████████

5   A    -- with explanation --

6   ████████████      ████████████

7   ████████    ██████████    ████████

8   Q    Well, you didn't review the EEG images, so you can't

9   offer a different opinion about them without looking at

10  them, right?

11  A    No.

12  ████████████    ████████████████████

13  A    With explanation.

14  ██████████    ████████    ████████

15  Q    You agree you can't offer an opinion about something

16  you don't look at.  Do you agree with that?

17  A    No, I don't agree with that.

18  ████████████    ████████    ██████████

19  ██████████    ████████    ██████████

20  Q    Dr. Nadkarni testified that Ms. Pierce had a verbal and

21  performance split in the neuropsychology consultation

22  report, right?

23  A    Yes.

24  Q    And you actually don't know what that means, do you?

25  A    I don't know what that means?

APRIL - CROSS - MAAZEL                              1536

1  Q     Right.  You've testified you just don't even know what

2  that means.

3  A     When did I testify that?

4  Q     Okay.  You have no certification in neuropsychology,

5  right?

6  ███████████████  ███████████

7  A     I obtained -- I don't have certification on each of the

8  fields that Dr. Nadkarni does, but there's an explanation.

9  ████████████  ████████████

10 Q     Now, on page 3 of your expert report you wrote that the

11 claimant, Brigid Pierce, was diagnosed with TBI at Brooklyn

12 Hospital Center on the date of the incident, right?

13 A     Just direct my attention.

14 Q     Oh, sure.

15 A     Page 3 where?  Where on page 3?  I'm sorry.

16       Oh, yes, here it is.  She was diagnosed with TBI

17 at Brooklyn Hospital Center on the date of the incident.

18 Q     And that is an accurate statement, correct?

19 A     That is an accurate statement about Brooklyn Hospital,

20 with explanation.

21 Q     Okay.  I'd like to show you Exhibit L, at 1238, in

22 evidence.

23       THE COURT:  It's a video?

24       MR. MAAZEL:  This is from the Brooklyn Hospital

25 records, Judge.

1     THE COURTROOM DEPUTY:  What was the exhibit

2  number?  I'm sorry.

3     MR. MAAZEL:  L, Defense Exhibit L.

4     (Exhibit published.)

5  Q    You reviewed these records, of course.  Yes?

6  A    Yes.

7     MR. MAAZEL:  If we could just call out the top --

8  well, where it says traumatic brain injury and the first

9  couple of bullet points.

10     It says:  Traumatic brain injury is an injury to

11  the brain that results from a hard, direct blow to the head.

12     Do you see that?

13  A    Yes.

14  Q    And of course you agree with that.  Yes?

15  A    Yes.

16  Q    And it says What Are The Causes is the next section,

17  and the causes include falls and assaults.  Do you agree

18  with that?

19  A    Yes.

20  Q    And then the bottom section on the next page, it says

21  What Are The Signs Or Symptoms of TBI.

22     MR. MAAZEL:  If we could call that out.  The prior

23  page, sorry, the bottom.

24  Q    Symptoms may vary from person to person and may

25  include.

APRIL - CROSS - MAAZEL                    1538

1           First of all, do you agree that symptoms of TBI

2    may vary from person to person?

3    A    Yes, with explanation.

4    Q    And it lists a whole bunch of symptoms.  Do you agree

5    with the symptoms that Brooklyn Hospital listed that are

6    signs or symptoms of TBI?  I just want you to let me know if

7    you agree with this list.  You have four bullet points here,

8    and then we have a bunch on the next page.

9           Have you had a chance to look at these four bullet

10   points?

11   A    I did.

12   Q    And can we look at the next page?

13   A    Yes.

14   Q    If you could just take a look at all those symptoms.

15          Do you agree that all the symptoms listed by

16   Brooklyn Hospital are symptoms of traumatic brain injury?

17   A    This is like reading a cookbook for a cake.  Yes, I

18   agree with everything.  This is how we make a cake.

19   Q    Okay.

20   A    But which cake?

21   Q    So I just want to go through some of these symptoms.

22          MR. MAAZEL:  If we could go back to the prior

23   page.

24   Q    So Ms. Pierce reported headache, correct?

25   A    Yes.

APRIL - CROSS - MAAZEL                                          1539

1   Q    She certainly reported fatigue, right?

2   A    Yes.

3               MR. MAAZEL:   Next page.

4   Q    She reported many changes in sleep.  Yes?

5   A    Yes.

6   Q    Nightmares, palpitations, nocturnal sweats, right?

7   A    Yes.

8   Q    She reported dizziness when she was on the bus after

9   the incident and at the jail, right?

10  A    Yes.

11  Q    She reported mood or personality changes.  Yes?

12  A    I didn't know about that.

13  Q    Well --

14  A    I mean, mood, yes.  Personality changes, I'm not sure.

15  Q    Well, you read the -- okay.  Mood.

16             She reported memory problems.  Yes?

17  A    Yes, she did, but she didn't demonstrate them, I agree.

18  Q    For example, were you aware that she'd forgotten about

19  her friend's surgery?

20  A    I don't remember reading that.

21  Q    And by the way, these things that she reported, she

22  didn't just report them to you.  She reported them to

23  Dr. Pearson, she reported them in the neuropsychological

24  report, she reported them to Dr. Nadkarni, correct?

25  A    I don't know.

1   Q    She reported nausea when she was on the bus and at the

2   precinct and then later when she had migraines, correct?

3   A    Yes.

4   Q    She reported depression.  Yes?

5   A    She did.

6   Q    For example, you read the expert report of Dr. Pearson,

7   who did a psychological analysis of Ms. Pierce.  That's one

8   of the things you reviewed, correct?

9   A    Yes.

10  Q    Anxiety, Ms. Pierce also reported anxiety, correct?

11  A    Yes.

12  Q    And anger, that was in Dr. Pearson's report.  Yes?

13  A    Yes.

14  Q    And trouble concentrating, right?

15  A    Yes.

16  Q    And trouble organizing.  Yes?

17  A    Yes.

18  Q    And trouble making decisions?

19  A    Right.

20  Q    And she reported an inability to control emotions, for

21  example, when she would have all these panic attacks, right?

22  A    Yes.

23  Q    She reported a loss or dulling of vision, both blurred

24  vision and the flashes, right?

25  A    Yes.

1  Q    She reported a loss or dulling of touch, the decreased

2  sensation of her hand and arm over months and years, right?

3  A    Yes.

4  Q    You mentioned Dr. Davis earlier.  She saw Dr. Davis

5  about numbness in her arms or sudden pain in her right arm

6  for at least six months, right?  One appointment after the

7  other?

8  A    Yes.

9  Q    So, so far we've discussed 16 symptoms listed here as

10 symptoms of traumatic brain injury, right?

11 A    Yes.

12 Q    And --

13 A    They're also nonspecific to any other disease.

14 Q    In addition, her neuropsychological testing at NYU

15 discussed her paroxysmal hypothermia, right?  Do you

16 remember that?

17 A    Yes.

18 Q    And that's sudden episodes of abnormally low body

19 temperature.  Yes?

20 A    I think it's sudden episodes of feeling cold or hot.

21 Q    She also report that in your intake form, right?

22 A    Yes.

23 Q    That's also a symptom of traumatic brain injury, right?

24 A    You're making implications it's the only explanation.

25 It's not.  It could be, but it's not necessarily.

APRIL - CROSS - MAAZEL                           1542

1   Q    It is a symptom of traumatic brain injury.  It may be a
2   symptom of something else.  Is that fair?
3   A    Yes.
4   Q    So now we're up to 17 symptoms, correct, that we've
5   discussed?
6   A    Yes.
7   Q    She also reported hand tremors to you, didn't she?
8   A    I don't remember.  I don't think so.  There were no
9   hand tremors that I saw.
10  Q    Do you have that in your -- do you have your intake
11  form with you?
12  A    No.
13  Q    If we could show you, Doctor, just for identification
14  Plaintiff's Exhibit 78.  You see on page 2 there's a
15  Claimant Intake Form for Brigid Pierce?
16       THE COURTROOM DEPUTY:  I'm sorry, use the
17  microphone.
18  Q    On page 2, if we can show you that, that's a Claimant
19  Intake Form for Ms. Pierce at your office?  Yes?  Do you see
20  that, Doctor?
21  A    Yes.
22       MR. MAAZEL:  If we could just turn to the next
23  page.
24  Q    Where she's listing complaints, do you see that hand
25  tremors is one of them at the bottom of the page.

APRIL - CROSS - MAAZEL                    1543

1    A    Yes.

2    Q    Is that also a symptom of TBI?

3    A    Not in this case.  I don't believe she has a TBI.  You

4    know that.

5    Q    I'm just asking --

6    A    I will always answer according to what I testify.

7    Q    Generally speaking, is that a symptom of TBI?

8    A    Not really, no.

9    Q    Okay.

10   A    Can be, I suppose, if you have the right lesions ar.

11   Q    By the way, when you met Ms. Pierce, you had no reason

12   to doubt her credibility, right?

13   A    I never said I did.

14   Q    I'm just asking.  You --

15   A    Never.

16   Q    In your analysis, she tells you what she feels and

17   what's going on in her life.

18   A    Yes, like any other patient.

19   Q    You found her to be truthful, right?

20   A    Yes.

21   Q    In your second expert report from a few weeks ago, you

22   wrote that the only possible suspicion of TBI in her case is

23   her history, right?

24   A    I'm just trying to see what I said exactly because I

25   want to be sure I'm accurate when I'm answering.

1    Q    Sure.  That's the bottom of page 2.

2    A    Yeah.

3    Q    And you wrote that.  Yes?

4         And take your time.  It's the bottom paragraph.

5         Do you see that sentence, Doctor?

6    A    I'm really looking for it.  I don't see it.  Where are

7    you?

8         MR. MAAZEL:  Judge, can I approach?

9    A    Bottom of page 2, last paragraph?

10        Oh, yes.  The only possible suspicion of traumatic

11   brain injury in her case is her history, like I've stated

12   over and over.

13   Q    And --

14   A    At least that's the way I see it.

15   Q    You would agree that medical history is hugely

16   important in any medical analysis, right?

17   A    Yes, but that's not saying anything in response to

18   this.  I understand what you're saying.  Yes, in general,

19   with explanation.

20   Q    So if someone comes to a doctor and they report

21   shortness of breath and chest pain and then you listen to

22   their heart with a stethoscope and it's normal, you don't

23   send them home, you give them testing, right?

24   A    Well, that's not an analogy.  I'll tell you why that's

25   not an analogy if you want.

1          THE COURT:  Why don't you wait for the next

2     question.

3          THE WITNESS:  Okay.

4     Q    Did you know that Ms. Pierce was fired from her

5     marketing job in New York City?

6     A    I think I was told that, yes.

7     Q    Okay.  Because you noted in your report that she moved

8     to France, right?

9     A    Yes.

10    Q    Did you know that her migraines and light flashes made

11    computer work untenable?

12    A    I think she mentioned that to me too, and also I read

13    it elsewhere.

14    Q    In fact, in her intake form with you, she wrote that

15    migraines and light flashes were making computer work

16    untenable.  That's in your own intake form, right?

17    A    Yes.

18    Q    Did you ever review the performance improvement plan

19    that she received before she was fired from New Music USA?

20    A    No.

21    Q    Did you know that her employer reported that she was

22    concerned about Ms. Pierce's capacity to initiate, navigate,

23    and complete and finish tasks?  Did you know that?

24    A    No.  That's interesting.

25    Q    Why is that interesting?

1   A    Because I didn't know it.  Thank you for telling me.

2   Q    Okay.  Did you know that her supervisor reported that

3   Ms. Pierce had challenges with juggling meetings?

4   A    I'm sorry?

5   ██ ██████████████████████████████████████████

6   ██████████████████████

7       █████████ ████████████████

8       █████████████████

9       ██████████ ████████

10  Q    You agree that one can have a normal cranial nerves and

11  mechanical examination and still have traumatic brain

12  injury, right?

13  A    Yes.

14  Q    Now, you mentioned memory in the direct examination,

15  and I think you said you weren't aware of evidence that she

16  had any memory issues, right, concerning the incident?

17       Let me say that again.

18       You testified on direct that you were unaware if

19  Ms. Pierce had been unable to remember part of the police

20  incident.  Do you remember that?

21  A    That, I'm sorry, I was unaware of that?

22  Q    Let me ask it differently.

23       You testified on direct that Ms. Pierce reported

24  the whole incident beginning to end, right?

25  A    Yes.

1  Q    Did you know that Ms. Pierce does not remember what

2  happened in between when she was thrown to the ground and

3  when she was on her stomach, that there's a memory lapse

4  there?  Did you know that?

5  A    Well, how much of a time lapse is that?

6  Q    I'm just asking, did you even know that?

7  ████████████████    ██████████

8  A    No.  If I don't know if it's important, I'd like to

9  know more about it.

10 ████████████    ████████████    ████████████████████

11 █████████████████████████████████████████████████████████

12 █████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████

14    ████████████████████████████████

15    ██████████████    ████████████

16 Q    Would it be relevant to you to know that Ms. Pierce

17 actually doesn't remember part of the incident?  Would that

18 be relevant to you?

19            THE COURT:  If that was the case.

20 A    Yes, like any other relevant fact that she doesn't

21 remember.

22 Q    Okay.  Would it be relevant to you if there was a whole

23 second part of when she -- after she was arrested when she

24 was sitting on a street and had a conversation and has no

25 memory of that whatsoever, would that be relevant to you?

1    THE COURT:  Assuming that it is true.

2  A    Yes.

3  Q    Okay.  Because that would be evidence of some memory

4  loss, right?

5  A    Yes.

6  Q    And that would be important for you to know about in

7  analyzing whether there's a TBI, right?

8  A    That would be part of the data to look at and put into

9  context.

10  Q    Okay.  Now, Ms. Pierce had an MRI six weeks after the

11  police incident at Brooklyn Hospital, right?

12  A    Yes, yes.

13  Q    And it was normal?

14  A    Yes.

15  Q    No sclerosis, correct?

16  A    It was normal.

17  Q    No sclerosis, no atrophy, no brain death, right?

18  A    Nothing like that was reported.

19  Q    Okay.  And you have no evidence that the scanner at NYU

20  was better than the scanner at Brooklyn Hospital, do you?

21  A    You mean, have I seen the patents on both?  No.

22  Q    You mentioned something about a scanner on direct.

23       You're not telling us that the reason why there's

24  all this brain damage on the NYU report but it's not in the

25  Brooklyn Hospital report is because Brooklyn Hospital has a

APRIL - CROSS - MAAZEL                                    1549

1   lousy scanner.  You're not saying that, are you?

2   A    No, I didn't say lousy.  I said it's probably an

3   inferior magnet.

4   Q    Okay.  And --

5   A    The magnets now are up to a 5 and 6 tesla, and most of

6   them used in non-tertiary hospitals, like general hospitals,

7   are a 3.  So you get a much greater resolution, much more

8   data to look at, and many more lesions can be seen.

9   Q    Sir --

10  A    Really.

11  Q    None of this is in any of your expert reports,

12  including your one from a few weeks ago, correct?

13  ███████████████  ████████████

14  A    You just asked me.  I wanted to answer.

15  ██████████  ███████████  ████████████

16           Was it in any your reports?  That's the question,

17  if you remember.

18  A    About the -- no.

19           About the quality of scanners?

20  Q    Right.

21  A    No.

22  Q    And on direct, you said it was speculation, right?

23  That was the actual word you used?

24  A    It's kind of highly learned speculation.  It's like,

25  it's most probable.

APRIL - CROSS - MAAZEL                                    1550

1    ████████████████████████████████████████████████

2    ████████████████████████████████

3    █  ███████████████

4            THE COURT:  ████████████████████

5            Did you see any?

6    Q    Are you aware of any evidence that Ms. Pierce had a

7    head injury before the police incident?

8    A    No.

9    █  ████████████████████████████████████████

10   ██████████████████████████████

11        █████████████  █████████████

12   █  ███████████████

13            THE COURT:  Were you presented with any evidence

14   that she had a history?

15            THE WITNESS:  Well, there was only a -- no.  I

16   mean, not -- not neurological.  Neurological is damage to

17   the nervous system.  No.

18   Q    Okay.  You agree that -- withdrawn.

19            Did you see the ER records that reported bruising

20   to Ms. Pierce's head and face?

21   A    Yes.

22   Q    And you agree that that is objective clinical evidence

23   of trauma to the scalp, a face, and head, yes?

24   A    Yes.

25   Q    And you agree that the MRI report is objective clinical

1   evidence, yes?

2   A    Is what?

3   Q    Objective.

4   A    Within the limits of its capability of being so.

5   Q    Okay.  You agree the PET scan is an objective finding,

6   yes?

7   A    Yes, yes.

8   Q    Okay.

9   A    I mean, the hypometabolism data part of it certainly

10  is.

11              MR. MAAZEL:  One moment, Judge.

12              (Pause in proceedings.)

13              MR. MAAZEL:  Doctor, I have no further questions.

14  Thank you.

15              THE WITNESS:  Thank you.

16              THE COURT:  And thank you, Mr. Maazel.

17              Before Mr. Hutchinson -- you can take the podium,

18  but before you begin, I just want to caution the jury on one

19  thing.

20              Which is that I allowed Mr. Maazel to ask certain

21  questions formulated as would it have been relevant for you

22  to know, and then if a certain fact was true.  But remember

23  that it is ultimately up to you to decide whether any

24  particular fact has been proven by a preponderance of the

25  evidence or not.  But because Dr. April is an expert, he can

APRIL - CROSS - MAAZEL                    1552



1    opine about hypotheticals, assuming certain facts to be

2    true.

1  (In open court.)  (Continued.)

2          THE COURT:  So, ladies and gentlemen, I wanted to

3  explain that we might go just a little bit past one because

4  this is the only witness we're going to hear from today, so

5  we're going to end early.  I wish we could have had, because

6  there's one more witness after this, I wish they could have

7  both testified today but there was a scheduling issue.  So

8  that's why we may run longer than one.  I don't think

9  significantly longer than one.

10          If it looks like we are, then we'll break for lunch.

11  But it may just be if we go a little past our normal lunch

12  break, you'll get to go home early and eat lunch at home, or

13  wherever you want to that's not here.  Or the jury room,

14  because I understand you might have ordered some pizza.

15  That's all good, too.  Wherever you want to eat is fine with

16  me.  We may just be done for the day, earlier than usual.

17  Mr. Hutchinson, please, your redirect.

18  REDIRECT EXAMINATION

19  BY MR. HUTCHINSON:

20  Q    Good afternoon, again, Dr. April.

21          Dr. April, on cross-examination you testified that

22  you never reviewed any photographs depicting the plaintiff's

23  injuries as part of your consultation.  Do you recall that

24  testimony?

25  A    Yes.

April - Redirect - Hutchinson                    1562

1   Q    That's not correct, is it?

2   A    Sorry.

3   Q    On page 7 of your report, first line.

4        THE COURT:  While we have this pause.  Hang on,

5   Doctor.  Let me correct what I said earlier.  We're going to

6   break at one because I foresee this could last long enough

7   that your pizza will be cold.  We'll break at one.  I don't

8   want to rush either party.

9        MR. HUTCHINSON:  We have a scheduling issue in the

10  afternoon, but the witness can come back after.

11       THE COURT:  He can come back at two.

12       MR. HUTCHINSON:  Three, then, if we don't push

13  through.

14       THE COURT:  All right.  Let's see where we are.

15  Continue, Mr. Hutchinson.

16       MR. HUTCHINSON:  I'm going to move quickly.

17       THE COURT:  Don't speak too quick.

18       MR. HUTCHINSON:  I won't.

19  BY MR. HUTCHINSON:

20  Q    Doctor, you did, in fact, review photographs of the

21  plaintiff's injuries as part of your consultation, correct?

22  A    Yes.  I just didn't remember them.

23  Q    You also viewed some videos up on the screen earlier.  Do

24  you remember that?

25  A    Yes.

April - Redirect - Hutchinson                           1563

1   Q    And counsel asked you if there was an external force if

2   that could cause an injury, right, something like that?

3   A    Yes.

4   Q    And you said yes, with explanation.  I'm sorry I'm not

5   framing it with the complete question.  Do you recall what you

6   meant by that?

7   A    Yes.

8   Q    Can you explain?

9   A    Yes.  It's a question of intensity of momentum, force,

10  striking the skull, and transmitting that to the brain

11  underneath as the cross-examining attorney stated about the

12  soft and hard and shaking and so forth.

13       So there can be a force to the head that doesn't

14  injure the brain.  That's not uncommon.  As a matter of fact,

15  in the least severe TBI, which is a concussion, it is defined

16  as no structural damage to the brain.  So her injury is either

17  below that threshold or just around the threshold of a

18  concussion.

19       But what's against it is looking at the patient, as

20  Morris Bender, my teacher said, look at the patient.  Here is

21  a patient that we even have not heard is being treated by any

22  doctors at this time, no neurologists we know are following

23  her.

24       I haven't seen any up-to-date report of a treating

25  doctor.  That seems very strange when you're dealing with two

April - Redirect - Hutchinson                    1564

1  lesions that you can't explain and are supposed to be

2  traumatic brain damage.  I, if I were treating her, would

3  follow her very carefully and I would refer her to a colleague

4  in France if she were in France.

5  Q    Now, you described the intensity of the external force to

6  the head, correct, that's significant to you?

7  A    Yes.

8  Q    And you watched the video, right?

9  A    Yes.

10 Q    Was it of significance to you that plaintiff's left leg,

11 hip, side, arm, backpack, all struck the ground before her

12 head?

13 ▇▇▇▇▇▇▇▇▇▇▇    ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

14         THE COURT:  ▇▇▇▇▇▇▇  ▇▇▇▇▇▇▇▇▇▇▇

15 ▇▇▇▇▇▇    Was that your recollection?

16 A    Was it of interest to me?  It was certainly of interest

17 that was she roughed up.  She had a traumatic injury.  How

18 much affected the brain is the question before us all.

19 Q    Now, you also answered no with explanation to a series of

20 questions about your board certifications.  And so can you

21 explain what you meant by that?

22 A    Prior to about 1985 all of these boards, grandfathered

23 those of us who had gotten our certification before.  So I got

24 in under the grandfather clause, whether for the good of the

25 world or the worst I have not been reexamined.  I say thank

April - Redirect - Hutchinson                     1565

1    God but, anyway, I don't think I'm any of the worse for it but

2    others might be.  I don't know.  That's what I mean.

3              So in my day, when I did have a fellowship at Mount

4    Sinai in the EEG and EMG, there was no certification.  You

5    were just a fellow who had done his thing and had neurology

6    qualifications and we could do our own testing in our own

7    offices, and I did for many years.

8              So I've done many, many, many EEGs.  When I was in

9    Baltimore, I worked with Curtis Marshal, who was the biggest

10   electroencephalographer in Maryland, and we did hundreds of

11   thousands of EEGs.  So I've seen enough EEGs to fill my plate,

12   and I've had experience in neuropsychology because I've worked

13   with neuropsychologists very closely and I've published papers

14   with them on aphasia and other language dysfunction, which was

15   all worked up by neuropsychologists I worked with when I was

16   with Burt S. Coler.

17             So I had experience in all these areas, including

18   psychiatry and neurobehavioral studies.  I've been a

19   neurophysiologist at NYU, so I've been around most all these

20   specialities and I have more than just a passing acquaintance

21   with them, despite the absence of modern certification.

22   Q    Understood.  The next thing that you said no explanation

23   to that I wanted to ask you about was -- the question was

24   whether you ordered an MRI, an EEG, and a neuropsychology

25   consultation as part of your consultation.  Please explain

1  what you meant by that.

2  A    Yes.  That's not part of the rules of the game.  I'm not

3  a doctor and this is not a patient.  I'm an examiner and this

4  is a legal thing.  And the law determines what I'm supposed to

5  do.  As I understand it, I'm allowed to do what they give me

6  to do and what's available.

7          So if I didn't see the films, it's not that I didn't

8  order them or want to, it's because I'm not treating and I'm

9  not responsible for the care of this individual.  Therefore, I

10  can only take what's given and do my best.

11  Q    So when you were reviewing Dr. Nadkarni's report, would

12  it be fair to say that you had at your disposal what he

13  included in that report?

14  A    I really thought he was the treating doctor because he

15  had done so much work and he's on staff at NYU, and he does

16  those things on people and I thought he was the treating

17  doctor.  That's why there was that confusion when he explained

18  he wasn't.

19  Q    Now, you also were cross examined on your conversation in

20  French with plaintiff.  Were you aware that there is no

21  evidence that plaintiff was fluent in French before June 3,

22  2020?

23  A    No, I am not aware of any of that.  It has really little

24  neurological relevance.  If it happened, it's a remarkably

25  wonderful thing and shows an intact nervous system from my

April - Redirect - Hutchinson                    1567

1    point of view.

2    Q    Did Dr. Nadkarni inform you, through his report and the

3    materials that he attached, that plaintiff had a pre-existing

4    injury to her cervical spine area, including a chipped C-7

5    vertebrae?

6    A    I saw that somewhere.

7    ███████████  ██████████  ██████████████████

8    ██████

9            ███████████  ███████████

10   Q    Okay.  You were asked about the tests that Dr. Nadkarni

11   did with the neurological testing, right?  And you don't

12   dispute any of his observations, correct?

13   A    No, I just don't understand the explanation for them.

14   Q    You also talked about cell death and the loss of

15   function, or you were asked about that.  Did you observe any

16   evidence of loss of function in plaintiff?

17   A    No.  I thought she was remarkably neurologically and

18   psychologically and behaviorally intact.

19   Q    Did the records that you reviewed from Dr. Davis, the

20   neurologist who had previously examined plaintiff after her

21   injury in 2020, did he observe any loss of function that he

22   noted?

23   A    No.  But I was surprised.  You know, if he had thought

24   there was anything wrong he would have followed her because

25   he's a very active clinician.

April - Redirect - Hutchinson                    1568

1   Q     You were asked about an article, and I think you wanted

2   to elaborate on the fact that it didn't actually talk about

3   TBI but rather TAI?

4   A     TAI is a very different kettle of fish.

5   Q     So the article you were asked about, about how regionally

6   selective atrophy after trauma, how it progresses over months.

7   That didn't even apply to traumatic brain injury.  It applied

8   to something else?

9   A     Well, I'd like to explain what that something else is.

10  Q     Please.

11  A     This --

12          THE COURTROOM DEPUTY:  Use the microphone.

13          THE COURT:  Pull the microphone to you.

14  A     This is a question in neurology.  Why do lesions have

15  certain severity result in distant wasting of the other parts

16  of the brain.  That really happens.  But patients are selected

17  that show these are very severely injured.  They usually have

18  Glasgow Coma scores that show they don't respond or have

19  really a major neurological deficit and in a partial coma.

20          So these people set off a cascade in the brain that

21  affects other regions through axons, and the research that is

22  going on now is showing that there are very basic changes in

23  the molecular biology that are unique to these kinds of

24  injuries.  But not everybody with a TBI has a TAI, and the

25  group included in these studies are TAI patients.  That's

1  traumatic axonal injury.

2  Q    What is a traumatic axonal injury?

3  A    It's a very severe traumatic brain injury that affects

4  the axon of the nervous system to the distant areas way far

5  away from where the injury was.  Atrophy can progressively get

6  worse with age, but these people do not make good functional

7  recoveries.  If you follow these studies, you'll see that

8  their functional level doesn't improve very much and the

9  phenomenon is still an unusual phenomenon that nobody

10  understands.

11  Q    And the article that plaintiff's counsel was

12  cross-examining you on, you're saying that that article

13  pertained to a study involving people who were so severely

14  with traumatic axonal?

15  A    Yes.  For long periods of time there were patients I took

16  care of --

17  Q    Did it say that in the article that those --

18  A    Not all of them, but it was on the basis of the Glasgow

19  Coma score that I assume these were severely injured people.

20  ██████████████████████████████████████████████████

21  ██████████████████████████████████████

22         █████████████    █████████

23         ████████    ██████████    ████████████

24  Q    You mentioned -- you answered a question on cross that

25  plaintiff did have atrophy in 2022 and you said yes, with

April - Redirect - Hutchinson                    1570

1  explanation.  Plaintiff did have atrophy to certain regions in

2  her brain, a amygdala hippocampus and two other structures, I

3  think that you mentioned, or that was in an article.  You said

4  yes with explanation.  What did you mean by that?

5  A    It was a radiological finding and, again, look to the

6  patient to see what it means.

7  Q    Understood.  And you described earlier that you expected

8  that some of these differences in size and brain structures

9  that may have preexisted June 3, 2020.  Do you remember that?

10 A    Yes.

11 Q    Is that still your testimony even after all the

12 cross-examination and even after all the studies you've been

13 shown?

14 A    Yes.

15 Q    And did you have a chance to review those studies before

16 testifying today?

17 A    Which studies?

18 Q    The articles, rather.

19 A    Yes, yes.

20 Q    And so when you testified on direct exam your

21 interpretation --

22         THE COURT:  Stay near the microphone.

23 Q    When you testified on direct exam that your

24 interpretation of plaintiff was that she did not sustain a

25 traumatic brain injury, that was after reviewing all of those

April - Redirect - Hutchinson                    1571

1   articles cited to you?

2   A    It didn't change my opinion based on my examining her.

3   Q    Do most people have PET scans done on their brain?

4   A    What do you mean most people?

5   Q    In the world.

6   A    Of course not.

7   Q    And so what conclusion can you draw from that?

8   A    It's not necessary except when clinically indicated.

9   Q    You also were asked about a study involving I think it

10  was survivors of traumatic brain injury had hippocampal

11  atrophy, and you were asked didn't plaintiff have hippocampal

12  atrophy, as well.

13  A    Yes.  According to the radiologist who did the

14  measurement.

15  Q    And so you said yes with explanation with reference to

16  that study?

17  A    It doesn't necessarily mean that that is producing any

18  neurological clinical sign and symptoms.  As I said, we used

19  to see it at autopsy as an unexplained incidental finding that

20  led to the theory it was a birth injury that people carried

21  with them to the grave, but didn't necessarily morph into

22  epilepsy.

23  Q    And those people that you're describing who had these

24  different volumes observed during an autopsy, are you saying

25  those people never had any sort of loss of function in their

April - Redirect - Hutchinson                    1572

1  lives?

2  A    I didn't say that.  If they were elderly they may have

3  suffered from some cognitive dysfunction.  But they didn't

4  have epilepsy that was a major clinical problem in their

5  existence.  Even though we recognized that mesial temporal

6  sclerosis is a lesion associated with interactive epilepsy.

7  That is a big clinical problem in such cases.

8  Q    And did you find that to be an issue that plaintiff was

9  suffering from?

10  A    No, of course not.

11  Q    There was some cross-examination that you issued a second

12  supplemental expert report just weeks ago, right?

13  A    Yes.

14  Q    Was that in response to something?

15  A    To Dr. Nadkarni's report.

16  Q    So that was in --

17  A    It was when he introduced all of his thoughts about

18  long-term temporal wasting and what it meant here.

19  Q    And that was a second supplemental report from Dr.

20  Nadkarni?

21  A    Yes.

22  Q    And was that report from November of this year?

23  A    I think so.  Let me see the date here.  It says

24  September 27, 2022.  I don't know.  I don't remember the

25  November one.  Oh, yes, the November one is with the articles.

April - Redirect - Hutchinson                    1573

1   Yes.   Yes.

2   Q    So just to confirm, because we had a lot of dates thrown

3   out there, your second supplemental report was issued in

4   response to a second supplemental report issued by Dr.

5   Nadkarni sometime this year in 2025, correct?

6   A    Yes.

7   Q    You testified earlier that you observed Dr. Nadkarni's

8   report to indicate that plaintiff was diagnosed with a TBI on

9   the date of the incident, right?

10  A    Yes.

11  Q    And you were relying on Dr. Nadkarni relaying that

12  information accurately, correct?

13  A    Yes.

14  Q    And did you know that that information came merely from

15  discharge papers?

16  A    Yes.

17  Q    And you were provided with additional records from that

18  date of treatment later on, correct?

19  A    Yes, later on.

20  Q    And did you then learn that plaintiff was actually not

21  diagnosed with a traumatic brain injury but rather a quote

22  mild closed head injury?

23  ████████████  ██████████████████████████

24  ████████████  ████████  ████████████

25  A    I am, yes.  But you know, when somebody comes into an

1    emergency room and has a history like this, the diagnosis is

2    traumatic brain injury because insurance will pay all of the

3    tests you need to do and that's the only way to get it done.

4    That's why the diagnosis TBI is much more common than the

5    reality is.

6    Q    Understood.  Now, the plaintiff read you a laundry of

7    list of symptoms.  I think he listed 17 symptoms.  I was

8    writing them down.  Let's see if I was quick enough.  Sleep

9    changes, dizziness, mood changes, memory problems, nausea,

10   depression, anger, trouble concentrating, inability to control

11   emotions, and vision disturbances, right?

12   A    Yes.

13   Q    How many of those symptoms are self reported?

14   A    Symptoms are all self reported.  Symptoms are subjective.

15   It's how do you feel.  I hurt here.  All of that is important.

16   That's a subjective person who is talking to you.  You have to

17   look at the patient and determine what signs there are that he

18   is in medical neurological trouble, and then figure out what

19   tests to run it down precisely.

20   Q    Now, I wanted to follow up on an answer that you gave on

21   cross-examination about the analogy to someone's experience in

22   chest pain, shortness of breath.  You wouldn't order them

23   additional testing.  You would just send them home and you

24   said you wanted to explain further.

25   A    That's not a good analogy because a person coming in with

April - Redirect - Hutchinson                1575

1    chest pain, you may be having a heart attack or an embolism to

2    the lungs.  An examination with a stethoscope is not

3    sufficient.  There has to be a cardiogram, chest x-rays, blood

4    tests, and so forth.  Then you can make a decision about

5    whether to go home.

6                MR. HUTCHINSON:  One moment, please, Your Honor.  No

7    further questions.  Thank you.

8                THE COURT:  Thank you.  Any recross?

9                MR. MAAZEL:  One question, Judge.

10   RECROSS-EXAMINATION

11   BY MR. MAAZEL:

12   Q    Just to clarify this article in the Archives of

13   Neurology.  The quote was a common consequence of TBI is

14   cerebral atrophy, which progresses over months and possibly

15   years after injury.  That's the quote, right?

16   A    That's a general statement, which is true.

17   Q    That's referring to traumatic brain injury, not the TAI?

18   A    The cases in that study all had TAIs.

19   Q    The statement in the Archives of Neurology is true?

20   A    Yes.  That's the statement that engenders the curiosity

21   to do that study.

22                MR. MAAZEL:  Understood.  Thank you.

23                THE COURT:  Doctor, you're free to go.  Thank you

24   very much.

25                THE WITNESS:  Thank you very much.

PROCEEDINGS                                                    1737

1 ████████████████████████

2          ███████████████        ██████████████

3          █████████████████████████

4          ████████████  ██████████████████████████

5          Good morning, ladies and gentlemen of the jury.  I

6 hope you had a restful evening.

7          Before we heard from the next witness, there are a

8 couple of instructions I want to give you.  One relates to the

9 testimony you heard yesterday from Dr. April.  You may recall

10 that there were some questions asked of him about records he

11 did not review before producing his 2023 expert report.

12          I want to advise you that there were records -- and

13 I think this referred to some EEGs produced by NYU.  I want

14 you to understand that neither side had those records before

15 Dr. April produced his report.  So I just want to be careful

16 that you don't infer anything negative from the fact he didn't

17 review those because neither side had those at the time he was

18 preparing and producing his report or by the time he produced

19 it.

20          █████████████████████████████████

21 ███████████████████████████████████████

22 ████████████████████████████████████████████

23 ████████████████████████  ██████████████████

24 ████████████████████████████████████████████

25 ████████████████████████████████████